# EXHIBIT C

**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF ALABAMA
                  SOUTHERN DIVISION

UNITED STATES
                         CRIMINAL ACTION 99-13-S
                         Montgomery, Alabama
                         October 26 - November 1, 1999
     vs

BILLY J. REEVES, RONALD L. CHERRY,
LARRY J. COBB AND BILLY J. ADAMS

              * * * * * * * * *
              TESTIMONY OF TIM REEVES
                 October 28, 1999
              * * * * * * * * *
         BEFORE THE HONORABLE ROBERT B. PROPST
              UNITED STATES DISTRICT JUDGE
              * * * * * * * * *
                   APPEARANCES

FOR THE GOVERNMENT:
                         C. Redding Pitt
                         U.S. Attorney
                         Montgomery, Alabama
                   BY:   Ashton Holmes
                         Charles R. Niven
                         Ass't U.S. Attorneys

FOR THE DEFENDANT BILLY J. REEVES:
                         William Baxley
                         Attorney at Law
                         Birmingham, Alabama

FOR THE DEFENDANT CHERRY:
                         John T. Kirk
                         Attorney at Law
                         Montgomery, Alabama

FOR THE DEFENDANT COBB:
                         John T. Smith
                         Attorney at Law
                         Dothan, Alabama

FOR THE DEFENDANT ADAMS:
                         Samuel L. Adams
                         Attorney at Law
                         Dothan, Alabama

         Proceedings recorded by mechanical
```

**Page 2**

```
              * * * * * * * * * * *
```

MS. HOLMES: The United States calls Tim Reeves.

TIM REEVES, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

COURTROOM DEPUTY CLERK: State your name and spell your last name.

A. Tim Reeves. R-e-e-v-e-s.

BY MS. HOLMES:

Q. Please state your name.

A. Tim Reeves.

Q. And where do you live, Mr. Reeves?

A. 1073 Malvern Road.

Q. What city is that in?

A. Dothan, Alabama.

Q. How long have you lived in Dothan?

A. All my life.

Q. During... Well, at least as early as 1994 were you involved in a bookmaking operation in Dothan, Alabama?

A. I was.

Q. What was the structure of this organization?

A. I don't really know what...

Q. Well, what was your role in this organization?

A. Well, I owned the organization. It was mine.

Q. And who were your employees; salaried employees?

A. Ronnie Cherry and Joe Cobb and David Mims and Mills

**Page 3**

Hornsby.

Q. Do you see Joe Cobb in this room today?

A. Yes, ma'am.

Q. Would you please point him out?

Tell us who you are pointing to.

A. The fellow with the black hair there.

Q. Do you wee Ron Cherry?

A. Yes.

Q. Would you please point him out?

A. In the light blue shirt.

MS. HOLMES: Your Honor, may the record please reflect that the witness has accurately identified each of the defendants.

Q. What was Mr. Cherry's job in your organization?

A. He run the day-to-day; run the operation.

Q. Well, when you say he ran the day-to-day operations, what does that consist of?

A. Just answered phones, took the bets, checked it up.

Q. What do you mean by checked it up?

A. Check up the wins and losses.

Q. Did he have any duties with regards to settling up?

A. Yes. He paid... He paid some players.

Q. With respect to the organization's or the operation's accounting system, who was responsible for that?

A. Ronnie kept up with the books.

**Page 4**

Q. And if it was time to settle up, what exactly were his duties with regards to settling up with the bettors?

A. Well, he would... I would give him the money and he would settle up with the bettors.

Q. Do you know how he went about doing this?

A. Go see them, pay them.

Q. Did he ever... Are you familiar with an envelope system that was used by your organization?

A. Yes. Where you put the money in envelopes with somebody's name on the outside of it or a number, or whatever.

Q. And were some of those envelopes delivered to Hunt's Restaurant and Oyster Bar?

A. There was a few, yes.

Q. And why were they delivered there?

A. There was a few people that come in there that picked up. There were not many, but a few.

Q. Was line information also disseminated there?

A. The sheet? Line sheet? Yeah, I had a line sheet there.

Q. How many employees did you have at the trailer answering telephones?

A. Three.

Q. And I believe you identified earlier three different individuals who had, at different times, operated the telephone?

A. Yes.

### Page 5

1  Q. Who controlled...
2     Let me back up. Did you all have a line service?
3  A. Yes, we did.
4  Q. Explain to the jury what a line service is.
5  A. It is.. It just gives you the line where you get the
6  numbers off of; same thing you see in the "USA Today" except
7  you get it through a different thing.
8  Q. Well, how much did that line service cost per month?
9  A. I don't remember the exact figures on that.
10 Q. Do you know who your line service was with?
11 A. Don Best Sports. Is that right?
12 Q. If I showed you a money order to Don Best Sports would
13 that give you an indication of how much you paid for your line
14 service?
15 A. Yeah.
16    Okay.
17 Q. How much did you pay a month for that line service?
18 A. Five hundred.
19 Q. Now, this line service, there has been a lot of talk
20 about whether --
21    THE COURT: Just ask questions.
22 BY MS. HOLMES:
23 Q. Why would you pay five hundred dollars a month if you
24 could just get the line out of "USA Today"?
25 A. Well, you use get it because you get changes faster if you

### Page 6

1  had it right there in front of you.
2  Q. Did help you keep a sharper lane?
3  A. Well, you just get... I reckon, you know, better numbers.
4  Q. In your organization... Excuse me, your operation, who
5  would have controlled the movement of the line?
6  A. Well, Ronnie would have moved the line. He might have
7  called me if there was some decision had to be made on
8  something. And I might make the final decision on that.
9  Q. But, in general, was Mr. Cherry in charge of the line
10 information?
11 A. Yeah.
12 Q. Do you know Billy Joe Adams?
13 A. I know him, yes, ma'am.
14 Q. Do you know him by a name other than Billy Joe Adams?
15 A. Goat.
16 Q. Did you have a business relationship with Goat?
17 A. No, I didn't have a business relationship. I bought a few
18 watermelons from him.
19 Q. Was Goat Adams tied into your gambling operation?
20    MR. ADAMS: I object, may it please the Court.
21    THE COURT: Well, just ask what activities, if any,
22 did he have in relation to it.
23 BY MS. HOLMES:
24 Q. What activity or associations, if any, did you have with
25 respect to Billy Joe Adams?

### Page 7

1  A. I didn't have any association with him myself.
2  Q. Were you aware of who he was or --
3     THE COURT: And the question, when she asked if you
4  were aware, it means did you have some personal knowledge. Did
5  you see it or hear it or... Not what something somebody told
6  you.
7  A. That I...
8     MS. HOLMES: If I may, Your Honor.
9  Q. Did you have an arrangement with regards to gambling with
10 Billy Joe Adams?
11 A. I didn't have any arrangement, no.
12 Q. Did our organization?
13    MR. ADAMS: I object, may it please the Court.
14    THE COURT: Well, again, the question is do you have
15 some personal knowledge by having virtue of seen Mr. Adams say
16 or do something as opposed to what somebody may have told you.
17 A. I didn't see him do anything.
18    THE COURT: All right. Go ahead with another
19 question, then.
20 BY MS. HOLMES:
21 Q. With respect to monies that were paid out by our
22 organization, are you aware of any monies that were paid by
23 your gambling operation to Billy Joe Adams?
24 A. The way I did that, I didn't stuff the envelopes. I just
25 gave out the money.

### Page 8

1     MS. HOLMES: May I approach the witness, Your
2  Honor?
3     THE COURT: All right.
4  BY MS. HOLMES:
5  Q. I am going to show a copy of a piece of paper that...
6     If I might have just one moment, Your Honor.
7     I am showing you what has been introduced and admitted
8  in evidence as Government's Exhibit 61. These are papers that
9  were removed from your restaurant.
10    Based on your business relationship with Ronnie Cherry
11 and... did he provide you with certain updates with regards to
12 the gambling business?
13 A. Yes. As far as who we needed, such as that.
14 Q. What about what you were paying out to whom, how the
15 business was doing?
