# EXHIBIT D

COPY     Exhibit D                          1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4  UNITED STATES OF AMERICA,

5              Plaintiff,

6                                        CIVIL ACTION
       vs.                              NO. 98-T-1334-S
7
   FIFTY-FIVE THOUSAND SEVEN
8  HUNDRED THIRTY-ONE AND 49/100
   DOLLARS ($55,731.49) IN UNITED
9  STATES CURRENCY, SEIZED FROM MONEY
   MARKET ACCOUNT NUMBER 912-7931-4,
10 AND MONEY MARKET ACCOUNT NUMBER
   912-7931-4, LOCATED AT
11 THE SOUTHTRUST BANK OF DOTHAN

12 AND

13 THIRTY THOUSAND TWO HUNDRED
   THIRTY-FIVE AND 19/100 DOLLARS
14 ($30,235.19) IN UNITED STATES
   CURRENCY SEIZED FROM CHECKING
15 ACCOUNT NUMBER 02-004-85, AND
   CHECKING ACCOUNT NUMBER 02-004-85,
16 LOCATED AT THE FIRST BANK OF DOTHAN.

17              Defendant.

18 ///////////////////////////////////

19 UNITED STATES OF AMERICA,

20              Plaintiff,
                                         CIVIL ACTION
21       vs.                            NO. 98-T-336-S

22 ONE HUNDRED NINETY SEVEN
   THOUSAND ($197,000) DOLLARS
23 IN UNITED STATES CURRENCY,

24              Defendant.

25          DEPOSITION OF TIM REEVES
       Taken on Thursday, February 3, 2000

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      SOUTHERN DIVISION

 4  UNITED STATES OF AMERICA,

 5                    Plaintiff,
                                        CIVIL ACTION
 6      vs.                             NO. 98-T-571-S

 7  ONE HUNDRED NINETY SEVEN
    THOUSAND ($197,000) DOLLARS
 8  IN UNITED STATES CURRENCY,

 9                    Defendant.

10  ///////////////////////////////////

11  UNITED STATES OF AMERICA,

12                    Plaintiff,
                                        CIVIL ACTION
13      vs.                             NO. 97-T-63-S

14  PARCEL OF REAL PROPERTY KNOWN
    AS HUNT'S RESTAURANT, LOUNGE,
15  AND OYSTER BAR LOCATED AT
    177 CAMPBELLTON HIGHWAY,
16  DOTHAN, HOUSTON COUNTY,
    ALABAMA, WITH ALL APPURTENANCES
17  AND IMPROVEMENTS THEREON,

18                    Defendant.

19             * * * * * * * * * * *

20      DEPOSITION OF TIM REEVES, taken pursuant to

21  stipulation and agreement before Renee W. Marchand, Court

22  Reporter and Commissioner for the State of Alabama at Large,

23  at the Federal Courthouse, Dothan, Alabama on Thursday,

24  February 3, 2000, commencing at approximately 11:05 a.m.

25             * * * * * * * * * * *
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:

 3   Mr. John Harmon
     Assistant United States Attorney
 4   OFFICE OF THE UNITED STATES ATTORNEY
     One Court Square, Suite 201
 5   Montgomery, Alabama  36104

 6   FOR MR. TIM REEVES:

 7   Mr. David Johnston
     JOHNSTON, HINESLEY, FLOWERS & CLENNEY
 8   Attorneys at Law
     P. O. Box 2246
 9   Dothan, Alabama  36302

10   FOR MR. BILLY JOE REEVES:

11   Mr. David McKnight
     BAXLEY, DILLARD, DAUPHIN & McKNIGHT
12   Attorneys at Law
     2008 Third Avenue South
13   Birmingham, Alabama  35233

