IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIMOTHY JOE REEVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-CV-00542-MHT |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF MATERIAL FACTS FOR
<u>MOTION OF UNITED STATES FOR SUMMARY JUDGMENT</u>

The defendant, United States of America, respectfully submits its Statement of

Material Facts for its Motion for Summary Judgment filed contemporaneously herewith

and represents that there is no genuine issue to be tried with respect to the following

material facts:

1.      On June 8, 2005, the plaintiff, Timothy Joe Reeves, commenced this

action, seeking, *inter alia*, to recover a refund of certain excise taxes, including penalties

and interest, paid by him for the tax periods ended September 30, 1994 through January

31, 1995, September 30, 1995 through January 31, 1996 and September 30, 1996 through

January 31, 1997.  The sum sought to be recovered by Reeves totals $1,500, plus interest

thereon.  <u>See</u> Plaintiff's Complaint; Plaintiff's Amended Complaint.  <u>See also</u> Exhibit

"11," <u>infra</u>, for Administrative Refund Claims filed by Reeves.

2.      On August 23, 2005, the United States filed a counterclaim, seeking a judgment against Mr. Reeves for the remaining unpaid balance of the assessment, totaling $1,967,844, plus interest thereon.  See Government's Answer and Counterclaim.

3.      On January 3, 2006, Reeves filed an Amended Complaint.  See Plaintiff's Amended Complaint.

4.      On January 12, 2006, the United States renewed its original counterclaim previously filed in August, 2005.  See Government's Answer to Plaintiff's Amended Complaint and Counterclaim; ¶ 2, supra.

**GENERAL BACKGROUND OF REEVES' CRIMINAL CASE:**

5.      In the late 1990's, Timothy Joe Reeves and his confederates were indicted and criminally prosecuted for certain non-tax offenses committed by them, among which included operating an illegal gambling business and engaging in money laundering activities in or around Dothan, Alabama.  See United States v. Billy Joe Reeves, et al., Case No. 99-CR-0013-S (M.D. Ala.); Government's Exhibit "A" for Declaration of Charles Niven, at ¶ 3.

6.      Charles Niven, retired First Assistant United States Attorney, was primarily responsible for handling the indictment and criminal prosecution of Reeves and his confederates.  In this respect, Niven was responsible for negotiating, drafting and approving any plea agreements that were entered into with Reeves and/or his confederates and, if pleas were not entered, handling the trial of those persons who declined to plead. Niven's responsibilities also included monitoring any and all matters involving the

2

sentencing of those persons who pled guilty or were convicted.  As part of Niven's duties,

he also was responsible for supervising the Assistant United States Attorneys ("AUSAs"),

including former AUSA Ashton Holmes Ott, who were assigned to assist in the

prosecution of Reeves and/or his confederates.  See Government's Exhibit "A," supra,

at ¶¶ 3 and 17.

7.     Reeves, along with approximately twelve (12) other individuals, operated

an illegal gambling business during the periods covering 1994 through  1997.  See e.g.,

Government's Exhibit "1" for Indictment filed in United States v. Billy Joe Reeves, et al.,

Case No. 99-CR-0013-S (M.D. Ala.), on February 3, 1999, at pp. 1-2.  See also,

Government's Exhibit "A," supra, at ¶ 4.

8.     In February, 1999, a grand jury indicted Reeves and his confederates[1] for

conducting a specified unlawful activity (i.e., illegal gambling business) and engaging in

certain money laundering activities.  The illegal gambling business primarily involved the

receipt of wagers placed on professional and college football games during 1994 through

1997.  See Government's Exhibit "1," supra.  See also, Government's Exhibit "A," supra,

at ¶ 5.

9.     The Indictment charged Reeves with the following 14 counts:

Count I:                          Conspiracy to operate an illegal gambling business
                                  18 U.S.C. §§ 371 and 1955

---

[1]  Some of Reeves' confederates entered guilty pleas while others were tried, some of
whom were convicted and others were acquitted.  See e.g., Government's Exhibit "4," infra.  See
also, Government's Exhibit "A," supra, at ¶ 5, n. 1.

1650747.1

| | | |
|---|---|---|
| **Count II:** | Operation of an illegal gambling business<br>18 U.S.C. § 1955 | |
| **Count III:** | Money Laundering<br>18 U.S.C. § 1956(a)(1)(A)(i) | |
| **Count VI-XV:** | Money Laundering<br>18 U.S.C. § 1956(a)(1)(B)(i) | |
| **Count XVI:** | Conspiracy to launder money<br>18 U.S.C. § 1956(h) | |

See Government's Exhibit "1," supra, at pp. 1-8 and 10-21.  See also, Government's Exhibit "A," supra, at ¶ 6.

10.     The Indictment also alleged that if Reeves was convicted of the money laundering offenses, identified in paragraph 9, above, he would be required to forfeit certain property, among which included any and all property involved in the money laundering offenses or any property traceable to such property.  See Government's Exhibit "1," supra, at pp. 21-22.  See also, Government's Exhibit "A," supra, at ¶ 7.