16 A. Well, the only thing he would really ever get into,
17 something like that, if somebody owed you, you know, and he was
18 worried about them not paying you, or something like that.
19 Q. This was taken from your restaurant. Do you recognize
20 that?
21 A. Are you sure that wasn't taken out of my truck, actually?
22 Q. It was taken either from the restaurant or your truck
23 parked in front of the restaurant.
24    No. I believe that was taken from the restaurant
25 itself. It is Government's Exhibit 61. Do you recognize this

USA vs Reeves, et al
Case 1:05-cv-00542-MHT-WC    Document 27-4    Filed 05/05/2006    Page 4 of 17
Tim Reeves

Page 9

1 sheet of paper?
2 A. Yes.
3 Q. What is this?
4 A. It just the totals for what.
5 Q. The totals for what?
6 A. Wins, losses, whatever.
7 Q. Does it have... What is this listed to the side here?
8 A. That would be the ones that got juice.
9 Q. What is juice?
10 A. They turn in some bets and you give them twenty percent of
11 the winners.
12 Q. And the third one from the top, who does this show getting
13 juice?
14     MR. ADAMS: I object based on the fact he didn't
15 write this, it wasn't done by him and I don't think he can
16 testify as to that.
17     THE COURT: I will overrule and make reference to
18 the Bourjaily again.
19     MR. ADAMS: Yes, sir.
20 A. Now, what was the question?
21 BY MS. HOLMES:
22 Q. Third from the top under the list of juice agents who does
23 that show getting juice?
24 A. Says Goat.
25 Q. How much?

Page 10

1 A. Ten eighty-three.
2 Q. Who is Goat?
3     MR. ADAMS: I object, may it please the Court.
4     THE COURT: Well, it's repetitious. Go ahead.
5 BY MS. HOLMES:
6 Q. Is the Goat noted on this piece paper the same Goat that
7 you previously identified as also being B.J. Adams?
8     MR. ADAMS: I object, may it please the Court. It's
9 repetitious again --
10     THE COURT: You can ask him does he have any, any
11 personal knowledge, as to who that references to.
12 BY MS. HOLMES:
13 Q. Do you have any personal knowledge as to who that
14 references to?
15 A. Well, it says Goat, you know. I didn't do business with
16 Goat. But... you know. I am kind of at a loss here.
17 Q. Mr. Reeves, do you recognize the individuals listed here
18 under the word juice?
19 A. Right.
20 Q. Do you know who each of those individuals would be?
21 A. I don't know who this is. I don't who that one is. I
22 know who the rest of them are.
23 Q. Okay. Now, you pointed out C.L. Is that correct?
24 A. Yes.
25 Q. So, you are saying that you do know who Goat is?

October 28, 1999

Page 11

1     MR. ADAMS: Your Honor, I object again.
2     THE COURT: All right. I sustain.
3 BY MS. HOLMES:
4 Q. Is this one of the business records from your gambling
5 business?
6 A. Yes. I didn't make it out, but it is mine.
7 Q. Who wrote it out?
8 A. Ronnie.
9 Q. Did he give it to you?
10 A. Yes, he give it to me.
11 Q. For what reason would he give you this piece of paper?
12 A. Well, to be honest with you, I was looking at the bottom
13 figure there. I wasn't really paying no attention to the rest
14 of it.
15 Q. Why did he give you this paper?
16 A. To look at the figures.
17 Q. To let you know how the business was doing?
18 A. Let me see if I won or lost.
19 Q. In your position as the owner of this business, were aware
20 of Goat's arrangement, or Billy Joe Adams' arrangement, as far
21 as how much he would be paid, when he would be paid, how he
22 would be paid?
23     MR. ADAMS: Objection, may it please the Court.
24 Compound question. And in addition to that, it's repetitive.
25     THE COURT: I sustain as to the form of the

Page 12

1 question.
2 BY MS. HOLMES:
3 Q. As the owner of this gambling operation were you aware of
4 what your operations arrangement was with Billy Joe Adams as
5 far as compensation is concerned?
6     MR. ADAMS: Objection.
7     THE COURT: You all come up here just a minute.
8     (OUT OF THE PRESENCE OF THE JURY)
9     THE COURT: Let me ask my officers of the court a
10 question.
11     I see no reason why, if somebody was on the stand who
12 was not and had not been a defendant in the case, under the
13 rules regarding conspiracy, somebody could testify as to what
14 somebody told them that was in aid of and in furtherance of the
15 conspiracy.
16     Now, I would assume that this witness could testify as
17 to what somebody told him that might be in aid of and in
18 furtherance of the conspiracy, even if it mentioned Mr. Adams.
19     Now, do you see any reason why he couldn't?
20     MR. ADAMS: Judge, I still go back and... I
21 understand you have told us the Bourjaily case and all that --
22     THE COURT: This is not really Bourjaily. This is
23 pre-Bourjaily.
24     MR. ADAMS: And I go back to the Apollo case --
25     THE COURT: Well, Apollo, I think, about is as old

Page 13

1 the original Apollo.
2     MR. ADAMS: I know it's old, but from what I
3 researched I think it is still good law. And I think it
4 should be.
5     THE COURT: I think you would find differently if
6 you really got into it.
7     But I am just trying to decide in my mind.
8     Does anybody... I can't see why he can't tell what
9 somebody told him that might have been in furtherance of the
10 conspiracy.
11     MR. NIVEN: He should be able to.
12     THE COURT: Well, you know, the questions that
13 sometimes just infuriate me, because it gets so old, is
14 somebody says "are you aware of something". You know, I'm
15 aware that there was killing over Armenia or somewhere
16 yesterday. But I can't testify to it.
17     So, try to pin it down as to: Did you have some
18 conversation with somebody concerning your gambling operation,
19 and so forth.
20     The awareness, I don't know where that comes from.
21     (IN THE PRESENCE OF THE JURY)
22     THE COURT: All right.
23 BY MS. HOLMES:
24 Q. Mr. Reeves, were you informed by Ron Cherry or some other
25 member of your gambling operation as to what your business

Page 14

1 arrangement was with respect to Billy, or Goat, Adams?
2     MR. ADAMS: Your Honor, I object to the compound
3 question again.
4     THE COURT: Well, just ask them one at a time.
5 BY MS. HOLMES:
6 Q. Were you informed by Ronnie Cherry what your gambling
7 operation relationship was with B.J. Adams?
8 A. I know that... I didn't make any arrangements as far as
9 the percentages, and such as that. I didn't do that. He did
10 that.
11 Q. But did he tell you what those percentages were?
12 A. Yes, some of them. Like I said, I don't remember all of
13 them exactly. Yeah, it would have come up.
14 Q. What did he tell you the business arrangement was with
15 Goat Adams?
16     MR. ADAMS: I object, just for the record.
17     THE COURT: All right. Overruled.
18 A. I think it was twenty percent.
19 BY MS. HOLMES:
20 Q. You say you think it was twenty percent. Does that mean
21 Mr. Adams was a juice agent for your operation?
22 A. I ain't never heard it called that way, but...
23 Q. Well, explain to the jury what Mr. Adams' role was with
24 respect to your gambling business.
25 A. Well, he would turn the bets in, you know. And at the end

Page 15

1 of checking up, it would be twenty percent if there was any
2 winners.
3 Q. So, you are saying that he placed bets for more people
4 than just himself?
5 A. I don't know what he did about that, now. I didn't take
6 his bets.
7 Q. If I were to just call up and place a bet with your
8 organization, and I lost that bet, are you going to give me
9 twenty percent of that bet?
10 A. Just by yourself, no.
11 Q. So, in order for a person to get a percentage of the
12 losses from your organization, what did they have to be?
13 A. Well, they would just have to have few players, you know,
14 to be worth doing it.
15 Q. So, what was Mr. Cobb's role in your organization?
16 A. He just answered the phones.
17 Q. Was he salaried?
18 A. Yes.
19 Q. What was he paid? Do you know?
20 A. I think three hundred dollars a week.
21 Q. What did he answer the phone for?
22 A. To take bets.
23 Q. And where did he answer the phone?
24 A. At the trailer.
25 Q. Is that the trailer that was next to your home?

Page 16

1 A. Yes.
2 Q. Now, how many phone lines were running into that trailer?
3 A. I think three.
4 Q. Were any of those lines 1-800 numbers?
5 A. Yes.
6 Q. How many?
7 A. I don't remember, but I think it was 1-800 number on each
8 phone.