14   ALSO PRESENT:

15   Mr. Gillis Douglass

16             * * * * * * * * * *

17              EXAMINATION INDEX

18   Examination by Mr. Harmon
     Examination by Mr. McKnight        4
19                                      59

20             * * * * * * * * * *

21                STIPULATIONS

22        It is hereby stipulated and agreed by and between

23   counsel representing the parties that the deposition of TIM

24   REEVES is taken pursuant to the Federal Rules of Civil

25   Procedure and that said deposition may be taken before Renee
```

1  W. Marchand, Court Reporter and Commissioner for the State of
2  Alabama at Large, without the formality of a commission; that
3  objections to questions other than objections as to the form
4  of the questions need not be made at this time but may be
5  reserved for a ruling at such time as the deposition may be
6  offered in evidence or used for any other purpose as provided
7  for by the Federal Rules of Civil Procedure.
8      It is further stipulated and agreed by and between
9  counsel representing the parties in this case that said
10 deposition may be introduced at the trial of this case or
11 used in any manner by either party hereto provided for by the
12 Federal Rules of Civil Procedure.
13             * * * * * * * * * *
14                  TIM REEVES
15     The witness, having first been duly sworn or affirmed
16 to speak the truth, the whole truth and nothing but the
17 truth, testified as follows:
18                 EXAMINATION
19 BY MR. HARMON:
20     Q.   Mr. Reeves, we talked with your attorney earlier.
21 What's your desire about reading and signing the deposition?
22     A.   I'm lost.  What are you talking about?
23         MR. JOHNSTON:  He's asking you whether you want to
24 read the deposition and sign it rather than just -- and the
25 answer is you do want to read and sign.

1    A.    Hunt's Restaurant.

2    Q.    And what do you do there?

3    A.    I run it.  Own it.  Whatever.

4    Q.    You are the owner of the restaurant?

5    A.    I am owner of the -- I don't own the property.  I

6 just own the business.

7    Q.    I understand.  When did you first become owner of

8 the business?

9    A.    It would probably be around the -- I'm going to say

10 '88.  You know, I can't give you exact.  But it's somewhere

11 in that neighborhood.

12    Q.    Is Hunt's Seafood Restaurant a corporation?

13    A.    Yes.

14    Q.    And is there stock in the corporation?

15    A.    Right.

16    Q.    Who owns that stock?

17    A.    I do.

18    Q.    And did you get that stock in 1988?

19    A.    Yes.

20    Q.    How did you obtain that stock?

21    A.    I don't remember.  I'd have to look back.  How I

22 obtained it, I don't know.  I just know I own the stock in

23 it.

24    Q.    Who owned the stock before you did?

25    A.    Daddy did.

1    Q.   That would be your father?

2    A.    Uh-huh.

3    Q.   And your father is -- what's your father's name?

4    A.   Billy Joe Reeves.

5    Q.   And so somehow there was a transfer of ownership of

6    the stock from Billy Joe Reeves, your father, to you?

7    A.   Right.

8    Q.   At approximately 1988?

9    A.   Uh-huh.

10    Q.   Did you pay for the stock or was it given to you?

11    How did you effect the transfer?

12    A.   I don't recall how that got transferred right now.

13    I'd have to look back at the paperwork on that.  I don't

14    remember.

15    Q.   And make sure I understand, you stated that the

16    stock is in the restaurant itself.  It does not reflect

17    ownership of the real property where the restaurant is

18    located?

19    A.   Right.

20    Q.   And who owns the real property where the restaurant

21    is located?

22    A.   Billy Joe and my mother, Wilda Reeves.

23    Q.   You say you operate the restaurant.  Are you the

24    person that's in charge of the day-to-day operation of it?

25    A.   That's right.

1    Q.    You have any employees there?

2    A.    Oh, yes.

3    Q.    Who are the current employees of the restaurant?

4    A.    We're going to name all of them?

5    Q.    Well, how many you got?

6    A.    It's probably 35.

7    Q.    Oh, I won't do that, then.  I'll just -- I'll ask

8    you about some specific people later.  You have an accounting

9    service that assists you in doing the accounting work for the

10   restaurant?

11   A.    Does it for me, right.

12   Q.    And who is that person?

13   A.    Sandra McCormick.

14   Q.    And how long has Ms. McCormick done this for you?

15   A.    I want to say since probably about '90.

16   Q.    Who did it before that?

17   A.    Billy King.

18   Q.    Billy?

19   A.    King.

20   Q.    K-I-N-G?

21   A.    Uh-huh.

22   Q.    Does Ms. McCormick also prepare your tax returns?

23   A.    Yes.

24   Q.    Do you generally do a tax return for the restaurant

25   corporation?

1    A.    Uh-huh.

2    Q.    And do you also do a tax return for your personal

3    income?

4    A.    Uh-huh.

5    Q.    And Ms. McCormick does both of them?

6    A.    Does it all.

7    Q.    Does Ms. McCormick do bookkeeping work for you also?

8    A.    What do you mean by -- what kind?

9    Q.    What I'm trying -- I guess -- you're right.  I

10   should be more specific.  For example, does she do your

11   payroll?

12   A.    Yeah.

13   Q.    And does she do any -- let me back up.  Does she

14   ensure that bills and invoices are paid?

15   A.    No.  I do that.

16   Q.    You do that yourself?

17   A.    I pay the bills.

18   Q.    How do you report information to Ms. McCormick so

19   she can prepare these tax returns?

20   A.    She prepares me a daily work sheet.

21   Q.    And what's on that daily worksheet?

22   A.    Restaurant sales, beer, liquor, oysters.  And you

23   just -- you know, down to what the credit cards is.  If

24   there's any cash, you know, any cash payouts of any kind.

25   Q.    And you fill that out every day and submit that to

1    her on a daily basis?

2        A.   No, it's -- we fill it out and she gets it at the

3    end of the month.

4        Q.   So it's submitted to her on a monthly basis?

5        A.   That is on a monthly basis, yes.

6        Q.   Does she give you -- based upon that give you

7    reports about money made or money lost during the months or

8    does --

9        A.   Yeah.  We go over it, yeah.  We --

10        Q.   Now, Mr. Reeves let me ask you this.  And I

11    apologize for having to bring up a sore subject.  But as I

12    understand, you have pleaded guilty in federal court to a

13    violation of 18 United States Code, Section 1957; is that

14    right?

15        A.   Whatever is -- what is that?

16        Q.   Okay.  Let me ask you this.  Do you recall -- you

17    have --

18        A.   I pled guilty to something, but if that's what I

19    pled guilty to, I guess I did.

20        Q.   Well, has -- anybody tell you it's like a money

21    laundering offense?  Did you understand it to be that?

22        A.   Well, I pled guilty to an information on money

23    laundering.  Isn't that right, David?

24            MR. JOHNSTON:  That's correct.

25        Q.   And again, in that information, it indicated that