11.     On October 14, 1999, and after extensive negotiations, Reeves entered into a written Plea Agreement.  See Government's Exhibit "2" for Plea Agreement of Timothy Joe Reeves filed in United States v. Billy Joe Reeves, et al., Case No. 99-CR-0013-S (M.D. Ala.), on October 14, 1999, at pp. 1-3; Government's Exhibit "3" for File-stamped Copy of Plea Agreement of Timothy Joe Reeves.  See also, Government's Exhibit "A," supra, at ¶¶ 8 and 9.

12.     In the Plea Agreement, Reeves agreed, in pertinent part, to plead guilty to one count of money laundering, with the remaining charges in the Indictment being

1650747.1

dismissed against Reeves and his wife, Wendy Ann Smith Reeves.  The United States

Attorney, in turn, agreed to recommend certain reductions in the offense level for

sentencing purposes if certain conditions were met, including full compliance by Reeves

with the terms of the Plea Agreement.  See Government's Exhibit "2," supra, at pp. 1-3.

See also, Government's Exhibit "A," supra, at ¶ 10.

     **13.**     In the Plea Agreement, the parties also agreed to the disposition of certain

properties subject to forfeiture.  Specifically, Reeves agreed to forfeit his interest in the

following properties:  **(1)** cash in the sum of $95,296.87; **(2)** real property at 1073

Malvern Road, including improvements, fixtures and trailers thereon; and **(3)** a 1997

GMC Sierra pick-up truck.  The United States Attorney, in turn, agreed to return the

following properties to Reeves and dismiss the civil forfeiture proceedings pertaining to

such properties:  **(1)** real property at 1075 Malvern Road, including fixtures and

improvements; **(2)** computer equipment; and **(3)** cash in the sum of $14,000.  See

Government's Exhibit "2," supra, at pp. 4-5.  See also, Government's Exhibit "A,"

supra, at ¶ 11.

     **14.**     As part of the Plea Agreement, the United States Attorney also agreed that

he would recommend that no fine be imposed, since Reeves had agreed to the property

forfeitures, identified in paragraph 13, above.  With respect to the charge for which

Reeves pled guilty, a fine could have been imposed in an amount not to exceed

$250,000.  See Government's Exhibit "2," supra, at pp. 2-3 and 9.  See also,

Government's Exhibit "A," supra, at ¶ 12.

1650747.1

**15.**    The Plea Agreement contained the following integration clause in order

that the parties could confirm and acknowledge that their entire agreement was contained

within the "four corners" of the written Plea Agreement:

>    **K.    Scope Of The Agreement**
>
> _____. . . .
>
>        2.    The undersigned attorneys for the Government and for
>    [Reeves] represent to the Court that the foregoing Plea Agreement is the
>    agreement of the parties that has been reached pursuant to the Plea Agreement
>    procedure provided for in Rule 11, Federal Rules of Criminal Procedure, as
>    amended.  It is further understood and agreed that no additional promises,
>    agreements or conditions have been entered into other than those set forth in this
>    agreement, and that this agreement supersedes any earlier or other understanding
>    or agreement.

See Government's Exhibit "2," supra, at pp. 3 and 11, § III(K)(2).  See also,

Government's Exhibit "A," supra, at ¶ 13.

**16.**    On October 14, 1999, Reeves signed the Plea Agreement.  In signing the

Plea Agreement, Reeves expressly acknowledged the following:

>        I have read the foregoing Plea Agreement, consisting of 12 pages,
>    understand the same, and the matters and facts set forth therein accurately and
>    correctly state the representations that have been made to me and accurately set
>    forth the conditions of the Plea Agreement that has been reached.

See Government's Exhibit "2," supra, at p. 12.  See also, Government's Exhibit "A,"

supra, at ¶ 14.

**17.**    When Reeves entered into the Plea Agreement, he did so knowingly and

voluntarily.  See e.g., Government's Exhibit "2," supra, at pp. 8-11, § III(K)(1).  See also,

Government's Exhibit "A," supra, at ¶ 15.

1650747.1

18.     When Reeves negotiated and executed the Plea Agreement, he was represented by counsel, L. Drew Redden, Esquire.  Redden signed the Plea Agreement on October 14, 1999.  See Government's Exhibit "2," supra, at pp. 1, 10 and 12, §§ III(K)(1)(c) and (3).  See also, Government's Exhibit "A," supra, at ¶ 16.

19.     Niven, on behalf of the United States Attorney, approved the Plea Agreement.  As evidence of that approval, the Plea Agreement was signed by Niven and former AUSA Ashton Holmes Ott, on behalf of the United States Attorney, on October 14, 1999.  See Government's Exhibit "2," supra, at pp. 1 and 12.  See also, Government's Exhibit "A," supra, at ¶ 17.