9 Q. And why did you have 1-800 numbers in that trailer?
10 A. Well, I don't remember how that come about. I got them,
11 you know, but I don't remember how it came about.
12 Q. Does it cost more to have a 1-800 number than it does to
13 have just a regular telephone number?
14 A. I'm sure it does.
15 Q. So, why did your - not what caused it - but for what
16 reason did your gambling operation pay to have those 1-800
17 numbers running into that trailer?
18 A. Well, I'm sure it was for people that was, you know, long
19 distance; it would be a free call to them.
20 Q. I'm showing you what has been marked Government's Exhibit
21 80. Can you tell me what this is?
22 A. This is a Fed Ex copy.
23 Q. And who is it to?
24 A. Carey Shahid.
25 Q. Who is it from?

USA vs Reeves, et al.  Case 1:05-cv-00542-MHT-WC   Document 27-4   Filed 05/05/2006   Page 6 of 17

Condenselt™

Tim Reeves

**Page 17**

1  A. From Ronnie Cherry.
2  Q. Was this in your residence on January 12th, 1997, when a
3  search warrant was executed?
4  A. I don't remember that. But where you got it from?
5  Q. If... do you recognize this?
6  A. Yeah.
7  Q. What is... Do you know what it was for?
8  A. I don't know exactly what the package was that was
9  involved in it. But I'm sure it was for gambling.
10        MS. HOLMES: Your Honor, we would move that
11 Government's Exhibit 80 be admitted.
12        THE COURT: All right. No objection. Admitted.
13 BY MS. HOLMES:
14 Q. I am going to show you what has been marked Government's
15 Exhibit 81. Do you recognize that?
16 A. Is this out of my Rolodex?
17 Q. I believe it is from your restaurant.
18 A. That is what I'm asking about.
19 Q. Do you recognize that as a document that would have been
20 at your restaurant on January 12th, 1997?
21 A. Actually, I believe this would have come out of the
22 Rolodex at the trailer. I recognize the number... I mean, the
23 name.
24 Q. Okay. Regardless of where this came from, do you
25 recognize this...

**Page 18**

1  What do you recognize this as?
2  A. Some of these folks that bet.
3        MS. HOLMES: Your Honor, we move that Government's
4  Exhibit 81 be admitted.
5  Q. I'm showing you what has been marked as Government's
6  Exhibit 82.
7        THE COURT: Wait a minute. Let him take a look at
8  that and let me rule on it.
9        What is the number?
10       MS. HOLMES: 81, I believe, Your Honor.
11       THE COURT: Any objection?
12       MR. ADAMS: I don't have any.
13       THE COURT: Admitted.
14 BY MS. HOLMES:
15 Q. I'm showing you what has been marked Government's Exhibit
16 82. Do you recognize that?
17 A. Yes.
18 Q. What is that?
19 A. That was a thing that me and Danny Austin wrote up. And,
20 like I say, I don't know whether I paid him for that or
21 something. we wrote up saying I received ownership.
22 Q. Of what?
23 A. The trailer.
24 Q. That would be the trailer at 1073 Malvern Road?
25 A. That's right.

October 28, 1999

**Page 19**

1  Q. Is that your signature at the bottom?
2  A. That is.
3        MS. HOLMES: we would move that Government's Exhibit
4  82 be admitted.
5        THE COURT: Admitted.
6  BY MS. HOLMES:
7  Q. Mr. Reeves, I'm showing you what has been admitted as
8  Government's Exhibit 107. It's a deposit made into the
9  operating account for Hunt's Restaurant and Oyster Bar on
10 September 19th, 1996. I'm going to ask you if you recognize
11 that... Excuse me. Do recognize that check?
12 A. Yes.
13 Q. And who is it made out to?
14 A. Ronnie Cherry.
15 Q. Was that check... Did that check represent lost sporting
16 wagers?
17 A. Yes.
18 Q. This check from K.W. Mitchell made out to you. How much
19 is that?
20 A. Three hundred and two dollars.
21 Q. What is the date on it?
22 A. 9/9.
23 Q. And what was that check for?
24 A. Gambling proceeds, I imagine.
25 Q. Showing you what has been admitted as Government's Exhibit

**Page 20**

1  112. This is a deposit made into Hunt's Restaurant and Oyster
2  Bar operating account on October 6th, 1996. This is a check
3  from K.W. Mitchell to Tim Reeves. Do you recognize that check?
4  A. Yes.
5  Q. What is the date on the check?
6  A. 10/1.
7  Q. And what is the amount of the check?
8  A. Two fifty-seven fifty.
9  Q. What is that check for?
10 A. Football bets.
11 Q. Showing you what has been admitted as Government's Exhibit
12 114. Deposit made into Hunt's restaurant and Oyster Bar
13 operating account on 10/28/1996. Showing you a check made out
14 to Tim Reeves drawn on the account of K.W. Mitchell. What is
15 the date on that check?
16 A. 10/22.
17 Q. What year?
18 A. '96.
19 Q. And how much is the check for?
20 A. Cash, three hundred and seventy dollars.
21 Q. And what was that check for?
22 A. A football bet.
23 Q. Showing you what has been marked Government's Exhibit 115,
24 deposit made into Hunts' operating account on 10/31/1996.
25 Showing you a copy of a check, does show who it's payable to,

Page 21

1  but it is drawn on the account Doyle Newby. How much that is
2  for?
3  A. Case for three hundred dollars.
4  Q. And what is the date on it?
5  A. I can't tell. Tenth month... And I don't know what the
6  other part is.
7  Q. What was that check for?
8  A. Well, Doyle... That could have been cashing a check there
9  or it could have been a football bet.
10 Q. Showing you Government's Exhibit 117, a deposit made into
11 Hunt's operating account on November 14th, 1996, another check
12 from Doyle Newby for three hundred dollars. Do you know what
13 that check is for?
14 A. I don't know. Doyle cashed some and he made some
15 football, too. This here I feel he just cashed a check there.
16 I don't know that.
17 Q. Now I'm showing you what has been admitted as Government's
18 Exhibit 120; Hunt's operating account deposit for November
19 29th, 1996, a check from Doyle Newby for two hundred and
20 forty-five. Dollars do you know what that check is for?
21 A. Like I said, it could have been for a gambling debt. But
22 I could have cashed that check for Doyle, too.
23 Q. Right underneath that there is a check drawn on the
24 account of Robert Shahid?
25 A. I cashed that for three hundred, and that was a gambling

Page 22

1  debt.
2  Q. How is it made payable to?
3  A. Ronnie Cherry.
4  Q. Showing you what has been admitted as Government's Exhibit
5  125. This is a deposit made into Hunt's operating account on
6  12/19/96. This is a check from K.W. Mitchell to Tim Reeves.
7  How much is that check for?
8  A. Nine forty-five.
9  Q. What is the date on it?
10 A. 12/10.
11 Q. What year?
12 A. '96.
13 Q. What is that check for?
14 A. Probably cashed that for a football bet.
15 Q. Here is another check from Doyle Newby. Who is that
16 payable to?
17 A. Looks like Ronnie.
18 Q. Ronnie who?
19 A. Cherry.
20 Q. How much is that check for?
21 A. One hundred seventy.
22 Q. And what was that check for?
23 A. That could have been cashed for a football bet.
24 Q. Government's Exhibit 126. This is a deposit made into
25 Hunt's operating account on January 2nd, 1997. This is a check

Page 23

1  from Robert Shahid to Ronnie Cherry. How much is that check
2  for?
3  A. Three hundred dollars.
4  Q. What was that check in payment of?
5  A. Cash for a football bet.
6  Q. I'm showing you Government's Exhibit 133. That is a
7  cashier check that has Ronnie Cherry as the remitter. It is
8  payable to Subhash Patel and it's for two thousand, seven
9  hundred eighty dollars. Was that check made at your direction?