1    you expended approximately 25,000, maybe a little less,

2    $25,000 to purchase a vehicle; is that correct?

3        A.    Yeah.

4        Q.    And the information also alleged that this $25,000

5    were gambling proceeds; is that correct?

6            THE WITNESS:  We get back into this every time, you

7    know.

8            MR. JOHNSTON:  You pled guilty to --

9            THE WITNESS:  I pled -- yeah.

10           MR. JOHNSTON:  Tell him the circumstances.

11           THE WITNESS:  Yeah.  Can I tell the circumstances?

12           MR. JOHNSTON:  Tell him the circumstances of the

13   bank loan.

14       A.    Okay.  I traded trucks every two years.  That's a

15   business truck.  I trade a truck every two years.  I called

16   my banker up, Rex Blount.  And I said, I'm fixing to get me a

17   truck.  It's come in over here at the GMC place.  Do you want

18   me to write a check for it or do you want me to come over

19   there and get a cashier's check from you.  Just write a

20   check.  I'll cover the -- I'll cover the upper -- check in

21   the account.  And you come by here and sign a note one day

22   next week.  I said, All right.  That's fine.  So, you know,

23   we put them as the lienholder on it, the whole nine yards.

24   Just like I did any other truck I bought.  And Rex got sick.

25           When I went by there to sign a note, he had it on his

1  desk but didn't have it all done.  In other words, to me, I

2  thought he had already funded the check in my banking

3  account, but he had not.  Well, this comes up and my truck is

4  gone and, you know, he had never funded the check.  So the

5  loan never made it through.  So --

6       Q.   Well, let me ask you this, then.  Are you saying

7  you're not guilty of what you pleaded guilty to?

8       A.   I pled guilty to information, you know.

9       Q.   I understand.  But didn't -- didn't -- during the

10  acceptance of your guilty plea, didn't the judge ask you or

11  give you a factual basis for the guilty plea?  Didn't you

12  hear that?

13       A.   Yeah.

14       Q.   Didn't you say that was what you did?

15       A.   Yes, I reckon it was.

16       Q.   Were you telling the truth when you told the judge

17  that was what you did?

18       A.   Well, yeah, I think I was telling the truth.  I

19  just, you know, just to be honest with you this money

20  laundering business I got to catch on a little about knowing

21  what all this was about.  You know, maybe I didn't interpret

22  it the same way some other people do but, you know.  I do

23  recall what I done then, you know, and that's what I said.

24       Q.   And I'm not trying to put words in your mouth.  I'm

25  just trying to find out were you truthful with the judge when

1  he -- at the time of your guilty plea?

2      A.    Yeah, I was truthful with the judge.

3      Q.    Now, if that approximately 25,000 -- I think it may

4  be a little less.  I understand that.  But that $25,000 in

5  gambling proceeds that you used to purchase the truck, how

6  did you obtain those?

7          MR. McKNIGHT:  Now, I'm going to state an objection

8  for the record.

9          MR. HARMON:  Okay.

10         MR. McKNIGHT:  I don't understand what this has any

11  relevance to do with the charges that we're facing as far as

12  the two bank accounts, the money in the restaurant, and the

13  restaurant.  It just seems --

14         THE WITNESS:  My truck is already gone.

15         MR. HARMON:  Well, that's not -- here's where I'm

16  going on it.  What I want to do is, Mr. Reeves has pleaded

17  guilty --

18         MR. McKNIGHT:  Correct.

19         MR. HARMON:  -- to conducting a financial

20  transaction involving approximately $25,000 in gambling

21  proceeds.  It's my belief -- that's why we got this case --

22  that Mr. Reeves has conducted an extensive gambling

23  operation.  I need to know -- you know, that's the --

24  starting with the established fact, as I hope Mr. Reeves did

25  when he pleaded guilty, that he has obtained at least

1    $25,000 in gambling proceeds.  So I want to know how he got

2    it.

3        MR. McKNIGHT:  Well, he's pled guilty to getting the

4    25,000 and the car.  I don't see where we need to go back in

5    and open that can of worms.

6        MR. HARMON:  Well, I need to know -- I want to find

7    out about how he got it, because he had to get it through a

8    gambling operation.  That's my -- unless I may be wrong.

9        MR. McKNIGHT:  Now, didn't the guilty -- didn't the

10   information say that?

11       MR. HARMON:  The information said that he pleaded

12   guilty to a 1957 violation, which is not specifically a

13   gambling offense.  It's money laundering.

14       MR. McKNIGHT:  Well, doesn't it say that -- does the

15   information say that the money came from gambling?

16       MR. JOHNSTON:  Yes.  I think the information does

17   speak for itself.

18       MR. HARMON:  That's fine.

19       MR. McKNIGHT:  You know, and he's pled guilty to

20   that and I --

21       MR. HARMON;  I want to know how he got the money.

22   That's what I'm asking.

23       MR. McKNIGHT:  Well, the information says he got it

24   from gambling and pled guilty to it.

25       MR. HARMON:  That's fine.  And I want to find out

1    MR. HARMON:  I have.  It's been established.  I'm

2 going to find out the basis for it.  Mr. Johnston, do you

3 have any objection to going into this question?

4    MR. JOHNSTON:  John, not up to this point.

5    MR. HARMON:  Okay.

6  Q.  Now, Mr. Reeves, as I recall, what I posed to you

7 was, you know, the guilty plea.

8  A.  Right.

9  Q.  And the, you know, the approximate amount of money

10 involved in the transaction which -- and the information

11 alleges it was gambling proceeds.  You pleaded guilty to

12 that.  That's established conclusively for purposes of this.

13 What I want to find out is where did you -- how did you

14 obtain that $25,000 that was used in the purchase of the

15 truck?

16  A.  I don't really -- you know, exact transaction I

17 don't how I obtained it, you know.

18  Q.  Well, I'm not asking you specific transactions.

19 We'll look at it like this.  Were you conducting a gambling

20 operation during this period whereby you obtained this funds?

21  A.  Yes.  I guess that was right.

22  Q.  Well, now, don't guess, Mr. Reeves.  I need to know

23 if that was right, yes or no?

24  A.  Yes, that's what I -- that's what I pled guilty to

25 in that information count gambling proceeds.  That's what I

1    did.

2        Q.    And were you in fact conducting an illegal gambling

3    operation during this period?

4        A.    I was.

5        Q.    Now, who all was involved with you in that illegal

6    gambling operation?  The people.  Other than I don't want to

7    know anything about your father.

8        A.    You mean people that was helping me?

9        Q.    Yes, sir.

10       A.    Okay.  Well, me and Ronny Cherry and Joe Cobb.  And

11   David Mims, and Mills Hornsby would have been the ones.

12       Q.    Now, I don't want to go into great detail but tell

13   me what each one of these individuals was doing for your

14   gambling organization?

15       A.    Well, now, Ronny run the thing.  A to Z, he done