20.     On February 1, 2000, the Court sentenced Reeves to serve a term of imprisonment of 15 months, and upon release from imprisonment, to be placed on supervised release for a term of three years.  After acknowledging the terms of the Plea Agreement, the Court ordered that no fine be imposed.  Reeves, however, was ordered to pay a special assessment of $100.  See Government's Exhibit "4" for Transcript of Sentence Hearings held in United States v. Billy Joe Reeves, et al., Case No. 99-CR-0013-S (M.D. Ala.), on February 1, 2000, at pp. 7, 19 and 25-28; Government's Exhibit "5" for Judgment in a Criminal Case entered in United States v.Timothy Joe Reeves, Case No. 1:99-CR-00013-002, on February 10, 2000.  See also, Government's Exhibit "A," supra, at ¶ 18.

21.     During Reeves' Sentencing Hearing, Redden, Reeves' counsel, discussed the terms of the Plea Agreement, but never once mentioned a purported promise to settle

1650747.1

or compromise Reeves' civil tax liabilities.  Instead, Redden made repeated

representations consistent with the Plea Agreement, that the parties agreed that no fine

would be imposed because of the property forfeitures agreed to by Reeves.  See

Government's Exhibit "4, supra, at pp. 7-8 and 16-19.  See also, Government's Exhibit

"A," supra, at ¶ 19.

**IRS'S DETERMINATION OF REEVES' CIVIL TAX LIABILITIES:**

   **22.**    In July, 2000, the Internal Revenue Service ("IRS") determined and

advised Reeves that he owed excise taxes of $585,876, plus penalties and interest, on

wagers accepted by him in connection with sporting events, primarily professional and

college football games, during certain periods covering 1994 through 1997.  See

Government's Exhibit "6" for IRS Administrative Files for Excise Tax Assessment

against Reeves, at Bate-stamped Nos. IRS002-IRS015.  See also, ¶¶ 23 and 24, infra.

   **23.**    In October, 2004, the IRS proposed to assess income taxes, plus interest

thereon, against Reeves for the tax years 1996 and 1997.  As of October 15, 2004, the

income tax deficiency totaled $219,020, plus interest thereon.  The income tax deficiency

primarily reflects the income taxes due and owing on income arising from the illegal

gambling business conducted by Reeves during 1996 and 1997.  Reeves' income tax

deficiency is currently pending before the United States Tax Court.  See Exhibit "7" for

Petition filed by Timothy Joe Reeves with the United States Tax Court in Reeves v.

Commissioner, Docket No. 24261-04, on December 21, 2004, at p. 2.  See also, ¶ 22,

supra, and ¶ 24, infra.

24.     On October 25 and November 15, 2004, the IRS made the following

assessments of excise taxes, plus penalties and interest, against Reeves:

| Tax Period | Excise Tax | Penalty | Assessed Interest | Total Assessment |
|---|---|---|---|---|
| 9/30/94 | $      23,498 | $      17,623 | $      46,214 | $      87,335 |
| 10/31/94 | 48,562 | 36,422 | 94,179 | 179,163 |
| 11/30/94 | 46,995 | 35,247 | 89,821 | 172,063 |
| 12/31/94 | 48,562 | 36,422 | 91,461 | 176,445 |
| 1/31/95 | 32,896 | 24,673 | 61,476 | 119,045 |
| 9/30/95 | 23,498 | 17,623 | 38,499 | 79,620 |
| 10/31/95 | 48,562 | 36,422 | 78,822 | 163,806 |
| 11/30/95 | 46,995 | 35,247 | 74,622 | 156,864 |
| 12/31/95 | 48,562 | 36,421 | 75,878 | 160,861 |
| 1/31/96 | 32,897 | 24,673 | 50,938 | 108,508 |
| 9/30/96 | 23,498 | 17,623 | 31,825 | 72,946 |
| 10/31/96 | 48,562 | 36,422 | 64,665 | 149,649 |
| 11/30/96 | 46,995 | 35,247 | 61,479 | 143,721 |
| 12/31/96 | 48,562 | 36,422 | 62,397 | 147,381 |
| 1/31/97 | 17,232 | 12,924 | 21,781 | 51,937 |
| **Total** | **$      585,876** | **$      439,411** | **$      944,057** | **$   1,969,344** |

See Exhibit "8" for Certificate of Assessments, Payments and Other Specified Matters,

for Form 730, Tax on Wagering, for Reeves for the tax periods ending September, 1994

through January, 1995, September, 1995 through January, 1996 and September, 1996

through January, 1997.  See also, ¶¶ 22 and 23, supra.

25.     In determining the excise tax assessment, the IRS used the "wagers

accepted per day" method.[2]  See e.g., Government's Exhibit "6," supra, at Bate-stamped

---

[2]  Two methods are commonly used to compute the gross wagers subject to excise tax
when no records of the wagering business are kept.  One is the "wagers accepted per day"
method; the other is the "wagers accepted per game."  See e.g., United States v. Lochamy, 724

1650747.1

Nos. IRS002-IRS015 and IRS173-IRS174.  Specifically, the IRS determined the excise

tax assessment by primarily relying on the following:  **(1)** an FBI report prepared during

the criminal investigation from various court-authorized wire tap communications; **(2)** the

testimony given by Reeves at trial in the criminal proceedings and by deposition in

various civil forfeiture proceedings; and **(3)** court records disclosing information or items

obtained from the execution of search warrants at the residential and/or business premises

of Reeves and his confederates, including gambling paraphernalia (e.g., betting slips, line

sheets and substantial amounts of cash).  See e.g., Government's Exhibit "6," supra, at

Bate-stamped Nos. IRS017-IRS034 and IRS162-238.  See also, ¶¶ 43-47, infra, for

further discussion regarding Reeves' testimony.