10 A. It was to pay off a gambling debt.
11 Q. The next page, what is that?
12 A. That is another cashier check we paid off a gambling debt.
13 Q. And how much is it for?
14 A. Twenty-seven eighty.
15 Q. Who is it to?
16 A. Subhash Patel.
17 Q. And who is the remitter?
18 A. Ronnie Cherry.
19 Q. Was this cashier check made at your direction?
20 A. Yes.
21 Q. Third page. Can you tell me what that is?
22 A. Another cashier check.
23 Q. Who is it payable to?
24 A. Ronnie Cherry... I mean Lalit Desai.
25 Q. Who is the remitter?

Page 24

1  A. Ronnie Cherry.
2  Q. Was that check made at your direction?
3  A. Yes.
4  Q. What was it for?
5  A. To pay him off what we owed him.
6  Q. For what?
7  A. For a football bet.
8  Q. Showing you Government's Exhibit 134. Do you recognize
9  that?
10 A. Yes.
11 Q. What is it?
12 A. Cashier check for six hundred dollars.
13 Q. Payable to whom?
14 A. Don Best Sports.
15 Q. Who is the remitter?
16 A. Ronnie Cherry.
17 Q. What was this check for?
18 A. That would have been for line service.
19 Q. And at whose direction was it made?
20 A. Mine.
21 Q. Showing you Government's Exhibit 137. Do you recognize
22 that?
23 A. Yes.
24 Q. And what is that?
25 A. Cashier check for twenty-eight ten made payable to J.T.

## Page 25

1  Starling.
2  Q. Who is the remitter?
3  A. Ronnie Cherry.
4  Q. And what was this... Excuse me.
5     Was this check made at your direction?
6  A. Yes, it was.
7  Q. And what was the purpose of this check?
8  A. To may off a football bets.
9  Q. Showing you Government's Exhibit 138. Can you please
10 identify that?
11 A. Yes. Another cashier check.
12 Q. Who is it made payable to?
13 A. J.T. Starling.
14 Q. And who is the remitter?
15 A. Ronnie Cherry.
16 Q. What was this check for?
17 A. Paying off a football bet.
18 Q. Was it made at your direction?
19 A. Yes. .
20 Q. Tell me about how these cashier checks came to be.
21 A. What do you mean how they came to be?
22 Q. When you needed a cashier check made out as part of your
23 gambling business, what would you do?
24 A. I would just call over there and get a cashier check made
25 out.

## Page 26

1  Q. Who would you call?
2  A. I would usually called Janet.
3  Q. Janet Newton?
4  A. That's right.
5  Q. Where was she employed at tat time?
6  A. First Bank of Dothan.
7  Q. What instructions would you give her?
8  A. I said I need a cashier check for the amount of money.
9  Q. Would you tell her who the remitter was to be?
10 A. Yeah.
11 Q. And then what would happen?
12 A. We would pay off the bet off.
13 Q. Well, after the check was made, who would go get it?
14 A. Ronnie would, usually.
15 Q. And after he picked up the check, what would he do with
16 it?
17 A. He send it to whomever I owed the money to.
18 Q. Was this a regular part of you all's business; gambling
19 business?
20     THE COURT: It has been indicated to me that one of
21 the jurors needs to take a recess. Let's be in recess for five
22 minutes. Please don't discuss or comment on the case.
23     (After recess)
24     THE COURT:. I understand the government is through
25 questioning this witness. Go ahead.

## Page 27

1           CROSS EXAMINATION
2  BY MR. ADAMS:
3  Q. Mr. Reeves, as I understand your testimony, and I tried
4  the summarize it real quick. You didn't have any dealings with
5  the day-to-day gamblers or anybody else in the operation. Is
6  that correct?
7  A. I didn't have anything to do with nothing except, like I
8  said, just getting up the money.
9  Q. And the bottom line?
10 A. That's right.
11 Q. And you didn't have any direct dealings with Mr. B.J.
12 Adams?
13 A. No.
14 Q. And the only dealings direct to Mr. B.J. Adams is, you
15 bought a load of watermelons and cantaloupes to go in your
16 restaurant?
17 A. It is. And I don't think I paid him yet.
18     MR. ADAMS: That is what I understood.
19     That's all I have. Thank you.
20           CROSS EXAMINATION
21 BY MR. SMITH:
22 Q. Ron Cherry was an employee. I believe that is what you
23 said. Is that correct?
24 A. That's correct.
25 Q. Did he receive any commissions for anything that he did?

## Page 28

1  A. He received a salary.
2  Q. That's what I am talking about. He did receive a salary.
3  But did he get any juice money, so to speak?
4  A. He didn't get juice money, no.
5  Q. And juice money was really a commission for what you all
6  charged for handling transactions when the other side lost,
7  isn't it?
8  A. Yeah. For certain ones, right.
9  Q. So, he did not receive any commission...
10    Some of the so-called juice agents that has been
11 referred, you paid twenty percent?
12 A. That's right.
13 Q. But Ronnie was a straight salary. Is that correct?
14 A. That's right. He wasn't a juice agent.
15 Q. What was his salary?
16 A. I am thinking, five hundred.
17 Q. To refresh your recollection, was it four hundred dollars
18 a week?
19 A. I was thinking five. I don't know.
20 Q. And did he receive a bonus at the end of year?
21 A. Yes.
22 Q. Was the bonus based on any kind of sales commission or
23 anything, or was that just a straight bonus that he received?
24 A. It was just a bonus.
25 Q. Now, you owned the business?

Page 29

1  A. That's right.
2  Q. And you had the ultimate say in everything that went on,
3  did you not?
4  A. Yes. I would have if I was needed.
5  Q. But Ronnie operated the business for you on your behalf?
6  A. Right.
7  Q. And you trusted him to do that?
8  A. Yes.
9  Q. Now, all the proceeds that came in from the business,
10 whether it was by cash or by check, went into your account. Is
11 that correct?
12 A. Went into my hands.
13 Q. And you put it wherever you wanted it to be?
14 A. That's right.
15 Q. Ronnie do not have a bank account?
16 A. No.
17 Q. Do you know whether he had a bank account of any kind?
18 A. I didn't keep up with his banking business, so I don't
19 know.
20 Q. None of the proceeds that came by check or cash, though,
21 went into the bank on behalf of Ronnie?
22 A. No.
23 Q. Now, when you would receive a check, some of the checks
24 would be made out to you individually for gambling debts. Is
25 that correct?

Page 30

1  A. That's right.
2  Q. And you would endorse those checks and would place them in
3  whatever account that you wanted them to go into?
4  A. Or cash them.
5  Q. Sometimes into Hunt's Seafood and Restaurant account?
6  A. Yeah, when I cashed a check sir.
7  Q. Did you own Hunt's Seafood and Restaurant?
8  A. I do.
9  Q. You operated it?
10 A. I own and operate it.
11 Q. Now, when these proceeds that would come in that would be
12 made payable... checks, let me say, that would come in that
13 would be made payable to Ronnie Cherry, you had the authority
14 to endorse Ronnie's name on those checks and to place them into
15 whatever account you wanted to, didn't you?
16 A. If they hadn't been signed, I signed them. Yeah.
17 Q. You signed... As a matter of fact, you signed most of them
18 that came in, regardless of whose name was on it?
19 A. I would have done that.
20 Q. Do you know or have you seen any of the checks here that
21 Ronnie signed?
22 A. I don't know.
23 Q. If we... Do you know his signature?
24 A. Not really.
25 Q. I see. But as far as you know, you would sign the checks

Page 31

1  as they came in no matter whose name was on the check?
2  A. Yeah, I have done that.
3  Q. Now, when you all lost a bet, as I understand the business
4  was that you would take bets on, let's say, Georgia and
5  Florida. And you would take bets for and against either one of
6  them, would you not?
7  A. That's right.
8  Q. And sometimes it would be pretty much a balanced out,
9  let's say ten thousand on one hand and ten thousand on the
10 other. Is that correct?
11 A. Well, you can't go by that all the time. It wasn't like
12 that always.
13 Q. But the only money that you would make if that was the
14 case would be the commission that came off of it. Is that
15 correct?
16 A. The ten percent.
17 Q. And that did not go to Ronnie Cherry, except in the form
18 of salaries?