16   it.  Rest of them just answered the phone.

17       Q.    And that would be like taking bets that came in --

18       A.    Right.

19       Q.    -- over the phone.  Now what did you do in relation

20   to the gambling operation?

21       A.    I didn't do nothing as far as the everyday operation

22   was concerned.  I was working my tail off up there at that

23   restaurant.  But the only thing I would have done would have

24   been, you know, I naturally would have known if we won or we

25   lost, you know.  You'd think that would naturally be a

1  concern that you'd have.  And I'd give Ronny money to pay

2  people off with.

3      Q.   Now, how did Ronny report to you the wins and

4  losses?  How did you know what you had done?

5      A.   It wasn't no set thing.  We would just run into one

6  another.  He'd stop by my house or, you know, call me on the

7  truck or, you know, whatever.

8      Q.   Now, was Ronny getting a percentage of the take or

9  was he a salaried employee?

10     A.   No, he got a bonus at the end of the year.

11     Q.   I understand he got a bonus.  But how did he get

12  paid during the year?

13     A.   He just -- it was like a salary, yeah.

14     Q.   In other words, he did not get a percentage of the

15  winnings that he --

16     A.   Every week, you mean?

17     Q.   Yes, sir.

18     A.   No.

19     Q.   Who received the winnings?  Who got the winnings

20  from the organization?

21     A.   Me.

22     Q.   And on average during the period of the time you

23  were conducting the operation, what was your average weekly

24  income during the betting periods?

25     A.   It varies.  You know, some weeks you win, some you

1   lose.  I don't know, you know.  And you know, I don't

2   necessarily mean you win when you win.  Because when you win,

3   you may not win because they may not pay you.  So it's hard.

4   I couldn't give you an accurate figure on that knowing

5   exactly how much it was.

6       Q.   Did you make money, though, during the conduct of

7   this organization?

8       A.   At times I did and sometimes we didn't.

9       Q.   Were you in a -- generally, did you make money

10  during the entire year or --

11      A.   Last year?

12      Q.   Yes, sir.

13      A.   Unh-unh.

14      Q.   How about the year before that?  Did you make money?

15      A.   Made some money year before that.

16          MR. JOHNSTON:  What year are you referring to when

17  you asked the last year?

18          MR. HARMON:  Well --

19          THE WITNESS:  Last year would have been '96.

20          MR. HARMON:  '96.  Yes.  I'm sorry.  You're right.

21  I should have been more specific.

22      Q.   1996 would have been the last year that the gambling

23  operation was conducted; is that correct?

24      A.   That's right.  And that was not a very good year.

25      Q.   And that would -- I think it ended at the time of

1    the execution of the search warrants and the arrest?

2        A.    You better believe it.

3        Q.    And do you remember when those were conducted?

4        A.    Oh, yeah, I can remember that well.  January the

5    12th.

6        Q.    Of 19 --

7        A.    '97.

8        Q.    In the periods when you made money in the gambling

9    operation, did you report the income to Ms. McCormick?

10       A.    No.

11       Q.    What would you do with the proceeds that you

12   obtained from the gambling operation?  Physically what did

13   you do with them?

14       A.    Just kept them in cash.

15       Q.    And where did you keep the cash?

16       A.    I'd keep some of it in my safe up at the restaurant.

17       Q.    And anywhere else?

18       A.    Yeah, Ronny would keep some sometime in his safe.

19       Q.    Where was Ronny's safe?

20       A.    At Hodgesville Road.

21       Q.    I'm sorry?

22       A.    Hodgesville Road.

23       Q.    That's was Ronny's home?

24       A.    His daddy's.

25       Q.    Physically where was your gambling operation

1    conducted?

2        A.    Down in the trailer behind my house.

3        Q.    That's on Padget Road?

4        A.    No, that's on Malvern Road.

5        Q.    Excuse me.    Malvern Road.    Excuse me.    That's

6    correct.    And how close is that to your home?

7        A.    I'd say about seven -- six, seven hundred yards.

8        Q.    And did anyone live in that trailer?

9        A.    Yeah.

10        Q.    Who lived there?

11        A.    Terry Knighton.

12        Q.    And was Mr. Knighton working with you?

13        A.    No, he works in the oyster bar.

14        Q.    Were any of the gambling operations or activities

15    conducted at Hunt's Seafood Restaurant?

16        A.    No, we didn't take bets there.    We took them down at

17    the trailer.

18        Q.    Did you ever keep line sheets at the Hunt's Seafood

19    Restaurant?

20        A.    Yeah, I've kept -- I've had line sheets there.

21    Yeah.

22        Q.    Did you ever have envelopes there, kept there to pay

23    off individuals who had won bets?

24        A.    I've had a few.    I didn't have that much.    A few

25    times.

1    Q.    And how would that -- tell me how that envelope
2    process worked?

3    A.    Ronny just put the money in the envelope, put their
4    name on the envelope, put it in the drawer, and they just
5    come by and get the envelope.

6    Q.    Who would actually take care of giving them the
7    envelope?

8    A.    Could have been me.  Could have, you know, just
9    whoever was right there handy, you know, just pick up the
10   envelope, you know.  Like I said, there wasn't that many of
11   them.

12   Q.    How about the -- any phone calls made to Hunt's
13   Seafood Restaurant in furtherance of the gambling operation?

14         MR. JOHNSTON:  Phone calls to who?

15   Q.    Were any phone calls made to Hunt's Seafood
16   Restaurant in order to place bets --

17   A.    No.

18   Q.    -- or receive betting lines?

19   A.    To receive betting lines or place bets?  No, they
20   didn't call.  They always -- if somebody had called, I would
21   have -- I know I would have referred them to the other
22   number.

23   Q.    How anybody called to get betting line information?
24   Anybody ever call Hunt's Seafood?

25   A.    No, they wouldn't have done that because they've got

1    them other numbers to call.

2        Q.    Did you ever make any phone calls from Hunt's to

3    individuals concerning the betting operation?

4        A.    Questions about -- such as what are you --

5        Q.    For example, did you ever make a call to anyone

6    from -- or anyone make a call, to your knowledge, from Hunt's

7    Seafood to someone about collecting a gambling debt that was

8    owed?

9        A.    I might have called Ronny and discussed it on the

10   phone, you know, somebody down there owed, you know.

11       Q.    Did you ever make any phone calls to a gambling

12   service or anyone to obtain line information from Hunt's?

13       A.    No.

14       Q.    How did you obtain your line information?

15       A.    Ronny got that from one of them outfits out there in

16   Vegas.  Don Best Sports, I believe is the name of it.