26.    The IRS's reliance on the FBI report was necessary because  Reeves had

not kept any books and records with regard to the operations of his illegal gambling

business.  See e.g., Government's Exhibit "6," supra, at Bate-stamped Nos. IRS010 and

IRS014.  See also, Government's Exhibit "12," infra, at p. 1; ¶ 60, infra.

27.    The FBI report determined the daily wager amounts for a seven-day period

(i.e., obtained via court authorized wire tap communications covering a period from

December 27, 1996 through January 2, 1997)  The daily wager amounts, as determined

in the FBI report, did not include any adjustments to reflect increases due to the 10%

---

F.2d 494, 496 (5th Cir. 1984); Heyman v. United States, 497 F.2d 121, 122 (5th Cir. 1974).

1650747.1

"vigorish" or "juice" charged to losing bettors.[3]  See Government's Exhibit "6," supra, at

Bate-stamped Nos. IRS004-IRS005, IRS010-IRS011 and IRS162-IRS174.

28.     The daily wager amounts, as determined by the FBI, were derived from

court-authorized wire tap communications only. The FBI did not include any other

wagers that were evident from documents obtained via search warrants or witnessed

during surveillance.  The FBI excluded the latter wagers in an effort to prevent any

possible duplication of wagers made during the seven-day period.  See Government's

Exhibit "6," supra, at Bate-stamped Nos. IRS162-IRS168.

29.     The seven-day wagering period used by the FBI to determine the daily

wager amounts occurred during the college bowl season.  See Government's Exhibit "6,"

supra, at Bate-stamped No. IRS168.

30.     The IRS determined the wagering amount upon which the excise tax was

imposed, by using the data from the FBI report, and making an adjustment thereto.  See

Section 4401 of the Internal Revenue Code, 26 U.S.C.  The IRS's adjustment was to

increase the daily wager amounts for each of the seven-day period by 10% to reflect the

"vigorish" or "juice" potentially due and owing from a bettor if he lost (i.e., to reflect the

total amount at risk by the bettor).[4]  See Government's Exhibit "6," supra, at Bate-

_____

[3]  The terms "vigorish" and "juice" generally refers to the commission paid by a losing
bettor to a bookie over and above the amount bet.  See e.g., Robinson v. Commissioner, T.C.
Memo 1986-382.

[4]  The increase in the wagering base to reflect the 10% "vigorish" or "juice" component
on the wagers is required pursuant to IRC § 4401(b).  See also, Treas. Reg. § 44.4401-1(b)(2), 26

1650747.1

stamped Nos. IRS010-IRS011 and IRS173-IRS174.

31.     After adjusting the FBI data, as described in paragraph 30, above, the IRS

determined an average of the daily wagering amounts (i.e., $78,325.81), by dividing the

total wagers for the seven-day period by seven.  Next, the IRS multiplied the number of

days in each month at issue by the daily wagering average.  The wagering amount for the

periods September 15, 1994 through January 31, 1995, September 15, 1996 through

January 31, 1996 and September 15, 1996 through January 12, 1997 totaled

approximately $29.3 million.  See Government's Exhibit "6," supra, at Bate-stamped

Nos. IRS003 and IRS173-IRS174.

32.     Applying a 2% excise tax rate to the total wagering amount of $29.3

million, the IRS determined excise taxes due and owing from Reeves in the amount of

$585,876 for the periods covering 1994 through 1997.  See Government's Exhibit "6,"

supra, at Bate-stamped Nos. IRS002-IRS003.  See also, ¶¶ 22 and 24, supra.

33.     The IRS also determined that assessment of a civil fraud penalty was

appropriate under the circumstances.  The fraud penalty totaled $439,411.  See

Government's Exhibit "6," supra, at Bate-stamped Nos. IRS002 and IRS012-IRS015.

34.     Based on the above determination, the IRS made an assessment against

Reeves in  the total amount of $1,969,344, which consists of excise taxes of $585,876,

penalties of $439,411 and interest of $944,057.  See Government's Exhibit "6," supra, at

---

C.F.R.; Robinson, T.C. Memo 1986-382 (Vigorish is included in the wagering base without
regard to whether the bettor ultimately loses or wins).

1650747.1

Bate-stamped No. IRS002.  See also, ¶¶ 22 and 24, supra.