19 A. I got the money, yeah.
20 Q. Now, when you would lose a bet, generally you would pay
21 the person that won out of the proceeds of the money that came
22 in in cash. Is that correct?
23 A. That's right.
24 Q. Now, if you had someone that won a bet, though, that lived
25 out of town, how would you pay that individual?

Page 32

1  A. We would send them a cashier check.
2  Q. Now, you stated that you would call the bank and, I
3  believe, Janet Newton, I believe, and have her to make out a
4  cashier check for the amount, I suppose that would be the
5  amount of the payment of the bet. Is that correct?
6  A. That's correct.
7  Q. And you called her, and you all were on first name basis.
8  Is that correct?
9  A. Yeah, she was a friend of mine.
10 Q. And you would have... You would instruct her how to make a
11 check out?
12 A. I did.
13 Q. And you instructed her to make Ron Cherry the remitter?
14 A. I did.
15 Q. Now, in fact, you were actually the remitter, were you
16 not? You were the one paying for it?
17 A. Well, I guess so. I mean...
18 Q. You just put Ron's name on it because he was--
19 A. Because he was going to pick it up.
20 Q. He was going to pick it up. And he was the one that was
21 running the business for you?
22 A. Right.
23 Q. And... But you paid the money, did you not?
24 A. That's right.
25 Q. Did you put the money... Generally you would put the money

## Page 33

1  in an envelope and give it to Ron to go pay it?
2  A. Right. Give him cash or whatever.
3  Q. Well, if you gave him cash did you put it in something or
4  just hand him 25 hundred dollars and say, Hey, go get it?
5  A. Either way. I have given him a check and I have given him
6  cash.
7  Q. Did you tell him where the proceeds, the money that you
8  gave him came from; whether you got it from your restaurant
9  business, whether you took it out of your gambling business?
10 Did you go into any detail as to where the money that he bought
11 those money orders or certified checks with?
12 A. No. I just give him the money to go get a check.
13 Q. And he didn't inquire as to where the money came from?
14 A. No.
15 Q. Now, let me ask you this. Was that transaction, did he...
16 did you give it to him knowing that you were trying to conceal
17 the source of ownership or disguise the money in any manner?
18 A. No. I was just trying to pay the bettor off.
19 Q. And he did not know where the money came from and he was
20 not trying to conceal or disguise the proceeds of that money,
21 was he?
22 A. He was just trying to pay the bettor off.
23 Q. As far as Ronnie Cherry knew, he was just in the business
24 of taking bets?
25       MS. HOLMES: Objection. How could he know what

## Page 34

1  Ronnie Cherry knew?
2       THE COURT: I sustain as to the form of the
3  question.
4  BY MR. SMITH:
5  Q. Now, I believe that we have a list in one of the
6  exhibits... If I could find it just a moment here.
7       Exhibit 14-F, of several checks, cashier checks, that
8  was made out. You ordered all these cashiers checks, did you
9  not?
10 A. I am not looking at them, but, yeah, I think I did.
11 Q. You don't ever know of Ronnie ordering one from the bank?
12 A. No, sir. I had to do that.
13 Q. When you would take bets, many times the people that you
14 dealt with did not pay until a later time, and sometimes you
15 all would wait until the end of month or end of the year even
16 to anti up as to who owed whom?
17 A. I have done that on a few occasions, yes.
18 Q. Did you ever have any bets that individuals did not pay?
19 A. Sure.
20 Q. What did you do with regard to those bets?
21 A. You just ate them.
22 Q. You marked them off?
23 A. Well, there wasn't nothing you could do.
24 Q. You didn't send anybody out to break any bones?
25 A. Lord, no.

## Page 35

1  Q. And you didn't have any problems like that?
2  A. No, sir.
3  Q. Now, there was some exhibits that is in evidence that are
4  money orders. We have talked about cashier checks. The money
5  orders that you... Did you order for money orders to be made
6  out to various individuals that had won bets?
7  A. It would be the same way the cashier checks.
8  Q. And you would have instructed Ronnie, then, to go do that
9  and you gave him the money and he was just a courier, so to
10 speak. Is that correct?
11 A. I give him money and he went and bought the money orders.
12 Q. You were not present back on the 12th of January when they
13 first came into the trailer at Rehobeth?
14 A. I was not there.
15 Q. Is that close to where you live?
16 A. Yes.
17 Q. You actually live in Rehobeth, don't you?
18 A. Right. It is about six or seven hundred yards from our
19 house.
20 Q. But it has a Dothan address, doesn't it?
21 A. Right.
22 Q. But it's an independent town of Rehobeth?
23 A. It is now.
24 Q. And did you... We have an exhibit of briefcase in
25 evidence. We have Government's Exhibit Number 23 that was

## Page 36

1  found in Ron Cherry's apartment, I believe. Do you know whose
2  briefcase that is?
3  A. Yep. That is mine.
4  Q. And all the documents and so forth contained in it would
5  belong to you?
6  A. Yes. Whatever is in there.
7  Q. You don't remember... Or do you know how it got there at
8  Ron's house?
9  A. To the best of my knowledge, I just left it over there
10 with him and hadn't went back to pick it up.
11 Q. You would discuss the business with Ron. You all had a
12 magazine and you had a line service, I believe, you testified
13 to. But this type of line service, it has been brought out
14 before, but I ask you: You could get it out of the newspaper
15 any day, could you not?
16 A. It changes every day. Any paper, yeah.
17 Q. Well, would your service was faster than the paper?
18 A. Yes.
19       MR. SMITH: I believe that is all I have, Your
20 Honor.
21       CROSS EXAMINATION
22 BY MR. BAXLEY:
23 Q. Tim, you have a lawyer who is out here. And you made an
24 agreement with the government to plead guilty, didn't you?
25 A. I did.

## Page 37

1  Q. And you are going to have to go to prison?
2  A. I am.
3  Q. How long did they say they would recommend that the judge
4  sentence you to?
5  A. 15 to 22 months.
6  Q. Any further time after that on some kind of--
7  A. Probation.
8  Q. But you have actually got to go to the federal prison for
9  15 to 22 months?
10 A. That's right.
11 Q. And to get that reduced from all the charges you were
12 charged with, you had to agree to tell the truth, didn't you?
13 A. That's right.
14 Q. If pled guilty to everything in this indictment, it would
15 be years and years and years and years, wouldn't it?
16 A. A bunch of them.
17 Q. So, part of the deal for you to get 15 to 22 months in
18 prison is, you have got to tell the truth?
19 A. That's right.
20 Q. All right. Now, during the time that this indictment
21 charges, in fact, at any time in the 1990's, has your daddy,
22 Billy Joe Reeves, been involved in the gambling operation that
23 you have testified about?
24 A. Never. Not in those times.
25 Q. In fact, does your dad now... or during this time have

## Page 38

1  anything to do with the operation of Hunt's? I mean, as far as
2  payroll or --
3  A. No, he didn't have anything to do with it. He hasn't been
4  through the bank statement in ten years.
5  Q. During this period of time did he receive salary from
6  Hunt's?
7  A. He gets a lease check for the building.
8  Q. So, he owns the property?
9  A. That's right.
10 Q. And you have the business and you lease the property from
11 your dad... your dad and mama?
12 A. That's right.
13 Q. That briefcase that Mr. Smith showed you that was found in
14 Mr. Cherry's house or apartment was yours?
15 A. That's right.
16 Q. And there were some papers in there, an insurance policy,
17 I think, of your dad's in there. Did that have anything at all
18 to do with any kind of gambling?
19 A. No. That insurance policy, I handle a lot of daddy's
20 insurance for him.
21 Q. Did you know that there were some papers, also, that your
22 dad had in there about a man named Ward? Do you know what that
23 was about?
24 A. Ward? I don't know...
25 Q. We will come back to that.

## Page 39

1  This trailer that there has been so much testimony
2  about is down there six or seven hundred yards away from you
3  house. Where was that located?
4  A. 1073 Malvern Road.
5  Q. How far away is that from Hunt's?
6  A. Six and a half miles.
7  Q. All right. Did your daddy, Billy Joe Reeves, ever set
8  foot in that trailer down there?
9       MS. HOLMES: Your Honor, we object. That exceeds
10 the scope of the direct examination.