17       Q.    And that would have the latest line information?

18       A.    Yeah.

19       Q.    Did you have an office at Hunt's?

20       A.    Yeah.

21       Q.    And was it your office?

22       A.    Uh-huh.

23       Q.    And what did you use that office there at Hunt's

24   for?

25       A.    Well, you know, pay my bills, whatever -- what does

1    anybody use an office for, you know.

2        Q.    Did you ever conduct any gambling business from or

3    in that office?

4        A.    No, I didn't.  No.  That's for the restaurant

5    business there.

6        Q.    Do you have any other offices besides that one?

7        A.    No.

8        Q.    Was there a safe in that office?

9        A.    Uh-huh.

10       Q.    And who had access to the safe?

11       A.    I did, my father did, and Ricky's got access to it.

12       Q.    Ricky?

13       A.    Enfinger.  One of my managers.

14       Q.    What did you use the safe for?

15       A.    Well, I had a lot of different documents in there.

16   You know, wills and put my -- you know, I'd always put my

17   restaurant stuff in there too or whatever at the end of the

18   night, you know.  Whatever money you had took in, put it in

19   there.  And I also had some cash in there to get to anyway.

20       Q.    Now, where did you that cash come from that you had

21   in the safe?

22       A.    What I had in there come from -- it come from

23   gambling.

24            MR. JOHNSTON:  Excuse me.  Which cash are you

25   referring to?

1    you recall specifically the day that the law enforcement

2    executed the search warrants?

3         A.    Yeah, I remember the date.

4         Q.    Were you at Hunt's Seafood Restaurant when the

5    warrant was executed?

6         A.    All day and half the night.

7         Q.    Do you recall making a statement to law enforcement

8    authorities regarding the cash in the safe when they found

9    it?

10        A.    What statement are we talking about?

11        Q.    Well, do you recall any statements you made?

12        A.    No, not really.  I had a rough day that day.

13        Q.    Do you recall telling the law enforcement that you

14   couldn't put that kind of money in the bank or else the IRS

15   would be on you?  Do you recall making a statement or words

16   to that effect?

17        A.    Whom did I make that statement to?

18        Q.    Law enforcement.

19        A.    I know, but who?

20        Q.    Well, I'm asking you did you make it?

21        A.    I'd have to find out who it was to make me remember

22   if I said something like that.  I don't believe I said that

23   but, you know.  I had a hard day, but I don't remember saying

24   it.

25        Q.    Do you remember being interviewed in the U.S.

1    Attorney's office about your cooperation agreement in this --

2    in the criminal case?

3        A.    Yeah.

4        Q.    Do you remember Mr. Gillis being there in that

5    interview?

6        A.    Yes.

7        Q.    Do you remember telling Mr. Gillis that as far as

8    you were concerned all the money in the safe was gambling

9    proceeds?

10       A.    I don't remember what I said.  I -- you know.  That

11   day, you can't imagine what that day was like for me.

12       Q.    Well, tell me what it was like for you.  What was

13   the problem?

14       A.    I was -- I was completely to pieces.

15       Q.    Were you intoxicated?

16       A.    No, I wasn't intoxicated.

17       Q.    Were your under the influence of any drug?

18       A.    No.  Wasn't under the influence of nothing.  I was

19   just upset.

20       Q.    You were upset.  Well, I understand you were upset,

21   but tell me how that affected what you were --

22       A.    Well, I was just -- you know, been up there all day

23   in front of the magistrate judge.  And I watched all these

24   people, friends of mine all my life.  And, you know, it

25   just -- that would have been better if it waited till another

1    Q.    Well, even when you did that, even when you got the
2    money out of the safe, what would ultimately happen to the
3    checks?

4    A.    Well, they'd ultimately go to the bank.  Ultimately
5    have to, you know.

6    Q.    Who did the deposits of the checks at the bank?

7    A.    I did.

8    Q.    Did your father ever cash --

9        MR. McKNIGHT:  I object.

10       MR. JOHNSTON:  Object.

11       MR. HARMON:  Excuse me.  You're right.  I'm sorry.

12    Q.    Other than your father, anyone else ever do any
13    checks for you at the bank?

14    A.    Make a deposit for me?

15    Q.    Yes.

16    A.    They might have run over there and made a deposit,
17    but they didn't do the -- I worked it up.  You understand
18    what I'm saying?  You know what I'm saying, they might have
19    went over there and got my change and made the deposit.  But
20    I had worked it up myself.

21    Q.    Did Ronny Cherry ever go the bank for you and do
22    this?

23    A.    I don't know.  I couldn't answer that question.  I
24    don't.

25    Q.    You don't remember or you just don't know?

1     A.    I don't remember.  If -- I don't think he had, but I

2     don't remember.

3     Q.    When someone was placing a bet with you, how did

4     they physically place the bet?  Was there a written sheet

5     done by that person?

6     A.    Are you talking about the bettor or the --

7     Q.    The bettor.  Let me back up and I'll ask it another

8     way.  How did you keep a record of the bets placed by a

9     bettor?

10     A.    Just wrote it down on a piece of paper.

11     Q.    Who wrote it down?

12     A.    Ronny.

13     Q.    Did you ever write one down?

14     A.    Not to my knowledge.

15     Q.    Now, what would you do with those sheets of paper

16     that reflected the debts?  Where were they kept?

17     A.    Ronny took care of them.  They were down there at

18     the trailer.

19     Q.    Any of them ever maintained there at the Hunt's

20     Seafood Restaurant?

21     A.    No.  Not the betting.  As far as the day-to-day,

22     that would have been down there.

23     Q.    And then how were these bets reconciled so that you

24     know who was the loser and who was the winner?  Who went

25     through the sheets to determine winners and losers?

1    A.    You mean figure the sheet up?

2    Q.    Yes.

3    A.    Ronny.

4    Q.    And did you ever go back and check that to see if he
5    was doing it accurately?

6    A.    No, I didn't.  I trusted him.  I didn't have no
7    problem with Ronny.  I didn't even worry about that.  I
8    didn't have time to go back and do that.

9    Q.    Do you make money through the operation of Hunt's
10    Seafood Restaurant?

11    A.    Oh, yeah.

12    Q.    Let me back up a minute.  Since the execution of the
13    search warrants and the arrest, has there been any change in
14    the management procedures at Hunt's Seafood Restaurant?

15    A.    No.

16    Q.    Has your father become more involved in the
17    operation of the restaurant?

18        MR. JOHNSTON:  Object.

19        MR. McKNIGHT:  Object to asking about his dad.

20        MR. HARMON:  That's not a question about any