**REEVES' CLAIM THAT PLEA AGREEMENT SETTLED HIS CIVIL TAX LIABILITIES:**

_____**35.**    Reeves claims that the IRS was precluded from assessing excise taxes, including penalties and interest, against him for the periods covering 1994 through 1997 because the Plea Agreement provided for the settlement and compromise of such tax liabilities.  See Plaintiff's Complaint, at ¶ 16, including Exhibit "A" for Affidavit of Ashton Holmes Ott, at ¶ 7; Plaintiff's Amended Complaint, at ¶ 16.  See also, Government's Exhibit "11" for Administrative Refund Claims filed by Reeves; ¶¶ 22-24, supra.

**36.**    The Plea Agreement did not provide for any settlement or compromise of Reeves' civil tax liabilities for the periods covering 1994 through 1997.  Nowhere in the Plea Agreement is such a settlement or compromise ever mentioned.  In fact, the Plea Agreement does not contain any references to a settlement or compromise of ***any*** civil tax liabilities.  See Government's Exhibit "2," supra; Government's Exhibit "A," supra, at ¶ 20.  See also, ¶ 15, supra (integration clause) and ¶¶ 22-24, supra.

**37.**    When Reeves entered into the Plea Agreement on October 14, 1999, the IRS had not made any determinations of what type of taxes (e.g., income, excise, employment), if any, were owed by Reeves in connection with the wagering activities conducted by him during 1994 through 1997 or the amount of taxes, including penalties and interest, that may be due from Reeves for such period.  See ¶¶ 22-34, supra.

**38.**    The IRS had not begun to make any determinations regarding Reeves' civil tax liabilities, until or about July, 2000.  See ¶¶ 22-34, supra.

**39.**    The amount of Reeves' civil tax liabilities was not an element for any of the non-tax criminal offenses for which he was indicted or the offense to which he ultimately pled guilty.  See Government's Exhibits "1" and "2," supra.  See also, Government's Exhibit "A," supra, at ¶ 21.

**40.**    Niven, on behalf of the United States Attorney, participated in the discussions to negotiate the Plea Agreement.  Niven has declared that at no time during the plea discussions did the parties ever discuss a settlement or compromise of Reeves' civil tax liabilities.  Niven also has declared that had such discussions occurred, he would have advised Reeves and his counsel, Redden, that the United States Attorney and/or his delegate did not have the authority to settle or compromise Reeves' civil tax liabilities. See Government's Exhibit "A," supra, at ¶ 22.

**41.**    Niven has declared that he never represented to Reeves and/or his counsel, Redden, that he had any authority to control any actions that the IRS may take in determining, assessing or collecting any tax liabilities due and owing by Reeves for the periods covering 1994 through 1997.  See also, Government's Exhibit "A," supra, at ¶ 23.

**42.**    Although the parties never discussed settlement of Reeves' civil tax liabilities, they did discuss and agree that there would be no further criminal prosecution of Reeves for any tax offenses committed in connection with his illegal wagering activities, based on information and evidence then available to the government.  See ¶ 50,

14

1650747.1

fn. 5, <u>infra</u>, for the definition of the term "offense." On this point, the following

provision was included in the Plea Agreement to reflect the parties' agreement:

> **G.      No Further Prosecution**
>
> The United States further agrees that in return for the defendant's
> compliance with the terms of this agreement there will be no further federal
> criminal prosecution of the defendant in the Middle District of Alabama based on
> the information and evidence now available to the United States regarding the
> defendant's involvement with violations of 18 U.S.C. § 1955, 1956, and 1957 or
> any federal tax provision.

<u>See</u> Government's Exhibit "2," <u>supra</u>, at pp. 3 and 8, § III(G).  <u>See</u> <u>also</u>, Government's

Exhibit "A," <u>supra</u>, at ¶ 24.

### <u>REEVES' CLAIM THAT HIS TESTIMONY IS ENTITLED TO EXCLUSIONARY PROTECTION UNDER THE PLEA AGREEMENT:</u>

    **43.**      Reeves also claims that the Plea Agreement precludes the IRS from

relying on, or using, any prior testimony given by him, at trial or by deposition, in order to

assess any excise taxes, including penalties and interest, against him for the periods

covering 1994 through 1997.  <u>See</u> Plaintiff's Complaint, at ¶¶ 5 and 16, including Exhibit

"A" for Affidavit of Ashton Holmes Ott, at ¶ 8; Plaintiff's Amended Complaint, at ¶¶ 5

and 16.  <u>See</u> <u>also</u>, Government's Exhibits "6" and "11," <u>supra</u>; ¶¶ 22-34, <u>supra</u>.

    **44.**      After entering into the Plea Agreement on October 14, 1999 and pursuant

to its terms, Reeves testified at the trial held in the criminal proceedings, <u>United States v.</u>

<u>Billy Joe Reeves, et al.</u>, 99-CR-0013-S (M.D. Ala.).  During that trial, Reeves offered

substantial testimony with regard to the operations of the illegal gambling business

conducted by him during the periods covering 1994 through 1997.  <u>See</u> Government's

15

1650747.1

Exhibit "6," supra, at Bate-stamped Nos. IRS223-IRS238.  See also, Government's

Exhibit "A," supra, at ¶ 25.