11      THE COURT: All right. I overrule.
12 BY MR. BAXLEY:
13 Q. Has your daddy ever been in that trailer?
14 A. Not to my knowledge.
15 Q. Now, was there some money in Hunt's in a lock-box and a
16 safe that was your daddy's money?
17 A. Yes.
18 Q. It has been his --
19      MS. HOLMES: We object. It exceeds the scope of
20 direct.
21      THE COURT: Well, come up just a minute.
22      (OUT OF THE PRESENCE OF THE JURY)
23      THE COURT: I know that I suggested this as a
24 possibility. And it is my suggestion and it may look like I'm
25 waffling.

## Page 40

1  But on the other hand, he was asked about his
2  organization, and so forth. And you have got a man out there
3  whom you all are at least suggesting is part of the
4  organization. And the man has testified as to what his
5  organization is, and I can't see why it is not appropriate to
6  ask on cross, you know, who is in that organization. And that
7  seems like to me that is appropriate.
8       Now, with regard to the plea agreement part of this
9  thing, I don't know whether the term third party beneficiary is
10 applicable or not. But to the extent that... You know, this
11 may or may not open up whatever that might look like it is in
12 conflict with the plea agreement. It's being opened up, if it
13 is opened up, by the man who supposedly was the beneficiary.
14 So, I assume that will have something to do with it. I don't
15 know.
16      (IN THE PRESENCE OF THE JURY)
17 BY MR. BAXLEY:
18 Q. Tim, the question I think was: Did your daddy have some
19 money that belonged to him that was out there in a lock-box or
20 a safe at Hunt's?
21 A. Yes.
22 Q. Is that money that he has had for years?
23 A. I don't know just what it is. It's his money. I don't
24 know how long it's been there.
25 Q. And he kept it in a certain place out there?

### Page 41

1  A. Yeah.
2  Q. Now, some of the money that he was seized wasn't your
3  dad's. Is that right?
4  A. That's right.
5  Q. And he made claim and they have introduced the money he
6  said belongs to him?
7  A. I don't know what has been introduced but...
8  Q. Well, let me ask you if... Do you know whether your dad
9  loaned people money from time to time and charged... loaned
10 them money?
11       MS. HOLMES: Your Honor, we object unless he has
12 firsthand knowledge.
13       THE COURT: All right. If he saw it happen, he can
14 tell about it. But he can't tell something somebody just told
15 him.
16 A. I have seen dad loan money for years to people.
17 BY MR. BAXLEY:
18 Q. Well, do you know whether your dad cashed for people
19 often?
20 A. All the time.
21 Q. Out of his money?
22 A. Out of his money.
23 Q. How long had he been doing... Did you ever ask your dad to
24 cash checks for you?
25 A. On numerous occasions.

### Page 42

1  Q. Now, the government has... In fact, there are some
2  exhibits here the government is going to offer. Let me ask you
3  if you asked your dad to cash five checks on the 24th of
4  November, 1994, from a fellow by the name of Brian Hennessy?
5  A. Yeah, he cashed those for me.
6  Q. At your request?
7  A. Yes.
8  Q. So, you got cash from your dad?
9  A. I did.
10 Q. And gave him those checks?
11 A. That's right.
12 Q. All right. Did... Over into '96, do you remember whether
13 you asked your dad to cash a check that you had that was sent
14 from a fellow named Chris Wilkins?
15 A. I cashed that check.
16 Q. You cashed that check?
17 A. He cashed that check, but I got the cash.
18 Q. You got cash from your dad for it?
19 A. Right.
20 Q. What about the same question in February for Lalit Desai?
21 A. Yeah. He cashed that check for me, as well.
22 Q. What about in November of '96; a Doctor James Johnson?
23 A. He cashed that check for me, too.
24 Q. What the same date in January in '97, three checks from...
25 two of them from a fellow Laman Lefler and one from a fellow

### Page 43

1  named Paul Letterman?
2  A. He cashed all those checks.
3  Q. What about in '96, November the 5th, the same day, another
4  check from a Chris Wilkins, a check from a Glen Toole, a check
5  from James Shorter a check from W.G. McClendon?
6  A. He cashed those checks for me.
7  Q. What about the end of the month of November '96, a check
8  are John N. Bowden?
9  A. He cashed that for me, as well.
10 Q. What about a check the December '96 a check from Lalit
11 Desai and another one from Doctor Johnson?
12 A. He cashed those checks, too.
13 Q. Why did you ask your daddy to cash those checks?
14 A. I just... He was going to go to the bank and I had the
15 checks in my pocket and said, How about if cash the checks for
16 me.
17 Q. Why did you want cash for them?
18 A. Where I could pay off some gambling debts.
19 Q. At the time you asked your dad to do that were you
20 attempting to conceal or disguise where those checks came from?
21 A. No. I just wanted him to cash them for me so I would have
22 the cash.
23 Q. So, when you deposited checks in the Hunt's account, were
24 you running those checks through Hunt's or did you take cash
25 money out of Hunt's for the checks?

### Page 44

1  A. I took cash money out of it.
2  Q. So every check that you deposited in Hunt's account--
3  A. I cashed it.
4  Q. And you took cash back out?
5  A. That's right.
6  Q. What did you do... What did you want that cash for?
7  A. To pay off people.
8  Q. So, you weren't cashing or depositing those checks to
9  conceal or disguise where they came from?
10 A. No.
11 Q. I want to show you what came out of your briefcase - If
12 you know. You may not - what has been marked Exhibit 52-B and
13 D, having to do with Jamie Ward. Do you know anything about
14 that?
15 A. Yeah. We paid Mr. James' light bill for him.
16 Q. Tell the jury... That was in your briefcase?
17 A. Yeah.
18 Q. What... Who is Mr. James Ward and what did your dad do for
19 him?
20       MS. HOLMES: Objection unless he has firsthand
21 knowledge, Your Honor; has actually seen what his father has
22 done for him.
23       THE COURT: Tell under what circumstances you have
24 known about it other than something your father told you, if
25 there are any such circumstances.

Page 45

1  A. Well, I did, too. I paid the light bill for Mr. James
2  myself. He had a little camper trailer down at a little
3  fishing place. And, you know, he would make sure the, you
4  know, grass was cut, and whatever. And we paid his light bill.
5  Q. Who is Mr. Ward?
6  A. Well, he is dead now. He is an old friend of ours.
7  Q. So, that is what those documents there were; Mr. Ward...
8  your dad took care of the power at the little --
9  A. Power for the little trailer down at the fishing place.
10 Q. Tim, I asked you this generally but I'm going to ask you
11 specifically by reading some language from the indictment.
12      During this period of time, '94 until now, did your
13 daddy, Billy Joe Reeves, in any way conduct gambling
14 the things you pled to and have testified to.
15      MS. HOLMES: Objection, Your Honor. That asks for a
16 legal conclusion that will legally be defined by your
17 instructions in this particular case.
18      THE COURT: Well, gambling is, I think, not just
19 necessarily a legal term. I think most people understand what
20 it is. I overrule.
21 A. Ask the question again.
22 BY MR. BAXLEY:
23 Q. Did your daddy, during this period of time the indictment
24 covers or any time in '90's that you have testified about being
25 involved in gambling, during any of that period of time, did

Page 46

1  your daddy conduct any gambling?
2  A. None whatsoever.
3  Q. Did you finance any of the gambling part of it?
4  A. No, sir.
5  Q. Did he manage any of the gambling part of it?
6  A. No, sir.
7  Q. Did he supervise any of the gambling part of it?
8  A. No, sir.
9  Q. Did he direct any of the gambling part of it?
10 A. No, sir.
11 Q. Did he own all or part of that gambling enterprise?
12 A. Not a bit.
13 Q. All right. Let me ask you this. Did he...
14     Let's go back to Count 1. During this same period of
15 time did you conspire with your dad to conduct any part of that
16 gambling operation?
17 A. I did not.
18 Q. Did you conspiracy or agree with your dad to finance any
19 part of it?
20 A. He had no part of the financing of it.
21 Q. Did you conspire or agree with him to manage any part of
22 it?
23 A. I did not.
24 Q. Did you conspire or agree with him to supervise any part
25 of it?

Page 47

1  A. Did not.
2  Q. Did you conspire or agree with him to direct any part of
3  the gambling?