21    criminal.  I'm just asking if he'd become more -- since
22    the --

23        MR. JOHNSTON:  The judge said no questions, period.

24        MR. McKNIGHT:  The judge said absolutely no
25    questions about his dad.

1    Q.    Has the restaurant become more profitable since the

2    operation of -- I mean since the execution of the search

3    warrants?

4    A.    It's doing well.

5    Q.    Has it become more profitable than it was before?

6    A.    I mean, we do a little better every year.

7    Q.    Did the --

8    A.    And hope to keep on doing a little better every

9    year.

10    Q.    Did you ever use the Hunt's Seafood operating

11    account to clear checks you received from losing bettors?

12    A.    To clear?

13    Q.    Yes.  Or deposit.  Maybe deposit checks that you --

14    A.    Well, I cash the checks, and then, you know, I just

15    got cash out of the checks.  And, yeah, they went in a

16    deposit, you know.  But I had gotten the cash out of my check

17    cashing money.

18    Q.    So let me make sure I understand.  You correct me if

19    I'm wrong.  If you received a check from a losing bettor for

20    $100, you would go into the safe and get $100 out; is that

21    right?

22    A.    I'd go into my check cashing money.

23    Q.    Where was the check cashing money?

24    A.    Had a box there where we had money separated that we

25    could cash payroll checks and all that stuff, and that's

1  where I cashed them checks out of.

2      Q.   And whose money was that?

3      A.   Well, what I was cashed out of it would have been my

4  money.

5      Q.   All right.  So you go in that check cashing box and

6  get $100 out for this check?

7      A.   Right.

8      Q.   Now what happened to the check?  What would happen

9  to the check?

10      A.   Either I'd take the check and go to the bank and get

11  it cashed, or I'd put it in the deposit, you know, and I'd

12  get the cash back out.

13      Q.   So if you went and got the -- if you cashed the

14  check and you got $100 from the bank, what would you do with

15  that $100?

16      A.   Put it in my pocket.

17      Q.   And if you deposit the check, what would happen to

18  the money that was deposited into the account?  What happened

19  to it ultimately?

20      A.   I'd got the cash back in my hand.

21      Q.   You would eventually get cash out of the --

22      A.   No, I got it out before then.  I already had that.

23  I cashed it before I put the check in there.

24      Q.   All right.  Now, I'm sorry.  I'm being confused

25  now.  Listen to me carefully.  If someone -- a losing bettor

1       A.    (Witness nods head.)

2             MR. HARMON:  Then you get that $100 out.  He's got

3       $100 now, and he's got a check in his hand.  He's got a

4       check for $100 and a $100 bill.  Example.  And you told me,

5       if I understood you right, either that $100 bill either

6       might go to pay off another bet or might go in your pocket?

7       A.    Uh-huh.

8       Q.    But you've still got that check.  You see what I'm

9  saying?  You've still got the check in your hand.

10      A.    Uh-huh.

11      Q.    Now, what do you do with that check?

12      A.    Well, I deposit the check into the -- some of them,

13  like I said, if I had some checks, I just went and cashed.

14  Some of them I might have deposited into the account.

15      Q.    And what account did you use to deposit those

16  checks?

17      A.    The Hunt's account.

18      Q.    Did you ever use any other accounts to deposit

19  checks?

20      A.    Well, not to my knowledge.  But it said -- I think

21  Gillis showed me one or two checks were somehow allowed to

22  me.  I didn't remember getting into the -- into an account.

23      Q.    Well, me let ask you about some specific

24  individuals.  Do you know an individual named Saket Sharen?

25  That's S-A-K-E-T, S-H-A-R-E-N?

1     A.   Uh-huh.

2     Q.   Did Chris pay off with checks?

3     A.   Sometime.

4     Q.   How about Dr. Jimmy Johnson?

5     A.   I don't know him.

6     Q.   Do you know if Dr. Johnson bet with you?

7     A.   I don't even know Dr. Jimmy Johnson.

8     Q.   How about Paul E. Lederman?

9     A.   Is that a Georgia?

10    Q.   I don't know.

11    A.   I don't know.

12    Q.   Do you know if Mr. Lederman ever bet with you?

13    A.   I couldn't answer that because I'm not sure about --

14 I know some Pauls, but I don't know if that's the same Paul

15 I'm thinking about.

16    Q.   How about Raymond Leppla?

17    A.   Uh-huh.

18    Q.   Did Mr. Leppla bet with you?

19    A.   He bet with Mr. Myron Brown.

20    Q.   And did Mr. Leppla ever pay off to you with any

21 checks?

22    A.   He paid off to Myron and Myron paid me or paid Ronny

23 whatever.  I wound up getting it.

24    Q.   How about Enoch Glenn Toole?

25    A.   I know him.

1    Q.    Did Mr. Toole bet with you?

2    A.    Yes.

3    Q.    Did he pay off with checks?

4    A.    Sometimes.

5    Q.    How about James E. Short, Jr.?

6    A.    I don't recall that name. I'd have to -- I'm

7    sitting here looking at blank paper. I don't know.

8    Q.    Now, did you ever -- besides paying -- we've been

9    talking about how you got paid when you won. How did you pay

10   when you lost? I say -- I'm talking about your

11   organization. How did your organization pay off bettors that

12   won?

13   A.    Cash.

14   Q.    Did you ever use anything else?

15   A.    Yes, some days. Ronny used some money orders and

16   some cashier's checks.

17   Q.    Did you ever go and obtain money orders and

18   cashier's checks in order to pay off winning bettors?

19   A.    Yeah.

20   Q.    Where would you go and do that?

21   A.    First Bank of Dothan.

22   Q.    Would you use cash to obtain the money orders or

23   cashier's checks, or would you use your funds from an account

24   to do that?

25   A.    I just used cash.

1    Q.   When the government initially seized a couple of

2    accounts, account number 912-7931-4 at SouthTrust Bank and

3    account number 02-004-85 at First Bank.  You filed a claim to

4    those accounts.  Do you recall that?

5    A.   I don't recall that.  I think Drew and David handled

6    the filing of the claim.

7    Q.   Did you have any interest in the accounts?

8    A.   What accounts are there?

9    MR. JOHNSTON:  Yeah.  You'd have to show them to us

10   if you know whose name they're in.

11   MR. HARMON:  Here are the account numbers SouthTrust

12   Bank.  And Mr. Reeves filed a claim asserting an ownership.

13   Now, they've subsequently been withdrawn.

14   A.   Yeah, that's right, because I remember Drew saying

15   something about that.

16   Q.   So it would be your statement now you don't think

17   you have any -- did you have any interest in the accounts?

18   A.   No.

19   Q.   Did you have any advance information that the law

20   enforcement authorities were looking at your gambling

21   operation before the execution of the warrants?

22   A.   Don't -- excuse me for laughing.  Why no.

23   Q.   What?

24   A.   No, sir.

25   Q.   Did you have any advance information that there was

1    any type of investigation of you as far as a gambling