45.    At trial, Reeves testified that he was conducting an illegal gambling

business in Dothan, Alabama as early as 1994.  See Government's Exhibit "6," supra, at

Bate-stamped Nos. IRS223-IRS224 and IRS233-IRS234 (cross-examination).

46.    In addition to the criminal proceedings, discussed in paragraphs 44 and

45, above, various civil forfeiture proceedings were commenced to seek, in pertinent part,

forfeiture of various properties in which certain persons claimed to have an interest.

After Reeves entered into the Plea Agreement and pursuant to its terms, he was deposed

in the civil proceedings and, during such deposition, provided testimony with regard to

the operations of his illegal gambling business.  See Government's Exhibit "6," supra, at

Bate-stamped Nos. IRS176-IRS220.  See also, Government's Exhibit "A," supra, at ¶ 26.

47.    At trial and by deposition, Reeves testified that the "vigorish" or "juice"

typically charged on wagers made by losing bettors was equal to at least 10% of the

wagers made by such bettors.  See Government's Exhibit "6," supra, at Bate-stamped

Nos. IRS210, IRS230 (cross-examination) and IRS236-IRS237.

48.    In negotiating the Plea Agreement, the parties had no discussions that the

Plea Agreement would preclude the IRS and/or the Department of Justice, Tax Division,

from relying on the statements made by Reeves during his trial or deposition testimony

for purposes of determining, assessing or collecting the taxes, plus penalties and interest,

due and owing by him for the wagering activities conducted by him during 1994 through

1650747.1

1997, and/or from admitting such statements against him in the above-captioned civil

proceeding.  See Government's Exhibit "2," supra.  See also, Government's Exhibit "A,"

supra, at ¶ 28; ¶ 15, supra (integration clause).

     **49.**     As part of the Plea Agreement, Reeves agreed to cooperate with the

government and, on this point, the Plea Agreement provided, in pertinent part, the

following:

### C.     Cooperation Agreement

1.     [Reeves] agrees to cooperate fully and testify truthfully against any and all persons as to whom he may have knowledge at grand jury, trial or whenever called upon to do so, with the exception that [he] will not be required to testify against his father, Billy Joe Reeves. . . .

2.     Provided that [Reeves] satisfies the terms of the plea agreement, any information that he truthfully discloses to the government during the course of his cooperation, concerning related offenses, will not be used against him, directly or indirectly.  [Reeves] understands that this agreement does not bar his prosecution for capital felonies, perjury, false statements, and obstruction of justice. ____

3.     If [Reeves] has failed or should fail in any way to fulfill completely his obligations under this agreement, then the government will be released from its commitment to honor all of its obligations to him.  Thus, if at any time he should knowingly and willfully withhold evidence from the government investigators or attorneys prior to or during his testimony before grand juries or in trials, then the government will be free  (1) to prosecute him for perjury, false declaration, false statement, and/or obstruction of justice (18 U.S.C. Section 1621, 1623, 1001, 1503); (2) to prosecute him for all violations of federal criminal law which he has committed; (3) to use against him in all of those prosecutions and sentencings the information and documents that he has himself disclosed or furnished to the government during the course of his cooperation; (4) to recommend a maximum sentence; and (5) to seek forfeiture of any and all forfeitable properties of [Reeves].  The parties agree to submit to the court, to be

decided by a preponderance of the evidence standard, the question of whether [Reeves] has breached this agreement.

See Government's Exhibit "2," supra, at pp. 3 and 5-7, § III(C).  See also, Government's Exhibit "A," supra, at ¶ 29.

    **50.**    The provision of the Plea Agreement, quoted above in paragraph 49, above, does not preclude use of Reeves' trial or deposition testimony by the IRS to determine, assess or collect the civil tax liabilities due and owing by him.  Instead, the provision operates to preclude the United States Attorney from using any of the statements for the purpose of prosecuting Reeves for any "related offenses."  The term "offenses," as used in its ordinary and usual meaning, refers to "criminal offenses."[5]  See also, Government's Exhibit "A," supra, at ¶ 30.

    **51.**    The Plea Agreement also included the following acknowledgment made by Reeves regarding the specific terms governing the inadmissibility of statements made

---

[5]  The term "offense" is defined, as follows:

> A violation of the law; a crime . . . [a]lso termed *criminal offense*. . . .  The terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably.  'Offense' may comprehend every crime and misdemeanor, or may be used in a specific sense as synonymous with 'felony' or with 'misdemeanor,' as the case may be, or as signifying a crime of lesser grade, or an act not indictable, punishable summarily or by the forfeiture of a penalty.

Black's Law Dictionary, (8th ed. 2004).

during plea negotiations:

**K.    Scope Of The Agreement**

1.    [Reeves], before entering a plea of guilty to Count One of the information currently pending against him, advises the Court that:

. . . .

h.    [Reeves] further advises the Court that [Reeves] understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Information herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against [Reeves]. However, [Reeves] does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Information herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by [Reeves] under oath, on the court record, and in the presence of counsel.

See Government's Exhibit "2," supra, at pp. 3 and 11, § III(K)(1)(h). See also, Government's Exhibit "A," supra, at ¶ 31.