4  A. I did not.
5  Q. Did you conspire or agree with him to own any or all of
6  it?
7  A. I did not.
8  Q. Now, when your dad cashed those checks that I showed you
9  for you, did he... He gave you money for every check you gave
10 him. Is that right?
11 A. That's right.
12 Q. So, he didn't... When those checks were deposited in his
13 account, he wasn't making any profit out of the gambling
14 operation. Is that right?
15 A. Not a penny.
16     MS. HOLMES: Objection.
17     THE COURT: All right. Go ahead.
18     MR. BAXLEY: I am not sure they could hear his
19 answer.
20     THE COURT: All right. What was your answer?
21 A. Not a penny.
22 BY MR. BAXLEY:
23 Q. I will also ask if you during the time of this indictment,
24 did you ever conspired or agree with your dad to purchase
25 cashier checks, or otherwise, in an effort to conceal or

Page 48

1  disguise where the money came from?
2  A. No, sir.
3  Q. Did you conspiracy or agree with your dad to purchase any
4  postal money orders with the intent to conceal where the money
5  came from?
6  A. No, sir.
7  Q. Why, one more time, did you want this cash?
8      MS. HOLMES: Objection, Your Honor. Asked and
9  answered.
10     THE COURT: All right. Overruled.
11 BY MR. BAXLEY:
12 Q. Why did you want cash for these instruments?
13     MS. HOLMES: Same objection, Your Honor.
14     THE COURT: Overruled.
15 A. To pay off gambling debts with.
16 BY MR. BAXLEY:
17 Q. When Mr. Smith asked you about this and I think might have
18 answered it.
19     When you either went or you sent Mr. Cherry to go buy
20 money orders or cashier checks, why did you want to do that?
21 A. To pay off gambling debts. To pay people off I owed.
22 Q. Was there a penny of that gambling money that ever went to
23 the operation or into the account of Hunt's?
24 A. Do what, now?
25 Q. Was there ever a penny of the gambling money that went

October 28, 1999

Page 45 - Page 48

Page 49

1 into the Hunt's account without cash coming back?
2 A. No. I cashed all the checks.
3 Q. Was there ever a penny of the gambling money during this
4 period time that ever went to your dad?
5 A. No.
6          MR. BAXLEY: That's all.
7          THE COURT: Mr. Kirk?
8                CROSS EXAMINATION
9 BY MR. KIRK:
10 Q. Can I ask you to use the date of January 12th, '97, as a
11 point of reference, and can you tell us, if you will, how long
12 Joe Cobb had been at the trailer at Malvern Road, Rehobeth.
13 How many weekends or months had he been at that trailer under
14 the term that you used, as an employee?
15 A. I will say around September.
16 Q. Could it have been November when he began working there?
17 A. I don't recall that. I was just trying to think when
18 football season started.
19 Q. Let me ask you this, sir. Were you, in the fall of '95...
20 I'm sorry. Excuse me. In the fall of '96 did you consider,
21 and I believe you pronounce the name Mills, Hornsby; was he an
22 employee?
23 A. I'm trying to think. '96.
24 Q. Up before the raid of January the 12th of '97, as a point
25 of reference.

Page 50

1 A. Are you saying that same month? Is that what you are
2 saying?
3 Q. Let me ask you this way.
4      Do you recall and is it not true that Joe Cobb went to
5 work at that trailer only because of Mills Hornsby's sickness
6 with alcoholism?
7 A. That was one of reasons. It sure was.
8 Q. Now, at that point in time would that have been during the
9 football season, fall of '96, preceding the raids of January of
10 '97?
11 A. That's correct.
12 Q. Now, at that same point in time were you and Mr. Joe Cobb
13 involved in another business venture raising emus?
14 A. We were.
15 Q. All right. Some of us may not know what a emu is.
16 Including myself. What is it in reference to another animal
17 called a rhea?
18 A. It's like an ostrich; smaller ostrich.
19 Q. Now, during the fall of '96 would it be fair to say that
20 Joe Cobb became pretty heavily indebted to you for his part of
21 the business raising emus?
22 A. Yes. He owed me some money.
23 Q. Did you at that time, is it not true, suggest to him that
24 he work off some of the indebtedness to you over the animal emu
25 farm by working up at the trailer?

October 28, 1999

Page 51

1 A. Yes, he worked some of his debt off doing that. Because
2 he had to look after them sometimes.
3 Q. Now, Mr. Reeves, if he is working off an indebtedness to
4 you that doesn't have anything to with the gambling
5 organization at that time, would you say that he entered into
6 that employment, so to speak, at the trailer on a willful
7 basis?
8          MS. HOLMES: Objection, Your Honor.
9          THE COURT: All right. I sustain.
10     There is no need to shout the objections. I have got
11 relatively good hearing.
12 BY MR. KIRK:
13 Q. Mr. Reeves, from the point in time that he did go up to
14 take trail, for whatever reason, do you remember that during
15 the months of November and December and up until the date of
16 the raid of January the 12th, that Mr. Joe Cobb did not work
17 every weekend where college and pro ball games were involved?
18 A. There might have been one weekend or two when the eggs...
19     The emus lay eggs and you have got to be right on top
20 of it when the eggs are coming. And that is somewhere around,
21 I think they start laying in November, early December. And you
22 have got to get them incubated or you will lose them.
23 Q. If we use the point in time of early November of '96 up
24 until the raid of '97, January 12th, would you give us your
25 best judgment, please, sir, how many weekends Joe Cobb was not

Page 52

1 in any way associated with, present at, participating in
2 anything going on in that trailer on Malvern Road?
3 A. I couldn't recall the exact dates. You are talking about
4 a long time ago. I don't remember.
5 Q. Did you ever pay him any money yourself for services
6 rendered or traded off on those emus, did you pay him in any
7 way directly yourself?
8 A. Well, the way we were doing that, I didn't have to pay
9 him. He was working out a debt.
10 Q. And to your knowledge he was working off indebtedness to
11 you, rather than being paid by the organization for gambling
12 services?
13 A. He was working off a debt.
14 Q. Now, may I ask please, sir, just so that I understand: He
15 was not in any way involved with the financing of that
16 business, such as paying utilities, such as financing money on
17 the trailer for various things that they needed, he wasn't
18 involved in any way in that?
19 A. No. Not at all.
20 Q. He certainly was not in a supervisor position in any form
21 or fashion, was he?
22 A. No.
23 Q. He certainly in no way directed you as the owner of the
24 business how you ought to operate that business?
25 A. No.

## Page 53

1  Q. And certainly he did not own even the slightest percentile
2  of your business?
3  A. No.
4  Q. To your knowledge, was his only function in the working
5  off debt, on a separate debt, the emus, was his only function
6  in working that indebtedness off was writing down numbers on a
7  sheet of paper and giving it to someone else?
8  A. Writing down the bets?
9  Q. Yes, sir.
10  A. Yes, he was writing them down.
11  Q. That is all he did to work off that indebtedness?
12  A. To my knowledge, he just wrote the bets down.
13  Q. Let me ask you this, please, sir. To your knowledge did
14  he ever write a single person's name on a white envelope of any
15  kind designating someone could pick it up by giving their name?
16  A. No.
17  Q. Did he ever by a stamp, or postage, by licking it on a
18  white envelope and mailing it?
19  A. Not to my knowledge.
20  Q. Did he ever go to the post office to mail any of these
21  items the government has introduced in this case?
22  A. Not to my knowledge.
23  Q. Did he ever buy stamps or retrieve anything from the P.O.
24  box for you or anyone else in the operation of that business
25  that you owned?

## Page 54

1  A. No, he never did.
2  Q. Did he ever write a check out at your direction where his
3  writing would have been on any document that the government has
4  in this case?
5  A. Not to my knowledge.
6  Q. Did he ever have anything to do with setting the line or
7  in any way affecting the individual bettors and how they placed
8  their bets?
9  A. He didn't set the line.
10  Q. He didn't solicit bets from anybody?
11  A. He just took the bets.
12  Q. To your knowledge did he ever make a deposit out of
13  kindness or offering through some service, did he ever to go to
14  the bank for you or anybody in your organization?