2    operation?

3        A.    No.

4        Q.    Tell me how Hunt's operates.  When does it open for

5    business?

6        A.    Opens about eight o'clock in the morning to let the

7    domino players start playing dominos.

8        Q.    And how many domino players generally do you have

9    there?

10        A.    Well, you've got about eight or ten playing and

11    about five or six sweaters, I call them.

12        Q.    What's that?

13        A.    Standing around arguing about why he should have

14    played this one and didn't play that one.  These are all

15    retired people.

16        Q.    And are you cooking any food or serving anything

17    during that period?

18        A.    No.  Just do serve a beer.  Not that many, but you

19    serve a few.

20        Q.    When do you open for business, start serving lunch,

21    for example?

22        A.    Eleven o'clock.

23        Q.    And how late do you stay open at night?

24        A.    Till ten.  But, you know, sometimes it's -- I left

25    there last night at 12:15.

1  and go back to work with GTE.  So she went back over there

2  and finished out that little time where it would benefit her

3  more on her retirement.  And then she come back.  And she's

4  been with me ever since, you know.

5      Q.   Mr. Reeves, what time does she usually arrive at the

6  restaurant?

7      A.   Generally about 4:30 or five o'clock.

8      Q.   Okay.  How late does she stay there?

9      A.   She usually tries to get out of there about nine.

10 Sometimes she'll stay to closing, but she's old.  She

11 don't --

12     Q.   And how about your father?  Does he come to the

13 restaurant often?

14          MR. JOHNSTON:  Objection.

15          MR. HARMON:  Excuse me.  That's right.

16     Q.   Mr. Reeves, explain to me, looking at your trial

17 testimony you talked about individuals that got juice.  And I

18 know you explained it in the criminal trial.  But it was hard

19 for me to understand.  Can you explain that to me again what

20 you meant by the individuals that got juice on the bets?

21     A.   It's got 20 percent of the winners -- winning week,

22 you know.

23     Q.   And how do those individuals get that?  What do they

24 have to do to get that?

25     A.   Wasn't no set deal about what they had to do.  They

1    just had some few people that played with them.  And you know

2    it was a common thing.  There's so many people booking

3    football around here and everybody was doing it.

4        Q.   As I understand how -- and you correct me if I'm

5    wrong -- the gambling business works is if you win, you get

6    paid, you know, what you bet.  If you lose, you pay what you

7    bet plus a certain percentage; is that correct?

8        A.   That's right.

9        Q.   How much more over his bet does a loser pay?

10       A.   Ten percent on his losing.

11       Q.   And so --

12       A.   But that would not be on all bets, now.

13       Q.   What would be an example where you have a different

14   percentage?

15       A.   Like on a -- if he played a parlay or something.  He

16   gets odds on that, win more money.  And if he loses, it's

17   even money.

18       Q.   And then so that when you paid juice money, where

19   did that come from?  How did you get money to pay the juice?

20       A.   It just come out of their winnings.

21       Q.   So in other words, if an individual -- and correct

22   me if I'm wrong.  I don't want to put words in your mouth.

23   If an individual brought you some bettors and they lost and

24   they had to pay that extra 10 percent and, of course, their

25   loss, you would, of course, receive the total amount of

1    money, but you were giving the people that brought you the

2    bettors 20 percent or something as juice for them bringing

3    them to you?

4         A.   Yeah.   It varied with different things, yeah.   20

5    percent.   Some got less than that.

6         Q.   And who were some of the people, you know, that were

7    getting juice from you on this situation?

8         A.   I think Vivian.   And like I said, you know, this is

9    one of these deals Ronny handled all this stuff with these

10   people with the juices.

11        Q.   Did you ever have any bettors that were unhappy or

12   perhaps felt like they had been mistreated by Ronny that came

13   to you about the situation?

14        A.   They'd been mistreated?

15        Q.   Yes.

16        A.   In what kind of way?

17        Q.   Maybe they thought that somebody -- Ronny wrote

18   their bet down wrong.   For example, Georgia and Florida

19   and -- you know, Ronny wrote down that they picked Florida,

20   and they said no, I picked Georgia.   How would that situation

21   with that be handled?

22        A.   Ronny would handle it.

23        Q.   Well, did anybody ever come to you about that?

24        A.   No, because he would have handled it because most of

25   the time you can't tell nobody.   When they tell you

1    something, you just got to go ahead and say that's the way it

2    is, I guess.  I made the mistake and go on.  Like that.

3        Q.    You indicated that sometimes you couldn't collect

4    from people?

5        A.    Oh, yeah.

6        Q.    And how did you handle that?  What would you do if

7    you couldn't collect?

8        A.    Well, you'd just talk with all the bookies in Dothan

9    and tell them that this person don't pay.  Let's don't take

10   no bets off of him.  And that's about the end of it.

11       Q.    And this would be, for example -- in other words,

12   you would contact other bookies in the area and tell them

13   this was happening, and you would just say, you don't get to

14   bet anymore?

15       A.    Yeah.  Well, tell them I'd -- be in their best

16   interest they wouldn't need to take no bets off of them.

17       Q.    Did they ever call you and let you know somebody

18   wasn't paying?

19       A.    Yeah.

20       Q.    And how did you keep up with the people that you did

21   not want to accept bets from?

22       A.    Well, I reckon you can just remember that.

23       Q.    So you didn't keep a sheet or anything like that?

24       A.    I didn't, no.

25       Q.    Do you know if Ronny kept one?

50

1     A.   He could have.  I don't know.

2     Q.   Do you know if Mr. Cherry had a bank account?

3     A.   I don't have any idea.

4     Q.   Do you know if he had any method of handling any of

5     the -- for example, any checks that were received by the

6     organization as payoff for a losing bet?

7     A.   If he had a what now?

8     Q.   Did he have any method of handling those checks that

9     came in as payment for a losing bet on his own as an

10    individual?

11    A.   I don't know.

12    Q.   Excuse me.

13    A.   I don't know.

14    Q.   Do you know if he ever took care of any checks on

15    his own without having to get you involved as far as handling

16    a check that was received on a losing bet?

17    A.   I wouldn't know that anyway.  I would -- most of it

18    would have come through me, I'm sure.

19    Q.   Did you ever obtain a tax stamp for gambling?

20    A.   No, I didn't know you could get one.