52.    The provision of the Plea Agreement, quoted in paragraph 51, above, provides exclusionary protection for only statements that were made "in the course of plea discussions." See Government's Exhibit "A," supra, at ¶ 32.

53.    The Plea Agreement does not provide exclusionary protection for any statements that were made after, or pursuant to, the agreement, such as statements made in cooperation with the government or testifying against co-defendants at trial. See Government's Exhibit "A," supra, at ¶ 33.

54.    Any statements made during Reeves' trial and deposition testimony, as described in paragraphs 44 through 47, above, are not part of plea negotiations and,

1650747.1

therefore, fall outside the exclusionary protection provided for in the Plea Agreement.
See  Government's Exhibit "A," <u>supra</u>, at ¶ 34; ¶ 15, <u>supra</u> (integration clause).

  **55.** The provisions of the Plea Agreement, quoted in paragraphs 49 and 51, above, do not expressly preclude the IRS from relying on, or using, Reeves' trial or deposition testimony to determine, assess or collect Reeves' civil tax liabilities.  <u>See</u> Government's Exhibit "A," <u>supra</u>, at ¶ 35; ¶ 15, <u>supra</u> (integration clause).

  **56.** The provisions of the Plea Agreement, quoted in paragraphs 49 and 51, above, are not unique to Reeves' agreement, but instead are standard provisions that generally were included in all plea agreements that the United States Attorney's Office for the Middle District of Alabama entered into at or around the time that Reeves entered into his Plea Agreement on October 14, 1999.  <u>See</u> Government's Exhibit "A," <u>supra</u>, at ¶ 36.  <u>See</u> <u>also</u>, Government's Exhibit "9" for Plea Agreement of Vivian Welch Bond filed in <u>United States v. Billy Joe Reeves, et al.</u>, Case No. 99-CR-0013-S (M.D. Ala.), on October 14, 1999, at pp. 3-5, § III(C) and pp. 7 and 9, § III(K)(1)(h); Government's Exhibit "10" for Plea Agreement of David Franklin Mims filed in <u>United States v. Billy Joe Reeves, et al.</u>, Case No. 99-CR-0013-S (M.D. Ala.), on October 20, 1999, at pp. 3-5, § III(C) and pp. 7 and 9, § III(K)(1)(h).

**<u>REEVES' CLAIM THAT EXCISE TAX ASSESSMENT IS ERRONEOUS</u>:**

  **57.** Reeves claims that the excise tax assessment that he purportedly settled as part of his Plea Agreement is "erroneous" and/or "grossly overstated."  See Plaintiff's Complaint, at ¶14; Plaintiff's Amended Complaint, at ¶ 14.

20

58.     In support of Reeves' contention that the excise tax assessment is "erroneous" and/or "grossly overstated," he offers a report prepared by his expert, David W. Parsons, CPA.  See Government's Exhibit "12" for Report prepared by Reeves' Expert, David W. Parsons, CPA, entitled "Excise Tax Calculation" - Tim Reeves for Specific Tax Periods 2004, 2005, 2006 and 2007 [*sic*] and dated January 30, 2006.

59.     In Parsons' report, he claims that Reeves' excise tax liability (excluding penalties and interest) totals $158,938.16.  See Government's Exhibit "12," supra, at Letter dated January 30, 2006.

60.     Parsons acknowledges that Reeves did not maintain any books and records for his illegal gambling operations conducted during the periods covering 1994 through 1997.  See Government's Exhibit "12," supra, at p. 1.  See also, ¶ 26, supra.

61.     In preparing his report, Parsons advises that he primarily relied on:  **(1)** the oral representations of Reeves and Ronald Lynn Cherry, the person in charge of managing Reeves' illegal gambling operations during the periods covering 1994 through 1997; and **(2)** an unqualified analysis performed by Cherry of some, but not all, of the court authorized wire tap communications that occurred during the period covering December 27, 1996 through January 12, 1997.  See Government's Exhibit "12," supra, at pp. 1-5 and Appendix "C" for Affidavit of Ronald Lynn Cherry dated January 30, 2006, at ¶¶ 2, 4  and 5.

1650747.1

**62.**    On November 2, 1999 in <u>United States v. Billy Joe Reeves, et al.</u>, Case No. 99-CR-0013-S (M.D. Ala.), Cherry was found guilty of the following offenses: **(1)** conspiracy to operate an illegal gambling business; **(2)** operation of an illegal gambling business; **(3)** money laundering; and **(4)** conspiracy to commit money laundering.  The above offenses were committed in connection with the illegal gambling business operated by Reeves during the periods covering 1994 through 1997.  <u>See</u> Government's Exhibit "13" for Judgment in a Criminal Case entered in <u>United States v. Ronald Lynn Cherry</u>, Case No. 1:99-CR-00013-004, on February 10, 2000.

**63.**    In arriving at an estimate of Reeves' excise tax liability, Parsons used the "wagers accepted per day" method based on information provided by Reeves and Cherry. <u>See</u> Government's Exhibit "12," <u>supra</u>, at pp. 1-5 and Appendix "C;" ¶ 61, <u>supra</u>.