15  A. No, sir.
16  Q. Mr. Reeves, the government has showed you a series of
17  checks today - And please correct me if I am wrong - on every
18  check that was written for the amount of three hundred dollars,
19  you the qualified your answers being it could have been a
20  gambling debt or for something else?
21  A. Uh-huh.
22  Q. Let me ask you, sir, from your experience, when I look at
23  a three hundred dollar check is there any way that you can
24  determine that that includes juice as a result of a gambling
25  debt, when it comes out to three hundred dollars even?

October 28, 1999

## Page 55

Tim Reeves

1  A. Well, you don't know. It could have been different
2  denominations. But usually it has got three thirty, or
3  something like that.
4  Q. Okay. Isn't it reasonable to assume, and the jury can
5  look at these documents and assume, if it doesn't have a ten or
6  hundred on it, it probably did not involve juice?
7  A. Well, it may have just been a check I cashed.
8  Q. Okay. So, if it didn't have ten dollars per hundred on
9  it, from your experience, you would look at the check and you
10  could not say it had anything to do with gambling, could you?
11  A. Well, I would have look at each one, you know, to make
12  that decision by looking at it.
13  Q. And, also, some of checks that government has in this case
14  include pennies, like sixty-five cents. Do you think, from
15  anything that you ever did in the gambling business, that a
16  check for sixty-five cents had anything to do with the gambling
17  operation that you ran?
18  A. Not sixty-five cents.
19  Q. So, if anything was on there was, like a hundred and
20  eleven dollars and sixty-five cents, would it be fair to say,
21  from your experience, that nothing to do with gambling debts?
22  A. I would have to look at it, but it doesn't sound like one.
23  Q. Mr. Reeves, if you were to think back about Joe Cobb and
24  his in-kind working to work off that debt, would it be fair to
25  say your recollection would probably be that Joe Cobb worked a

## Page 56

1  few weeks in between mid November of '96 up until the first
2  part of January of '97?
3  A. I don't know how many weekends. I couldn't answer that
4  question fairly. But I know he had to get out there with them
5  some.
6  Q. But at no time did you ever entrust to Joe Cobb the
7  function of taking money and holding it in one hand and passing
8  on to someone else, having anything to do with a single bet
9  during that period of time?
10  A. Not to my knowledge.
11       MR. KIRK: Mr. Reeves, that is all I have. Thank
12  you very much, sir.
13       REDIRECT EXAMINATION
14  BY MS. HOLMES:
15  Q. Mr. Reeves, you were talking about these checks are either
16  even amounts or with some cents on the end. If someone lost a
17  parlay or a teaser, would there have been any juice?
18  A. Not on a parlay. I think maybe on a three- or four-game
19  teaser there would have been.
20  Q. So, if someone bet parlay and lost, it would be an even
21  hundred dollar amount possibly?
22  A. Yeah.
23  Q. Additionally, if somebody made a twenty dollar bet and
24  lost it, what would the juice on that twenty-five dollar bet
25  be?

USA vs Reeves, et al
Case 1:05-cv-00542-MHT-WC    Document 27-4    Filed 05/05/2006    Page 16 of 17
CondenseIt™
Tim Reeves

### Page 57

1  A. Two dollars an fifty.
2  Q. Mr. Reeves, I believe you testified earlier that every one
3  of these checks that went into your daddy's account, you asked
4  him to cash. What checks did you ask him to cash on November
5  5, 1996?
6  A. I don't remember right off hand. But them checks, he
7  cashed them for me. I remember that.
8  Q. Well, let's see. On January 23, 1996, how many checks did
9  he cash for you?
10 A. I don't recall.
11 Q. So, you only recall that your daddy cashed for you
12 specifically the checks that relate to this case?
13 A. No. He has cashed checks for me many times. But, you
14 know, I have never paid no attention to it. I just got the
15 cash.
16 Q. So, you only paid attention to those that are in this case
17 now?
18 A. No. He just showed them to me and I know he cashed the
19 checks for me.
20 Q. Where would you have been when he would cash these checks
21 for you?
22 A. Numerous places.
23 Q. Such as?
24 A. We may have been right outside the building. We might
25 have been in his truck.

### Page 58

1  Q. Right outside what building?
2  A. Outside of Hunt's.
3  Q. Hunt's. Now, that is the same restaurant where you had
4  three hundred and ninety-seven thousand dollars in cash right
5  inside?
6  A. That's right.
7  Q. Speaking of that three hundred and ninety-seven thousand
8  dollars cash, I believe you testified today that part of that
9  was your daddy's?
10 A. To my knowledge, yes.
11 Q. And it didn't have anything to do with gambling?
12 A. I don't have anything to do with that. That's his money.
13 He would have to answer that.
14 Q. Do you remember sitting at an interview in my office with
15 federal agent Bravata and others, and telling those individuals
16 that every bit of the money in that safe, that three hundred
17 and ninety-seven thousand dollars, was from gambling and you
18 didn't know why your daddy's lawyer filed a claim on that
19 hundred and ninety-seven thousand dollars?
20 A. I said my dad's lawyer had filed a claim on a hundred and
21 ninety-seven thousand dollars.
22 Q. Are you testifying that you did not state that that entire
23 amount of money was from gambling?
24 A. Ashley, I don't recall. You know what kind of state of
25 mind I was in right then.

### Page 59

1       MS. HOLMES: No further questions.
2       THE COURT: All right.
3       MR. ADAMS: Your Honor, can I ask a couple of short
4  ones and just stand here?
5       THE COURT: Sure.
6            RECROSS EXAMINATION
7  BY MR. ADAMS:
8  Q. Mr. Reeves, back from December the 27th of 1996 down
9  through January 6th of 1997, did B.J. Adams ever operate any
10 bookmaking out of that trailer on Malvern Road to your
11 knowledge?
12 A. Ronnie done the bookmaking out of the trailer.
13 Q. And B.J. Adams, to your knowledge, never worked out of the
14 trailer. Is that correct?
15      MS. HOLMES: We object. This exceeds the scope of
16 redirect.
17      THE COURT: Overruled.
18 BY MR. ADAMS:
19 Q. Did he ever, to your knowledge, operate... during that
20 period of time operate an illegal gambling business out of 1073
21 Malvern Road, Dothan, Alabama?
22 A. Not to my knowledge.
23 Q. Have you ever seen B.J. Adams in that trailer?
24 A. No, sir.
25 Q. And you are the one that bought the trailer, aren't you?

### Page 60

1  A. Yes, sir.
2  Q. Do you know where B.J. lives?
3  A. Somewhere in Esto, I think it is.
4  Q. Down in Florida?
5  A. To the best of my knowledge. I ain't never been there.
6  That is just what I heard.
7       MR. ADAMS: That's all. Thank you.
8            RECROSS EXAMINATION
9  BY MR. KIRK:
10 Q. Mr. Reeves, Joe Cobb did not work for you in the football
11 season '94 through '95, did he?
12 A. No.
13 Q. He did not work with you in any form or fashion in that
14 gambling that you structured down there booking games in '93 to
15 '94?
16 A. Not to my knowledge.
17 Q. His only contact with that bookmaking, did I understand
18 you correctly, was mid-November, several weekends up until the
19 raid of January '97?
20 A. You know, I think '96 was the year. That stuff is three
21 years old. I think '96.
22      MR. KIRK: That is all.
23      THE COURT: All right. The witness is excused.
24           * * * * * * * * * *
25

Page 61

```
 1              * * * * * * * * * *
 2              REPORTER'S CERTIFICATE
    UNITED STATES DISTRICT COURT
 3  MIDDLE DISTRICT OF ALABAMA
         I, Lewis F. Wimberley, Official Court Reporter for the
 4  United States District Court for the Middle District of
    Alabama, do hereby certify that the foregoing 60 computer
 5  printed pages represent a true and correct transcription of the
    testimony of TIM REEVES on October 28, 1999, in the heretofore
 6  captioned cause, Criminal Action 99-13-S, heard in the United
    States District Court for the Middle District of Alabama,
 7  Montgomery, Alabama.
         DATED, this the 3rd day of January, 2000.
 8
 9
            LEWIS F. WIMBERLEY
10           Official Court Reporter
11
12
...
25
```