21    Q.   Did you ever file a gambling tax return?

22    A.   I filed some gambling on tax returns.

23    Q.   Would that be the Hunt's return or your personal

24    return?

25    A.   Personal return.

1    Q.   Did you report to Ms. McCormick that that was

2  gambling income that you received?

3    A.   Well, I got a -- when I was in Vegas was what it

4  was.

5    Q.   This was money you won while you were in Vegas?

6    A.   Right.

7    Q.   Did you ever report to her any of the money you made

8  in the gambling operation here in Dothan?

9    A.   No.

10    Q.   Was Ms. McCormick aware that you were conducting a

11  gambling operation here?

12         MR. McKNIGHT:   Object to the form of the question.

13    A.   No.

14    Q.   Did you ever tell her you were doing that?

15    A.   No.

16    Q.   And I know we mentioned you don't own the real

17  property where the --

18    A.   That's right.

19    Q.   -- where the restaurant is located.  And I believe

20  you have a lease agreement with your father?

21    A.   Right.

22    Q.   Mr. Reeves, the money that you -- that was yours in

23  the safe, how long did it take you to accumulate that amount

24  of money there?

25    A.   I don't even know.  I wouldn't even know what the

1    answer to be to that.

2        Q.    Did you begin accumulating it when you started your

3    gambling operation?

4        A.    Yeah.    That's where it come from, I mean, you know.

5    I don't know what years, you know.

6        Q.    How did you know what money you made from, for

7    example, Hunt's Seafood or some activity conducted at Hunt's

8    Seafood versus money you made gambling?  How did you

9    differentiate between the two?

10        A.    When I had Hunt's, I just drew a paycheck, you know,

11    just like everybody there.

12        Q.    Well, I understand.  I'm not talking about

13    specifically how you got paid.  I'm talking about when you

14    made money gambling, and you made money through Hunt's, how

15    did you keep the two separate so you knew what you were

16    making gambling versus what you were making through Hunt's?

17        A.    Well, it was because it was separated.

18        Q.    I understand that.  But how did you keep them

19    separate, though?

20        A.    I didn't have to keep them.  That was just

21    separated.  That would happen somewhere else and that was

22    happening -- the rest was happening up there.

23        Q.    Well, for example, you mentioned that you used the

24    Hunt's Seafood account in some instances to handle checks you

25    received from losing bettors; is that correct?

1    A.   Never had to.  That never did become a problem.

2    Q.   No one ever asked you about that?

3    A.   No.  Never had the wrong person go get the wrong

4    money either so, you know, I don't know.

5    Q.   Pretty honest bunch down here, huh?

6    A.   Yeah.

7    Q.   Mr. Reeves, when you obtained cash from your

8    gambling operation, did you ever go to the bank and exchange

9    small bills for large bills?

10    A.   Now, how that -- I'm going put -- that's one thing

11    that I read in something and some of this stuff.  How that

12    happened is not like that's been told.  Let me tell you how

13    that happened.  You go up there and I cash some checks.  And

14    they either say, how do you want it.  I said, it don't make

15    no difference.  She said, will large be fine?  I say that's

16    fine.  That's how that come up.  I didn't run up there and

17    say I want $100 bills for everything I got, you know.  And

18    you know human nature if somebody's going to count money,

19    they'd rather count $100 bill than they'd count 20 in there.

20    So that goes vice versa with that.  That didn't -- ain't all

21    my, you know.  I said -- if they said that, I said, okay.  If

22    they didn't, I have gotten 20s.

23    Q.   So you didn't care if it was in large bills or small

24    bills?

25    A.   No.  It didn't make that much difference to me.

1    A.    I don't know.

2    Q.    Did you specifically need, for example,

3    approximately $200,000 in cash at the Hunt's Seafood

4    Restaurant for any specific business purpose?

5    A.    No.  Just -- I just had the money.

6    Q.    Mr. Reeves, is there anything else you want to tell

7    me about?

8    A.    No.  My daughter is getting surgery on her ear.  I

9    just want to get out of here where I can go see about her.

10    Q.    I understand.

11    MR. HARMON:  Well, gentlemen, that concludes me

12    unless y'all have something.

13    MR. McKNIGHT:  I've got a couple of real quick

14    ones.

15                    EXAMINATION

16    BY MR. McKNIGHT:

17    Q.    We're talking about the envelopes in the restaurant,

18    and you said that happened on an infrequent basis?

19    A.    Right.

20    Q.    As far as the gambling bets operation go, what

21    percentage of the bets were ever collected at the

22    restaurant?  Can you put a percentage on it?

23    A.    It would have to be less than five percent.  Two or

24    three percent at the most.

25    Q.    And when you talk about the envelopes behind there

1  in the lounge, did you also put envelopes back there to

2  pay --

3      A.    Vendors with?

4      Q.    -- vendors?

5      A.    Yeah.  Done that too.

6      Q.    And so if somebody was bringing oysters by, you

7  might have an envelope back there for the oyster man?

8      A.    And beer trucks too.

9      Q.    Okay.  And they would go, and Don Taylor would hand

10  them those envelopes when they came back there?

11      A.    Oh, yeah.

12          MR. McKNIGHT:  That's all I've got.

13          THE WITNESS:  Are y'all through with me?

14          MR. HARMON:  You have anything?

15          MR. JOHNSTON:  I don't have anything.

16          MR. HARMON:  Just one second, Mr. Reeves, and I'll

17  be almost through.

18              (Short pause)

19          MR. HARMON:  I have nothing further.

20              (The deposition concluded at 12:11 p.m.)

21          * * * * * * * * * *

22          FURTHER DEPONENT SAITH NOT

23          * * * * * * * * * *

24

25

### REPORTER'S CERTIFICATE

STATE OF ALABAMA

AUTAUGA COUNTY

I, Renee W. Marchand, Court Reporter and Commissioner for the State of Alabama at Large, hereby certify that on Thursday, February 3, 2000, I reported the deposition of TIM REEVES, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that pages 4 through 60 contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 15th day of February, 2000.

RENEE W. MARCHAND, Court Reporter Commissioner for the State of Alabama at Large

MY COMMISSION EXPIRES: 7/20/2002

1

### SIGNATURE OF WITNESS

2       I, **TIM REEVES**, hereby certify that I have read the

3   transcript of my deposition consisting of pages 4 through 60,

4   and except for the corrections listed below, certify that it

5   is a true and correct transcription.

6

7

8       _____

9                    **TIM REEVES**

10

11  SWORN TO AND SUBSCRIBED before me

12  this_____ day of_____, 2000.

13  _____
                 NOTARY PUBLIC

14        * * * * * * * * * * *

15

16  Page    Line   Correction and reason therefor

17

18

19

20

21

22

23

24

25