**64.**    Parsons' report does not take into account any wagers accepted on pre-season and regular season football games that occurred prior to September 15th of each football season.  <u>See</u> Government's Exhibit "12," <u>supra</u>, at pp. 6-10.

**65.**    On page 5 of Parsons' report, he refers to certain wagers classified as "Other" under the Avg. Daily Bet column and indicates that the amounts of such "Other" wagers are $3,187, $3,346 and $3,514 for the football seasons for 1994-1995, 1995-1996 and 1996-1997.  <u>See</u> Government's Exhibit "12," <u>supra</u>, at p. 5.  However, his chart calculating Reeves' excise tax liability, at pages 6 through 10, does not include such "Other" amounts.  <u>See</u> Government's Exhibit "12," <u>supra</u>, at pp. 6-10.

1650747.1

66. Parsons relies solely on Cherry's "best judgment" to conclude that "[t]he gross wagers accepted by [t]he Operation have been estimated to have increased at an average rate of 5% per year from 1994 football season to the 1996 football season." See Government's Exhibit "12," supra, at pp. 2 and 5 and Appendix "C," at ¶ 9.

67. Parsons' relies on Cherry's "unqualified" analysis of certain court authorized wire tap communications for the days including January 4, 5 and 12, 1997. See Government's Exhibit "12," supra, at pp. 2-4 and Appendix "C," at ¶¶ 4-5.

68. In arriving at a wagering base, Parsons includes an adjustment for vigorish, but only computes the adjustment based on 50% of the wagers that he claims to represent the amount of the wagers made by losing bettors during 1994 through 1997. See Government's Exhibit "12," supra, at p. 4 and Appendix "C," at ¶ 8. However, for excise tax purposes, the vigorish/juice is computed based on wagers made by all bettors, whether they lose or win. See ¶ 30, n. 4, supra.

69. Cherry's affidavit, which Parsons relied on significantly in order to prepare his report, was executed on January 30, 2006 and was prepared for the sole purpose to contest the IRS assessment at issue in this action. See Government's Exhibit "12," supra, at Appendix "C," at ¶ 10.

**"EXCISE TAX" ESTIMATE BY GOVERNMENT'S EXPERT:**

70. After this litigation commenced, the government retained an expert, George Ignatin, Ph.D., to opine on the excise tax liability (excluding penalties and interest) due and owing from Reeves for the periods covering 1994 though 1997. See

23

Government's Exhibit "14" for Report prepared by Government's Expert, George Ignatin, Ph.D., dated February 28, 2006.

**71.**     Dr. Ignatin arrived at his estimate by using the "wagers accepted per game" method.  <u>See</u> Government's Exhibit "14," <u>supra</u>, at pp. 1-3.  <u>See also</u>, ¶ 25, n. 2, <u>supra</u>.

**72.**     Applying the method, identified in paragraph 71, above, Dr. Ignatin estimated that the excise tax liability (excluding penalties and interest) due and owing from Reeves for the periods covering 1994 through 1997 would total approximately $499,360.  <u>See</u> Government's Exhibit "14," <u>supra</u>, at pp. 1-3.

**<u>REEVES' OTHER MISCELLANEOUS CLAIMS</u>:**

**73.**     Reeves claims that the assessment of excise taxes, including civil fraud penalties and interest, subjects him to an excessive fine in violation of the Eighth Amendment to the United States Constitution.  <u>See</u> Plaintiff's Amended Complaint, at ¶ 18.

**74.**     Reeves also claims that the assessment of excise taxes, including civil fraud penalties and interest, constitutes multiple punishments proscribed by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.  <u>See</u> Plaintiff's Amended Complaint, at ¶ 18.

**75.**     In support of Reeves' constitutional claims, identified in paragraphs 73 and 74, above, he relies on the following provision in the Plea Agreement:  "The United States further agrees that, based upon the substantial forfeitures made pursuant to this

1650747.1

agreement, there should be no fine imposed." <u>See</u> Plaintiff's Amended Complaint, at

¶ 18.  <u>See</u> <u>also</u>, Government's Exhibit "2," <u>supra</u>, at pp. 2-3, § I(B).

    **76.**    In Reeves' Complaint, he also seeks declaratory and injunctive relief in an

effort to preclude the IRS from collecting the excise taxes, plus penalties and interest,

assessed against Reeves for the periods covering 1994 through 1997.  <u>See</u> Plaintiff's

Complaint, at ¶¶ 11-12; Plaintiff's Amended Complaint, at ¶¶ 11-12

    Dated this 5th day of May, 2006.


LEURA GARRETT CANARY
United States Attorney


s/ Lynne M. Murphy
LYNNE M. MURPHY
Trial Attorney, Tax Division
La. Bar No. 20465
D.C. Bar No. 485928
U.S. Department of Justice
P.O. Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone:    (202) 514-5881
Facsimile:    (202) 514-9868
E-mail:    Lynne.M.Murphy@usdoj.gov

1650747.1