# GOVERNMENT EXHIBIT "1"

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

FEB

CLERK
U S DISTRICT COURT
MIDDLE DIST OF ALA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) CR NO $99-13-S$ |
| v | ) [18 USC 1955, |
| | ) 18 USC 371; |
| BILLY JOE REEVES, | ) 18 USC 1956(a)(1)(A)(i), |
| TIMOTHY JOE REEVES, | ) 18 USC 1956(a)(1)(B)(i), |
| WENDY ANN SMITH REEVES, | ) 18 USC 1956(h)] |
| RONALD LYNN CHERRY, | ) |
| VIVIAN WELCH BOND, | ) |
| LARRY JOE COBB, | ) |
| DAVID FRANKLIN MIMS, | ) |
| BENJAMIN MILLS HORNSBY, | ) |
| MILTON K PHILLIPS, | ) |
| BILLY JOE ADAMS, | ) |
| JERRY O'NIEL SIMS, | ) |
| VIRGIL LEE SELLERS, | ) |
| RONALD BENEFIELD, | ) |
| TERRY DOUGLAS JOHNSON, and | ) |
| MYRON BROWN | ) INDICTMENT |

The Grand Jury charges

## COUNT I

From on or about a time in 1994, the exact date being
unknown to the grand jury, and continuously thereafter up to and
including January 12, 1997, in the Middle District of Alabama,
and elsewhere, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES,
WENDY ANN SMITH REEVES,
RONALD LYNN CHERRY,
VIVIAN WELCH BOND,
LARRY JOE COBB,
DAVID FRANKLIN MIMS,
BENJAMIN MILLS HORNSBY,
MILTON K PHILLIPS,



GOVERNMENT
EXHIBIT
1

BILLY JOE ADAMS,
JERRY O'NIEL SIMS,
VIRGIL LEE SELLERS,
RONALD BENEFIELD,
TERRY DOUGLAS JOHNSON, and
MYRON BROWN,

did willfully and knowingly combine, conspire, confederate, and

agree together, with each other and various other persons both

known and unknown to the grand jury, to commit the following

offense against the United States

to willfully conduct, finance, manage, supervise, direct and

own all or part of an illegal gambling business as defined

in Title 18, United States Code, Section 1955(b) and (c),

that is a gambling business in violation of the laws of the

State of Alabama, Section 13A-12-22, Code of Alabama, 1975,

and involving five or more persons who conducted, financed,

managed, supervised, directed and owned all or a part

thereof, and which remained in substantially continuous

operation for a period in excess of thirty days and which

had a gross revenue of $2,000 in any single day, all in

violation of Title 18, United States Code, Section 1955(a)

### Overt Acts

In furtherance of the conspiracy and to effect the objects

thereof, one or more of the defendants and co-conspirators

2

performed the following overt acts, among others

    1   On or about the 6th day of December, 1994, John Thomas Starling paid gambling debts totaling $3710 00 to the REEVES' gambling organization   This payment was in the form of three checks, two payable to RONNIE CHERRY, one payable to TIM REEVES, all deposited into account number ▮▮▮▮▮▮ at the First Bank of Dothan, an account assigned to Hunt's Restaurant, which designates BILLY JOE REEVES and TIMOTHY JOE REEVES as signatories thereon

    2.  On or about the 16th day of February, 1995, Lalit Desai paid gambling debts totaling $3000 00 to the REEVES' gambling organization   This payment was in the form of two checks, made payable to RONNIE CHERRY and which were deposited in account number ▮▮▮▮▮▮ at the First Bank of Dothan, an account assigned to TIMOTHY JOE REEVES, which designates TIMOTHY JOE REEVES as signatory thereon

    3   On or about the 25th day of May, 1995, Raymond Leppla paid gambling debts totaling $180 to the REEVES' gambling organization   This payment was made in the form of a check made payable to MYRON BROWN and deposited in account number ▮▮▮▮▮▮ at the First Bank of Dothan, an account assigned to TIMOTHY JOE REEVES, which designates TIMOTHY JOE REEVES as signatory thereon

4   On or about the 5th day of February, 1996, Lalit Desai paid gambling debts totaling $3000 00 to the REEVES' gambling organization   This payment was in the form of one check made payable to RONNIE CHERRY and deposited into account number ████ ████ at the First Bank of Dothan, an account assigned to BILLY JOE REEVES, which designates BILLY JOE REEVES as the signatory thereon

5   On or about the 5th day of November, 1996, Chris Wilken paid gambling debts totaling $1470 00 to the REEVES' gambling organization   This payment was in the form of a check made payable to MILTON PHILLIPS and was deposited into account number ████████ at SouthTrust Bank, an account assigned to BILLY JOE REEVES, which designates BILLY JOE REEVES as the signatory thereon

6 - 13   On or about the following dates VIVIAN WELCH BOND and TERRY DOUGLAS JOHNSON, in conjunction with BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY ANN SMITH REEVES, RONALD LYNN CHERRY, LARRY JOE COBB, and DAVID FRANKLIN MIMS, operated an illegal bookmaking operation from VIVIAN WELCH BOND's home located at 3221 South State Highway 109, Dothan, Alabama

     6   December 27, 1996

     7   December 28, 1996

4

8    December 29, 1996

9.    December 30, 1996

10    December 31, 1996'

11    January 1, 1997

12    January 2, 1997

13    January 4, 1997

14 - 23  On or about the following dates RONALD LYNN CHERRY,
DAVID FRANKLIN MIMS, and LARRY JOE COBB, in conjunction with
BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY ANN SMITH REEVES,
BENJAMIN MILLS HORNSBY, VIVIAN WELCH BOND, BILLY JOE ADAMS, JERRY
O'NIEL SIMS, VIRGIL LEE SELLERS, RONALD BENEFIELD and MYRON
BROWN, operated an illegal bookmaking operation from a trailer
located at 1073 Malvern Road, Dothan, Alabama

14.    December 27, 1996

15    December 28, 1996

16.    December 29, 1996

17    December 30, 1996

18.    December 31, 1996

19    January 1, 1997

20    January 2, 1997

21    January 4, 1997

22    January 5, 1997

5

23    January 6, 1997

All in violation of Title 18, United States Code, Section 371

## COUNT II

From on or about a time in 1994, the exact date being unknown to the grand jury, and continuously thereafter during the football seasons of each year up to and including January 12, 1997, in the Middle District of Alabama, and elsewhere, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES,
WENDY ANN SMITH REEVES,
RONALD LYNN CHERRY,
VIVIAN WELCH BOND,
LARRY JOE COBB,
DAVID FRANKLIN MIMS,
BENJAMIN MILLS HORNSBY,
MILTON K PHILLIPS,
BILLY JOE ADAMS,
JERRY O'NIEL SIMS,
VIRGIL LEE SELLERS,
RONALD BENEFIELD,
TERRY DOUGLAS JOHNSON, and
MYRON BROWN,

and other persons whose names are known and unknown to the grand jury, unlawfully, willfully and knowingly did conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business, said illegal gambling business involving bookmaking for a gambling operation accepting and making wagers on sporting events in violation of Section 13A-12-22, Code of

6

Alabama, 1975, said illegal gambling business involved five or more persons who conducted, financed, managed, supervised, directed and owned all or a part thereof, and which gambling business remained in substantially continuous operation for a period in excess of thirty days and which had a gross revenue of $2,000 in any single day, all in violation of Title 18, United States Code, Section 1955

COUNT III

On or about the 20th day of December 1996, in the Middle District of Alabama and elsewhere, the defendants,

TIMOTHY JOE REEVES and<br>RONALD LYNN CHERRY,

aided and abetted by others, both known and unknown to the grand jury, did knowingly conduct, attempt to conduct, and cause to be conducted, financial transactions affecting interstate commerce, to wit the purchasing of cashiers checks 015503 and 015504 drawn on First Bank of Dothan, using the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, with the intent to promote the carrying on of such specified unlawful activity, all in violation of Title 18, United States Code,

Section 1956(a)(1)(A)(ı)

## COUNT IV

On or about 7th day of January, 1997, in the Middle District of Alabama, the defendant,

### BILLY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, depositing monetary instruments into account number 02-004-85 at the First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $3650 00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(ı)

## COUNT V

On or about the 5th day of November, 1996, in the Middle District of Alabama, the defendants,

BILLY JOE REEVES and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, depositing monetary instruments into account number ▮▮▮▮ ▮▮▮▮ at SouthTrust Bank, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $6070 00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

## COUNT VI

On or about the 27th day of November, 1996, in the Middle
District of Alabama, the defendants,

### BILLY JOE REEVES and
### TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a
financial transaction affecting interstate and foreign commerce,
to wit, depositing monetary instruments into account number ███
███ at SouthTrust Bank, a bank involved in interstate and
foreign commerce, which involved the proceeds of a specified
unlawful activity, that is conspiracy to operate and the
operation of an illegal gambling organization, in violation of
Title 18, United States Code, Sections 371 and 1955, knowing that
the transaction was designed in whole and in part to conceal and
disguise the nature and source of the proceeds of said specified
unlawful activity and that while conducting and attempting to
conduct such financial transaction knew that the property
involved in the financial transaction, that is monetary
instruments in the amount of $5700.00 representing the proceeds
of some form of unlawful activity, all in violation of Title 18,
United States Code, Sections 1956(a)(1)(B)(i)

## COUNT VII

On or about the 16th day of February, 1995, in the Middle District of Alabama, the defendants,

TIMOTHY JOE REEVES and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, depositing monetary instruments into account number ████ ████ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $3000.00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

11

## COUNT VIII

On or about the 27th day of February, 1995, in the Middle District of Alabama, the defendants,

TIMOTHY JOE REEVES and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, depositing a monetary instrument into account number ▮▮▮ ▮▮▮ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $1015 00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

12

## COUNT IX

On or about the 25th day of May, 1995, in the Middle District of Alabama, the defendant,

### TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, depositing a monetary instrument into account number ████ ████ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $180 00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

13

<u>COUNT X</u>

On or about the 8th day of October, 1996, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ██████ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $7220 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

14

<u>COUNT XI</u>

On or about the 7th day of November, 1996, in the Middle District of Alabama, the defendants,

**BILLY JOE REEVES and**
**TIMOTHY JOE REEVES,**

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, endorsing and depositing monetary instruments into account number ████████ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $4260 00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

## COUNT XII

On or about the 21st day of November, 1996, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ▇▇▇▇▇▇ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $3400 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

16

<u>COUNT XIII</u>

On or about the 9th day of December, 1996, in the Middle District of Alabama, the defendants,

**BILLY JOE REEVES and**
**TIMOTHY JOE REEVES,**

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, endorsing and depositing monetary instruments into account number ▉▉▉▉▉ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $2906 50 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

## COUNT XIV

On or about the 19th day of December, 1996, in the Middle District of Alabama, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, endorsing and depositing monetary instruments into account number ███████ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $1390 00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

## COUNT XV

On or about the 9th day of January, 1997, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES and
TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ████████ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $3050 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

## COUNT XVI

From an unknown date, but commencing at least as early as the 6th day of December, 1994, and continuing up to on or about the 20th day of December, 1996, in the Middle District of Alabama and elsewhere, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

did knowingly and willfully combine, conspire, and confederate with each other and with divers other persons, known and unknown to the grand jury, to knowingly conduct, attempt to conduct, and cause to be conducted, financial transactions affecting interstate commerce, to wit  purchasing cashiers checks from First Bank of Dothan, a bank involved in interstate and foreign commerce, and money orders from the United States Postal Service, using the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, with the intent to promote the carrying on of the specified unlawful activity, and depositing monetary instruments into bank accounts at First Bank of Dothan and SouthTrust Bank, both being banks involved in interstate commerce, such monetary instruments being the proceeds of a

20

specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, with the intent to conceal and disguise the nature and source of such funds, all in violation of Title 18, United States Code, Section 1956(h)

### FORFEITURE ALLEGATION

1    Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant who is convicted of the offense set forth in Counts III through XVI shall forfeit to the United States the following property

a    All right, title, and interest in any and all property involved in these money laundering offenses in violation of Title 18, United States Code, Section 1956, and all property traceable to such property, including but not limited to the following  1) all money or other property that was the subject of each financial transaction that the defendant(s) conspired to conduct in violation of Section 1956(a)(1) and (h), 2) all commissions, fees and other property obtained as a result of those violations, and 3) all property used in any manner or part to commit or to facilitate the commission of those violations

b    A sum of money equal to the total amount of money the

21

defendant(s) conspired to launder    If more than one defendant is

convicted of the offense, the defendants so convicted are jointly

and severally liable for the amount involved in such offense

c    Account number ████████ at First Bank of Dothan in the

name of Hunt's Restaurant and Oyster Bar, Inc

2    Pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 18, United States Code, Section

982(b), each defendant shall forfeit substitute property, up to

the value of the amount described in paragraph 1, if, by any act

or omission of the defendant, the property described in paragraph

1, or any portion thereof, cannot be located upon the exercise of

due diligence, has been transferred, sold to or deposited with a

third party, has been placed beyond the jurisdiction of the

court, has been substantially diminished in value, or has been

commingled with other property which cannot be divided without

difficulty

A TRUE BILL

_Carolyn K Summons_
Foreperson

_William Pitt_
REDDING PITT
United States Attorney

_Ashton Holmes_
ASHTON HOLMES
Assistant United States Attorney

22

# GOVERNMENT
# EXHIBIT "2"

# Exhibit A

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v | ) | CR  NO  99-13-S |
| | ) | |
| TIMOTHY  JOE  REEVES | ) | |

## PLEA AGREEMENT

DEFENSE COUNSEL              DREW REDDEN

ASSISTANT U S  ATTORNEY          ASHTON HOLMES

## COUNT AND STATUTES CHARGED

| | | |
|---|---|---|
| Count I | 18 U S C  §§ 371 and 1955 |
| | Conspiracy to operate an illegal gambling business |
| Count II | 18 U S C  § 1955 |
| | Operation of an illegal gambling business |
| Count III | 18 U S C  § 1956 (a)(1)(A)(i) |
| | Money Laundering |
| Counts IV-XV | 18 U S C  § 1956 (a)(1)(B)(i) |
| | Money Laundering |
| Count XVI | 18 U S C  § 1956 (h) |
| | Conspiracy to launder money |

## COUNT PLEADING PURSUANT TO PLEA AGREEMENT

Count I of an information    18 U S C  § 1957
Engaging in a monetary transaction in property derived
from specified unlawful activity

1


GOVERNMENT
EXHIBIT
2

## MAXIMUM PENALTY

IMPRISONMENT OF NOT MORE THAN TEN (10) YEARS OR A FINE OF NOT MORE THAN $250,000, OR BOTH, AND NOT MORE THAN THREE (3) YEARS OF SUPERVISED RELEASE, PLUS A $100 00 ASSESSMENT FEE

## ELEMENTS OF THE OFFENSE

18 U S C § 1957
1    That the defendant engaged in a monetary transaction in criminally derived property that is of a value greater than $10,000,
2    That such transaction involved property derived from a specified unlawful activity, and
3    That the defendant knew that such property was derived from such specified unlawful activity

## I    SPECIAL PROVISIONS

A   The government will recommend a three-level reduction of the offense level for acceptance of responsibility pursuant to § 3E1 1 of the United States Sentencing Guidelines

B   The defendant agrees to cooperate with the government under the conditions set forth below and, if the government, in its sole discretion, concludes that the defendant has fully complied with the terms of the cooperation agreement and has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the government agrees to make a recommendation to the Court that the defendant receive an additional two-level reduction of the offense level pursuant to § 5k1 1 of the United States Sentencing Guidelines, and that a sentence of 15 months is appropriate   The United Sates will dismiss the indictment currently pending against Timothy Joe Reeves and Wendy Ann Smith Reeves   The United States further agrees that, based upon the substantial forfeitures made

2

pursuant to this agreement, there should be no fine imposed   This agreement is entered into pursuant to the provisions of Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure

C   The defendant agrees with the representations made in the government's factual basis statements

* * * * * * * * * * * * * * * * * * * * * * * * *

## II.   INTRODUCTION

A   Ashton Holmes, Assistant United States Attorney, and Drew Redden, attorney for the defendant, pursuant to the provisions of Rule 11, Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the indictment herein and a plea agreement has been reached by said parties as set forth below

## III   AGREEMENT OF THE PARTIES

The government and the defendant agree to the following

A   Sentencing Guidelines

The government and the defendant agree that the provisions of the Federal Sentencing Guidelines apply and control the sentence in this case

B   Acceptance of Responsibility

1   The United States agrees to recommend that the Court find that the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his

3

criminal conduct, and in recognition thereof, in accordance with U S S G § 3E1 1(a), reduce the defendant's offense level by three levels   The defendant understands that these assertions are not binding on the Court

2   The United States will move the Court, at the time of sentencing, for a two-level downward departure, provided that the defendant fulfils his obligation to provide certain information and assistance   In addition, the United States reserves the right to respond to factual or legal questions from the Court and to rebut or clarify matters raised by the defendant in mitigation of defendant's sentence or contained in the presentence report, if the United States deems the same to be inaccurate or misleading

3   The Defendant agrees to forfeit his interest in the following property

(1)   Ninety-four Thousand Two Hundred Ninety-six Dollars and Eighty-seven Cents ($94,296 87) from Hunt's Seafood Operating Account Number         Additional money in said account to be retained by the Defendant

(2)   The real property at 1073 Malvern Road, Dothan, AL and all improvements, fixtures and trailers thereon Reference Civil Action Number 97-T-64-S

(3)   One 1997 GMC Sierra Pick-Up Truck   Reference Civil Action Numbers 98-C-335-S,98-D-570-S

(4)   One Thousand Dollars($1,000 00) seized on January 12, 1997   Reference Civil Action Number 98-C-332-S

4

        b    The United States agrees to return the following
property to the defendant and to dismiss the referenced civil
forfeiture cases

            (1)    The real property at 1075 Malvern Road,
Dothan, AL and all fixtures and improvements thereon    Reference
Civil Action Number 97-T-64-S

            (2)    Miscellaneous Computer Equipment seized at
1075 Malvern Road, Dothan, AL    Reference Civil Action Number 98-
M-333-S

            (3)    Fourteen Thousand Dollars($14,000 00) of the
One Hundred Ninety-Seven Thousand Dollars($197,000 00) seized in
Civil Forfeiture Actions numbered 98-T-336-S and 98-t-571-S

        c    The defendant further agrees to testify truthfully
and completely at any subsequent criminal and civil forfeiture
action related in any manner to this criminal case

        C  Cooperation Agreement

            1  The defendant agrees to cooperate fully and testify truthfully against
any and all persons as to whom he may have knowledge at grand jury, trial, or whenever
called upon to do so, with the exception that the defendant will not be required to testify
against his father, Billy Joe Reeves  The defendant understands that this agreement does not
require him to implicate any other particular individual or individuals nor to "make a case,"
rather it requires him to be truthful and to testify truthfully whenever called upon  The
defendant agrees to make himself available for the review of documents and other materials
and for interviews by law enforcement officers and attorneys for the government upon

                                5

reasonable request and to fully and truthfully respond to all questions asked of him by law enforcement officers and attorneys for the government   He agrees to fully and truthfully disclose to the government everything he knows about any and all documents and materials in his possession that relate to violations of federal gaming laws and any other criminal violations in the Middle District of Alabama and elsewhere   The defendant agrees to submit to a polygraph examination conducted by the government if requested to do so

       2   Provided that the defendant satisfies the terms of this plea agreement, any information that he truthfully discloses to the government during the course of his cooperation, concerning related offenses, will not be used against him, directly or indirectly The defendant understands that this agreement does not bar his prosecution for capital felonies, *perjury, false statements, and obstruction of justice*

       3   If the defendant has failed or should fail in any way to fulfill completely his obligations under this agreement, then the government will be released from its commitment to honor all of its obligations to him   Thus, if at any time he should knowingly and willfully withhold evidence from the government investigators or attorneys prior to or during his testimony before grand juries or in trials, then the government will be free (1) to prosecute him for perjury, false declaration, false statement, and/or obstruction of justice (18 U S C  Section 1621, 1623, 1001, 1503), (2) to prosecute him for all violations of federal criminal law which he has committed, (3) to use against him in all of those prosecutions and sentencings the information and documents that he has himself disclosed or furnished to the government during the course of his cooperation   (4) to recommend a maximum sentence, and (5) to seek forfeiture of any and all forfeitable properties of the defendant   The parties

6

agree to submit to the court, to be decided by a preponderance of the evidence standard, the question of whether defendant has breached this agreement

### D  Acknowledgment And Waiver Of Rights/Understanding Of Maximum Penalties

The defendant agrees that he has been fully advised of his statutory and constitutional rights herein, and that he has been informed of the charges and allegations against him and the penalties therefor, and that he understands same  The defendant further agrees that he understands that by entering a plea of guilty as set forth hereafter, he will be waiving certain statutory and constitutional rights to which he is otherwise entitled

### E  Application of Sentencing Guidelines

The United States and the defendant,  agree  that the base offense level upon which the defendant's sentence should be initially calculated, pursuant to U S S G  § 2S2 1 is 19

### F  Substantial Assistance To Authorities

If the government, in its sole discretion, concludes that the defendant has fully complied with the terms of the cooperation agreement and, in its sole discretion, determines that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense,  the United States agrees to file a motion under U S S G  § 5K1 1 recommending a two-level departure from the guidelines  The defendant understands that the United States retains sole discretion to file such a motion and that the final decision on the amount of the departure, if any, rests within the sole discretion of the Court

*1*

G  No Further Prosecution

The United States further agrees that in return for the defendant's compliance with the terms of this agreement there will be no further federal criminal prosecution of the defendant in the Middle District of Alabama based on the information and evidence now available to the United States regarding the defendant's involvement with violations of 18 USC § 1955, 1956, and 1957 or any federal tax provision

H  Basis For Plea Of Guilty

The defendant agrees that the Stipulation of Facts constituting the basis for the defendant's guilty plea in this case, appended hereto and incorporated herein by this reference, is a true and accurate statement of the defendant's actions or omissions with regard to the charges to which he is entering a plea and that the Court may rely thereon in determining the basis for the defendant's plea of guilty as provided for in his plea agreement

I  Potential Postponement of Sentence

Defendant understands and agrees that sentencing may be delayed until the cooperation phase has been completed

J  Payment of Special Assessment

The defendant agrees to remit to the Clerk of Court for the Middle District of Alabama a certified or cashier's check payable to the Clerk of Court in the amount of $100 00, in full satisfaction of the statutory costs pursuant to 18 U S C § 1957, and to remit said sum with this signed agreement in full satisfaction of this paragraph

K  Scope Of The Agreement

1  The defendant, before entering a plea of guilty to Count One of the

8

information currently pending against him, advises the Court that

a    The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent

b    The defendant understands the nature of the charge to which the plea is offered in Count One of the Information, that the defendant did commit an offense against the United States, that is to say, violations of Title 18, United States Code, Section 1957    That the defendant understands that the penalty provided by law for violation of Count One of the Information is a fine of not more than $250,0000 or imprisonment for not more than 10 years, or both, and a term of not more than three years supervised release, in addition to a *Special Assessment of $100 pursuant to Title 18, United States Code, Section 3013*, said assessment to be paid by the defendant on the date of sentencing    The defendant understands that if a fine is imposed by the Court at sentencing, the defendant shall meet with a member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense    The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief and agrees to make an honest, good faith effort to pay the said fine as directed by the Financial Litigation Section of the United States Attorney's Office    The defendant further understands that the nature of the charge to which the plea is offered involves proof as to Count One of the Information, that the defendant did during December 1996, in the Middle District of Alabama  knowingly engage in a monetary

9

transaction in violation of Title 18, United States Code, Section 1957

      c   The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney

      d   The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court

      e   The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful

      f   Defendant further understands and advises the Court that the plea agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement   The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the

10

attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge and consent

g    The defendant further advises the Court that it is understood that the Government can only make a recommendation which is not binding on the Court, and that the defendant understands that after the entry of the guilty plea, the defendant has no absolute right to withdraw the plea

h    The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Information herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant   However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Information herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel

2    The undersigned attorneys for the Government and for the defendant represent to the Court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11, Federal Rules of Criminal Procedure, as amended   It is further understood and agreed that no additional promises  agreements or conditions have been entered into other than those set forth in this agreement  and that this agreement supersedes any earlier or other understanding or agreement

11

3  The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein, of the maximum possible penalty provided by law, that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant, and that if the defendant pleads guilty, there will not be a further trial of any kind   Further the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful

Dated this ____ day of October, 1999

REDDING PITT
UNITED STATES ATTORNEY


DREW REDDEN
Attorney for Defendant

CHARLES NIVEN
First Assistant United States Attorney


ASHTON HOLMES
Assistant United States Attorney

12

I have read the foregoing Plea Agreement, consisting of 12 pages, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached

TIMOTHY JOE REEVES
Defendant

Date

guilty and to be tried by a jury on all issues herein, of the maximum possible penalty provided

by law, that by the entering of a plea of guilty as aforesaid, the defendant waives the right to

be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses

against the defendant and the right not to be compelled to incriminate the defendant, and that if

the defendant pleads guilty, there will not be a further trial of any kind   Further the defendant

has been advised that if the defendant pleads guilty, the Court may ask questions about the

offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn,

that the answers to such questions may not be used against the defendant in a civil or criminal

proceeding, but that the defendant's answers may later be used against the defendant in a

prosecution for perjury or false statement if the answers are not truthful

Dated this _14th_ day of October, 1999

REDDING PITT
UNITED STATES ATTORNEY


DREW REDDEN
Attorney for Defendant

CHARLES NIVEN
First Assistant United States Attorney


ASHTON HOLMES
Assistant United States Attorney


I have read the foregoing Plea Agreement, consisting of 12 pages  understand

12

the same, and the matters and facts set forth therein accurately and correctly state the

representations that have been made to me and accurately set forth the conditions of the Plea

Agreement that has been reached

TIMOTHY JOE REEVES
Defendant

Date

# FACTUAL BASIS FOR PLEA

That in December 1996 the defendant did engage in a monetary transaction in criminally derived property that is of a value greater than $10,000, that is the purchase of a 1997 GMAC truck with proceeds derived from an illegal gambling business as defined in Title 18, United States Code, Section 1955(b) and (c), that is a gambling business in violation of the laws of the State of Alabama, Section 13A-12-22, Code of Alabama, 1975, and involving five or more persons who conducted, financed, managed, supervised, directed and owned all or a part thereof, and which remained in substantially continuous operation for a period in excess of thirty days and which had a gross revenue of $2,000 in any single day

# GOVERNMENT EXHIBIT "3"

[ F I L E D

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

OCT 1 4 1999

CLERK
U S DISTRICT COURT
MIDDLE DIST OF ALA

UNITED STATES OF AMERICA,    )
                             )
        v                    )    CR. NO. 99-13-S
                             )
TIMOTHY JOE REEVES           )

## PLEA AGREEMENT

DEFENSE COUNSEL              DREW REDDEN


ASSISTANT U S ATTORNEY      ASHTON HOLMES


## COUNT AND STATUTES CHARGED

| | | |
|---|---|---|
| Count I | 18 U S C §§ 371 and 1955 | |
| | Conspiracy to operate an illegal gambling business | |
| Count II | 18 U S C § 1955 | |
| | Operation of an illegal gambling business | |
| Count III | 18 U S C § 1956 (a)(1)(A)(i) | |
| | Money Laundering | |
| Counts IV-XV | 18 U S C § 1956 (a)(1)(B)(i) | |
| | Money Laundering | |
| Count XVI | 18 U S C § 1956 (h) | |
| | Conspiracy to launder money | |

## COUNT PLEADING PURSUANT TO PLEA AGREEMENT

Count I of an information    18 U S C § 1957
                            Engaging in a monetary transaction in property derived
                            from specified unlawful activity

1

GOVERNMENT
EXHIBIT
3

## MAXIMUM PENALTY

IMPRISONMENT OF NOT MORE THAN TEN (10) YEARS OR A FINE OF NOT MORE THAN $250,000, OR BOTH, AND NOT MORE THAN THREE (3) YEARS OF SUPERVISED RELEASE, PLUS A $100 00 ASSESSMENT FEE

## ELEMENTS OF THE OFFENSE

18 U.S C § 1957

1. That the defendant engaged in a monetary transaction in criminally derived property that is of a value greater than $10,000;
2. That such transaction involved property derived from a specified unlawful activity, and
3  That the defendant knew that such property was derived from such specified unlawful activity.

## I.    SPECIAL PROVISIONS

A   The government will recommend a three-level reduction of the offense level for acceptance of responsibility pursuant to § 3E1 1 of the United States Sentencing Guidelines

B   The defendant agrees to cooperate with the government under the conditions set forth below and, if the government, in its sole discretion, concludes that the defendant has fully complied with the terms of the cooperation agreement and has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the  government agrees to make a recommendation to the Court that the defendant receive an additional two-level reduction of the offense level pursuant to § 5k1 1 of the United States Sentencing Guidelines, and that a sentence of 15 months is appropriate  The United Sates will dismiss the indictment currently pending against Timothy Joe Reeves and Wendy Ann Smith Reeves  The United States further agrees that, based upon the substantial forfeitures made

2

pursuant to this agreement, there should be no fine imposed    This agreement is entered into

pursuant to the provisions of Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure

           C    The defendant agrees with the representations made in the government's

factual basis statements

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## II.    INTRODUCTION

        A    Ashton Holmes, Assistant United States Attorney, and Drew Redden,

attorney for the defendant, pursuant to the provisions of Rule 11,

Federal Rules of Criminal Procedure, as Amended, have, with the

authorization of the undersigned defendant, heretofore entered

into discussions with a view towards reaching a pretrial

conclusion of the charges pending in the indictment herein and a

plea agreement has been reached by said parties  as set forth

below.

## III.    AGREEMENT OF THE PARTIES

The government and the defendant agree to the following

        A    *Sentencing Guidelines*

        *The government and the defendant agree that the*
*provisions of the Federal Sentencing Guidelines apply and control*
*the sentence in this case*

        B    Acceptance of Responsibility

        ▼    1    The United States agrees to recommend that the

Court find that the defendant clearly demonstrates a recognition

and affirmative acceptance of personal responsibility for his

3

criminal conduct, and in recognition thereof, in accordance with U S S G § 3E1 1(a), reduce the defendant's offense level by three levels   The defendant understands that these assertions are not binding on the Court.

2   The United States will move the Court, at the time of sentencing, for a two-level downward departure, provided that the defendant fulfils his obligation to provide certain information and assistance   In addition, the United States reserves the right to respond to factual or legal questions from the Court and to rebut or clarify matters raised by the defendant in mitigation of defendant's sentence or contained in the presentence report, if the United States deems the same to be inaccurate or misleading.

3   The Defendant agrees to forfeit his interest in the following property

(1). Ninety-four Thousand Two Hundred Ninety-six Dollars and Eighty-seven Cents ($94,296 87) from Hunt's Seafood Operating Account Number ▮▮▮▮▮▮   Additional money in said account to be retained by the Defendant.

(2)   The real property at 1073 Malven Road, Dothan, AL and all improvements, fixtures and trailers thereon. Reference Civil Action Number 97-T-64-S

(3). One 1997 GMC Sierra Pick-Up Truck   Reference Civil Action Numbers 98-C-335-S,98-D-570-S.

(4). One Thousand Dollars($1,000.00) seized on January 12, 1997   Reference Civil Action Number 98-C-332-S

4

b.   The United States agrees to return the following property to the defendant and to dismiss the referenced civil forfeiture cases:

(1). The real property at 1075 Malvern Road, Dothan, AL and all fixtures and improvements thereon   Reference Civil Action Number 97-T-64-S

(2)   Miscellaneous Computer Equipment seized at 1075 Malvern Road, Dothan, AL   Reference Civil Action Number 98-M-333-S.

(3)   Fourteen Thousand Dollars($14,000 00) of the One Hundred Ninety-Seven Thousand Dollars($197,000.00) seized in Civil Forfeiture Actions numbered 98-T-336-S and 98-t-571-S

c.   The defendant further agrees to testify truthfully and completely at any subsequent criminal and civil forfeiture action related in any manner to this criminal case.

### C  Cooperation Agreement

1  The defendant agrees to cooperate fully and testify truthfully against any and all persons as to whom he may have knowledge at grand jury, trial, or whenever called upon to do so, with the exception that the defendant will not be required to testify against his father, Billy Joe Reeves   The defendant understands that this agreement does not require him to implicate any other particular individual or individuals nor to "make a case," rather it requires him to be truthful and to testify truthfully whenever called upon   The defendant agrees to make himself available for the review of documents and other materials and for interviews by law enforcement officers and attorneys for the government upon

5

reasonable request and to fully and truthfully respond to all questions asked of him by law enforcement officers and attorneys for the government He agrees to fully and truthfully disclose to the government everything he knows about any and all documents and materials in his possession that relate to violations of federal gaming laws and any other criminal violations in the Middle District of Alabama and elsewhere The defendant agrees to submit to a polygraph examination conducted by the government if requested to do so

       2 Provided that the defendant satisfies the terms of this plea agreement, any information that he truthfully discloses to the government during the course of his cooperation, concerning related offenses, will not be used against him, directly or indirectly The defendant understands that this agreement does not bar his prosecution for capital felonies, perjury, false statements, and obstruction of justice

       3 If the defendant has failed or should fail in any way to fulfill completely his obligations under this agreement, then the government will be released from its commitment to honor all of its obligations to him Thus, if at any time he should knowingly and willfully withhold evidence from the government investigators or attorneys prior to or during his testimony before grand juries or in trials, then the government will be free (1) to prosecute him for perjury, false declaration, false statement, and/or obstruction of justice (18 U S C Section 1621, 1623, 1001, 1503), (2) to prosecute him for all violations of federal criminal law which he has committed, (3) to use against him in all of those prosecutions and sentencings the information and documents that he has himself disclosed or furnished to the government during the course of his cooperation, (4) to recommend a maximum sentence, and (5) to seek forfeiture of any and all forfeitable properties of the defendant The parties

6

agree to submit to the court, to be decided by a preponderance of the evidence standard, the question of whether defendant has breached this agreement

### D Acknowledgment And Waiver Of Rights/Understanding Of Maximum Penalties

The defendant agrees that he has been fully advised of his statutory and constitutional rights herein, and that he has been informed of the charges and allegations against him and the penalties therefor, and that he understands same   The defendant further agrees that he understands that by entering a plea of guilty as set forth hereafter, he will be waiving certain statutory and constitutional rights to which he is otherwise entitled

### E  Application of Sentencing Guidelines

The United States and the defendant,  agree  that the base offense level upon which the defendant's sentence should be initially calculated, pursuant to U S S G  § 2S2 1 is 19

### F  Substantial Assistance To Authorities

If the government, in its sole discretion, concludes that the defendant has fully complied with the terms of the cooperation agreement and, in its sole discretion, determines that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense,  the United States agrees to file a motion under U S S G  § 5K1 1 recommending a two-level departure from the guidelines The defendant understands that the United States retains sole discretion to file such a motion and that the final decision on the amount of the departure, if any, rests within the sole discretion of the Court

7

### G  No Further Prosecution

The United States further agrees that in return for the defendant's compliance with the terms of this agreement there will be no further federal criminal prosecution of the defendant in the Middle District of Alabama based on the information and evidence now available to the United States regarding the defendant's involvement with violations of 18 USC § 1955, 1956, and 1957 or any federal tax provision

### H  Basis For Plea Of Guilty

The defendant agrees that the Stipulation of Facts constituting the basis for the defendant's guilty plea in this case, appended hereto and incorporated herein by this reference, is a true and accurate statement of the defendant's actions or omissions with regard to the charges to which he is entering a plea and that the Court may rely thereon in determining the basis for the defendant's plea of guilty as provided for in his plea agreement

### I  Potential Postponement of Sentence

Defendant understands and agrees that sentencing may be delayed until the cooperation phase has been completed

### J  Payment of Special Assessment

The defendant agrees to remit to the Clerk of Court for the Middle District of Alabama a certified or cashier's check payable to the Clerk of Court in the amount of $100 00, in full satisfaction of the statutory costs pursuant to 18 U S C  § 1957, and to remit said sum with this signed agreement in full satisfaction of this paragraph

### K  Scope Of The Agreement

1   The defendant, before entering a plea of guilty to Count One of the

8

information currently pending against him, advises the Court that

    a  The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent

    b  The defendant understands the nature of the charge to which the plea is offered in Count One of the Information, that the defendant did commit an offense against the United States, that is to say, violations of Title 18, United States Code, Section 1957   That the defendant understands that the penalty provided by law for violation of Count One of the Information is a fine of not more than $250,0000 or imprisonment for not more than 10 years, or both, and a term of not more than three years supervised release, in addition to a Special Assessment of $100 pursuant to Title 18, United States Code, Section 3013, said assessment to be paid by the defendant on the date of sentencing   The defendant understands that if a fine is imposed by the Court at sentencing, the defendant shall meet with a member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense   The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief and agrees to make an honest, good faith effort to pay the said fine as directed by the Financial Litigation Section of the United States Attorney's Office.  The defendant further understands that the nature of the charge to which the plea is offered involves proof as to Count One of the Information, that the defendant did during December 1996, in the Middle District of Alabama, knowingly engage in a monetary

9

transaction in violation of Title 18, United States Code, Section 1957

    c The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney

    d The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court

    e The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful

    f Defendant further understands and advises the Court that the plea agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the

10

attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge and consent

        g    The defendant further advises the Court that it is understood that the Government can only make a recommendation which is not binding on the Court, and that the defendant understands that after the entry of the guilty plea, the defendant has no absolute right to withdraw the plea

        h    The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Information herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant    However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Information herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel

        2    The undersigned attorneys for the Government and for the defendant represent to the Court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11, Federal Rules of Criminal Procedure, as amended    It is further understood and agreed that no additional promises, agreements or conditions have been entered into other than those set forth in this agreement, and that this agreement supersedes any earlier or other understanding or agreement

11

guilty and to be tried by a jury on all issues herein, of the maximum possible penalty provided

by law, that by the entering of a plea of guilty as aforesaid, the defendant waives the right to

be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses

against the defendant and the right not to be compelled to incriminate the defendant, and that if

the defendant pleads guilty, there will not be a further trial of any kind   Further the defendant

has been advised that if the defendant pleads guilty, the Court may ask questions about the

offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn,

that the answers to such questions may not be used against the defendant in a civil or criminal

proceeding, but that the defendant's answers may later be used against the defendant in a

prosecution for perjury or false statement if the answers are not truthful

Dated this _14th_ day of October, 1999

REDDING PITT
UNITED STATES ATTORNEY


_____
DREW REDDEN
Attorney for Defendant

_____
CHARLES NIVEN
First Assistant United States Attorney

_____
ASHTON HOLMES
Assistant United States Attorney


I have read the foregoing Plea Agreement, consisting of 12 pages, understand

12

I have read the foregoing Plea Agreement, consisting of 12 pages, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

TIMOTHY JOE REEVES
Defendant

_Oct 14, 99_
Date

# FACTUAL BASIS FOR PLEA

That in December 1996 the defendant did engage in a monetary transaction in criminally derived property that is of a value greater than $10,000, that is the purchase of a 1997 GMAC truck with proceeds derived from an illegal gambling business as defined in Title 18, United States Code, Section 1955(b) and (c), that is a gambling business in violation of the laws of the State of Alabama, Section 13A-12-22, Code of Alabama, 1975, and involving five or more persons who conducted, financed, managed, supervised, directed and owned all or a part thereof, and which remained in substantially continuous operation for a period in excess of thirty days and which had a gross revenue of $2,000 in any single day.

# GOVERNMENT EXHIBIT "4"

U.S.A. vs Reeves, et al      CondenseIt™      2/01/00 Sentencing

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      SOUTHERN DIVISION
 4   UNITED STATES
 5                            CRIMINAL ACTION 99-13-S
                              Montgomery Alabama
                              February 1  2000
 6
         vs
 7
     TIMOTHY J  REEVES, LARRY J  COBB,
 8   VIVIAN W  BOND  BENJAMIN M  HORNSBY
     TERRY D  JOHNSON  MILTON K  PHILLIPS
 9   RONALD BENEFIELD, MYRON BROWN
10                    *  *  *
                    SENTENCING
11                    *  *  *
         BEFORE THE HONORABLE ROBERT B  PROPST
12            UNITED STATES DISTRICT JUDGE
                      *  *  *
13                    APPEARANCES
14   FOR THE GOVERNMENT          C  Redding Pitt
                                 U S Attorney
15                               Montgomery, Alabama
                            BY   Charles R  Niven
16                               Ass t U S Attorney
17   FOR THE DEFENDANT TIMOTHY J  REEVES    L  Drew Redden
                                            Ronald J  Gault
18                                          Attorneys at Law
                                            Birmingham  Alabama
19
     FOR THE DEFENDANT COBB       John T  Kirk
20                                Attorney at Law
                                  Dothan Alabama
21
     FOR THE DEFENDANTS BOND  PHILLIPS   James W  Parkman
22        AND BENEFIELD              Charles N  Amos
                                     Attorneys at Law
23                                   Dothan, Alabama
24   FOR THE DEFENDANT HORNSBY    Bryan S  Blackwell
                                  Attorney at Law
25                                Dothan  Alabama
```

**Page 2**

```
 1   FOR THE DEFENDANT JOHNSON      Federal Defenders
                              BY  John W  Focke
 2                               Attorney at Law
                                 Montgomery, Alabama
 3   FOR THE DEFENDANT BROWN      Charles N  Reese
                                 Attorney at Law
 4                               Daleville, Alabama
 5
         Proceedings recorded by mechanical
 6    stenography  Transcript produced by computer
 7
 8
 9
10
11
12
13       U.S.
14       ATTORNEY
15       FILE
16
17
18
19
20
21
22          GOVERNMENT
23             EXHIBIT
24                4
25
```

**Page 3**

1   THE COURT  I think the clerk has staggered some of
2 these scheduled sentencings now, but if there is somebody that
3 has any sort of special problem, any attorneys or any parties
4 or whatever, that have some sort of special problem, if you are
5 here and you want to suggest that I will be glad to give
6 consideration to it

7   Other than that, I think this  I am not trying to
8 suggest that this is something that ought to be done, or
9 whatever  I am just suggesting it as a possibility of some
10 convenience to one or more of the parties and one or more of
11 the attorneys, that with regard to the other scheduled
12 sentencings, that we may give some consideration as to whether
13 or not or are not going to be extensive objections that have to
14 be heard  I know as an attorney I hate to sit around for an
15 hour and a half listening to somebody else's case  So, if we
16 have got some people here now where there are no objections to
17 the presentence report either on the part of the government or
18 the defendant, if somebody wants to raise their hand and
19 suggest that that, coupled with other scheduling matters that
20 you have, that you would like to go first, we will consider
21 that.

22   All right  Other than that, we will just go in the
23 order that the clerk calls them.

24   Who is the first case scheduled?

25   COURTROOM DEPUTY CLERK  Timothy Joe Reeves

**Page 4**

1   THE COURT  State for the record who is here
2 representing Mr  Reeves

3   MR. REDDEN  David Johnson and L  Drew Redden from
4 Birmingham

5   THE COURT  Mr  Redden, have you and Mr  Reeves had
6 at least thirty-five days in which to review the presentence
7 report?

8   MR. REDDEN  Your Honor  I think we have.  But we
9 signed the waiver  I think we have had just about exactly that
10 much time.

11   THE COURT  Well, I'm not trying to totally pin you
12 down, but  It makes no difference to me, you know  We will
13 either reschedule it or we will accept the waiver  But if I'm
14 going to need to accept a waiver, I'm going to need to go
15 beyond just his signing a waiver  And I don't know whether you
16 can or cannot give me a total answer as to whether you have had
17 the thirty-five days  If you haven't, it won't but take but a
18 few minutes to talk to Mr  Reeves

19   MR. REDDEN  We have had that much time, certainly,
20 with the original report, presentence report that Mr  Mathis
21 prepared

22   THE COURT  Well, let me just briefly ask Mr
23 Reeves

24   Mr  Reeves, under the law you are entitled  you and
25 your attorney are entitled to at least thirty-five days in

---

99-13-S             Page 1 - Page 4

U S A. vs Reeves , et al          CondenseIt™          2/01/00 Sentencing

### Page 5

1  which to review the presentence report  The reason for that
2  thirty-five days is that the sentence that you will receive
3  will be substantially influenced by what is contained in the
4  presentence report  And if there is no objections to the
5  presentence report, the presentence report will very
6  substantially influence the sentence that you receive
7       But on the other hand, you are entitled to the full
8  thirty-five days so that you and your attorney can object to
9  what is in the presentence report, prepare for a sentencing
10  hearing and so forth
11       And it makes no difference to me whether we go ahead
12  and proceed with the sentencing today or whether we make some
13  further determination as to whether you have or not had the
14  full thirty-five days  If you haven't had the full thirty-five
15  days we can reschedule it.
16       Whatever decision is made in that regard, particularly
17  if you haven't had to fill thirty-five days, has to be a
18  voluntary decision on your part
19       Do you understand that?
20  A  Yes, sir
21       THE COURT  Even if there has been a day or so
22  difference in the thirty-five days, do you or do you not wish
23  to go ahead and proceed with sentencing today?
24  A  I want to go ahead
25       THE COURT  You want to go ahead today?

### Page 6

1  A  Yes, sir
2       THE COURT  And you understand it is immaterial to
3  the Court if you ever not had the full thirty-five days it I am
4  to me whether we go ahead today and reschedule it?
5  A  Yes, sir
6       THE COURT  But you want to go ahead and regardless?
7  A  Yes sir
8       THE COURT  Do you have any questions about that?
9  A  No sir
10       MR. REDDEN  I was about to say we have filed
11  written objections to the report first submitted and the Court
12  has those.
13       THE COURT  Is there anything else with regard to
14  the same issues?
15       MR. REDDEN  NO sir
16       THE COURT  All right  If you have signed a written
17  waiver, if the clerk will get that
18       Is there a place to there for me to sign?
19       MR. REDDEN  Yes, sir
20       THE COURT  Here you go
21       All right  Now, Mr Redden, you indicated that you
22  have filed some written objections  It is my practice to want
23  you to state on the record now what, if any, objections that
24  you have as to any part of the presentence report. And I
25  consider any previously filed objections waived unless they are

### Page 7

1  stated here  But we will take them up in order, whatever
2  objections you have
3       MR. REDDEN  All right.  As I recall our objections
4  that we have filed - And there no new ones that we are making
5  today  that we refer to the fact that this defendant was first
6  charged in a multi-count indictment, conspiracy and a group of
7  substantive offenses  That while that was the charge against
8  him, a plea agreement was reached between the government and
9  the defendant  That plea agreement, under Rule 11, stated that
10  the appropriate sentence the parties agreed to was 15 months
11  And, also, that because of the substantial forfeitures to which
12  this defendant had assented - And when I say substantial I am
13  talking about in value and money - that there would be a
14  recommendation that no fine be imposed for that reason
15       The agreement contained a statement that the defendant
16  would testify if called upon except, as Your Honor is aware,
17  provided that he would not be called upon by the United States
18  to testify against his father  Subsequently to the entry of
19  the plea agreement, and without changing the agreement itself,
20  with reference to the appropriate sentence of 15 months, the
21  charge against this defendant was changed to that of a money
22  laundering, one-count information  And the --
23       THE COURT  Which I assume he has pled to  Right?
24       MR. REDDEN  He has  And that is what he is due to
25  be sentenced upon this morning

### Page 8

1       THE COURT  All right
2       MR. REDDEN  Actually, that read  A considerable
3  part of the objections that we made with reference to the
4  probation officer's report, he had, not improperly, but he had
5  spent many pages detailing the substance of the counts, I think
6  sixteen-count indictment, and then he took a look at the money
7  laundering count provisions in the guidelines for sentencing
8  and he increased the offense level from 17 to 18, to start
9  with, by one level  Because his view was that the amount of
10  money involved exceeded one hundred thousand dollars  And up
11  until that point there is no increase, but above one hundred
12  thousand there would be a one-level increase. And the
13  probation officer was of the view one hundred and seventy-five
14  thousand dollars was a correct assessment. For the reasons
15  that we gave in our objection, we disputed that. We think that
16  that was a valid dispute
17       And, again, I'm not here to argue with anybody except
18  to ask the Court  ultimately to ask the Court to impose the
19  sentence that the prosecution and the defense agreed upon as
20  being the appropriate sentence  But that is up to the Court
21  But we earnestly state that we felt that there should not have
22  been that one-level increase
23       And then he recommended a four-level increase on the
24  premise that this man was a leader or the leader of an at least
25  five-participant conspiracy with reference to the money

99-13-S          Page 5 - Page 8

U.S.A vs Reeves , et al             CondenseIt™             2/01/00 Sentencing

## Page 9

1  laundering charge, and then listed the names  -
2       THE COURT  You mean with reference to the money
3  laundering as opposed to gambling?
4       MR REDDEN  I read it that way  Because what he is
5  to be sentenced on, this is not in my view a matter of
6  considering relevant conduct  This is a matter of the charge
7  And it listed a group of people that we take the position in
8  our objection that probably Mr Cherry was the only one of the
9  that group of people listed who would have been parties at all
10 in the money laundering, so that the four-level increase we
11 felt there was inappropriate.
12      Those are the two primary things
13      THE COURT  All right  Let me ask this, Mr
14 Redden  You know, in view of the fact.  Of course, there are
15 several factors at play here.  One is, you know, we ask the
16 probation office to  in effect, look at the guidelines and so
17 forth totally objectively, and we rely on them to do that and
18 so forth  And I can understand why the probation office, once
19 they do that, they can feel like that, well, neither the Court
20 nor the U S  attorney nor anybody else should, by some sort of
21 an agreement, undermine the intent and purpose of the
22 guidelines
23      But on the other hand, there is some pragmatism
24 involved  And I don't say this totally flippantly, but when
25 they passed the guidelines they tended to give the prosecution

## Page 10

1  more control over sentencing than they did judges  or
2  whatever
3      But, in any event, I guess what it comes down, as a
4  practical matter  You have made some objections  Rather than
5  taking the time of a lot of people here, maybe just
6      I will ask the government  Are you aware of the
7  objections that have been filed by the defendant?
8      MR NIVEN  Yes  Your Honor  I am aware of them  I
9  have read them  And I might say to the Court --
10     THE COURT  Do you have  Do you dispute any of the
11 objections?
12     MR NIVEN  No, sir  Not in the sense that when the
13 counsel for the United States and defense counsel were
14 negotiating this plea agreement, we did not consider the
15 four-level adjustment for role in the offense, as Mr Redden
16 says  because he was pleading to a money laundering count
17     THE COURT  As opposed to the gambling?
18     MR NIVEN  Yes sir
19     THE COURT  Well, I was sitting here earlier when
20 Mr Redden said something about being the leader  I was
21 thinking if not he  who?
22     But you are parsing it with regard to the difference
23 between the gambling operation and any so-called money
24 laundering operation
25     MR NIVEN  We didn't give that  As a probation

## Page 11

1  officer, we didn't take that into consideration when we were
2  doing our calculations  And we were thinking about money
3  laundering and not thinking about a role in the money
4  laundering offense at the time. I did note when I went back
5  and looked this morning --
6      THE COURT  Well, I think it's certainly arguably
7  that there weren't more than, maybe, couple or three, at the
8  most, involved in, quote, money laundering itself
9      MR NIVEN  I think that's right, Judge  If you
10 separate them out --
11     THE COURT  As I recall, maybe Mr  Cherry and maybe
12 Mr  Reeves and possibly somebody else  But I'm not sure I
13 could get up to five
14     MR NIVEN  If Mr  Reeves were sentenced on the
15 gambling offense, basically he would come down to the 15  he
16 would fit in the 15 month range, even if you applied the four
17 points
18     THE COURT  Let me ask this  Was there anybody else
19 other than Mr Cherry and Mr Reeves that were convicted  not
20 Mr Reeves  Was there anybody else other than Mr Cherry what
21 was convicted any money laundering count?
22     MR NIVEN  No, sir
23     THE COURT  Okay
24     MR NIVEN  In fact, Mr  Cherry and Mr  Billy Joe
25 Reeves where the only two others besides Tim Reeves that were

## Page 12

1  charged with money laundering
2      THE COURT  All right  Let me ask the probation
3  officer, Mr Mathis, or anybody else that may be speaking for
4  the probation office
5      From a  As a practical matter  this is a 11 1(e) type
6  plea?  Whatever it is
7      USPO MATHIS  Yes  sir
8      THE COURT  So, we are in a position where whatever
9  the agreement that has been made, if the Court does not accept
10 that agreement, then we go through and total it, we are in a
11 position where the defendant could withdraw his plea anyway
12 Right?
13     MR NIVEN  That's correct
14     THE COURT  Not that that should be the total
15 measure of the situation  But I think we at least ought to
16 state for the record what the status is in that regard
17     From a practical standpoint, let's assume that we grant
18 the objections, more particularly as to
19     Was there a four-level increase by being a leader of a
20 money laundering operation?
21     USPO MATHIS  Your Honor  I applied the four-level
22 increase based on Mr Reeves  involvement in the gambling
23 activity  Because to apply technically enhancement in the
24 role, acceptance of responsibility and the other things in
25 Chapter 3, the fact of the conviction is not the only

99-13-S                                              Page 9 - Page 12

Page 13

1  consideration  Relevant conduct provides that the Court is to
2  consider all acts and omissions that occurred during the
3  offense of conviction
4     THE COURT  Not that the government has a right
5  necessarily to do it, but let's assume that the government is
6  conceding that objection  Are we talking about a four level
7  reduction by virtue of that?
8     USPO MATHIS. Yes, sir
9     THE COURT  And as it stands now, the offense level
10 is 21  That would get it down to 17  Right?
11    USPO MATHIS Yes sir
12    THE COURT  Then with the other objection  as I
13 understood it, was a one-level objection
14    MR. REDDEN  Yes, sir  That was on the amount of
15 money in the money laundering
16    THE COURT  Well, just as a practical matter let me
17 ask  With regard to the amount of money involved, does it make
18 a difference whether we are talking about the amount of money
19 involved in the gambling or the amount of money involved in the
20 money laundering?  I mean  what if we only look at it from the
21 perspective of the gambling  and assume that amount was a
22 hundred and seventy-five thousand - I'm not saying it was or
23 wasn't - what bearing does that have?
24    Or does it have to be the money laundering in order to
25 get to that?

Page 14

1     USPO MATHIS. It has to be the money laundering
2  There is increase under the guidelines for any amount of money
3     THE COURT  As I understand it, the government has
4  no objection to amending the presentence report with regard to
5  either of the leader upward adjustment, or it doesn't have any
6  objection with regard to the upward adjustment of one-level by
7  virtue of the amount  Is that correct?
8     MR. NIVEN  Correct.
9     THE COURT  All right.  Well, I want the probation
10 office to know that you know  by acquiescing in that or
11 whatever I'm doing with it  I'm not setting a precedent, I'm
12 not finding fault or anything else.  I am just  Who was it
13 James wrote. called the Pragmatist
14    At any rate  I will sustain those two objections and
15 that get us to offense level of 17  Is that right?
16    USPO MATHIS. I believe 16
17    THE COURT  Yes  16  Excuse me
18    All right  Now  with a criminal history category of 1,
19 what guideline range does that —
20    USPO MATHIS. 21 to 27 months
21    THE COURT  With a supervised release period of
22 what?  Does it stay two to three?
23    USPO MATHIS Yes sir
24    THE COURT  And a fine range of what?
25    USPO MATHIS  Just a moment, Judge

Page 15

1  Five thousand dollars to fifty thousand
2     THE COURT  Okay
3     Is there anything else, Mr Redden?  I'm looking at it
4  now just totally from the perspective of considering the
5  appropriate guideline range  I'm not getting into anything
6  else at this point  I will give you an opportunity to get into
7  other matters  But from the perspective of my announcing, for
8  the record and otherwise, the guideline range issues  is there
9  anything else?
10    MR. REDDEN  If it please the Court, I don't want to
11 say no if there is something else and I don't want to say yes
12 if there is nothing else
13    THE COURT  Well, you are the lawyer and you are
14 here and this is the time to do it  So
15    MR. REDDEN  Please excuse me stumbling around  But
16 I think that departure —
17    THE COURT  Well, that is not the issue
18    MR. REDDEN  Well, that is that question I am asking
19 the Court —
20    THE COURT  No, sir  All I'm looking at right now
21 is are there any other issues as they relate to the
22 determination of the guideline range before departure issues
23 are addressed?
24    MR. REDDEN  I don't think so
25    THE COURT  Anything else?

Page 16

1     MR. REDDEN  No, sir
2     THE COURT  All right.  Then, anything from the
3  government?
4     MR. NIVEN  No, sir
5     THE COURT  All right  That being the case, the
6  Court having sustained the two objections, otherwise adopts the
7  factual statements contained in the presentence report and
8  finds that the offense level is 16, the criminal history
9  category is 1, the guideline imprisonment range is from 21 to
10 27 months, the supervised release period from two to three
11 years, the fine range is from five thousand dollars to fifty
12 thousand dollars  And I assume
13    Is there any restitution claimed?
14    MR. NIVEN  No  sir
15    THE COURT  So  there is not a restitution claim
16    Now, is there any question about that announcement?
17 And we are still not to the issue of departure, we are still
18 not to the issue of plea agreement  Anything else on that
19 issue?
20    MR. REDDEN  No
21    THE COURT  All right.  Now, what was the plea
22 agreement, Mr Niven?
23    MR. NIVEN  The plea agreement, Your Honor, was that
24 the United States would make an appropriate downward departure
25 of two levels, I believe, which would bring it to a range of 15

Page 17

1  to 21 months  And that the United States would recommend that
2  a 15 months sentence was the appropriate sentence in this case.
3       THE COURT  All right  The low end?
4       MR. NIVEN  Yes, sir
5       THE COURT  All right.  Let's see.  Is that the
6  agreement as you understood it, Mr Redden?
7       MR. REDDEN  It is, Your Honor, with the addition
8  that there would be no fine because there have been very
9  substantial condemnation and forfeiture.
10       MR. NIVEN  That's correct
11       THE COURT  That is part of the agreement?
12       MR. NIVEN  Yes, sir
13       THE COURT  All right  Anything else?
14       MR. REDDEN  Well, included in the agreement were a
15  bunch of things that related to forfeitures and
16  nonforfeitures  But that is all, as I see it that --
17       MR. NIVEN  As far as sentencing is concerned
18       MR. REDDEN  -- that needs to be stated at
19  sentencing time.
20       THE COURT  But it's understood that nothing that I
21  will do here today with regard to sentencing will have any
22  bearing one way or the other over any issues of forfeiture
23  whenever they may have arisen  Is that correct?
24       MR. NIVEN  Yes, sir
25       MR. REDDEN  Yes, sir

Page 18

1       THE COURT  All right  So, that's an issue that is
2  collateral to what I am doing
3       MR. NIVEN  Yes, sir
4       THE COURT  Anything else. Mr Redden?
5       MR. REDDEN  No, Your Honor
6       THE COURT  All right  Now I m going to grant the
7  government s motion for downward departure, which is a filed
8  motion  As I understand, Mr Niven, it is based on the all
9  as it is with regard to other motions for downward departure,
10  it is based on the fact that the witness testified and offered
11  substantial assistance.  Is that correct?
12       MR. NIVEN  That's correct
13       THE COURT  And I have read the motion and, of
14  course, heard the trial and I will grant the motion
15       And the Court having granted the motion based on
16  substantial assistance I will depart two levels to a level 14
17  which, when combined with a criminal history category 1,
18  creates a guideline range of 15 to 21 months and a fine range
19  of from four thousand to forty thousand dollars
20       Does the supervised release term stay the same?
21       USPO MATHIS. Yes, sir
22       THE COURT  Now  Mr Redden  do you or Mr Reeves
23  have anything that you wish to say before the Court imposes
24  sentence that may have any further bearing on the sentence that
25  the Court imposes?

Page 19

1       MR. REDDEN  No, sir
2       THE COURT  Mr Reeves?
3  A  No, sir
4       THE COURT  All right.  Pursuant to the Sentencing
5  Reform Act of 1984 it is the judgment of the Court that the
6  defendant, Timothy Joe Reeves, is hereby committed to the
7  custody of Bureau of Prisons for a term of 15 months  Pursuant
8  to the plea agreement the fine is waived and no fine is
9  ordered, and for the further reason that there has been
10  indicated that there has been substantial obtaining of funds
11  through forfeiture or otherwise.
12       It is further ordered that the defendant shall pay to
13  the United States a special assessment of hundred dollars  The
14  assessment is due immediately and may be collected in
15  accordance with the Bureau of Prisons Inmate Financial
16  Responsibility Program  Upon release from imprisonment the
17  defendant shall be placed on supervised release for a term of
18  three years  While on supervised release the defendant shall
19  comply with the standard conditions of supervised release
20  reflected in this court and the following special conditions
21       Let me raise this question  Not that it's applicable
22  here because I'm not sure that  I'm not suggesting that if
23  there is some statute under which this can be done that I will
24  do it in this particular instance.
25       But I received a motion from one of the defendants -

Page 20

1  And I'm not sure which - that was styled Motion to Allow
2  Hunting Rights  And I told myself secretary to call the
3  lawyers
4       Is that lawyer here?
5       I told the secretary to call  Since we are talking
6  these cases up in order  I might as well see what your
7  position  I told my secretary to call your office and say
8  that, with regard to some of the defendants, I might be
9  amenable to that but I was not aware of any authority for my
10  being able to do such
11       MR. PARKMAN  I have got authority with me, Your
12  Honor  I brought the law with me. I'm not saying that you
13  have.  Well, I am saying you have the authority, so I brought
14  it with me for you to look at
15       THE COURT  Is the government aware of any
16  authority?
17       MR. NIVEN  I m not aware of any statute authorizing
18  the Court to do so
19       THE COURT  Well, maybe since.  if that's going to
20  be a matter with regard to
21       What's your authority?  Let me see it  If it's going
22  to be applicable to your client it could very well be
23  applicable to others  But I'm not aware of any such law
24       MR. PARKER  If I can, briefly  My name is Jim
25  Parkman and come from Dothan  Alabama  Let me tell you what I

U.S.A. vs Reeves, et al    CondenseIt™    2/01/00 Sentencing

### Page 21

1  found to make it real brief for you  And did this, too, by
2  calling the ATF also, to verify their position with regards to
3  this
4      And, if you will, I have marked this in red for you
5  And it is under 18 U S C 925, dealing with relief from
6  disabilities  What it talks about is, briefly, you file
7  supposedly you file a petition with the Secretary of Treasury
8  If they deny your position, then the federal court, federal
9  judge, has the authority then to hear the disability removal
10 and decide whether or not -
11     THE COURT  We haven't reach that point
12     MR PARKMAN  No  But what I was doing, I was just
13 cutting through the middleman
14     THE COURT  Well --
15     MR PARKMAN  And going to the higher authority
16 And if you will look, what it says in there, it talks about the
17 only disability being whether or not you are a danger to the
18 community  So, I think what may be the appropriate thing to
19 do
20     THE COURT  That's a disability or a --
21     MR PARKMAN  That would be  I'm sorry  That
22 would be the --
23     THE COURT  You mean if you are not a danger --
24     MR REDDEN  If you are not a danger  And it says
25 that in there  It's to be determined whether or not a person

### Page 22

1  is a danger to the community
2      So, what I said was is, we had reached an agreement in
3  my case with the U S attorney that my client that we are
4  filing for is not a danger  So, at the most, I guess what I
5  would like to do is put it on the record today  the agreement
6  And that way if we ever do have to come back it would be placed
7  on there, the agreement  Because I would hate for the U S
8  attorney —
9      THE COURT  Let me say this  In some of these
10 instances, one of the things that  you know we are not
11 allowed to depart from the law but we don't always have to
12 agree with it  And I do think that there are instances where
13 you know nonviolent, quote, felonies result in undue
14 restrictions in that area  So I am somewhat  although I'm
15 not a hunter I am sympathetic with your position  My family
16 was  I wasn't
17      But  in any event, I don't see from what you say
18 that  how you get around that idea that you first have go to
19 the Secretary of the Treasury
20     MR PARKMAN  I'm not saying maybe we ought to get
21 around it  I'm --
22     THE COURT  In fact, you have educated me that you
23 can do that  I'm glad to know that
24     MR REDDEN  I think the concern I had, really in
25 doing this is ultimately it can be your decision  But what I

### Page 23

1  thing I would like to do today is  What concerned me is --
2      THE COURT  I don't know it will be my decision
3  Because it sounds like to me it would be an independent
4  action  I don't know that it would be --
5      MR PARKMAN  Well, it says that if the ATF the
6  Secretary of the Treasury, denies the rights, then it goes
7  directly to the federal district court and a federal district
8  judge then has the ultimate authority
9      THE COURT  But not necessarily the one that had the
10 criminal case
11     MR PARKMAN  Not necessarily  But what I would
12 like to do, though, is, I think it is appropriate  Like, in my
13 case we have reached an agreement  I think it would be
14 appropriate to put it on the record at that time  Because what
15 happens if the assistant U S Attorney is absent at the time
16 that we get there?
17     THE COURT  Let me ask you this  Do you have any
18 other authority  other than that authority that suggests that
19 you can first make an application to the Secretary of Treasury,
20 that if that's denied that you can then petition the district
21 court?
22     MR PARKMAN  It says it in the statute, Your Honor
23     THE COURT  But you are not suggesting that --
24     MR PARKMAN  I have nothing else.
25     THE COURT  You are not suggesting that this statute

### Page 24

1  indicates that I have some present authority to make that
2  decision, other than just through the main strength in office
3      MR PARKMAN  Correct
4      THE COURT  Let me say this  Whatever your plea
5  agreement provides  I assume that is a matter of record
6      I will say this  to the extent that you think that I
7  have the present authority to do what you are saying  I'm not
8  going to say now whether I would or would not grant it because
9  I haven't conducted probably whatever I would have to do in
10 order to make that determination  But I will say that you will
11 reserved
12      Who is your client?
13     MR PARKMAN  That would be Mr  Phillips  And that
14 is coming up, I believe, at the 10 15 or 10 30 hour
15     THE COURT  All right  We will say that you and
16 your client have reserved the right to claim that I have that
17 present authority, and that I have indicated  And you can
18 reserve error  or whatever, by suggesting that I do have that
19 present authority
20     MR PARKMAN  I just felt like if we could get on
21 the record the agreement of the U S Attorney that talked to
22     THE COURT  If you want to put something else on the
23 record --
24     MR PARKMAN  At that time, when we get to Mr
25 Phillips' case I think it would be appropriate

Page 25

1  THE COURT since you have other defendants and
2  maybe that issue in other cases, I wanted to see where you were
3  coming from  It's somewhat of a matter of interest to me that
4  you came from where you did
5      MR PARKMAN Thank you  I appreciate it
6  May I be excused at this time?
7      THE COURT Yes, sir
8      Of course, I don't know that I need to state this but,
9  Mr Reeves, you need to be advised that under the present
10 circumstances that the law provides under Title 18, Section 921
11 that you shall not possess a firearm of any kind under any
12 circumstances  I assume you know that?
13 A  Yes, sir
14      THE COURT All right. And that's also a condition
15 of  will be a condition of supervised release, regardless
16      The defendant shall not illegal possess any controlled
17 substance and shall refrain from any use of any controlled
18 substance  That's a condition of supervised release  I am
19 further stating those conditions
20      There is no present indication that the defendant is
21 other than a low risk of future substance abuse, so the
22 mandatory drug testing provision under Title 18, Section
23 3563(a) is suspended unless and until such time as such an
24 indication, and then the condition may be modified
25      Further condition of supervised release is that the

Page 26

1  defendant shall submit his person, residence, office or vehicle
2  to a search conducted by the United States Probation Officer at
3  reasonable times and in a reasonable manner based upon
4  reasonable suspicion of contraband or evidence of a violation
5  of a condition of release  Failure to submit to search may be
6  grounds for revocation  The defendant shall warn any other
7  residents that the premises may be subject to searches pursuant
8  to this condition
9      Now  other than the objections that have already been
10 ruled on  are there any other objections from anyone as to the
11 manner in which the sentence has been imposed, the calculation
12 of the guidelines or anything else that has been considered or
13 ruled on by the Court or has not been considered or ruled on by
14 the Court?
15      MR NIVEN None from the United States  Your Honor
16      MR REDDEN None from the defendant, Your Honor
17      THE COURT Is there any question about the
18 reporting date?
19      MR REDDEN Yes sir
20      THE COURT All right
21      MR REDDEN We would request that he be committed
22 on his present bond and that he be allowed a voluntary
23 reporting on such date as the Court may fix
24      THE COURT Is the marshal here?
25      What time  If I'm going to allow him to report, how

Page 27

1  much time is needed?
2      U S MARSHAL It depends on whether you are going
3  to allow him to you turn in at the designated --
4      THE COURT That's what I'm talking about
5      U S MARSHAL That could probably be a minimum of
6  five over six weeks  Because we have to request a designation
7      THE COURT Okay  Well, give me a date on a Tuesday
8  about five weeks from now
9      USPO MATHIS Your Honor, Tuesday, March the 7th
10     THE COURT Is that satisfactory?
11     U S MARSHAL Yes, sir
12     THE COURT Mr Reeves, I direct that you either
13 report to the institution or the facility, prison, that may be
14 designated by the Bureau of Prisons on March 7, 2000, at 10 00
15 a.m , or that you report on that same date at that time to the
16 marshal's office
17     Is that located in this building?
18     U S MARSHAL Yes, sir
19     THE COURT The U S Marshal's office located in
20 this building  You have to report to either one of the two
21 places  either the designated institution or the marshal's
22 office on March 7th at 10 00 a.m  Failure to do so will
23 subject you to a further additional serious charge  And in the
24 meantime, you are under the same bond and under the same
25 conditions  If you were to violate a condition of your bond

Page 28

1  you would be subject to being taken immediately into custody
2      All right  Is there anything on here I need to sign?
3      COURTROOM DEPUTY CLERK No, sir
4      THE COURT Is that order complete?
5      COURTROOM DEPUTY CLERK Yes, sir
6      THE COURT With respect to the Middle District of
7  Alabama?
8      COURTROOM DEPUTY CLERK Yes, sir, it is
9      THE COURT All right  Anything else?
10     MR NIVEN Yes  Your Honor  At this time the
11 United States moves to dismiss the indictment in this case as
12 to Timothy Joe Reeves, pursuant to the plea agreement
13     THE COURT All right  So ordered  And he has
14 definitely entered a plea to an information  Right?
15     MR NIVEN Yes, sir
16     THE COURT All right  Anything else?
17     MR REDDEN Not from the defendant
18     THE COURT All right  Next case, please, ma'am
19     COURTROOM DEPUTY CLERK United States of America
20 versus Vivian Welch Bond, criminal number 99-13 S
21     THE COURT Who is here to represent Ms Bond?
22     MR PARKMAN James Parkman
23     MR NIVEN Excuse me  I believe that the Court
24 failed to advise Mr --
25     THE COURT Where is Mr Reeves? Get him, if you

Page 29

1  would
2      (Timothy Joe Reeves and his attorney return)
3      THE COURT  Mr  Reeves, this is to further advise
4  you that you have the right to appeal within ten days  And
5  that could be appeal of the conviction or appeal of anything
6  with regard to the sentence. And you have the right to appeal
7  within ten days  Any such notice of appeal must be filed
8  within ten days  If you are unable to afford an attorney one
9  will be appointed for you. If you are unable to pay the cost
10 of an appeal, that would be waived  If you ask your attorney
11 to file a notice he will do so on your behalf  or the clerk's
12 office will file it on your behalf, either one
13      Any questions about that?
14 A  No, sir
15      THE COURT  All right  Anything else?
16      MR. REDDEN  No, sir
17      THE COURT  All right
18      The Court calls the case of United States versus Vivian
19 Welch bond, 99-13-S
20      State for the record again who is here representing Ms
21 Bond
22      MR. PARKMAN  James W  Parkman, III from Dothan
23 Alabama, and Charles Amos  also from Dothan  Alabama, with my
24 firm
25      THE COURT  Have you and Ms  Bond had at least

Page 30

1  thirty five days in which to review the presentence report?
2      MR. PARKMAN  Yes, sir
3      THE COURT  Do you have any objections to the report
4  as it relates to content, calculations, observations, facts,
5  conclusions or otherwise?
6      MR. PARKMAN  None, Your Honor
7      THE COURT  Government?
8      MR. NIVEN  No, Your Honor
9      THE COURT  All right  There being no objections
10 the Court adopts the factual statements contained in the
11 presentence report and finds that the offense level is 10 and
12 the criminal history category is 1  the guideline imprisonment
13 range from 6 to twelve months, the supervised release period is
14 from two to three years and the fine range is from two thousand
15 dollars to twenty thousand dollars and there is no claim for
16 restitution
17      Is there any objection to that finding?
18      MR. PARKMAN  None, Your Honor
19      THE COURT  Was there a plea agreement in this
20 case?
21      MR. PARKMAN  There was, Your Honor
22      THE COURT  And what was that agreement as it
23 relates to sentencing?
24      MR. NIVEN  That the United States would recommend a
25 downward departure based upon the defendant's substantial

Page 31

1  assistance and she testified in this case, and that we would
2  recommend a sentence of probation
3      THE COURT  The Court has read the motion for
4  downward departure and, as I understand it, it is based on the
5  substantial assistance pursuant to the fact that she testified
6  during the trial  Is that correct?
7      MR. NIVEN  That's correct.
8      THE COURT  That motion is granted pursuant to 5K1 1
9  and based on substantial assistance  The Court thus finds that
10 the guidelines level should be 8, combined by a criminal
11 history category 1 creates a guideline range of zero to six
12 months and a fine range of a thousand dollars to ten thousand
13 dollars
14      Anything  Mr  Parkman, that you or Ms  Bond either one
15 wish to say before the Court imposes sentence?
16      MR. PARKMAN  The only thing I would say, Your
17 Honor, is to let the Court be aware that she has undergone some
18 severe medical problems dealing with her heart and other areas
19      THE COURT  I recall that.
20      MR. PARKMAN  And that is what I wanted to do is let
21 you recall that for whatever reason you want to take it into
22 consideration with regards to the sentence or with regards to
23 anything dealing with community service or something like
24 that. But I would like to have it to where it wouldn't burden
25 her with any medical problems  And that is the only reason I

Page 32

1  bring it to your attention
2      THE COURT  The government?
3      Ms  Bond, do you wish did say anything?
4  A  No, sir
5      THE COURT  Pursuant to the Sentencing Reform Act of
6  1984 it is the judgment of the Court that the defendant, Vivian
7  Welch Bond, be placed on probation for a term of three years
8      I'm going to make that two years
9      Is that acceptable, Mr  Mathis  or permissible?
10     USPO MATHIS  Yes, sir
11     THE COURT  All right  And  Let's see  I will
12 suggest that one year of that be with supervision and one year
13 without supervision  Is that permissible?
14     USPO MATHIS  We don't normally have unsupervised
15 probation here, Judge  I don t think I can --
16     THE COURT  Well, I'm just going to say probation of
17 one year, and that will take care of that
18     All right  Now, it's further ordered that the
19 defendant shall pay to the United States a special assessment
20 of a hundred dollars  The special assessment due immediately
21     While on probation the defendant shall not commit
22 another federal  state or local crime and shall comply with the
23 standard conditions of probation  resident in this court and the
24 following special conditions
25     The defendant shall not possess a firearm as defined in

| Page 33 |
| --- |

1  Title 18 United States Code, Section 921   The defendant shall
2  not illegal
3      I think, Mr Parkman maybe just in fairness, we ought
4  to say that Ms Bond has that same reservation with regard to
5  being able to make this application to the Department of
6  Treasury and further consideration of the Court as
7      MR BAXTER in all due respect, Ms Bond is really
8  not a hunter  So I would only file it on the basis of --
9      THE COURT Does that only apply to hunting?
10     MR PARKMAN No  I only ask it for hunting or
11 sporting purposes  And, really, I did it with Mr Philips
12 because he is a hunter and did --
13     THE COURT Well she can still do it if she wants
14 to
15     MR PARKMAN That's correct.
16     THE COURT All right  Now the defendant shall not
17 illegally possess a controlled substance and shall refrain from
18 any unlawful use of controlled substance  The defendant shall
19 submit to one drug test within 15 days of release from
20 imprisonment and at least two periodic drug tests thereafter as
21 directed by the probation officer
22     The defendant shall complete thirty hours of community
23 service at a location and schedule approved by the probation
24 officer
25     All right  Now, are there any objections to any matter

| Page 34 |
| --- |

1  with regard to the manner in which the guidelines range has
2  been determined, the manner in which the sentence has been
3  imposed or any other matters relating to the sentence in the
4  matter in which the sentencing hearing has been conducted,
5  other than any that may have been previously stated for the
6  record?
7      MR NIVEN No objection by the United States
8      MR PARKMAN None by the defendant, Your Honor
9      THE COURT All right  Ms Bond, I advise you that
10 you have the right to appeal both your conviction and your
11 sentence  Any notice of appeal must be filed within ten days
12 If you cannot afford an attorney one will be appointed for
13 you  If you can't afford the cost of appeal, that could be
14 waived if you can't pay the cost of appeal
15     Now, does probation need to see Ms Bond?
16     USPO MATHIS I will give her some instructions
17     THE COURT Yes, sir
18     MR NIVEN Pursuant to the plea agreement and Ms
19 Bond's plea to Count II of the indictment, the United States
20 moves to dismiss Count I as to Vivian Welch Bond
21     THE COURT All right  Granted
22 Anything else?
23     MR PARKMAN That's all we have, Your Honor
24     THE COURT All right  Next case
25     COURTROOM DEPUTY CLERK United States of America

| Page 35 |
| --- |

1  versus David Franklin Mims, 99-13-S
2      THE COURT All right  The Court calls up the case
3  of United States versus David Franklin Mims  Who is here
4  representing Mr Mims?
5      MR NEWMAN I am, Your Honor  Malcolm Newman from
6  Dothan, Alabama
7      THE COURT All right  Mr Newman, have you and Mr
8  Mims had at least thirty-five days in which to review the
9  presentence report?
10     MR NEWMAN I m not sure it's thirty-five, Judge
11 We have had about thirty
12     THE COURT All right  Let me ask you to consult
13 with Mr Mims, Mr Newman, and see if Mr Mims wishes to go
14 ahead and proceed with sentencing today or whether he wants to
15 me reschedule
16     (Mr Mims and Mr Newman confer)
17     MR NEWMAN Your Honor, we would like to proceed
18 today
19     THE COURT Does either the probation or the clerk
20 have a waiver form?
21     USPO MATHIS Mr Newman has it now
22     THE COURT Let me ask you, Mr Mims - and then sign
23 that if you wish and submit it to the clerk - under the law you
24 and your attorney are entitled to at least thirty-five days in
25 which to review the presentence report. The reason for that is

| Page 36 |
| --- |

1  that the sentence that you will receive will be substantially
2  influenced by what is contained in the presentence report  You
3  have a right to object to what is in that presentence report
4  And if you do have objections, the Court has to bear those
5  objections and make a final determination
6      Now it's immaterial to the Court whether we proceed
7  today or whether we reschedule the hearing so that you would
8  have had the full thirty-five days  That's up to you  But
9  whatever decision you make in that regard has to be voluntary
10 on your part  And it will not upset the Court one way or the
11 other what your decision is  Which do you wish to do?
12     What is your decision?
13 A  Well, some of the wording in this thing makes this sound
14 as bad as it possible can as opposed to the other side
15     THE COURT Let me put it this way  Whatever those
16 matters are that you have concerns about, they can be brought
17 up now  Or if you feel like you need more time to address
18 whatever those are. the hearing could be rescheduled  It's up
19 to you  I m not trying to suggest to you what to do or not to
20 do  I just want to make sure that
21     Do you have any questions what your rights are in that
22 regard?
23 A  No sir
24     THE COURT Whatever the decision is, it's
25 immaterial to me as long as it is a voluntary decision on your

Page 37

1  part
2  A  We need to reschedule then, please
3       THE COURT  Let me first confirm from the probation
4  officer that there hasn't been the full thirty-five days  I
5  have been proceeding on that presumption  I don't know
6       USPO MATHIS  Yes, sir  There has been
7  approximately thirty
8       THE COURT  All right  Then  Not that it would
9  make a whole lot of difference  And this shouldn't
10      Well, I won't even say that  I will just ask the clerk
11  to reschedule and put out a further notice on a sentencing
12  hearing
13      Anything else?
14      MR. NEWMAN  No, sir
15      THE COURT  All right  Next case
16      COURTROOM DEPUTY CLERK  United States of America
17  versus Benjamin Mills Hornsby, Criminal Number 99-13-8
18      THE COURT  I call up the case of United States
19  versus Benjamin Mills Hornsby, 99-13-8  Who is here
20  representing Mr Hornsby?
21      MR. BLACKWELL  Your Honor, I am Bryan Blackwell
22  from Dothan, Alabama
23      THE COURT  All right  Have you and Mr Hornsby had
24  at least thirty-five days, Mr Blackwell, in which to review
25  the presentence report?

Page 38

1  MR. BLACKWELL  Yes, sir, by my calculation I think
2  we have had at least thirty five days  So, I think we have had
3  thirty-five days to review it and we are satisfied with that
4  In fact, I believe it complies with the thirty -five days
5       THE COURT  I have no way to determine that other
6  than what you represent  Are you representing to me you have
7  had thirty five days?
8       THE COURT  Yes, sir
9       THE COURT  At least?
10      MR. BLACKWELL  Yes, sir
11      THE COURT  Now  Mr  Blackwell, do you have any
12  objections to the
13      Does that comport with what the probation officer
14  thinks about the time?
15      USPO MATHIS  Yes, sir
16      THE COURT  All right  Mr Blackwell, do you have
17  any objections to any of the content of the report as it
18  relates to calculations  facts  conclusions, observations,
19  guideline range, anything else?
20      MR. BLACKWELL  No, Your Honor
21      THE COURT  Government?
22      MR. NIVEN  No  Your Honor
23      THE COURT  All right  There being no objections,
24  the Court adopts the factual statements contained in the
25  presentence report and finds that the offense level is 10, the

Page 39

1  criminal history category is 3, the guideline prison range is
2  10 months to 16 months, supervised release period of two to
3  three years and a fine range of from two thousand dollars to
4  twenty thousand dollars  There is no claim for restitution
5       Was there a plea agreement?
6       MR. NIVEN  Yes, sir
7       THE COURT  what was the essence as it relates to
8  sentence?
9       MR. NIVEN  That the defendant would cooperate with
10  the United States and we would make a motion for a downward
11  departure  And I believe I have filed one with the Court
12  requesting a two-level
13      THE COURT  All right  And was there any further
14  agreement with regard to the guideline range if there was a
15  departure or anything?
16      MR BLACKWELL  The only other things, Your Honor,
17  this  I think this is addressed in the probation report, as
18  far as the  In the plea agreement it states that a downward
19  departure will be to Zone A, which is based on a criminal
20  history level  It may be impractical but  that is part of
21  plea agreement and I think that should be brought to the
22  Court's attention  The plea agreement was pursuant to Rule
23  11E1 (c) except for the base level 12  And --
24      THE COURT  Well, as I understand from what the
25  government is saying is that there is a downward departure of

Page 40

1  two levels, that that would be to a level 8  And that that
2  would a criminal history category of 3, which creates a
3  guideline range 6 to 12 months
4       Is that what you contemplated?
5       MR. BLACKWELL  Yes, Your Honor, that is exactly
6  right  That is in Zone B  And that is what we understand
7       THE COURT  Would that be consistent with the
8  agreement?
9       MR BLACKWELL  Well, I don't feel like I should
10  bring up the thing about Zone A because --
11      THE COURT  I didn't understand  You don't feel
12  like you can do what?
13      MR BLACKWELL  Your Honor, in the plea agreement it
14  specifically mentions Zone A  And I feel like just in fairness
15  to the Court I should mention that  We don't   I mean, the--
16      THE COURT  What Zone does 6 to 12 fall?
17      USPO MATHIS  Zone B
18      MR BLACKWELL  There is one discrepancy I thought I
19  should point out for the Court, judge  And I don't know that
20  that is a --
21      THE COURT  Mr  Niven, what is your position?
22      MR BLACKWELL  And there was one other thing I was
23  going to mention  I don't mean to talk over Mr  Niven
24      THE COURT  You are talking about the plea agreement
25  is indicates that he would fall into zero to six  Is that

Page 41

1  correct?
2       MR. BLACKWELL That is basically correct.
3       THE COURT Which, with a criminal history category
4  of 3, it would mean that would be down to an offense level of
5  4, which would be a six level.
6       MR. BLACKWELL Right. It also says that probation
7  would be recommended by the government and that—
8       THE COURT Well, of course, he could have
9  probation even in Zone B subject to more stringent
10  conditions.
11       MR. BLACKWELL Yes, sir Let me say this for
12  everyone's benefit here today We are not opposed to that.
13  But simply because you had asked about the terms of the plea
14  agreement I felt —
15       THE COURT That is what you should tell me now
16  I guess what I need to be from the government, the
17  defense lawyer is saying that he had an agreement with the
18  government that the government would recommend, not only a
19  downward departure, but would recommend a downward departure to
20  Zone A Which, in order to get to Zone A with that criminal
21  history category it would have to be a downward departure of
22  six levels, as I see it.
23       And you are saying that you recommend a downward
24  departure of two levels. Now where does that leave us?
25       MR. NIVEN well, do you have the agreement in front

Page 42

1  of you?
2       MR. BLACKWELL Yes
3       MR. NIVEN I think what happened in this case, Mr
4  Hornsby's criminal history category bumped it up some higher —
5       MR. BLACKWELL Let me say this Your Honor
6  Another provision in there was that the government would not be
7  opposed to a reduction in the criminal history level And I
8  think that may have been a factor in stating the --
9       THE COURT Well, I guess what I need to know
10  Obviously, whatever the government's position is, it ought to
11  be consistent with what it agreed to And I guess I need to
12  know, Mr Niven what the government has agreed to, to see if
13  there is any dispute
14       MR. BLACKWELL I don't know that there is really a
15  dispute, Your Honor
16       THE COURT Well you seem to suggest you don't want
17  to be hard to get along with Nobody is ever hard to get along
18  with if they are just expressing their client
19       MR. NIVEN Let me read the terms
20       That the government, in its sole discretion believe
21  that the defendant has fully complied with the terms of the
22  cooperation agreement, in its sole discretion may determine
23  that the defendant what has provided substantial assistance in
24  the investigation and prosecution of another person who has
25  committed an offense, the United States agrees to file a motion

Page 43

1  under 5K1 1 recommending a two-level departure from the
2  guideline to an offense level in Zone A of the sentencing
3  table. The defendant understands that the United States
4  retains sole discretion to file such a motion and the final
5  decision on the amount of departure.
6       THE COURT So you all decided to just create
7  confusion for me Is that right?
8       MR. BLACKWELL Apparently
9       MR. NIVEN Apparently so
10       MR. BLACKWELL And I just thought, for the record
11  you know, we should bring that up so it doesn't come back --
12       THE COURT Well, you know, if somebody says
13  something for the record I never do know what that means
14  Does that mean that I am to turn my head while you say that?
15  Or am I to listen to it and give consideration to it?
16       MR. BLACKWELL Well, Your Honor, the consideration
17  that I would ask the Court to give is simply in considering
18  whether probation should be granted.
19       THE COURT Well, I think what, as a practical
20  matter, that we are talking about is whether or not there is,
21  accompanying probation some sort of condition with regard to
22  home confinement or not That's really what we are talking
23  about
24       MR. BLACKWELL Yes, sir
25       THE COURT Now, obviously, it strikes me that if

Page 44

1  there is an ambiguity in the plea agreement that that probably
2  ought to lie at the feet of the government I don't know And
3  there is an ambiguity Right?
4       MR. NIVEN Yes, sir
5       THE COURT So I think what it really comes down to
6  is whether or not it would benefit the defendant and benefit
7  the government and benefit society for Mr Hornsby to serve
8  some time in home confinement as opposed to
9       What is Mr Hornsby's situation? Is he employed?
10       MR. BLACKWELL Your Honor, that is one Perhaps
11  if it can be conditioned on him being allowed to obtain
12  employment He is looking at taking over his father's
13  business, which is basically selling advertising, like
14  calendars and different things like that, to different
15  businesses And that would involve some you know, some of
16  it could be done from home. But I think some of it would
17  necessarily involve leaving the home. And I'm not sure how
18  wide an area that would be.
19       THE COURT Let me ask the probation office And
20  you can say that we don't like to say these things one way or
21  the other And if you don't, you don't and that would be the
22  end of it
23       But is there anything that you see from the presentence
24  investigation, other than the guideline range itself, that
25  would suggest that either Mr Hornsby or society either one

Page 45

1  would benefit from home confinement as opposed to just straight
2  probation supervised?
3        USPO MATHIS  The only thing that concerns our
4  office, Your Honor, is Mr Hornsby's record of driving under
5  the influence  Granted there hasn't been one since 1991
6        THE COURT  Is this the same defendant  I know we
7  had that with regard to another defendant  But that is this
8  defendant?
9        USPO MATHIS  Yes, sir  That's the primary corner
10 of the probation office.
11       MR. BLACKWELL  Of course, I would just respond with
12 the obvious, that he hasn't gotten trouble for that since
13 1991  So apparently, he did have several back in the late
14 '80's, early 90-91 period  So, I think that  he has got a
15 hold of that problem, Judge.
16       THE COURT  All right  Well, anything else on that
17 issue?
18       MR NIVEN  No, sir
19       MR. BLACKWELL  No, Your Honor
20       THE COURT  All right  The Court finds that the
21 government's motion for downward departure pursuant to 5K1.1
22 based on substantial assistance is due to be granted and is
23 hereby granted
24       Based on the plea agreement, the Court concludes that
25 the guideline level should be 4 which, combined with a criminal

Page 46

1  history category of 3 creates a guideline range of from zero
2  to six months  And a fine range from what?
3        USPO MATHIS  Two hundred fifty dollars to five
4  thousand dollars
5        THE COURT  Anything, Mr  Blackwell  that either or
6  Mr Hornsby wish to say before the Court imposes sentence that
7  may have any bearing on the sentence that the Court imposes?
8        MR. BLACKWELL  No, sir
9        THE COURT  Mr  Hornsby?
10 A  No
11       THE COURT  The government?
12       MR. NIVEN  No  Your Honor
13       THE COURT  Pursuant to the Sentencing Reform Act of
14 1984  it is the judgement of the Court that the defendant,
15 Benjamin Mills Hornsby, is hereby placed on probation for a
16 term of three years  The fine is waived because of inability
17 to pay  It is further ordered that the defendant shall pay to
18 the United States a special assessment of a hundred dollars
19 which is due immediately  While on probation the defendant
20 shall not commit another federal, state or local crime and
21 shall comply with the standard conditions of probation on
22 record in this court and the following additional conditions
23 The defendant shall not possess a firearm, as required
24 by law  The defendant shall not illegally possess a controlled
25 substance and shall refrain from any unlawful use of a

Page 47

1  controlled substance  The defendant shall submit to one drug
2  test within fifteen days of placement on probation and at least
3  two periodic drug tests thereafter as directed by the probation
4  officer  If determined necessary by the probation officer the
5  defendant shall participate in a drug or alcohol treatment
6  program as directed by the probation office  The defendant
7  shall contribute to the cost of any treatment in an amount
8  determined reasonable by the probation office, based on ability
9  to pay and the availability of third party payments
10       The defendant shall complete forty hours of community
11 service at a location and schedule approved by the probation
12 office.
13       A further condition of probation is that Mr  Hornsby
14 will not ever be behind the wheel of any motor vehicle at a
15 time during which he has used any alcoholic beverage of any
16 kind within the previous 48 hours
17       Now, are there any objections to anything related to
18 the sentencing hearing that have not been previously stated or
19 announced?  That is, any objections to the manner in which the
20 sentence has been pronounced, the calculation of the guidelines
21 or anything else that relates to the sentencing hearing?
22       MR. NIVEN  Nothing from the United States
23       MR. BLACKWELL  No, Your Honor
24       THE COURT  All right  Mr  Hornsby, I advise you
25 that you have the right to appeal the conviction and the

Page 48

1  sentence within ten days  Any notice of appeal must be filed
2  with the clerk within ten days  If you wish to appeal your
3  attorney will file notice of appeal within ten days or the
4  clerk will file it for you  If you cannot afford an attorney
5  one will be appointed for you  If you can't pay the cost of an
6  appeal you will be allowed to appeal in forma pauperis on
7  application and an attorney application would have to be made
8  for you if you wanted an attorney on appeal
9        Anything else?
10       MR. NIVEN  Pursuant to the plea agreement and Mr
11 Hornsby's prior plea to Count II of the indictment, the United
12 States moves to dismiss Count I as to Mr Hornsby
13       THE COURT  All right  Granted
14       Anything else?
15       MR. BLACKWELL  No, sir
16       THE COURT  Probation needs to see him?
17       USPO MATHIS  Yes, Your Honor
18       THE COURT  Mr  Blackwell, if you will arrange for
19 that
20       Next case
21       COURTROOM DEPUTY CLERK  United States versus Terry
22 Douglas Johnson  Criminal Number 99-13-S-14
23       THE COURT  The Court calls up the case of the
24 United States versus Terry Douglas Johnson
25       Who is here representing Mr Johnson?

U.S.A vs Reeves , et al                CondenseIt™                2/01/00 Sentencing

Page 49

1    MR. FOCKE. Your Honor, my name is John William
2 Focke  I am with the federal defender
3    THE COURT  All right  Mr  Focke, have you and Mr
4 Johnson had at least thirty five days in which to review the
5 presentence report?
6    MR. FOCKE. Your Honor, we have not had thirty five
7 days  But we would sign the waiver if the Court desires,
8 written waiver  Mr Johnson will state on the record that he
9 waives  We have had an opportunity to review it and we been
10 handed waiver just now from probation
11    THE COURT  All right  Let me ask Mr Johnson
12    Mr  Johnson, under the law you and your attorney are
13 entitled to at least thirty-five days in which to review the
14 presentence report. The reason for that is that the sentence
15 that you will receive will be substantially influenced by what
16 is contained in the presentence report  You and your attorney
17 are entitled to that thirty-five days so that you will have an
18 opportunity to prepare and object to what is contained in the
19 presentence report and prepare for a hearing. If you had
20 objections, the Court would have to here those objections and
21 make a final determination  So, that's the reason you are
22 entitled to the thirty-five days  It's immaterial to the Court
23 whether we have the hearing today or whether we set off the
24 hearing to some future time where you will have had the full
25 thirty-five days  Whatever decision that is should be a

Page 50

1 voluntary decision on your part and it makes no difference to
2 the Court which procedure is followed
3    Do you understand?
4 A  Yes, sir
5    THE COURT  Do you have any question about it?
6 A  No, sir
7    THE COURT  Do you wish to proceed today or do you
8 wish to be rescheduled?
9 A  Today is fine
10    THE COURT  All right  If you will sign that and
11 give it to the clerk, please
12    (Document signed and handed to the Court)
13    THE COURT  All right  Mr  Focke, do you have any
14 objections the presentence report as it relates to the content,
15 calculations, findings, observations conclusions, otherwise?
16    MR. FOCKE. No, Your Honor  I do have a couple of
17 comments on what the final sentence should be
18    THE COURT  The government?
19    MR  NIVEN  No
20    THE COURT  You say you have a couple of comments
21 Are you talking about comments that relate to the presentence
22 report?
23    MR. FOCKE. No, Your Honor  On the final sentence
24    THE COURT  All right  There being no objections to
25 the contents of the report the Court adopts the factual

Page 51

1 statements contained in the presentence report and finds that
2 the offense level is 6, the criminal history category is 1, the
3 guideline imprisonment range is from zero the six months,
4 supervised release period of from two to three years and a fine
5 range of five hundred dollars to five thousand dollars  There
6 is no claim for restitution
7    All right  Now, Mr  Focke, do you have anything you
8 wish to say or does Mr Johnson or both have anything you wish
9 the say before the Court imposes sentence?
10    MR. FOCKE. Yes, Your Honor  First, probation is
11 recommending two years probation  I would ask the Court to
12 imposing a term of one year probation  Indeed Paragraph 48 of
13 the presentence report says, quote, in this case the defendant
14 was clearly the least culpable of the participants
15    Up to this point he had been crime free. He is not a
16 convicted felon and he will be a convicted felon for the rest
17 of his life  I think that is more than enough punishment
18    THE COURT  Where is Mr Johnson where is  Is he
19 employed?
20    MR. FOCKE. Yes  Your Honor
21 A  Adams Beverage
22    MR. FOCKE. He is a route for a beverage company
23    THE COURT  As I recall, he is the son of Ms  Bond?
24    MR. FOCKE. Right
25    THE COURT  Who got who into it?  Not that that

Page 52

1 makes any difference
2    MR. FOCKE. But, Your Honor, I think one-year
3 probation adequately addresses his conduct in this case
4    THE COURT  He has no criminal record?
5    MR. FOCKE. No criminal record
6    THE COURT  Anything else?
7    MR. FOCKE. Yes, Your Honor, I would   He has no
8 history of drug abuse  I would ask the Court to excuse him
9 from the requirement that he do drug testing
10    THE COURT  All right  Anything else?
11    MR. FOCKE. No, Your Honor
12    THE COURT  Anything from the government?
13    MR. NIVEN  No, sir
14    THE COURT  All right. Let's see. I don't know
15 whether there was or was not a motion for downward departure
16 that relates to Mr Johnson  If there was, I don't have it
17    MR. NIVEN  There wasn't
18    MR. FOCKE. There was not a plea agreement in this
19 case.
20    THE COURT  So there is no real hearing
21    All right  Pursuant to the Sentencing Reform Act of
22 1984 it is the judgement of the Court that the defendant, Terry
23 Douglas Johnson  is hereby placed on probation for a term of
24 two years  The defendant is ordered to pay a fine of a hundred
25 and fifty dollars with interest  It is further ordered that

U.S.A. vs Reeves , et al              Condenselt™              2/01/00 Sentencing

## Page 53

1  the defendant shall pay to the United States a special
2  assessment of a hundred dollars  The special assessment is due
3  immediately and the fine the fine shall be paid in monthly
4  installment of not less than fifty dollars
5      I'm not sure I said how long he was placed on
6  probation  Did I?
7          MR. FOCKE You said two years
8      THE COURT well, I meant one year  One year
9      While on probation the defendant shall not commit
10 another federal, state or local crime and shall comply with the
11 standard conditions of probation of record in this court and
12 the following additional conditions
13      The defendant shall not possess a firearm as defined in
14 18 United States Code, Section 921
15      Of course, Mr Johnson, you understand that is not just
16 a condition of probation  That is as your attorney has
17 mentioned, a lifelong condition unless somehow or another it is
18 restored  I believe if I were some of these people here I
19 would be deluging the Department of Treasury with petitions  I
20 wasn't really aware of that provision and I think there are
21 instances where it would be appropriate
22          MR. FOCKE Just for the Court's information  though
23 that provision is there  congress has never funded it  never
24 provided funds for that to actually take effect.
25          THE COURT well, it is a condition that the

## Page 54

1  defendant shall not illegally possess a controlled substance
2  and shall refrain from use of a controlled substance
3      Is there any indication in the presentence report that
4  the defendant has had any problems with drug use?
5      USPO MATHIS Yes, Your Honor  He did acknowledge
6  at the presentence interview of using marijuana in the past
7  That is why we put the drug testing condition in
8  A  And that was, like, when I was a teenager, fifteen,
9  sixteen, whatever
10      THE COURT Is that what is stated in the
11 presentence report?
12      USPO MATHIS No, sir  One instance of using the
13 drug subsequent to his marriage in 1988
14 A  I got married when I was nineteen
15      THE COURT Well, let me put it this way  I'm going
16 to make it a condition that he submit to one drug test
17      Yes, sir?
18      PRETRIAL SERVICES OFFICER I'm with Pretrial
19 Services Office  And during his initial appearance he
20 submitted a urine test in which he did test positive for
21 marijuana
22          MR. FOCKE Your Honor, excuse me
23      THE COURT All right
24      (Mr Johnson and Mr Focke confer)
25      MR FOCKE Your Honor, we withdraw that request

## Page 55

1      THE COURT All right  Well, let's see  With that,
2  I'm going to compromise with you a little bit  I'm going to
3  make the term of probation 18 months  And I further say that
4  you shall submit to one  This is a condition of probation
5  That you submit to one drug test within fifteen days of release
6  from imprisonment and at least two periodic drug tests
7  thereafter as directed by the probation office
8      MR. FOCKE Your Honor, there is no imprisonment, so
9  I assume you mean fifteen days from today's date
10      THE COURT Right  Excuse me
11      Anything else?
12      MR. FOCKE No, Your Honor
13      THE COURT All right  Is there anything with
14 regard to the sentencing that anybody has any objection to that
15 has not already been previously stated for the record  That
16 is, the manner in which the sentence has been pronounced,
17 imposed, the calculations of the guidelines, anything else
18 relating to the sentence hearing that anyone has any objection
19 to that hasn't already been previously stated?
20      MR. FOCKE If I might confer with the government
21      THE COURT Sure
22      (Mr Niven and Mr Focke confer)
23      MR. FOCKE No further objections
24      THE COURT Government?
25      MR. NIVEN No objections, Your Honor

## Page 56

1      THE COURT All right  Do you have a motion?
2      MR. NIVEN Yes, sir  Pursuant to and as a result
3  of his plea to Count II we will dismiss Count I at this time
4      THE COURT The government moves to dismiss Count I
5  and that motion is granted
6      It was Count II that he plead to  Right?
7      MR. NIVEN Yes  sir
8      THE COURT All right  Then, Mr Johnson, I advise
9  you that you have the right appeal your conviction and/or the
10 sentence within ten days  Any such notice of appeal must be
11 filed within ten days with the clerk of this court  Your
12 attorney will file that notice on our request, or the clerk
13 will file it on your request  And if you are unable to afford
14 an attorney you can petition for an attorney to represent you
15 on appeal and that would be granted if you cannot afford an
16 attorney  You can petition, also, to appeal without paying the
17 cost of appeal  And that's an appeal in form pauperis if you
18 cannot afford it
19      Probation need to see him?
20      USPO MATHIS Yes, sir
21      THE COURT Let's be in recess for about ten
22 minutes
23      (After recess)
24      THE COURT Next case
25      COURTROOM DEPUTY CLERK United States of America

**99-13-S**                                   Page 53 - Page 56

U.S.A vs Reeves, et al                    CondenseIt™                    2/01/00 Sentencing

---

**Page 57**

1  versus Milton K. Phillips, Criminal Number 99-13-S-9
2      THE COURT All right The Court calls the case of
3  United States versus Milton K. Phillips, 99-13-9
4      State for the record who is here representing Mr
5  Phillips
6      MR. PARKMAN That will be Jim Parkman, Your Honor,
7  from Dothan and Charles Amos
8      THE COURT Mr Parkman, have you and Mr Phillips
9  had at least thirty-five days in which to review the
10  presentence report?
11  A Yes
12      MR. PARKMAN We have, Your Honor
13      THE COURT Do you have any objection to the content
14  of the report as it relates to findings, facts, conclusions
15  calculations or otherwise?
16      MR. PARKMAN No, sir, Your Honor, we do not
17      THE COURT The government?
18      MR. NIVEN No, sir
19      THE COURT All right. There being no objection,
20  the Court adopts to factual statements contained in the
21  presentence report and finds that the offense level is 10, the
22  criminal history category is 1, the guideline imprisonment
23  range from 6 to 12 months, the supervised release period from
24  two to three years, the fine range two thousand dollars to
25  twenty thousand dollars No claim for restitution

---

**Page 58**

1      Is there an agreement in this case?
2      MR. NIVEN Yes, sir The plea agreement was that
3  with Mr Phillips cooperation, the United States would move for
4  a downward departure of two levels, which I believe I have
5  already filed with the Court
6      THE COURT All right That motion is granted
7      And is it understood, Mr Parkman, from your
8  perspective that there would be a downward departure to a level
9  8?
10      MR. PARKMAN There was, Your Honor
11      THE COURT All right The Court grants that
12  motion The Court is familiar with the testimony and familiar
13  with the motion and grants the motion
14      The Court finds that the guideline level should be 8,
15  which combined with a criminal history category of 1 creates a
16  guideline range of from zero to six months, a fine range of a
17  thousand dollars to ten thousand dollars
18      Is there anything, Mr Parkman, that either you or Mr
19  Phillips either one wishes to say before the Court imposes the
20  sentence that may have any bearing on the sentence or range or
21  otherwise?
22      MR. PARKMAN The only thing I would I say to the
23  Court, Your Honor is in uniformity aspects of sentencing, that
24  you would take into consideration that he is in the same
25  identical situation that Ms Bond was in which you sentenced

---

**Page 59**

1  willing earlier no prior record, no history of drugs Same
2  situation And we ask that you consider, please, the same type
3  sentence that she was given in that case.
4      THE COURT Refresh me what you particularly have
5  reference to
6      MR. PARKMAN I had particularly in reference to a
7  probationary period of one year
8      THE COURT Anything else?
9      MR. PARKMAN That's all I have, Your Honor
10      THE COURT Government?
11      MR. NIVEN Nothing from the government
12      THE COURT All right Pursuant to the Sentencing
13  Reform Act of 1984 The probation office is not here
14      Pursuant the Sentencing Reform Act of 1984 it is the
15  judgment of the Court that the defendant, Milton K. Phillips,
16  is hereby placed on probation for a term of 1 year The
17  defendant is ordered to pay a fine of five hundred dollars with
18  interest It is further ordered the defendant shall pay to the
19  United States a special assessment of a hundred dollars The
20  special assessment and fine are due immediately
21      Let's see Mr Phillips, I'm not sure that I
22  specifically asked if you had anything to say?
23  A I have nothing Your Honor
24      THE COURT All right While on probation the
25  defendant shall not commit another federal, state or local

---

**Page 60**

1  crime and shall comply with the standard conditions of
2  probation of record in this court
3      Is this the defendant that you filed a motion on behalf
4  of?
5      MR. PARKMAN Correct, Your Honor this is
6      THE COURT I thought Mr Phillips looked like he
7  might be a hunter
8      Did you hear what Mr Focke said earlier concerning
9  that law?
10  A No, sir I wasn't here, sir
11      THE COURT I was asking Mr Parkman
12      MR. PARKMAN No, sir, I was not here either
13      THE COURT Mr Focke For your information Mr
14  Focke earlier, with regard to one of the defendants that he
15  represented, said, when I made some reference to that provision
16  that you called to our attention this morning, he said one
17  reason that we may not have heard of that provision all that
18  much is because the Congress has never funded granted funds
19  in order that that particular provision could be put into
20  affect Now, I don't know
21      MR. NIVEN That is not exactly right, Judge That
22  provision has been in effect for quite sometime And what it
23  entails is that ATF does a background investigation on a
24  defendant once they make application to the Secretary of
25  Treasury And what Congress has done, in about the last four

---

U S A  vs Reeves , et al                    Condenselt™                    2/01/00 Sentencing

## Page 61

1  or five years in the budgetary process has limited ATF to
2  saying none of its funds will be expended for investigations
3  for that particular section
4        THE COURT  What is different about that than what
5  he said?
6        MR. NIVEN  well, he said it had never been funded
7  And in the past has been funded and has been used  I am aware
8  of instances in which people have had their rights restored by
9  ATF
10       THE COURT  I believe some way or another I might
11 think in terms, if I was a lawyer representing Mr  Phillips,
12 thing in terms of the fact that if they don t fund it, that
13 maybe there is no other way to do it other than come directly
14 to court, if they won't do it
15       Mr Philip understands he can t keep hunting unless
16 something is done  Is that right?
17       MR. PARKMAN  That is correct
18       THE COURT  Another condition of probation  The
19 defendant shall not illegally possess a controlled substance
20 and shall refrain from any unlawful use of a controlled
21 substance. There is no need for mandatory drug testing because
22 there is no indication that he poses a risk of drug abuse
23       MR. PARKMAN  Excuse me  I apologize.
24       THE COURT  No  You don't owe me any apology  I'm
25 a public servant

## Page 62

1        MR. PARKMAN  But you were talking and I didn't mean
2  to interrupt you
3        Before you let us go, there is one issue about this
4  hunting thing that I want to get in and make certain of because
5  of something that I found out today
6        I had talked with our officer from the U S attorney's
7  office, who was Ashton Holmes  the assistant U S Attorney in
8  our case, and I had talked with her approximately right before
9  I filed my motion  In my motion I put in there the fact that I
10 had talked to her and she had indicated that she knew from Mr
11 Phillips' background check had been done and the office had done
12 that he was not a danger to the community, and she would have
13 no opposition to those rights being given to him for hunting
14 purposes
15       Now  the reason I bring this up is  I have heard this
16 morning - And I am not privy to this  But this was my concern
17 earlier when I mentioned it to you - that Ms Holmes has
18 resigned from the U S attorney's office and is going
19 somewhere in private practice, or whatever  So I would like
20 to have it put on the record that you know that my motion --
21       THE COURT  Are you saying that whatever
22 understanding that you had with Ms Holmes was verbal?
23       MR. PARKMAN  It was verbal  I talk to her face to
24 face here in this United States Courthouse the day before I
25 filed that motion  And I put in the motion that I had talked

## Page 63

1  with her  And that it was --
2        THE COURT  Well, I assume what she was in effect
3  saying is, I won't oppose the motion  Right?
4        MR. PARKMAN  Right  She said I have no problem
5  with that whatsoever
6        THE COURT  Well, now, whether Ms  Holmes has a
7  problem with it or not, she is not the Secretary of Treasury
8  so
9        MR. PARKMAN  Correct. But I think that it is
10 important that --
11       THE COURT  Well, I guess what it comes down to is
12 you are asking Mr Niven, I assume, if he is willing to say
13 that from the perspective of the U S  Attorney's office, that
14 they have no evidence that he is a danger to the community
15       MR. PARKMAN  Correct  And I just didn't know if he
16 was aware of that
17       MR. NIVEN  I can say that  I just don't think we
18 have any authority that would be binding on the Secretary of
19 the Treasury  We would probably have to represent them
20       THE COURT  Well, he has said it
21       MR. PARKMAN  Okay  That's good enough for me
22       THE COURT  Maybe you can make some law
23       MR. PARKMAN  Thank you, sir
24       THE COURT  All right  Mr  Phillips, I advise you
25 that you have

## Page 64

1        Let me ask this question first.  Is there any objection
2  from any party as to the findings of facts, the calculations,
3  conclusions, anything else relating to sentence and the manner
4  in which the sentence had has been pronounced other than
5  previously stated for the record?
6        MR. PARKMAN  No sir
7        THE COURT  Government?
8        MR. NIVEN  No, Your Honor
9        THE COURT  All right  Mr Phillips, I advise you
10 that you have the right to appeal both your conviction and
11 sentence within ten days  Any such notice of appeal must be
12 filed within ten days  If you are unable to afford an attorney
13 to represent you on appeal, on your petition, if you are unable
14 to afford an attorney, one will be appointed for you  If you
15 are unable to pay the cost of appeal, on petition you could
16 file in forma pauperis  Any such notice of appeal must be
17 filed with the clerk of this office within ten days
18       MR. NIVEN  Pursuant to plea agreement and Mr
19 Phillips' plea to Count II of the document, we move to dismiss
20 Count I as to Mr  Phillips
21       THE COURT  Granted
22       Probation need to see him?
23       USPO MATHIS  Yes, Your Honor
24       THE COURT  All right  What is the next case?
25       COURTROOM DEPUTY CLERK  United States of America

99-13-S                                    Page 61 - Page 64

## Page 65

1  versus Ronald Benefield, Criminal Number 99-13-S-13
2        THE COURT Mr Parkman, you represent him, also?
3        MR. PARKMAN I do, Your Honor  This is Mr Ronald
4  Benefield.
5        THE COURT All right  The Court calls up the case
6  of United States versus Ronald Benefield  And that is
7  99-13-13, represented by
8        MR PARKMAN Jim Parkman and Mr Amos, Your Honor
9        THE COURT Now, Mr Parkman, have you and Mr
10  Benefield had at least thirty-five days in which to review the
11  presentence report?
12        MR PARKMAN We have, Your Honor
13        THE COURT Do you have any objections to the
14  presentence report or any content of it, finds, facts,
15  conclusions, calculations or otherwise
16        MR PARKMAN None, sir
17        THE COURT Government?
18        MR. NIVEN None, Your Honor
19        THE COURT There being no objection, the Court
20  adopts the factual statements contained in the presentence
21  report and finds that the offense level is 10 and the criminal
22  history category is 1, the guideline imprisonment range from 6
23  to 12 months, the supervised release period from two to three
24  years and that the fine range is two thousand dollars to twenty
25  thousand dollars  There is no restitution claim

## Page 66

1        Is there a plea agreement?
2        MR. NIVEN Yes, Your Honor  Pursuant to the plea
3  agreement I have filed with the Court a motion for a downward
4  departure of two levels for Mr Benefield's assistance in
5  testifying at the trial of this case.
6        THE COURT All right  The Court has seen the
7  motion filed by the government and, of course, the Court heard
8  the testimony at trial  The motion is due to be granted and is
9  granted
10        From your perspective, Mr Parkman is it understood
11  that there would be a departure to a level 8?
12        MR PARKMAN That's correct, Your Honor
13        THE COURT All right. The Court grants the motion
14  and the Court finds that the guideline level should be 8, with
15  a combined criminal history category of 1, creates a guideline
16  range of zero to six months and a fine range of a thousand
17  dollars to ten thousand dollars
18        Is there anything, Mr Parkman that either or Mr
19  Benefield wishes to say before the Court imposes sentence that
20  might have any bearing on the sentence regarding sentencing
21  range or otherwise?
22        MR. PARKMAN On behalf of Mr Benefield and myself,
23  the only thing we would ask that you take into consideration,
24  again, that Mr Benefield is similarly situated to that of Mr
25  Phillips and Ms Bond  They are identical with regard to the

## Page 67

1  nature of the offense, they are identical in the fact that they
2  have never been in trouble before
3        THE COURT Where is Mr Benefield employed?
4        MR. PARKMAN Mr Benefield is employed with  His
5  wife owns a restaurant and nightclub in Dothan, Alabama, in
6  downtown called Mud Bugs and he is employed with that
7        THE COURT All right  Probation, is there any
8  special circumstances relating to Mr Benefield that the Court
9  should be aware of insofar as it has a bearing on the term of
10  probation or otherwise?
11        USPO MATHIS No, Your Honor
12        THE COURT All right  Anything else, Mr Parkman?
13        MR. PARKMAN That's all, Your Honor
14        THE COURT Mr Benefield, do you have anything you
15  wish to say?
16  A No, sir
17        THE COURT Government?
18        MR. NIVEN No, sir
19        THE COURT All right  Pursuant to the Sentencing
20  Reform act of 1984 it is the judgment of the Court that the
21  defendant, Ronald Benefield, is hereby placed on probation for
22  a term of 1 year  The fine is waived because of inability to
23  pay  It is further ordered that the defendant shall pay to the
24  United States a special assessment of a hundred dollars
25  That's due immediately  Following probation the defendant

## Page 68

1  shall not commit anther federal, state or local crime and shall
2  comply with the standard conditions of probation of record in
3  this court and the following special conditions
4        The defendant shall not possess a firearm  The
5  defendant shall not illegally possess a control substance and
6  shall refrain from any unlawful use of a controlled substance
7        Is there some indication of prior drug use?
8        USPO MATHIS Just the defendant's admission of
9  marijuana use in the 1970's
10        THE COURT All right  I'm going to say that he
11  will submit to at least one drug test during the term of
12  probation, as determined by the probation officer  And that he
13  shall complete forty hours of community service at a location
14  and schedule approved by the probation office
15        All right  Anything else?
16        MR. PARKMAN That's all we have, Your Honor
17        THE COURT Is there any objection to the
18  Yes?
19        USPO MATHIS Judge, I'm sorry  Just for
20  clarification for our office  Are you waiving the mandatory
21  testing condition and imposing instead that he have one test?
22        THE COURT Yes, sir
23        USPO MATHIS Thank you
24        THE COURT Is there any objection to anything
25  concerning the manner in which the sentencing has been

## Page 69

1  conducted as it relates to findings, conclusions, anything
2  other matters relating to the sentence imposed or the manner in
3  which it is imposed other than those previously stated for the
4  record?
5       MR. PARKMAN None from defendant, Your Honor
6       MR. NIVEN None from the government, Your Honor
7       THE COURT Government have a motion?
8       MR. NIVEN Yes, Your Honor Pursuant to the plea
9  agreement and Mr Benefield's plea to Count II, the United
10  States moves to dismiss Count I as to Mr Benefield
11       THE COURT Granted
12       Mr Benefield, I advise you that you have the right to
13  appeal the conviction and the sentence within ten days Any
14  such notice of appeal must be filed with the clerk in this
15  court within ten days On your request your attorney will do
16  that for you or the clerk will do it for you If you can't
17  afford an attorney, on petition one will be appointed for you
18  If you can't afford one and if you can't afford to pay the cost
19  of an appeal, on petition you can appeal in forma pauperis
20  without payment of costs
21       Probation need to see him?
22       USPO MATHIS. Yes Your Honor
23       THE COURT Next case
24       COURTROOM DEPUTY CLERK. United States of America
25  versus Myron Brown Criminal Number 99-13-S15

## Page 70

1       THE COURT All right Who is representing Mr
2  Brown?
3       MR. REESE. I am Charles N Reese from Daleville
4       THE COURT All right. The Court calls up the case
5  of the United States versus Myron Brown That is 989-13-15
6       Mr Reese have you and Mr Brown had at least
7  thirty five days in which to review the presentence report?
8       MR. REESE No, sir But we have signed a waiver,
9  Your Honor If I may approach
10       THE COURT Sure
11       Mr Brown, do you understand that under the law that
12  you and your attorney are entitled to at least thirty-five days
13  in which to review the presentence report?
14  A  Yes, sir
15       THE COURT And you understand that the reason of
16  that is that the sentence you will receive will be
17  substantially influenced by what is contained in that
18  presentence report?
19  A  Yes, sir
20       THE COURT And you understand that you and your
21  attorney are entitled to that thirty-five days so that if you
22  have an objection to the presentence report, that you could
23  prepare for the sentencing hearing and the Court would have to
24  make a final determination?
25  A  Yes sir

## Page 71

1       THE COURT And do you think you have had plenty of
2  time to review the presentence report?
3  A  Yes, sir, I have
4       THE COURT Notwithstanding it hasn't been a full
5  thirty-five days?
6  A  Yes, sir
7       THE COURT About how long has it been?
8  A  I have had a copy of it
9       MR. REESE. About three and a half or four weeks
10       THE COURT You think you have had time?
11  A  Yes, sir
12       MR. REESE. It's right close to the thirty-five
13  days
14       THE COURT And you understand it makes no
15  difference to the Court, Mr Brown, as to whether you go ahead
16  with sentencing today or we reschedule at some other time?
17  A  Yes, sir
18       MR. REESE. We are prepared, Your Honor
19       THE COURT Okay Now, Mr Reese, do you have any
20  objections to the contents of the presentence investigation
21  report as it relates to findings, facts, calculations
22  conclusions otherwise?
23       MR. REESE. No, Your Honor, I do not
24       THE COURT Government?
25       MR. NIVEN. None, Your Honor

## Page 72

1       THE COURT All right Is there a plea agreement in
2  this case?
3       MR. NIVEN Yes, Your Honor, we have a plea
4  agreement And Mr Brown pled guilty to a one-count
5  information and pursuant to that agreement we would dismiss the
6  indictment as to Mr Brown at sentencing
7       THE COURT Is that the only agreement?
8       MR. NIVEN I believe that's correct
9       MR. REESE. That's correct, Your Honor
10       THE COURT All right That motion is granted
11       Mr Reese, is there anything that either you or Mr
12  Brown either wish to say before the Court imposes sentence that
13  may have any bearing on the sentence the Court imposes?
14       MR. REESE. No, Your Honor
15       THE COURT Mr Brown?
16  A  No, sir
17       THE COURT All right Pursuant to the Sentencing
18  Reform Act of 1984 it is the judgment of the Court that the
19  defendant, Myron Brown, is placed on probation for a term of 1
20  year The defendant is ordered to pay a fine of two hundred
21  and fifty dollars with interest, further ordered that the
22  defendant shall pay to the United States a special assessment
23  of twenty-five dollars The special assessment penalty is due
24  immediately The fine shall be paid in monthly installments of
25  not less than a hundred dollars to commence within 30 days of

U S.A. vs Reeves, et al                 Condenselt™                 2/01/00 Sentencing

### Page 73

1  sentencing
2      While on probation the defendant shall not commit
3  another federal, state or local crime and shall comply with the
4  standard conditions of probation adopted by this Court  The
5  defendant shall not possess
6      Well, I'm not going to say you can't possess a
7  firearm  That is not a condition
8      The defendant shall not illegal possess a controlled
9  substance and shall refrain from any unlawful use of a
10  controlled substance  Mandatory drug testing is suspended
11  based on the Court's determination that he is a low risk
12      Is there any objection to anything relating to the
13  sentencing hearing, the manner in which the hearing has been
14  conducted, the sentence imposed, findings, calculations,
15  conclusions or anything else related to the sentence?
16      MR REESE  None from the defendant, Your Honor
17      MR. NIVEN  None from the government, Your Honor
18      THE COURT  Mr  Brown, I advise you that you have
19  the right appeal the conviction and sentence within ten days
20  Any notice of appeal must be filed with the clerk in this court
21  within ten days  Your attorney will file that on your
22  request  If you can't afford an attorney to represent you on
23  appeal you can petition for that and one will be appointed for
24  you  If you can't afford to pay the cost of appeal you may
25  petition for that and you can appeal without payment of cost

### Page 74

1      Anything else?
2      MR. REESE  No, Your Honor
3      THE COURT  Government?
4      MR. NIVEN  I believe the Court has already granted
5  the motion
6      THE COURT  Do you need to see him?
7      USPO MATHIS  No  Your Honor
8      THE COURT  All right  Next case.
9      COURTROOM DEPUTY CLERK  United States of America
10  versus Ronald Lynn Cherry, Criminal Number 99-13 S-4
11      THE COURT  All right  The Court takes up the case
12  of United States versus Ronald Lynn Cherry
13      Who is representing Mr  Cherry?
14      MR. McKNIGHT  Your Honor, David McKnight and Earl
15  Smith
16      THE COURT  All right  Mr  McKnight, have you and
17  Mr  Cherry had at least thirty-five days in which to review the
18  presentence report?
19      MR. McKNIGHT  No, sir  We have had twenty-five
20  days  but we are willing to waive the thirty-five days  We
21  have signed a waiver and I have discussed it with my client
22      THE COURT  All right  Mr  Cherry, you understand
23  that under the law you and your attorney are entitled to at
24  least thirty five days in which to review the presentence
25  report?

### Page 75

1  A  Yes, sir
2      THE COURT  And you understand that the reason for
3  that is that the sentence you will receive will be
4  substantially influenced by what is contained in the
5  presentence report?
6  A. Yes, sir
7      THE COURT  And you understand that you have a right
8  to object to what is in the presentence report, and that is the
9  reason you have the thirty-five days, so you can prepare for a
10  sentencing hearing?
11  A  Yes, sir
12      THE COURT  And you understand if you object to what
13  is contained in the presentence report that the Court would
14  have to conduct a hearing and make a final determination?
15  A  Yes, sir
16      THE COURT  And you understand it is immaterial to
17  me whether we proceed today or he set it off in the future?
18  A  Yes, sir
19      THE COURT  And do you wish me to proceed today or
20  do you want to set it off in the future?
21  A  I would like to proceed today, sir
22      THE COURT  And is that a voluntary decision?
23  A  Yes, sir
24      THE COURT  All right.
25      Mr  McKnight, are there any objections to the contents

### Page 76

1  of the presentence report?
2      Now, I know you filed some written objections, but my
3  practice is for whatever objections you have to be stated here
4  today so that we can take them up one by one  Any that are not
5  stated today will be considered to be waived
6      MR. McKNIGHT  Yes, sir, Your Honor  We have
7  several objections
8      THE COURT  All right
9      MR. McKNIGHT  Our first objection --
10      THE COURT  Let me ask this, just in the interest of
11  time.
12      I think I see Mr  Cobb here  Is his attorney here?
13      MR. KIRK  I am here
14      THE COURT  I am not trying to make whether somebody
15  does or does not have objections  but I understand that there
16  are a number of objections here  Does your client have any
17  objections to the presentence report?
18      MR. KIRK  No, sir, Your Honor
19      THE COURT  Would you like to go ahead and proceed?
20  Or does it make any difference?
21      MR. KIRK  We can proceed, yes, sir
22      MR. McKNIGHT  That's fine with us
23      THE COURT  Let's go ahead and proceed with Mr
24  Cobb
25      Mr  Kirk, you understand I'm not trying to make it a

Page 77

1 condition of proceeding  I'm just recognizing the fact that he
2 doesn't have objections, we can go ahead and save time
3      MR. KIRK  We can proceed, Your Honor
4      THE COURT  State for the record who is here
5 representing Mr  Cobb
6      MR. KIRK  I am listed as John T  Kirk  or Tommy
7      THE COURT  All right  Then, the Court calls up the
8 case of United States versus Larry Joe Cobb, 99-13-6
9      Mr  Kirk, have you and Mr  Cobb had at least
10 thirty-five days to review the presentence report?
11      MR. KIRK  We have had less than thirty five days,
12 but we are prepared to file a waiver of that thirty-five days
13 requirement, and do so at this time
14      THE COURT  Mr  Cobb, you have been here and you
15 have heard what I said but there could be somebody else that
16 didn't see it.  You understand that under the law that you and
17 your attorney have at least thirty-five days in which to review
18 the presentence report?
19 A  Yes, sir
20      THE COURT  And you understand that the reason for
21 that is that the sentence you receive will be substantially
22 influenced by what is contained the presentence report?
23 A  Yes, sir
24      THE COURT  And do you understand that the reason
25 you are given that thirty-five days is so that you can prepare

Page 78

1 to and object to what is contained in the presentence report?
2 A  Yes, sir
3      THE COURT  And you understand if you had
4 objections, the Court would have to conduct a hearing and make
5 a final determination?
6 A  Yes, sir
7      THE COURT  And you understand it makes no
8 difference to the Court whether we proceed today or whether we
9 schedule it off sometime in the future?
10 A  Yes sir
11      THE COURT  And do you have any questions about any
12 of that?
13 A  No, sir
14      THE COURT  Do you wish to proceed today or do you
15 wish to set it off in the future?
16 A  Yes, sir  Today
17      THE COURT  Today?
18 A  Yes, sir
19      THE COURT  And is that your voluntary decision, Mr
20 Cobb?
21 A  Yes, sir
22      THE COURT  Mr  Kirk  I'm not trying to hold you to
23 what you said earlier so you can give me a different answer if
24 you want  Do you have any objections to any of the content
25 of report it relates to the content, calculations, findings,

Page 79

1 conclusions or otherwise?
2      MR. KIRK  No, sir
3      THE COURT  Government?
4      MR. NIVEN  No, sir, Your Honor
5      THE COURT  All right  There being no objection,
6 the Court adopts the factual statements contained in the
7 presentence report and finds that the offense level is 9,
8 criminal history category is 1, guideline imprisonment range is
9 from 4 to 10 months, the supervised release period from two to
10 three years and the fine range is from a thousand dollars to
11 ten thousand dollars  There is no claim for restitution
12      Was there a plea agreement here?
13      MR. NIVEN  No, sir  He went to trial and he was
14 found guilty
15      THE COURT  All right  Mr  Kirk, do either you or
16 Mr Cobb either one have anything you wish to say before the
17 Court imposes sentence which may have a bearing on the
18 sentencing range or otherwise?
19      MR. KIRK  Judge, briefly, only in reference to the
20 sentencing recommendation  There is a typing error on page
21 12  It has under the recommended sentence provision a fine 1
22 million dollars  I would respectfully submit that should match
23 up at the bottom of page 1 of a thousand dollar fine
24 recommendation
25      THE COURT  Wait a minute, now  Where is that

Page 80

1      MR. KIRK  Page 1 of the sentencing recommendation
2 order  That's the only thing that we need to correct  And
3 it's just a typing error
4      THE COURT  I see what you are talking about  What
5 was that supposed to be, a thousand?
6      USPO MATHIS  Yes  Your Honor
7      MR. KIRK  And  Judge  we would  of course, ask the
8 Court's consideration, in light of the nature of the offense,
9 Mr Cobb's involvement and society's interest that the Court
10 grant straight probation  If the Court considers any
11 confinement at all under that provision of home confinement, we
12 would ask the Court to grant probation up to one year
13      THE COURT  Okay  Let's see  Under  This is an
14 offense level of 9 and criminal history category of 1  He is
15 eligible for just straight probation without any time?
16      USPO MATHIS  No, Your Honor  The guideline range
17 is 4 to 10 months  He has to do at least four months of home
18 confinement
19      THE COURT  Okay  Do you understand that, Mr
20 Kirk?
21      MR. KIRK  Yes, Your Honor
22      THE COURT  All right  Anything else before the
23 Court pronounces sentence?
24      MR. KIRK  No, sir
25      THE COURT  Mr  Cobb, do you have anything you wish

U.S.A  vs Reeves , et al | CondenseIt™ | 2/01/00 Sentencing

### Page 81

1 to say, sir?

2 A. No, sir

3 THE COURT Pursuant to the Sentencing Reform Act of

4 1984 it is the judgment of the Court that the defendant, Larry

5 Joe Cobb, is placed on probation for a term of two years as to

6 Counts I and II separately, each count to run concurrently

7 The defendant is ordered to pay a fine of a thousand dollars

8 with interest  It's furthered ordered that the defendant shall

9 pay to the United States a special assessment of two hundred

10 dollars  The special assessment is due immediately  The fine

11 shall be paid in monthly installments of not less than a

12 hundred dollars

13 While on probation the defendant shall not commit

14 another federal, state or local crime and shall comply with the

15 standard conditions of probation of record in this court and

16 the following special conditions

17 The defendant shall not possess a firearm  The

18 defendant shall not illegally possess a controlled substance

19 and shall refrain from any unlawful use of a controlled

20 substance

21 Is there some indication of --

22 USPO MATHIS  No, Your Honor

23 THE COURT  All right  The Court determines that

24 there is no indicated risk with regard to drug use and waives

25 the mandatory of the requirement of drug testing

### Page 82

1 The defendant shall participate in a home confinement

2 program for a period of four months to begin at a time

3 designated by the probation office.  During that time the

4 defendant shall remain in his place of residence except for

5 employment and other activities approved in advance by the

6 probation officer  If required by the probation officer, the

7 defendant shall wear an electronic monitoring device and follow

8 electronic monitoring procedures specified by the probation

9 office, and shall pay the cost of that if the probation office

10 determines he has the ability to do so  And in that

11 connection  he will provide the probation office with financial

12 information on request if he expresses an unwillingness to pay

13 the cost otherwise

14 Is there any objection from either party as to the

15 findings of the facts  calculations  conclusions  observations,

16 anything else with regard to the manner in which the sentencing

17 hearing has been conducted or the manner in which the sentence

18 has been imposed  other than previously stated for the record?

19 MR. NIVEN  Not from the government, Your Honor

20 MR. KIRK  Not from the defendant, Your Honor

21 THE COURT  All right  Mr Cobb, I advise you that

22 you have the right to appeal both the conviction and the

23 sentence.  Now  such notice of appeal must be filed within ten

24 days  Your attorney will file that notice on your request or

25 the clerk s office will file it on your request, either  If

### Page 83

1 you can t afford an attorney  if you petition for that, you

2 could be allowed to have an attorney appointed for you on

3 appeal.  If you can t afford to pay the cost of appeal  if you

4 petition for that  you can petition to appeal in form pauperis

5 or without payment of costs

6 Government  is there anything else?

7 MR. NIVEN  Nothing else in this case

8 THE COURT  Mr  Kirk?

9 MR. KIRK  Nothing

10 THE COURT  Probation need to see Mr  Cobb?

11 USPO MATHIS  Just briefly

12 • • • • • • • • • • • •

13 (SENTENCING OF RONALD LYNN CHERRY UNDER SEPARATE COVER)

14 • • • • • • • • • • • •

15 • • • • • • • • • • • •

16 REPORTER S CERTIFICATE

17 UNITED STATES DISTRICT COURT
   MIDDLE DISTRICT OF ALABAMA

18 I  Lewis F  Wimberley  Official Court Reporter for the
   United States District Court for the Middle District of

19 Alabama, do hereby certify that the foregoing 82 computer
   printed pages represent a true and correct transcription of the

20 SENTENCING HEARINGS on February 1  2000  in the heretofore
   captioned cause  Criminal Action 99-13 S, heard in the United

21 States District Court for the Middle District of Alabama,
   Montgomery  Alabama.

22 DATED  this the 8th day of March, 2000

23 LEWIS F  WIMBERLEY
   Official Court Reporter

24

25

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE MIDDLE DISTRICT OF ALABAMA
3                      SOUTHERN DIVISION
4    UNITED STATES
                          CRIMINAL ACT ON 99 13-S
5
                          Montgomery Alabama
6                         February 1  2000
7              vs
8    RONALD LYNN CHERRY
9
10                      SENTENCING
11
12       BEFORE THE HONORABLE ROBERT B  PROPST
         UNITED STATES CIRCUIT JUDGE
13
14                      APPEARANCES
15   FOR THE GOVERNMENT        C  Redding Pitt
                               U S  Attorney
16                             Montgomery  Alabama
                          BY   Charles R  Niven
17                             Ass t  U S  Attorney
18   FOR THE DEFENDANT     David McKnight
                           Attorney at Law
19                         Birmingham  Alabama
                      and  J  Earl Smith
20                         Dothan  Alabama
21
22              Proceedings recorded by mechanical
         stenography  Transcript produced by computer
23
24
25
```

Page 2

1        THE COURT  All right  The Court takes up the case
2    of United States versus Ronald Lynn Cherry
3        Who is representing Mr Cherry?
4        MR. McKNIGHT  Your Honor, David McKnight and Earl
5    Smith
6        THE COURT  All right  Mr McKnight, have you and
7    Mr Cherry had at least thirty-five days in which to review the
8    presentence report?
9        MR. McKNIGHT  No, sir  We have had twenty-five
10   days, but we are willing to waive the thirty-five days  We
11   have signed a waiver and I have discussed it with my client.
12       THE COURT  All right  Mr Cherry, you understand
13   that under the law you and your attorney are entitled to at
14   least thirty-five days in which to review the presentence
15   report?
16   A  Yes sir
17       THE COURT  And you understand that the reason for
18   that is that the sentence you will receive will be
19   substantially influenced by what is contained in the
20   presentence report?
21   A  Yes sir
22       THE COURT  And you understand that you have a right
23   to object to what is in the presentence report, and that is the
24   reason you have the thirty five days, so you can prepare for a

Page 3

1    sentencing hearing?
2    A  Yes, sir
3        THE COURT  And you understand if you object to what
4    is contained in the presentence report that the Court would
5    have to conduct a hearing and make a final determination?
6    A  Yes, sir
7        THE COURT  And you understand it is immaterial to
8    me whether we proceed today or be set it off in the future?
9    A  Yes, sir
10       THE COURT  And do you wish me to proceed today or
11   do you want to set it off in the future?
12   A  I would like to proceed today, sir
13       THE COURT  And is that a voluntary decision?
14   A  Yes, sir
15       THE COURT  All right
16       Mr McKnight, are there any objections to the contents
17   of the presentence report?
18       Now, I know you filed some written objections, but my
19   practice is for whatever objections you have to be stated here
20   today so that we can take them up one by one  Any that are not
21   stated today will be considered to be waived
22       MR. McKNIGHT  Yes, sir, Your Honor  We have
23   several objections
24       THE COURT  All right
25       MR. McKNIGHT  Our first objection —

Page 4

1        THE COURT  Let me ask this, just in the interest of
2    time.
3        I think I see Mr Cobb here.  Is his attorney here?
4        MR. KIRK  I am here
5        THE COURT  I am not trying to make whether somebody
6    does or does not have objections, but I understand that there
7    are a number of objections here  Does your client have any
8    objections to the presentence report?
9        MR. KIRK  No, sir, Your Honor
10       THE COURT  Would you like to go ahead and proceed?
11   Or does it make any difference?
12       MR. KIRK  We can proceed, yes, sir
13       MR. McKNIGHT  That's fine with us
14       THE COURT  Let's go ahead and proceed with Mr
15   Cobb
16
17       THE COURT  The court calls back up the case of
18   United States versus Ronald Lynn Cherry
19       We had reached a point where you said that he had
20   waived the thirty-five days and you had said that you did have
21   objections, and I said let's take those up individually one by
22   one even though you filed notice of those objections, and
23   anything that is not stated today will be deemed waived
24       MR. McKNIGHT  The gist of the objections, Your
25   Honor, is the injustice of the recommendation that he be

Page 5

1  sentenced to 78 months to 87 months, when that would be
2  completely out of line with the other sentences that have been
3  passed out
4        THE COURT I think that there is another
5        Let me say this The good news in there is if there is
6  any way I can keep from sentencing Mr Cherry to 78 months, in
7  light of what has occurred with other people I will say my
8  sense of justice is not that warped, I hope
9        But be that as it may, I think there is another, is
10 there not, Mr Mathis isn't there a guideline that I
11 think a substantial portion of this what seems to be,
12 particularly in view of what other defendants have received,
13 particularly at least one other defendant, isn't there a
14 guideline that talks in terms of when a substantial portion of
15 a sentence relates to money laundering and that seems to be not
16 representative of the real nature of the offense, that that
17 provides a basis for departure?
18       USPO MATHIS Your Honor, that would be under the
19 section 5K2.0 of the guidelines, wherein the Court could find
20 that the defendant's conviction and the circumstances
21 surrounding it are out of the heartland of the typical case
22 that the guideline contemplates
23       THE COURT All right Mr Niven, correct me if I
24 misstate anything in this regard
25       Insofar as the money laundering aspect of this case is

Page 6

1  concerned, that is, there is no question, I don't think, under
2  the facts of the case that Mr Cherry was significantly
3  involved in the gambling activity
4        Insofar as the money laundering aspect of it is I
5  don't know This is not what I would consider the typical
6  money laundering type case that, certainly, that I have been
7  used to It was almost here that the, quote, money laundering
8  was just a way of doing business as far as the gambling is
9  concerned It strikes me that
10       Well, let me ask probation What portion of this
11 guideline range that has been created comes about by virtue of
12 the money laundering activities?
13       Let's assume that all that Mr Cherry had been
14 convicted of was being involved in a gambling operation and
15 there had been no money laundering count What would the
16 guideline range be?
17       USPO MATHIS That would be identical to --
18       THE COURT Mr Cobb?
19       MR MATHIS -- what Mr Cobb and Mr Reeves and
20 just about every other defendant that has been sentenced today
21       THE COURT Well, you say what Mr Reeves' was Was
22 not Mr Reeves more than Mr Cobb?
23       USPO MATHIS I'm sorry I misspoke.
24       Had he been convicted only of the gambling charges Mr
25 Cherry would be sentenced under Section 2E3.1, which carries a

Page 7

1  base offense level of 12 There are no additions for
2  enhancement under that.
3        THE COURT So, in other words, if it weren't for
4  the, quote, money laundering aspect of the case and there was
5  nothing but the gambling, his offense level would be 12?
6        USPO MATHIS Base offense, yes, sir
7        THE COURT And what would be the adjusted?
8        USPO MATHIS I would apply a three-level adjustment
9  for being a manager in the gambling organization That would
10 increase it to level 15
11       THE COURT And criminal history category of 2
12 What is the primary nature of criminal history category 2?
13       MR McKNIGHT Judge, that is a unique circumstance,
14 also He pled guilty out of a business arrangement to --
15       THE COURT He did what now?
16       MR McKNIGHT He pled guilty to a Class C felony,
17 and he was sentenced to probation, with eighty thousand dollars
18 worth of restitution to be made That right there would be one
19 point and t would keep him in a criminal history category
20 number 1 But he was having trouble making payments, he was
21 making payments, he has paid fifty thousand worth of payments
22       THE COURT Are you talking about this was some sort
23 of so-called white collar type --
24       MR McKNIGHT It was out of the flower business
25 It was a theft of profit charge brought by his partner against

Page 8

1  him.
2        Now, while he was making restitution he had to go back
3  and ask them to cut the restitution from a thousand dollars a
4  month to five hundred dollars a month. And what happened is,
5  that extended out the probation period to fall into the time of
6  the criminal activity that we are involved with So he got
7  two extra points for being on probation while the gambling
8  operation was going on
9        So, we argue, as one of our objections, that that
10 overstates his criminal history for just having a Class C
11 felony
12       THE COURT Yes, sir?
13       USPO MATHIS I must disagree with counsel Mr
14 Cherry was sentenced to five years probation unsupervised
15 probation in 1990 - And that extended well into the gambling
16 organization before it was modified to supervised probation
17       MR McKNIGHT The gambling, I believe, in the
18 indictment, and I will have to look, was probation was three
19 years initially and then they moved it to five, which would be
20 outside the indictment period of the gambling operation
21       THE COURT Mr McKnight, I think what got us into
22 this initially was my question as to whether or not there were
23 any objections I consider the
24       We have talked about, and I think it is because I kind
25 of rushed into it And that was on the issue of the gambling

U.S.A vs Cherry        CondenseIt™        2/01/00 Sentencing

1 versus money laundering which, from the perspective that I was
2 talking about, it falls under the issue of the possibility of
3 departure
4     Let's go back and let's take up what specific
5 objections that you may have. And then you also started out
6 talking about disparity And I tend to agree with you there,
7 also But let's That's also an issue of departure
8     Let's take it up specifically with regard to what the
9 guideline range should be before we reach either of those
10 issues of departure, and then we will reach those later
11     What objections do you have to the presentence report
12 that resulted in a determination that there was an offense
13 level of 27 and a guideline range 78 to 97 months?
14     MR. McKNIGHT If it please the Court, I'm going to
15 address both issues, including departure, because with the
16 departure if we sentence under the gambling, then there is no
17 specific offense characteristics, as far the money amounts and
18 things like that So, there is two different ways to approach
19 this
20     THE COURT Now, he was convicted of money
21 laundering
22     MR. McKNIGHT That's correct
23     THE COURT So, obviously, the probation office was
24 correct in starting out with the fact that they had to address
25 this with respect to money laundering. So But on the other

1 hand, the Court can give that some consideration with regard to
2 departure.
3     Are you suggesting that there is something that the
4 probation office could have considered that would have resulted
5 in a guideline calculation of what less than what they
6 calculated?
7     MR. McKNIGHT I think all our arguments, judge,
8 with one exception, would be under the specific offense
9 characteristics following judicial discretion So, it would
10 not be something that probation office could have departed –
11     THE COURT I think that is my initial question Is
12 there any objection to anything in the presentence report as it
13 relates to what probation has determined that is, the facts,
14 calculations conclusions anything else?
15     MR. McKNIGHT Yes sir But they tie back in
16     Now, this is the fact we object to the way they
17 calculated the amount of money That would be a specific
18 offense characteristics if you are sentencing under the money
19 laundering We object to Mr Cherry's role in the offense if
20 he is sentenced under the money laundering We don't have the
21 same objection if he is sentenced under the gambling because,
22 admittedly he was an integral player in the gambling
23 operation
24     As far as the money calculations go, if he is going to
25 be sentenced under the money laundering aspect, and that is a

1 specific offense characteristic, the way Mr Mathis has
2 calculated it at eighty thousand dollars worth of winnings, of
3 which they paid off sixty thousand dollars worth of losses
4 So, our position is that there is only eighty thousand dollars
5 worth of money They take a hundred dollars from this guy that
6 they win and they lose this bet over here and they take that
7 hundred and pay fifty over there –
8     THE COURT That may be a good academic question and
9 I'm not sure what the answer to that would be. Because in some
10 instances you have to you look at the potential and you look
11 at amount handled, and so forth.
12     Let me tell you what my inclination is And, you know,
13 if we were talking about academic pursuits we could stay here
14 and discuss these issues, and it might be interesting and it
15 might not be interesting I don't know
16     But what I am inclined to do in so as far as it relates
17 to any departure Now, whether we get there by virtue the
18 departure or whether we get there by virtue of doing it the way
19 you are saying – That probation office shouldn't have looked at
20 this or that, or shouldn't figure the amount this way or that
21 way - my inclination is to sentence Mr Cherry based for Two
22 reasons, one is because I think the money laundering aspect of
23 it makes it way out of proportion and unrepresentative of what
24 the situation was And secondly, for the other reason that you
25 indicated The disparity in the sentences

1     Now, looking at it from that perspective, it has been
2 indicated that if we looked at it from the gambling
3 perspective And I would do this based on a departure But
4 probation has suggested that that would create an adjusted
5 offense level of about 15 Now, if we reach that level through
6 departure, does that still make it necessary to make these
7 other determinations?
8     MR. McKNIGHT It would eliminate the role in the
9 offense and it would eliminate the specific offense
10 characteristics, as well We would still have the criminal
11 offense category issue that we have already discussed
12     And, in addition we have an acceptance of
13 responsibility dispute with regard to Mr Cherry As you
14 recall, he had entered into verbal negotiations and had a
15 verbal agreement with the U S Attorney to plead in this
16 case. He appeared to give a statement, they submitted him to a
17 lie detector test, and based on the findings of the lie detector
18 test that he was not being honest about Mr Billy Joe Reeves'
19 involvement in the gambling operation, the plea agreement was
20 withdrawn
21     He filed a motion with Your Honor to enforce the plea
22 agreement He has admitted He gave a statement admitting
23 his involvement in the gambling operation when they came into
24 the place And Mr Smith basically stood up, as you recall, in
25 opening argument and said we are guilty of the gambling

U.S.A vs Cherry        Condenseit™        2/01/00 Sentencing

## Page 13

1  THE COURT Let me ask probation and the
2  government I gather And that is an interesting question
3  I don't think I have ever had it before
4  So, in effect, factually, based on what was indicated
5  to me back prior to the trial, factually what occurred was that
6  Mr Cherry, in effect, indicated that he was willing to
7  acknowledge his own complicity He just was not willing to
8  testify
9  MR. McKNIGHT What he testified was that Mr Billy
10 Joe Reeves was not involved in the gambling operation, which
11 every other codefendant who testified in the trial said the
12 same thing So I mean, he didn't I'm not testifying about
13 him He said he wasn't involved in it And based on that,
14 they said he was not telling the truth
15 THE COURT Well, obviously, there is a way for some
16 people who go to trial to be entitled to acceptance of
17 responsibility One of them is if they have got some legal
18 issue that they are hung up on In other words, if they think,
19 "Well, even under these facts I am not guilty I admit that I
20 did what you all say I did, but I am just not guilty because I
21 don't think the law says I'm guilty of anything in I do that"
22 And under those circumstances a defendant can be entitled to
23 acceptance of responsibility even if he goes to trial
24 Now, I don't know that I ever had this very situation
25 where somebody is saying, "I'm willing to admit my own

## Page 14

1  complicity but I'm not willing to admit the complicity of
2  somebody else"
3  Does either the probation or the government have
4  anything you want to say to that?
5  USPO MATHIS Your Honor, our --
6  THE COURT Was there any basis for saying that he
7  did not accept responsibility other than the fact that he went
8  to trial?
9  USPO MATHIS Yes, sir I explored the possibility
10 of giving acceptance of responsibility I telephoned Mr
11 Cherry's trial counsel, Mr Smith, and asked him what I knew
12 that he had never denied the gambling My question was about
13 the money laundering And he advised me that at trial he
14 denied the money laundering.
15 THE COURT Well, I don t know whether this may get
16 into that other category I was talking about whether he denied
17 money laundering or whether he just denied that what he did was
18 money laundering
19 USPO MATHIS I couldn't speak to that
20 MR. McKNIGHT I think the second one situation is
21 true.
22 THE COURT Because it is somewhat a close question
23 on the issue of money laundering
24 The government?
25 MR NIVEN There is no doubt that Mr Cherry did

## Page 15

1  admit to his role in the gambling operation, and did that in a
2  conversation with government counsel and investigators
3  THE COURT Well, insofar as the money laundering
4  was concerned, did he ever deny that he was involved in having
5  these checks cashed and that aspect I mean, did he ever deny
6  the facts?
7  MR. NIVEN No, sir
8  THE COURT In other words, really, all he was
9  saying, Even if did what I was supposed to have done, I
10 wasn't. that's not money laundering That is, in effect,
11 what he was saying, wasn't it?
12 MR. NIVEN Yes, sir
13 MR. McKNIGHT Yes, sir
14 THE COURT I think you are entitled to say that and
15 still get acceptance of responsibility
16 All right Now let's look at it take it step by step
17 just from the perspective of the guideline calculations
18 themselves, the initial ones before we undertake the issue of
19 departure.
20 I am going to give him a two-level reduction for
21 acceptance of responsibility Because I was advised back
22 before trial that, obviously, he had attempted to plead In
23 fact, he filed a motion to enforce it, and so forth Which was
24 denied because I think it is recognized that you can't enforce
25 that type agreement

## Page 16

1  Be that as it may, I am going to grant the two-level
2  reduction for acceptance of responsibility
3  Now, what else is there that the Court is due to
4  consider?
5  MR McKNIGHT The criminal history category Which
6  we have previously discussed is a criminal history category 2
7  THE COURT Are you talking now from the perspective
8  of departure, or are you talking about from the perspective of
9  the calculations?
10 MR. McKNIGHT Departure, Your Honor
11 THE COURT Is there anything else that relates to
12 the issue of calculations --
13 MR. McKNIGHT No, sir
14 THE COURT -- initially?
15 MR. McKNIGHT No, sir, Your Honor
16 THE COURT So, I have ruled on the only objection
17 that you have as it relates to the calculation of the
18 guidelines themselves Is that correct?
19 MR. McKNIGHT Yes, sir, Your Honor
20 THE COURT All right Government, do you have
21 anything you wish to say on that issue?
22 Or do you have any objection?
23 MR. NIVEN We object to the application of the
24 granting of a two-level downward departure for --
25 THE COURT All right Anything else?

Page 17

1   MR. MCKNIGHT No, sir
2       THE COURT All right Then the Court, having
3   considered the objections and granted the objection with regard
4   to acceptance of responsibility, otherwise adopts the factual
5   statements contained in the presentence report, and finds that
6   the offense level is 25
7       And that would create a guideline range of what?
8       USPO MATHIS. 63 to 78 months
9       THE COURT With a supervised release term of two to
10  three years And a fine range of what?
11      USPO MATHIS One moment, Your Honor
12  Ten thousand to one hundred thousand dollars I'm
13  sorry This case would be ten thousand to one million dollars
14      THE COURT All right Ten thousand dollars to one
15  million dollars Restitution is not an issue.
16      Of course, there was no plea agreement in this case
17      Now, Mr McKnight, we can get into the issue of
18  departure. And I have already indicated that And, so, from
19  this point on we are talking about levels And I'm going to
20  give you the two bases for departure that I would consider
21  And under the law, if I give one or more reasons for departure
22  and I say which I do - that I would depart downward the same
23  amount on any one or more of these, regardless of whether the
24  others are correct or not
25      I see as a basis for departure, one is that I think

Page 18

1   that the calculation into the guidelines as it relates to money
2   laundering is unrepresentative of what is truly intended with
3   regard to money laundering cases I mean, this I don't see
4   this as Well, particularly from Mr Cherry's perspective, it
5   seems like to me he was just taking to the bank what he was
6   given, and so forth I am not saying he wasn't guilty of money
7   laundering, but I think that is disproportionate.
8       Also I think that it is there is a disparity and it is
9   disproportionate in view of the fact that the sentence received
10  by Mr Reeves was 15 months and the only apparent difference is
11  that Mr Reeves had an agreement not to testify against his
12  father and Mr Cherry couldn't get an agreement not to testify
13  against his father If there is any other difference, I don't
14  know what it is
15      And maybe he should have got adopted before the case
16      Let's see Now do you have any other bases for
17  departure you want to suggest?
18      MR. MCKNIGHT Judge, those are the two bases that
19  are set out in our objections The first one. I cite six pages
20  worth of cases where, when the money laundering is
21  unrepresentative of the actual offense, the judge has the
22  discretion to depart downward And we would ask the Court to
23  do that
24      In addition I cite in my case where the Sentencing
25  Commission in my objections the Sentencing Commission in

Page 19

1   1997 said the same thing, that these money laundering things
2   are being misused and we ought to look to the substantive
3   offense underneath it to see whether or not it's actually a
4   money laundering scheme or not
5       I would like to make this a matter of record, if I
6   might, Your Honor
7       THE COURT Okay That's fine You can file it
8       And I'm granting the motion for downward departure on
9   that basis
10      I am also granting on the issue of disparity taking in
11  consideration all the circumstances That is, in the one
12  instance there was a plea agreement where he says, I will plead
13  if I don't have to testify against my father And in the other
14  instance was, Well, you can plead if you do testify I mean,
15  that helps create the disparity
16      MR. MCKNIGHT And for the record, I would just like
17  to cite the authority for doing that, which is 18 U S C 3553
18  subsection (a)(6), which says when the Court imposes a sentence
19  one of the things it is supposed to consider is the need to
20  avoid unwarranted sentence disparities among defendants with
21  similar records who have been found guilty of similar conduct
22      THE COURT Let me also state this for the record
23  That I recognize that in some instances when we talk about
24  disparity that the appellate Courts have said that it is an
25  appropriate disparity one pleads and the other doesn't and when

Page 20

1   one has a plea agreement and the other doesn't
2       But I think that there is a distinction here in that
3   the reason one was willing to plead, or at least apparently one
4   of the reasons is it was said, I don't have to the testify
5   against that fellow And the other they said, You can't plead
6   because you won't testify against him
7       So, that, to me seems to fall outside the heartland of
8   that area that we are talking about
9       Now, you also mentioned something earlier about
10  criminal history and I think we said we would get to that in
11  this stage.
12      MR. MCKNIGHT Yes, sir Basically our position on
13  the criminal history is, he has got a criminal history category
14  of 2 for basically, a Class C state felony ten years ago which
15  he has paid fifty thousand dollars of restitution and continues
16  to pay that. And I think that disproportionately represents
17  his what type of the person he is and the fact that he is
18  not a category 2 criminal
19      THE COURT All right Anything else?
20      MR. MCKNIGHT No, sir
21      THE COURT All right Well, let me say this With
22  regard to the criminal history category aspect of it, I will
23  indicate that I will grant that motion for departure But I
24  will also state for the record, as people are wont to say, that
25  on that basis I would not depart downward as far as I will with

Page 21

1  regard to the other aspects of it  But I will make that plain
2  when I announce it
3      Now, before I announce my rulings with regard to
4  departure, does either the government or the defendant either
5  one have anything you wish to say or add?
6      MR. NIVEN  We object to the Court's downward
7  departures based on those two bases
8      THE COURT  On any basis?
9      MR. NIVEN  Yes, sir
10      THE COURT  All right  Anything else?
11      MR. McKNIGHT  No, sir
12      THE COURT  All right  Let me say this  On either
13  the basis of disparity of sentencing - And I don't think I can
14  make it any more vivid as to why I recognize that there is an
15  appropriate basis for departing downward based on disparity
16  And I want to make this as clear as I can - that I recognize
17  that there is a difference in the fact that one went to trial
18  and the other one didn't  But I think that realistically there
19  has to be consideration given to the fact as to why one did go
20  to trial and the other one didn't  And I think that is what
21  helps bring about the disparity and I think that is what takes
22  it out of that area that you can and can't consider that
23      So, I am granting the motion for downward departure on
24  that basis
25      I'm also granting the motion for downward departure

Page 22

1  with regard to the fact that the money laundering aspects of
2  the case creates something that is unrepresentative of his
3  overall complicity with regard to the gambling operation
4      On either of those two bases, that is on disparity or
5  the unrepresentativeness of the money laundering, I would
6  depart to a level 11
7      With regard to the criminal history aspect of it, if
8  that were the sole basis for
9      Well, how does that work if I say that the criminal
10  history category is unrepresentative, do I change the criminal
11  history category?  That is what you do  Right?
12      USPO MATHIS  Yes, sir  If you were going to state
13  that his criminal history category is unrepresentative, you
14  would depart
15      THE COURT  Let me just say this, on that basis all
16  I would do is change the criminal history category to 1  And
17  that would create a level of what if I did that?
18      USPO MATHIS  At an offense level of --
19      THE COURT  Well, it would still be an offense level
20  25, wouldn't it?
21      USPO MATHIS  Yes, sir
22      MR. McKNIGHT  It wouldn't change the offense level
23      USPO MATHIS  At 25 and category 1 the range is 57
24  to 71
25      THE COURT  Does everybody understand what I'm

Page 23

1  saying?  Does the government understand it?
2      MR. NIVEN  Yes, sir
3      THE COURT  Do you understand it, Mr McKnight?
4      MR. McKNIGHT  Yes, sir
5      THE COURT  Probation understand it?
6      USPO MATHIS  Yes, sir
7      THE COURT  I am saying that if all I did was on the
8  criminal history category, we would be talking about a criminal
9  history category of 1 with an offense level of 25
10      But I'm departing downward at a criminal history
11  category 2 down to a level 11 under criminal history category
12  2
13      Now, is that consistent?  Because before I determine if
14  it is consistent or not, I want to make  What I do is going
15  to have some bearing on what criminal history category I am
16  in
17      MR. NIVEN  I thought the court was going to say
18  that the criminal history category should be 1
19      THE COURT  okay  Then, that has a bearing  I'm
20  going to say that it is 1
21      But in any event, in any event, it is my intention
22      And Judge Tjoflat, I believe, says this, anyway  He
23  always maintains that when you depart you shouldn't really go
24  to a level  You should just state what sentence you are going
25  to give  I have heard him say that

Page 24

1      So, what it really comes down to, I'm saying that
2  however I reach it, whether I reach it by criminal history
3  category or however I'm reaching it, I'm going to reach it on
4  the basis of creating a guideline range of from 10 to 16
5  months
6      And I think that's what Judge Tjoflat said you should
7  do anyway, that you shouldn't really go to a level  And
8  whether  My intention is whether or not we end up with a
9  criminal history category of 1 or whether we don't, my
10  intention is depart to a guideline range of 10 to 16 months
11      Anything else?
12      MR. NIVEN  The United States objects to that
13  downward departure
14      THE COURT  All right  Anything else?
15      MR. McKNIGHT  No, sir
16      THE COURT  I think it is plain, but I am not just
17  speaking for myself here
18      All right  Now, that being the case that creates
19      Well, I am just going to say that I'm departing to that
20  sentence  Because I think that is what Judge Tjoflat said you
21  should do anyway
22      And if this goes somewhere and somebody doesn't believe
23  me, please ask him if he hasn't said that.
24      The problem created, usually I restate what the
25  guideline range is, and so forth  And I'm not really sure with

Page 25

1 entering that criminal history and the other in there, that is
2 how you do that.
3       Does probation have any suggestion on it?
4       Let me say  I'm going to do it this way  I'm going
5 to do the it alternative and come down with the same thing
6       That alternative it is either an offense level of 12
7 with a guideline range of 10 to 16 months if criminal history
8 category  is one  If the criminal history category becomes
9 2, I'm departing to level 11 with a guideline range of 10 to 16
10 months
11       USPO MATHIS  I think that will get it
12       THE COURT  And what's the fine range?
13       USPO MATHIS  If it is level 11, it will be two
14 thousand to one million dollars   If it is level 12, it will be
15 three thousand dollars to one million dollars
16       THE COURT  So stated
17       All right  And a supervised release term of two to
18 three years?
19       USPO MATHIS  Yes, sir
20       THE COURT  All right   Pursuant to the Sentencing
21 Reform
22       Anything else anybody wishes to say before I impose
23 sentence? Mr McKnight?
24       MR. McKNIGHT  No, sir
25       THE COURT  Mr  Cherry?

Page 26

1 A  No, sir
2       THE COURT  Anyone?
3       MR. NIVEN  I just want to reserve my objections
4       THE COURT  All right  Anything else?
5       All right  Pursuant to the Sentencing Reform Act of
6 1984, it is the judgment of the Court that the defendant,
7 Ronald Lynn Cherry  is hereby committed to the custody of the
8 Bureau of Prisons to be imprisoned for a term of 10 months
9 This term consists of 10 months each on counts one and two, and
10 10 months each on counts 3 and 16  All terms to be served
11 concurrently
12       The fine is waived
13       It is further ordered that the defendant shall pay to
14 the United States a special assessment of four hundred
15 dollars  That is due immediately and may be collected in a
16 accordance with the Bureau of Prisons Inmate Responsibility
17 Program
18       Upon release from imprisonment the defendant shall be
19 placed on supervised release for three years  While on
20 supervised release the defendant shall comply with the standard
21 conditions of supervised release adopted by this court and the
22 following special conditions
23       You shall not possess a firearm  Of course, you
24 understand it's against the law for you to possess one, period
25 Mr Cherry

Page 27

1 A  Yes, sir
2       THE COURT  The defendant shall not illegally
3 possess a controlled substance and shall refrain from any
4 unlawful use of a controlled substance.
5       The defendant shall submit to one drug test within
6 fifteen days of release from imprisonment and at least two
7 periodic tests thereafter as directed by the probation
8 officer  If determined by the probation officer to be
9 necessary, the defendant shall participate in drug testing and
10 treatment as directed by the probation office, and shall
11 contribute to the cost of treatment if the probation office
12 determines that he is able to pay it
13       Is there anything relating to the sentence which has
14 been imposed as it relates to findings of facts, conclusions,
15 calculations, anything else as it relates to sentencing, the
16 manner in which the sentence has been pronounced, imposed or
17 anything else, other than previously stated for the record?
18       MR. NIVEN  No, sir
19       MR. McKNIGHT  No, sir, Your Honor
20       THE COURT  All right  Mr  Cherry, I advise you
21 that you have the right to appeal you conviction, and you have
22 the right to appeal anything related to the conviction or
23 sentence within ten days  Any such notice of appeal must be
24 filed within ten days in this court  On your request your
25 attorney would file that motion for you, or the clerk would

Page 28

1 file it  If you can t afford an attorney on appeal, you could
2 petition to have an attorney appointed  If you can't afford
3 one, one will be appointed for you  If you can't afford to pay
4 the cost of appeal, on petition you could have the cost waived
5 and appeal in forma pauperis
6       Anything else?
7       Mr McKnight, is there anything with regard to
8 reporting?
9       MR. McKNIGHT  Yes, sir  We would ask that be
10 allowed to voluntarily surrender
11       THE COURT  What was that date you gave me earlier?
12       USPO MATHIS  March 7th, 2000
13       THE COURT  All right  Mr  Cherry, I direct that
14 you either report directly to the institution that may be
15 designated by the Bureau of Prisons at 10:00 a.m on March 7,
16 2000, or that you report to the marshal's office in this
17 building. In the meantime, you are under the same bond and
18 under the same conditions  And if you violate the conditions
19 of that bond you will be subject to being taken into custody
20 immediately
21       I don't know what the situation is in this district,
22 but in our district I think people prefer to report directly
23 because if they report to the marshal they may be held in some
24 sort of county jail somewhere, who knows where
25       All right  Anything else?

U.S.A. vs Cherry                    CondenseIt™                    2/01/00 Sentencing

Page 29

1        MR. McKNIGHT  No sir

2        MR. NIVEN  No sir

3        THE COURT  All right.  I believe that concluded all

4   the cases except for one defendant that...

5        MR. NIVEN  Yes, sir  Mr Mims.

6        COURTROOM DEPUTY CLERK. Court is recessed.

7        * * * * * * * * * * *

8            REPORTER'S CERTIFICATE
    UNITED STATES DISTRICT COURT
9   MIDDLE DISTRICT OF ALABAMA
            I  Lewis F  Wimberley  Official Court Reporter for the
10  United States District Court for the Middle District of
    Alabama, do hereby certify that the foregoing 28 computer
11  printed pages represent a true and correct transcription of the
    SENTENCING HEARING on February 4  2000  in the heretofore
12  captioned cause  Criminal Action 99-13-S  heard in the United
    States District Court for the Middle District of Alabama,
13  Montgomery  Alabama,
            DATED this the 4th day of February, 2000
14

15            LEWIS F  WIMBERLEY
              Official Court Reporter
16

17

18

19

20

21

22

23

24

25

# GOVERNMENT EXHIBIT "5"



AO 245B (Rev 3/95) Sheet 1  Judgment in a Criminal Case

# United States District Court

## Middle District of Alabama

UNITED STATES OF AMERICA
v
**TIMOTHY JOE REEVES**

### JUDGMENT IN A CRIMINAL CASE

*(For Offenses Committed On or After November 1 1987)*

Case Number   1-99CR00013-0 **FILED**

L. Drew Redden

Defendant's Attorney

**FEB 1 0 2000**

**CLERK**
**U. S DISTRICT COURT**
**MIDDLE DIST. OF ALA.**

## THE DEFENDANT:

☒ pleaded guilty to count(s)   Is of the Superseding Information on 10/14/1999

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court

☐ was found guilty on count(s) _____
after a plea of not guilty

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U S C  § 1957 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity | 12/19/1996 | 1s |

The defendant is sentenced as provided in pages 2 through __6__ of this judgment  The sentence is imposed pursuant to the Sentencing Reform Act of 1984

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ (is)(are) dismissed on the motion of the United States

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid

| | |
|---|---|
| Defendant's Soc Sec No       ███-6033 | 02/01/2000 |
| Defendant's Date of Birth     ███1963 | Date of Imposition of Judgment |
| Defendant's USM No    10412-002 | |
| Defendant's Residence Address | |
| 1075 Malvern Road | *[signature]* |
| | Signature of Judicial Officer |
| Dothan                        AL      36301 | **ROBERT B PROPST** |
| | **SENIOR U S DISTRICT JUDGE** |
| | Name & Title of Judicial Officer |
| Defendant's Mailing Address | |
| 1075 Malvern Road | |
| | Feb. 1, 2000 |
| Dothan                        AL      36301 | Date |

EOD   2-11-00

GOVERNMENT
EXHIBIT
5

441

AO 245B (rev 3/95) Sheet 2 Imprisonment

Judgment Page __2__ of __6__

DEFENDANT        TIMOTHY JOE REEVES
CASE NUMBER      I 99CR00013-002

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of _____15____ month(s) __ __

☐ The court makes the following recommendations to the Bureau of Prisons

☐ The defendant is remanded to the custody of the United States Marshal

☒ The defendant shall surrender to the United States Marshal for this district or the designated institution

    ☒ at _____10 00_____ a m on ____03/07/2000____

    ☐ as notified by the United States Marshal

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons

    ☐ before 2 p m on _____ ____ ____

    ☐ as notified by the United States Marshal

    ☐ as notified by the Probation or Pretrial Services Office

## RETURN

I have executed this judgment as follows ~

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment

_____

**UNITED STATES MARSHAL**

By _____

Deputy U S Marshal

AO 245E (Rev 3/95) Sheet 3 - Supervised Release



Judgment Page __3__ of __6__

DEFENDANT       **TIMOTHY JOE REEVES**
CASE NUMBER     1 99CR00013-002

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of _____ 3 _____ year(s)

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons

The defendant shall not commit another federal  state, or local crime

The defendant shall not illegally possess a controlled substance

*For offenses committed on or after September 13, 1994*

The defendant shall refrain from any unlawful use of a controlled substance  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter  as directed by the probation officer

☒  The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse  (Check, if applicable )

☒  The defendant shall not possess a firearm as defined in 18 U S C  § 921  (Check, if applicable )

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below)   The defendant shall also comply with the additional conditions on the attached page (if indicated below)

See Special Conditions of Supervision - Sheet    3 01

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month,
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer,
4) the defendant shall support his or her dependents and meet other family responsibilities,
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or  other acceptable reasons,
6) *the defendant shall notify the probation officer ten days prior to any change in residence or employment*
7) the defendant shall refrain from excessive use of alcohol,
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed  or administered,
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer,
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer,
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer,
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court,
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant s compliance with such notification requirement

AO 240B (Rev 3/95) Sheet 3 - Supervised Release

DEFENDANT       **TIMOTHY JOE REEVES**
CASE NUMBER     **1 99CR00013-002**

# SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release, failure to submit to a search may be grounds for revocation, the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition

AO 245B (Rev 3/95) Sheet 5 Part A   Criminal Monetary Penalties

Judgment Page ___4___ of ___6___

DEFENDANT        TIMOTHY JOE REEVES
CASE NUMBER      1 99CR00013-002

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B

| | Assessment | | Fine | | Restitution |
|---|---|---|---|---|---|
| Totals | $        100 00 | $ | | $ | |

☐ If applicable, restitution amount ordered pursuant to plea agreement                $ _____

# FINE

The above fine includes costs of incarceration and/or supervision in the amount of $ ___        0 00

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U S C § 3612(f) All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U S C § 3612(g)

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that

☐ The interest requirement is waived

☐ The interest requirement is modified as follows

# RESTITUTION

☐ The determination of restitution is deferred in a case brought under Chapters 109A 110 110A and 113A of Title 18 for offenses committed on or after 09/13/1994  until _____ An Amended Judgment in a Criminal Case will be entered after such determination

☐ The defendant shall make restitution to the following payees in the amounts listed below

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below

| Name of Payee | ** Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| | | | |
| Totals | $ _____ . | $ _____ | |

** Findings for the total amount of losses are required under Chapters 109A 110, 110A and 113A of Title 18 for offenses committed on or after September 13, 1994

AO 245B (Rev 3/95) Sheet 5 Part B  Criminal Monetary Penalties

Judgment-Page __5__ of __6__

DEFENDANT     TIMOTHY JOE REEVES
CASE NUMBER   I 99CR00013-002

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order  (1) assessment, (2) restitution, (3) fine principal, (4) cost of prosecution (5) interest, (6) penalties

Payment of the total fine and other criminal monetary penalties shall be due as follows

A  ☒  in full immediately, or

B  ☐  $ _____  immediately  balance due (in accordance with C, D, or E), or

C  ☐  not later than _____ , or

D  ☐  in installments to commence _____  day(s) after the date of this judgment  In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U S  probation officer shall pursue collection of the amount due  and shall request the court to establish a payment schedule if appropriate, or

E  ☐  in _____ (e g  equal weekly monthly quarterly) installments of $ _____
        over a period of _____ year(s) to commence _____ day(s) after the date of this judgment

The National Fine Center will credit the defendant for all payments previously made toward any criminal monetary penalties imposed

Special instructions regarding the payment of criminal monetary penalties

Payment of all criminal monetary penalties shall be made to the U S  District Court Clerk, P O  Box 711, Montgomery, AL 36101
The special assessment is due immediately and may be collected in accordance with the Bureau of Prisons Inmate Financial Responsibility Program

☐  Joint and Several

☐  The defendant shall pay the cost of prosecution
☐  The defendant shall pay the following court cost(s)

☐  The defendant shall forfeit the defendant's interest in the following property to the United States

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment  All criminal monetary penalty payments are to be made to the United States Courts National Fine Center, Administrative Office of the United States Courts  Washington  DC  20544, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program  If the National Fine Center is not operating in this district, all criminal monetary penalty payments are to be made as directed by the court, the probation officer, or the United States attorney

AO 245️ (Rev 3/95) Sheet 6   Statement of Reasons

¹ DEFENDANT        **TIMOTHY JOE REEVES**

CASE NUMBER        1 99CR00013-002

# STATEMENT OF REASONS

☐  The court adopts the factual findings and guideline application in the presentence report

## OR

☒  The court adopts the factual findings and guideline application in the presentence report except (see attachment if necessary)

*See Additional Factual Findings and Guideline Application Exceptions - Sheet  6 01*

**Guideline Range Determined by the Court**

Total Offense Level        ___16___

Criminal History Category        ___I___

Imprisonment Range        ___21___ to ___27___ months

*Supervised Release Range*        ___2___ to ___3___ years

Fine Range  $ ___5,000 00___ to $ ___50 000 00___

    ☒  Fine waived or below the guideline range because of inability to pay

Total Amount of Restitution  $ ___0 00___

    ☐  Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U S C § 3663(d)

    ☐  For offenses that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments

    ☐  Partial restitution is ordered for the following reason(s)

☐  The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines

## OR

☐  The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s)

## OR

☒  The sentence departs from the guideline range

    ☒  upon motion of the government, as a result of defendant's substantial assistance

    ☐  for the following specific reason(s)

        *The sentence imposed is within the range of offense level 14, Criminal History Category I, and is the result of a 2 level departure from the offense level determined by the Court*

AO 245B (Rev 3/95) Sheet 6  Statement of Reasons

DEFENDANT          TIMOTHY JOE REEVES
CASE NUMBER        1 99CR00013-002

# ADDITIONAL FACTUAL FINDINGS AND GUIDELINE APPLICATION EXCEPTIONS

The Court finds that the four level increase pursuant to USSG 3B1 1 is not appropriate  The Court also finds that the amount of money laundered was less than $100 000 00, thereby decreasing the offense level by one level

# GOVERNMENT EXHIBIT "6"

IRS
ADMIN.
FILES

Excise Report

Ex A — Court Records

Ex. B — Gov. Exhibits

Ex. C — Indictment

Ex. D — FBI Records

Ex. E — Credentials/FBI agent

Ex. F — Wager Computations

Ex. G — Tim Reeves Deposition

Ex. H — SAme

Ex. I — Judgement in a Criminal Case

GOVERNMENT
EXHIBIT
6

IRS001

Form 5385
Re. May 1989

Department of the Treasury – Internal Revenue Service
**Excise Tax Examination Changes**

Return Form Number
730

Page 1 of 1 Page

Taxpayer's Name and Address
Tim Reeves
1075 Malvern Road
Dothan AL 36301

Social Security or Employer Identification Number
[blacked out]0909

| Period Ended (1) | IRS No. (2) | Kind of Tax (3) | Correct Liability (4) | Previous Assessment (5) | Adjustment Increase (Decrease) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Tax (6) | Penalties (See Explanation) (7) | Total (8) |
| 09/30/1994 | 198 | Excise | $ 23,497 74 | $ 0 00 | $ 23,497 74 | $ 17,623 31 | $ 41,121 05 |
| 10/31/1994 | 198 | Excise | $ 48,562 00 | $ 0 00 | $ 48,562 00 | $ 36,421 50 | $ 84,983 50 |
| 11/30/1994 | 198 | Excise | $ 46,995 49 | $ 0 00 | $ 46,995 49 | $ 35,246 62 | $ 82,242 11 |
| 12/31/1994 | 198 | Excise | $ 48,562 00 | $ 0 00 | $ 48,562 00 | $ 36,421 50 | $ 84,983 50 |
| 01/31/1995 | 198 | Excise | $ 32,896 84 | $ 0 00 | $ 32,896 84 | $ 24,672 63 | $ 57,569 47 |
| 09/30/1995 | 198 | Excise | $ 23,497 74 | $ 0 00 | $ 23,497 74 | $ 17,623 31 | $ 41,121 05 |
| 10/31/1995 | 198 | Excise | $ 48,562 00 | $ 0 00 | $ 48,562 00 | $ 36,421 50 | $ 84,983 50 |
| 11/30/1995 | 198 | Excise | $ 46,995 49 | $ 0 00 | $ 46,995 49 | $ 35,246 62 | $ 82,242 11 |
| 12/31/1995 | 198 | Excise | $ 48,562 00 | $ 0 00 | $ 48,562 00 | $ 36,421 50 | $ 84,983 50 |
| 01/31/1996 | 198 | Excise | $ 32,896 84 | $ 0 00 | $ 32,896 84 | $ 24,672 63 | $ 57,569 47 |
| 09/30/1996 | 198 | Excise | $ 23,497 74 | $ 0 00 | $ 23,497 74 | $ 17,623 31 | $ 41,121 05 |
| 10/31/1996 | 198 | Excise | $ 48,562 00 | $ 0 00 | $ 48,562 00 | $ 36,421 50 | $ 84,983 50 |
| 11/30/1996 | 198 | Excise | $ 46,995 49 | $ 0 00 | $ 46,995 49 | $ 35,246 62 | $ 82,242 11 |
| 12/31/1996 | 198 | Excise | $ 48,562 00 | $ 0 00 | $ 48,562 00 | $ 36,421 50 | $ 84,983 50 |
| 01/31/1997 | 198 | Excise | $ 17,231 68 | $ 0 00 | $ 17,231 68 | $ 12,923 76 | $ 30,155 44 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Other Information/Explanation

| Examiner's Signature | District | Date |
|---|---|---|
| Joe B Elison Jr    Badge Number 72 19090 | Gulf Coast | July 7 2000 |

Form 5385(Rev 5-89)

Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94 10-31-94,11-30-94,12-31-94,1-31-95, 09-30-95,10-31-95,11-30-95, 12-31-95,1-31-96 9-30-96,10-31-96,11-30-96 12-31-96,1-31-97 |

## ADJUSTMENT ITEM  GROSS GAMBLING WAGERS

| TAX PERIOD | WAGER AMOUNT | TAX RATE | FET TAX DUE |
|---|---|---|---|
| September 30, 1994 | $ 1,174 887 21 | 2% | $ 23 497 74 |
| October 31, 1994 | $ 2 428,100 24 | 2% | $ 48 562 00 |
| November 31, 1994 | $ 2,349,774 43 | 2% | S 46,995 49 |
| December 31, 1994 | $ 2,428 100 24 | 2% | S 48 562 00 |
| January 31, 1995 | $ 1 644,842 10 | 2% | S 32 896 84 |
| September 30, 1995 | $ 1,174,887 21 | 2% | $ 23,497 74 |
| October, 31, 1995 | $ 2,428,100 24 | 2% | S 48,562 00 |
| November 30,1995 | $ 2,349,774 43 | 2% | $ 46,995 49 |
| December 31, 1995 | $ 2,428,100 24 | 2% | $ 48,562 00 |
| January 31, 1996 | $ 1,644,842 10 | 2% | $ 32 896 84 |
| September 30, 1996 | $ 1,174 887 21 | 2% | $ 23,497 74 |
| October 31  1996 | $ 2,428,100 24 | 2% | $ 48,562 00 |
| November 30,1996 | $ 2,349,774 43 | 2% | S 46,995 49 |
| December 31, 1996 | $ 2,428,100 24 | 2% | $ 48,562 00 |
| January 31, 1997 | S    861 583 96 | 2% | $ 17,231 68 |

**BACKGROUND FACTS**  On January, 12 1997, a court ordered search and seizure warrant was executed at the taxpayer's residence as well as other locations  Exhibit A is a copy of the search warrants, affidavits used for the application of the warrants and listings of items secured pursuant to the warrants  Exhibit B is a photocopy of pictures taken during the execution of the warrants that show cash and other items consistent with illegal sports bookmaking operation  This was part of a joint investigation conducted by Federal, state, and local law enforcement agencies

Form   886-A(Rev 4-68)       Department of the Treasury - Internal Revenue Service
Page

IRS003

Form 886A
Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94 10-31-94,11-30-94,12-31-94,1-31-95, 09-30-95 10-31-95,11-30-95, 12-31-95,1-31-96,9-30-96,10-31-96,11-30-96 12-31-96,1-31-97 |

As a result of the search warrant, an indictment was returned showing Tim Reeves, among others, as those charged with the operation of an illegal sports bookmaking business   This indictment is included as Exhibit C


Based on a review of the seized evidence from this warrant, as well as taped telephone conversations pursuant to a Federally authorized wire tap, the Federal Bureau of Investigation, Racketeering Records Analysis Unit (RRAU), was able to positively identify these records as those used in a illegal bookmaking enterprise   Exhibit D for a copy of report from the RRAU   The RRAU is a well-known part of the FBI Laboratory in Washington, D C   A copy of the Curriculum Vitae of Doug Dunlap, the supervisor in charge of this case is also attached as Exhibit E   The RRAU has extensive knowledge of and experience in bookmaking activities   Bookmakers will record each individual bet amount that they take from various customers and normally keep these records for a period of time    Based on a review of these records and wiretap information, the RRAU was able to identify them as being from a 7 day time period covering the dates December 29, 1996 through January 2, 1997   The wagers were obtained from the recorded information only   The wagers from the documents were not included in order to eliminate the possibility of duplication   A total of $ 498,437 00 in gross wagers was placed during this time period   Exhibit F shows the computation to put this 7 day wager

IRS004

Department of the Treasury - Internal Revenue Service

## Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94,10-31-94,11-30-94,12-31-94,1-31-95, 09-30-95,10-31-95,11-30-95, 12-31-95,1-31-96,9-30-96,10-31-96 11-30-96 12-31-96,1-31-97 |

amount of $ 498,437 into a monthly sum to coincide with the Federal Excise Tax Form 730 which is computed and filed on a monthly basis

Furthermore, in his deposition for a forfeiture case in United States District Court for the Middle District of Alabama (Southern Division), Tim Reeves has admitted to conducting an illegal gambling operation (Exhibit G) In trial testimony, Tim Reeves admitted to being involved in this operation since 1994 (Exhibit H) Finally, Tim Reeves had pleaded guilty to charges under 18 U S C 1957 for Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activities and has been sentenced to 15 months imprisonment The specified unlawful activity in the charge is illegal bookmaking (Exhibit I)

All of the documents and testimony from Tim Reeves indicate only wagers on football were taken There is no evidence to support any findings of wagers being taken on basketball, baseball, hockey, etc. Furthermore, there is no evidence to support any findings that Reeves laid off bets to other bookmakers in order to make his gambling books balance

Form 886-A (Rev 4-68)     Department of the Treasury - Internal Revenue Service

Page.

IRS005

Form 886A

## Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94 10-31-94,11-30-94,12-31-94,1-31-95, 09-30-95,10-31-95,11-30-95, 12-31-95,1-31-96,9-30-96,10-31-96,11-30-96 12-31-96,1-31-97 |

**LAW AND GOVERNMENT POSITION**    The first element of an illegal wagering case is to prove that the person is in the business of accepting wagers   Section 4401 of the Internal Revenue Code imposes a 2 percent tax on wagers placed in states where wagers are not authorized   The Code further states that the wager will include all charges incident to the placing of such wager   The person subject to the tax is defined as the person in the business of accepting wagers   Treasury Regulation 44 4401-2, provides that every person engaged in the business of accepting wagers with respect to a sporting event is liable for the tax on any such wager accepted by him   A person is engaged in the business of accepting wagers if he makes it a practice to accept wagers with respect to which he assumes the risk of profit or loss depending upon the outcome of the event with respect to which the wager is accepted   Treasury Regulation 44 4401-3 provides that the tax attaches when a person engaged in the business of accepting wagers with respect to a sporting event accepts a wager from a bettor   In the case of a wager on credit, the tax attaches whether the amount of the wager is actually collected from the bettor

The Government would contend in this instant case, it has been proven that the taxpayer is in the business of accepting wagers as specified in Section 4401 of the Internal Revenue Code   This conclusion can be reached based on the taxpayer's arrest

Form   886-A (Rev 4-68)        Department of the Treasury - Internal Revenue Service
Page ·

IRS006

Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94,10-31-94,11-30-94,12-31-94,1-31-95, 09-30-95,10-31-95,11-30-95, 12-31-95,1-31-96,9-30-96,10-31-96,11-30-96 12-31-96,1-31-97 |

and subsequent guilty plea as well as his trial and deposition testimony. It was also proven based on the seized records obtained from the taxpayer and his employees, which the RRAU was able to identify as bookmaking records. Wire tap information further shows the taxpayer to be in the business of accepting wagers. Copies of all of the pertinent documents to support this finding are attached to this report.

The second element of an illegal wagering case is to identify the volume of wagers accepted. The size of the gross receipts of an illegal sports bookmaker is seldom available except for a short period of time. They will generally cover not more than one week of operations. This is because sports bets are traditionally made on credit, and settlement takes place with the bettor each week. After settlement, the sports bookmaker destroys all records except for the amount outstanding on open accounts. Section 4403 of the Internal Revenue Code requires those persons liable for tax under Section 4401, in addition to maintaining records required by Section 6001(a), also keep a daily record of wagers. Citing *Lucia vs. United States, 474 f 2d 565 (5th Circuit 1973), United States vs. Firtel, 446 f 2d 1005 (5th Cir 1971), Webb vs. Commissioner, 394 f 2d 366,377 (5th Cir, 1968),* the court in Waters vs. United States, *(80-2 USTC Paragraph 16,352)* stated "Where a taxpayer has failed to maintain adequate records, the IRS may determine his tax liability by any reasonable method including

Form 886-A (Rev 4-68)     Department of the Treasury - Internal Revenue Service
Page.

IRS007

Form 886A                                                    Schedule
                    Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94 10-31-94 11-30-94, 12-31-94, 1-31-95, 09-30-95, 10-31-95, 11-30-95, 12-31-95, 1-31-96, 9-30-96, 10-31-96, 11-30-96 12-31-96, 1-31-97 |

extrapolations " The same conclusion was reached United States vs Miller, (79-2 USTC Paragraph 16,318, Page 7938 (N D Tex , 1979) citing United States vs Firtel supra and Pinder vs United States, 330 f 2d 119 (C A 5, 1964) when it stated "It is settled that the Government may assess wagering tax on the basis of projections and extrapolations from wagering data relating to specific time periods In such cases where bookkeeping by the taxpayer is almost never either accurate or comprehensive, this as a practical matter is the only way that the tax can be assessed, a contrary rule would permit evasion of tax liability simply by destruction of records "

In instances where required records are not maintained and assessments are made by other reasonable methods, a taxpayer cannot expect to defeat the assessment through uncorroborated oral testimony As stated by the court in Alabama Power Company vs United States, U S District Court, Northern District of Alabama, 85-1 USTC paragraph 16,432 citing Griffin vs United States, supra, Carson vs United States, 561 f 2d 693, 699 (5th Cir , 1977), and Webb vs Commissioner, supra "    a taxpayer cannot meet his burden of proving that an assessment is wrong or the correct method he owes, solely by uncorroborated oral testimony The basis or rationale for the requirement of adequate record keeping is to keep the taxpayer from being able to meet his burden of proof by

IRS008

Form 886A

Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| | 9-30-94 10-31- |
| | 94,11-30-94,12- |
| | 31-94,1-31-95, |
| Tim Reeves | 09-30-95,10-31- |
| | 95,11-30-95, |
| | 12-31-95,1-31- |
| | 96,9-30-96,10- |
| | 31-96,11-30-96 |
| | 12-31-96,1-31- |
| | 97 |

casual recollection Put another way, where a taxpayer fails to keep records, he cannot make them up by use of oral testimony "

The use of projections is well-established in case law Such methods include using short-term periods determined from seized records or other sources as a basis for determining wagers over an extended period In Lucia vs United States, *474f 2d 565 (5th Cir, 1973)*, annual wagers of $5,612,100 were computed for a 4 ½ year period based on the seizure of one day's betting slips totaling $28,780 The case was remanded to the District Courts solely for the purpose of giving Lucia the opportunity to refute the IRS determination As stated by the Court, "In this suit for injunctive relief, the taxpayer, Lucia, will have to prove his case upon remand, and to the extent of our holding goes no further than to give him the opportunity " In the case of Pinder vs United States, *330f 2d 119 (C A 5, 1964)* an assessment was upheld where, " the taxes here involved were computed by taking the total wagers on the day of the raid, arrived at by adding the total amount of the lottery tickets found on the premises on that day and projecting that amount back for the previous 62 weeks " A similar determination was reached in the case of United States vs Firtel, *446f 2d 1005 (5th Circuit 1971)* The court stated, "The taxpayer was under duty to keep adequate records of the wagers he received When, contrary to this legislative mandate, a taxpayer fails to keep adequate records, the

IRS009

## Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94, 10-31-94 11-30-94, 12-31-94, 1-31-95, 09-30-95 10-31-95, 11-30-95, 12-31-95, 1-31-96, 9-30-96, 10-31-96, 11-30-96 12-31-96, 1-31-97 |

Commissioner is authorized to reconstruct the tax base by any reasonable method " In the case of William Dark vs United States, *81-1 USTC paragraph 16,360 (9th Cir 1981),* based on data collected over a three day span the Internal Revenue Service projected wagers and made assessments over an extended period

In this instant case, the taxpayer has failed to provide any records in which a precise assessment of tax can be made   Based on this fact, the Government has relied on the wire tap information of 7 days   The Government took this evidence and projected it over the football season, which ran from September through January each year   The Government would also offer that the records for this 7-day time period are an accurate reflection of the taxpayer's entire season of wagering

The final part of the second element of a wagering case is the inclusion of all amounts involved in a wager   Under Section 4401(b) of the Internal Revenue Code, the total amount of wagers subject to the tax under Section 4401(a) shall include all amounts incident to the placing of the wager   This means the tax is figured on the total amount at risk by the bettor   Reeves has testified that there was a 10% "vigorish" or "juice" on each wager placed   Thus, if the bettor were to wager $100 on a game, the bettor had a total amount of $110 at risk   A winning wager would pay $100, while a losing wager

IRS010

Explanation of Items

| Name of Taxpayer | Month/Period |
|---|---|
| Tim Reeves | 9-30-94,10-31-94,11-30-94,12-31-94 1-31-95, 09-30-95,10-31-95,11-30-95, 12-31-95,1-31-96,9-30-96,10-31-96,11-30-96 12-31-96,1-31-97 |

would cost the bettor $110  The wagers  as computed by RRAU  have been increased

10% to account for statute under Section 4401(b)

The third and final element of an illegal wagering case is to identify the time period of

operation  The Government would contend that it has sufficient evidence to determine

that the taxpayer was accepting illegal wagers from the fall of 1994 to January 1997

The starting point of September 1994 was determined based on Reeves' own testimony,

a copy of which is attached  Based on this information, this Revenue Agent used the

beginning of the football season for 1994, i e , September, as the initial month of the tax

liability  The last month of the tax liability is January 1997 as this is the date of the

taxpayer's arrest for this activity

**TAXPAYER'S POSITION.** None given at this time

**CONCLUSION.** Based on the above facts and law, the Government would submit that

they have met their burden of proof in making an accurate estimate of the taxpayer's

illegal wagering gross receipts

Form  886-A (Rev 4-69)        Department of the Treasury - Internal Revenue Service

IRS011

Explanation of Items

| Name of Taxpayer | Year/Period |
|---|---|
| | 9-30-94 10-31- |
| | 94,11-30-94,12- |
| Tim Reeves | 31-94,1-31-95, |
| | 9-30-95 10-31- |
| | 95,11-30-95,12- |
| | 31-95 1-31-96, |
| | 9-30-96,10-31- |
| | 96,11-30-96,12- |
| | 31-96,1-31-97 |

### ADJUSTMENT ITEM   CIVIL FRAUD PENALTY

| PERIOD | Amount |
|---|---|
| September 30, 1994 | $ 17,623 46 |
| October 31, 1994 | $ 36,421 50 |
| November 30, 1994 | $ 35,246 62 |
| December 31, 1994 | $ 36,421 50 |
| January 31 1995 | $ 24 672 63 |
| September 30, 1995 | $ 17,623 31 |
| October 31, 1995 | $ 36,421.50 |
| November 30, 1995 | $ 35,246 62 |
| December 31, 1995 | $ 36,421 50 |
| January 31, 1996 | $ 24,672 63 |
| September 30 1996 | $ 17.623.31 |
| October 31, 1996 | $ 36,421 50 |
| November 30, 1996 | $ 35,246 62 |
| December 31, 1996 | $ 36,421 50 |
| January 31, 1997 | $ 12,923 76 |

LAW AND GOVERNMENT POSITION   Section 6651(a) of the internal Revenue Code

sets forth the penalties for the filing of delinquent returns   Section 6651(f) states, "if any

failure to file any return is fraudulent, paragraph (1) of subsection (a) shall be applied --

by substituting "15 percent' for "5 percent' each place it appears, and by substituting "75

percent" for "25 percent"   Furthermore, Section 6663(a) of the Internal Revenue Code

states, "If any part of any underpayment of tax required to be shown on a return is due

to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of

the underpayment which is attributable to fraud "

---

Form   886-A (Rev 4-68)        Department of the Treasury - Internal Revenue Service

Page

IRS012

Form 886A
Explanation of Items

| Name of Taxpayer | Year/Period |
|---|---|
| Tim Reeves | 9-30-94,10-31-94,11-30-94,12-31-94,1-31-95 6-30-95 10-31-95,11-30-95,12-31-95 1-31-96 9-30-96,10-31-96,11-30-96,12-31-96,1-31-97 |

Section 6663(b) of the Internal Revenue Code states, "If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud "

Fraud is generally considered to be the intentional wrongdoing, involving an element of deception, with the specific purpose of avoiding tax  Civil fraud is defined as the intentional wrongdoing designed to evade a tax that the taxpayer believed to be owing  Thus, mere negligence or ignorance of the law does not constitute fraud  Since direct proof of a taxpayer's fraudulent intent is rarely available  circumstantial evidence and reasonable inferences may prove fraud  The courts have developed a number of objectives or "badges" which tend to establish fraud, including  understatement of income, inadequate records, implausible or inconsistent explanations of behavior, failure to cooperate with the examining agent, concealment of assets, engaging in illegal activities, dealing in cash

In this instant case, there are many of the above elements present to establish the imposition of the fraud penalty  First, it has been established that the taxpayer

Form  886-A(Rev 4-68)      Department of the Treasury - Internal Revenue Service
                                                                    Page

IRS013

Form 886A

Explanation of Items

| Name of Taxpayer | Year/Period |
|---|---|
| Tim Reeves | 9-30-94,10-31-94,11-30-94,12-31-94 1-31-95, 9-30-95 10-31-95,11-30-95,12-31-95 1-31-96, 9-30-96,10-31-96,11-30-96,12-31-96,1-31-97 |

consistently failed to report substantial amounts of income over a number of years, which is well established by the courts as evidence of fraudulent intent (Gromacki v Commissioner 66-1 USTC 9414, 361 F 2d 727 (7th Cir 1966), affg A Memorandum Opinion of this Court (Dec 27,039(M)) Romer v Commissioner (Dec 22,586), 28 T C 1228 (1957) The taxpayer received unreported illegal gambling income in the years 1994 through and including 1997 which the Government would contend is a substantial time period to meet this element of the Civil Fraud Penalty

Secondly, the Government has proved that the taxpayer failed to keep adequate records, i e , no evidence was presented by the taxpayer that he kept any records at all to properly monitor the income of business  The main reason for the taxpayer doing this was to conceal the business from the law enforcement authorities  This is further proof of fraudulent intent (Parsons v Commissioner (Dec 27,196), 43 T C 378 (1964)

Thirdly, the taxpayer failed to disclose his illegal wagering income to the individual who prepared his tax returns, which is further evidence of intent to conceal income and evade taxes (Farber v Commissioner (Dec 27 201), 43 T C 407 (1965)

Form  886-A (Rev 4-68)    Department of the Treasury - Internal Revenue Service

Page.

IRS014

Form 886A

## Explanation of Items

| Name of Taxpayer | Year/Period |
|---|---|
| Tim Reeves | 9-30-94,10-31-94,11-30-94,12-31-94,1-31-95, 9-30-95,10-31-95,11-30-95,12-31-95,1-31-96 9-30-96,10-31-96,11-30-96,12-31-96,1-31-97 |

Fourthly in this instant case it has been proven that the taxpayer participated in an illegal activity, as he pleaded guilty of operating an illegal bookmaking operation Fifthly, the taxpayer ran his operation using substantial amounts of cash as a means to conceal this activity from law enforcement authorities Both of these indicators have been used to uphold the fraud penalty in previous court cases (Bradford v Commissioner, 86-2 USTC 9602 796 F 2d 303, 307-308 (9th Cir 1986), affg Dec 41,615(M), T C Memo 1984-601, Recklitis v Commissioner (Dec 45,154) 91 T C 874,910 (1988)


Based on the above facts, it is the Government's contention that the fraudulent failure to file penalty under Section 6651 should be applied in this case

)

Form 886-A (Rev 4-68)     Department of the Treasury - Internal Revenue Service

Page.

IRS015

IRS016

# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

the persons of Tim Reeves and Wendy Reeves,
or the residence located at: 1075 Malvern
Road, Dothan, Alabama 36301

**SEARCH WARRANT**

**CASE NUMBER:**

To: __Charles A. Bravata, Sr.__ and any Authorized Officer of the United States

Affidavit(s) having been made before me by __Charles A. Bravata, Sr.__ who has reason to believe that

person of or ☒ on the property or premises located at (name, description and/or location)

Tim Reeves and Wendy Reeves, or the residence located at: 1075 Malvern Road,
Dothan, Alabama 36301

in the _____ MIDDLE _____ District of _____ ALABAMA _____ there is now concealed a certain
person or property, namely (describe the person or property to be seized)

Gambling records, gambling devices, wagering paraphernalia consisting of but not limited to: papers and record information, and any and all records relating to payoff of customers, letters, envelopes and United States mail, telephone address books, including electronic address books and electronic notebooks, United States currency, checks money orders, facsimile machines, facsimile transmission records, computers, including monitors, hard drives, computer diskettes, computer programs, computer printouts, computer software, bank account records and other financial institution records, safes, lock boxes, safe deposit box keys and records, documents relating to the purchase and acquisition of real property, including but not limited to mortgages, deeds, leases, contracts, tenant records and accounts, correspondence and insurance documents, daily tally sheets, receipts and disbursement records to others, invoices, supply records, expense records, money bags, documents relating to the acquisition or purchase of equipment, rental records, lease records. All travel records, including gasoline receipts, credit card receipts, restaurant receipts.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before __1. 20. 97__

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to __Susan Russ Walker__ as required by law.
United States Magistrate Judge

__1.10.97    4:09 pm__
Date and Time Issued

at __Montgomery, Alabama__
City and State

_Susan Russ Walker_ (signature)

Susan Russ Walker, United States Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

IRS017

FD-597 (Rev. 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page ___ of ___

On (date) _____ 1-12-97

Time: 2 ²⁰/pm

Item(s) listed below
☐ Received from
☐ Returned to
☐ Released to
☒ Seized

(Name) _____ Wendy Reeves

(Street Address) _____ 1075 Malvern Rd.

(City) _____ Dothan Al.

Description of
Item(s):

1. miscellaneous papers from black file cabinet next to desk in downstairs in Ducote

2. financial records / address books / misc papers from wooden desk in downstairs nursery - Ducote

3. address book from brown purse in upstairs master bedroom - Sorrells

4. business cards / miscellaneous papers from night table in master bedroom - Sor

5. eight checks + spread sheet from man's shirt pocket on bed post - master bedroom - Sorrells

6. check + miscellaneous papers from on triple dresser - Owens - master room

7. 1st Bank of Dothan Deposit slips from purse in closet in front of playroom - Woods

8. gambling papers + miscellaneous papers from file cabinet in garage - Ducote

9. checks and miscellaneous papers seized by Woods from laundry room

10. copy of cashier's check from closet next to living room - Richard Wade

11. miscellaneous papers from grocery b

Received by: _____ Ducote

Received from _____ W Reeves

P.83    205 732 5387    DOTHAN FBI RA    JAN 13 '97 16:15

IRS018

FD-597 (Rev. 3-29-83)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page ___ of ___

On (date) ___1/12/97___

Item(s): 
☐ Received
☐ Returned
☐ Released
☒ Seized

Time: ___2 20 pm___

(Name) ___Wendy Reaves___
(Street Address) ___1075 Malvern Rd.___
(City) ___Dothan Al___

Description of Item(s):

behind recliner in living room - 4
12. miscellaneous financial records - 
upstairs exercise / storage room - (
13. telephone books from laundry 
(Woods)
14. brown paper bag containing fina
records seized from exercise / stora
room - 2nd floor - Sorrells
15. one cardboard box with misc
records from exercise / storage room 
16. cardboard file box w/ financ
records from exercise / storage roo
17. monitor + CPU from downstairs
Barbara Wadiski - includes key
cables / mouse
18. an HP Desk Jet 855 C Color
printer from downstairs nursery - Wadi
19. box of assorted discs / CD Ro
assorted manuals + instruction gui
Wadiski
20. #1000 in U.S. Currency from
Tray in master bedroom - Sorrells
21. Old phone exercise /
book storage room
upstairs

Received by: _____

Received from _____

P-24    205 792 5387    IRS019

# United States District Cou⎯⎯

⎯⎯⎯⎯⎯ MIDDLE ⎯⎯⎯⎯⎯ DISTRICT OF ⎯⎯⎯⎯⎯ ALABAMA ⎯⎯

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

the person of Vivian Welch Bond or the
premises located at: 3221 South State
Highway 109, Dothan, Alabama 36301

**SEARCH WARRANT**

**CASE NUMBER:**

To: ⎯⎯ Charles A. Bravata, Sr. ⎯⎯⎯⎯ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ⎯⎯ Charles A. Bravata, Sr. ⎯⎯⎯⎯ who has reason to b⎯⎯ th⎯

the person of or ☒ on the property or premises located at (name, description and/or location)

Vivian Welch Bond, or the premises located at: 3221 South State Highway 109, D⎯⎯n, ⎯ a
36301

in the ⎯⎯⎯ MIDDLE ⎯⎯⎯ District of ⎯⎯⎯ ALABAMA ⎯⎯⎯ there is now ⎯ ale,⎯
person or property, namely (describe the person or property to be seized)

Gambling records, gambling devices, wagering paraphernalia consisting of but not limited to  papers a⎯ u record,⎯
record information, and any and all records relating to payoff of customers, letters, envelopes and United State⎯ ⎯ te⎯
address books, including electronic address books and electronic notebooks, United States currency, checks ⎯ ⎯ ⎯ mon⎯
facsimile machines, facsimile transmission records, computers, including monitors, hard drives, computer diskettes ⎯ ⎯om⎯ ⎯⎯ ⎯⎯
computer printouts, computer software, bank account records and other financial institution records, safes, lock b⎯ ⎯ s⎯⎯
box keys and records, documents relating to the purchase and acquisition of real property, including but not ll⎯ ⎯ lto m⎯ ⎯ ⎯ ⎯⎯
deeds, leases, contracts, tenant records and accounts, correspondence and insurance documents, daily tally shee⎯ ⎯ ce⎯ ⎯ ⎯ ⎯⎯
disbursement records to others, invoices, supply records, expense records, money bags, documents re⎯ating to t⎯ ⎯ ecqu ⎯ ⎯ ⎯ ⎯
purchase of equipment, rental records, lease records  All travel records, including gasoline receipts, credit card r⎯ ⎯ s, r⎯ ⎯ el
records, restaurant receipts.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the per⎯ ⎯ ir p⎯ ⎯ ⎯ s⎯
described is now concealed on the person or premises above-described and establish grounds for the issuance o⎯ ⎯ ⎯ wa⎯

**YOU ARE HEREBY COMMANDED** to search on or before ⎯⎯ / 20. 97 ⎯⎯

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warr⎯ ⎯ ⎯nd ⎯ ⎯ ⎯
search (in the daytime - 6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same, ⎯ ⎯ ng t⎯ ⎯ ⎯ ⎯⎯
warrant and receipt for the person or property taken, and prepare a written inventory of the person or property se⎯ ⎯ and ⎯ ⎯ ⎯ ⎯
return this warrant to ⎯⎯ Susan Russ Walker ⎯⎯⎯⎯ as required by law.
United States Magistrate Judge

_1.10.97_    _4:13 pm_
Date and Time Issued

at ⎯⎯ Montgomery, Alabama ⎯⎯⎯
City and State

Susan Russ Walker, United States Magistrate Judge
Name and Title of Judicial Officer

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Signature of Judicial Officer

IRS020

FD-597 (Rev 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page _1_

Item(s) listed below
☐ Received
☐ Returned
☐ Released
☑ Seized

On (date) _1/12/97_

Time: _11:05 AM_

(Name) _Vivian Bond_

(Street Address) _3221 South State Hwy 109_

(City) _Dothan AL_

Description of
Item(s):

_Notebooks betting lines + receipt b___
_1 Brief case with Contents_
_Check book_
_Rolodex_
_Cash from Purse $1,000 wrapp___
_"      "      "    2,000_
_Datebook_
_Ring + receipt w/ value of $750C_
_Bank records, documents_
_Tax forms_
_Phone bills_
_Answer Machine tape from msg___
_Receipt book + appointment b___
_Copy Machine_

Received by: _(Signature)_     Received from: _Vivian Bond (Signature)_

P.26     265 792 5387     DOTHAN AREA-FA

# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA

**In the Matter of the Search of**

(Name, address or brief description of person, property or premises to be searched)

the persons of Ronald Cherry, Larry Joe
Cobb, and David Hims, or the premises
located at: 1073 Malvern Road, Dothan,
Alabama 36301

**SEARCH WARRANT**

**CASE NUMBER:**

To: ____ Charles A. Bravata, Sr. _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___ Charles A. Bravata, Sr. _____ who has reason to believe that ☐

person of or ☒ on the property or premises located at (name, description and/or location)

Ronald Cherry, Larry Joe Cobb, and David Hims, or the premises located at: 1073 H
Road, Dothan, Alabama 36301

in the _____ MIDDLE _____ District of _____ ALABAMA _____ there is now co    cre the

person or property, namely (describe the person or property to be seized)

Gambling records, gambling devices, wagering paraphernalia consisting of but not limited to: papers and    cord,
record information, and any and all records relating to payoff of customers, letters, envelopes and United States    colleci
address books, including electronic address books and electronic notebooks, United States currency, checks    mort
facsimile machines, facsimile transmission records, computers, including monitors, hard drives, computer diskettes    ns, s
computer printouts, computer software, bank account records and other financial institution records, safes, lock box    saf
box keys and records, documents relating to the purchase and acquisition of real property, including but not limited to    me
deeds, leases, contracts, tenant records and accounts, correspondence and insurance documents, daily tally sheets    not
disbursement records to others, invoices, supply records, expense records, money bags, documents relating to the    pus
purchase of equipment, rental records, lease records. All travel records, including gasoline receipts, credit card r   r   m
records, restaurant receipts.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the pers   pr
described is now concealed on the person or premises above-described and establish grounds for the issuance of    arr

YOU ARE HEREBY COMMANDED to search on or before _____ _____  __

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant e  ma
search (in the daytime – 6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same, l    copy
warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seiz  d and p
return this warrant to __ Susan Russ Walker _____ as required by law.
    United States Magistrate Judge

_1.10.97    4:05 pm_                                            at __ Montgomery, Alabama _____ ___
Date and Time Issued                                              City and State

                                                                _Susan Russ Walker_
Susan Russ Walker, United States Magistrate Judge
Name and Title of Judicial Officer                              Signature of Judicial Officer

FD-59* (Rev 3 29 93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page __1__

Item(s) Rcvd
☒ Rece...
☐ Retur...
☐ Relea...
☐ Seiz...

On (date) ___1/12/97___

Time _____

(Name) __Ronnie  Cherry__

(Street Address) __1073  Malvern  Rd__

(City) __Dothan,  AL__

Description of Item(s):

1) AT&T model 822 telephone
2) Plantronics headset
3) Sharp Calculator model COMPET VX-16-...
4) Chicony Key pad Model KB-5311
5) Surge suppressor model CL-109
6) Two envelopes addressed to a) Knoxville, TX and b) ___
7) VDR VBI Data Receiver 2, SN VDR13C3
8) 1st National Bank of Dothan Money bag w/misc ___
9) Epson Quiet Color Printer Model LX-300
10) Videocipher II Plus descrambler VST-446
11) Black Computer cord
12) Computer table 6 "legs"
13) Datasys USA computer hard drive
14) 14" Cheer Color computer monitor SN 447 6...-51
15) Nine pages of "work papers"
16) Three ring binder - black - from Computer desk
17) Bates telephone index - computer desk
18) Ruled Index card binder - computer desk
19) Loose leaf paper
20) LZR Class 2 Transformer
21) Desk Chair - Black
22) Computer Desk - Gray
23) Extension Cord - white
24) Misc Papers from china cabinet, 2nd drawer - fur...
25) Misc Papers from china cabinet, 3rd drawer - fur...

Received by ___Ronnie Gramill___   Received from ___Ro...___
            (Signature)                        (Signature)

80 d          285 792 5387          DOTHAN, ALABAMA

IRS023

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

Page ___ __

On (date) _____ 1/12/97 _____

Item[ ] Received
[ ] Returned
[ ] Released
[ ] Seized

(Name) _____ Ronnie Cherry _____

(Street Address) _____ 1078 Malvern Rd _____

(City) _____ Dothan, AL _____

Description of
Item(s):

26) Various papers from 3rd drawer, far right, Cherry placed in one container

27) AT&T telephone, model 712, w/ headset - Doc's

28) Black 3 ring binder, alpha breakdown, Doc's Table

29) Single sheet of paper

30) One check, acct of J.C. Altewater, 1st AL Bank - in Cobb's wallet

31) Address book from Cobb

32) Black 3 ring binder, alpha breakdown, and papers - Cobb's table

33) Standard desk telephone, from lampstand by Cobb's - w/ headset

34) Single page w/ K-600© top from lampstand

35) Envelope addressed to Terry R. Knighten @ 1075 High- A-

36) Center upper shelf of China Cabinet - 21 with enve- envelopes (addressed), one manila envelope to Gary St- and one manila envelope to Mills

37) Bundle of line sheets from 3rd drawer, right side, China cab

38) Black tray w/ numbers & letters, 2nd drawer, middle, China Cab

39) Plastic bag w/ team names, 2nd drawer, middle, China cab

40) Photograph of "line board" from 2nd drawer, left side, China

41) Misc. papers from Kitchen Counter (Area 3)

42) Paper Shredder (Area 3)

43) Blank 1st Bank of Dothan check on Pete Austin Acc. [illegible]

44) Various documents/papers from Master Bedroom (Area

Received by _____ [signature] _____ Received from _____ [signature] _____
(Signature)                              (Signature)

FD-597 (Rev 3-29-93)

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

Page _2_

On (date) ___1/12/99___

items(s) ☒ Received
☐ Return
☐ Released
☐ Seized

Time _____

(Name) _Runnie Cherry_

(Street Address) _1078 Malvern Rd_

(City) _Dothan, AL_

Description of
Item(s)

FROM Area #1

45) P.C. Concepts Keyboard, mdl SK-1100CW, SN C7xxx
46) AT&T multi-line telephone, mdl 722
47) Activation Contract, 360 cellular, to Terry Knighten
48) Victor 1280A Adding Machine
49) Texas Instruments Calculator TI 5045
50) Boston electric pencil sharpener
51) Assorted papers, mail, receipts, from Roll Top Desk
52) Portable roll-up screen & 2 holders
53) College football score sheet - transparency
54) Apollo overhead projector
55) Canon NP 1020 copier
56) Score Keeping sheets
57) Copy paper
58) Computer paper
59) Sharp calculator
60) AT&T 2 line telephone
61) Rolodex card file
62) Texas Instruments calculator
63) Sharp pocket calculator
64) Plantronics headset, w/ box
65) Plantronics headset w/ box & receipt
66) Block letter board
67) One pack 500 count notebook paper
68) Black tray w/ white plastic numbers/letters
69) Box of transparency film

Received by _Cynthia Trammell_                     Received from _Terry Cherry_
            (Signature)                                          (Signature)

P 10          205 792-5387              DOTHAN ALABAMA

IRS025

FD-597 (Rev 3-29-93)

10

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

Page __ of __

On (date) _____ 1/12/97 _____

☐ Item(s) ___
☑ R ___
☐ Ret ___
☐ Re ___
☐ Se ___

Time _____

(Name) _____ Ronnie Cherry _____

(Street Address) _____ 1673 Malvern Rd. _____

(City) _____ Dothan, AL _____

Description of
Item(s)

20) Cannon Toner
21) Print/spread sheet from 1995
22) Computer manuals, (Cheyenne system, software
23) Chart sheets
24) Box of gambling stamps
25) Box of 7½ x 10½ class envelopes
26) Red binder w/ alpha breakdown w/ place & bus
27) Sentry Combination Safe, SN Sticker 1654846
28) Magnavox "Big Screen TV, SN 78381797
29) 1994 GMC plug- AL Lic 38CBP55
30) Two folding tables
31) Rolodex personal organizer w/ names & numbers, 511
94 GMC pickup.
32) Toshiba Satellite receiver mdl TRX-1500 .94
33) Misc. documents & papers from closet in MTI
34) Instructions for Satellite receiver
35) Two white game boards
36) Shredder plays (Trash)

Received by _____ (Signature) _____          Received from _____

p 11          285 792 5387          DOTHAN AL FBI

# United States District Cour

___MIDDLE___ _____ DISTRICT OF _____ALABAMA___

**In the Matter of the Search of**
<small>(Name, address or brief description of person, property or premises to be searched)</small>

the persons of Timothy Reeves and Billy Joe
Reeves or the premises known as Hunts
Restaurant located at 177 Campbellton
Highway, Dothan, Alabama 36301

**SEARCH WARRANT**

**CASE NUMBER**

To. __Charles A. Rcaxsta, Sr._____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___Charles A. Rcaxsta, Sr._____ who has reason to b t   ᵣ   l

person of or ☒ on the property or premises located at <small>(name, description and/or location)</small>

    Timothy Reeves and Billy Joe Reeves or the premises located at  '/7
Highway Dothan, Alabama 36301

in the ___MIDDLE_____ District of _____ALABAMA_____there is now    t.c
person or property, namely <small>(description of the person or property to be seized)</small>

    Gambling records, gambling devices wagering paraphernalia consisting of but not limited to  paper
record information, and any and all records relating to payoff of customers, letters  envelopes and Unite J Sta e
address books  including electronic address books and electronic notebooks, United States currency  che es   on
facsimile machines  facsimile transmission records  computers, including monitors  hard drives  computer diskettes
computer printouts, computer software  bank account records and other financial institution records  safe   lock  b)
box keys and records  documents relating to the purchase and acquisition of real property, including but not  r    c
deeds  leases, contracts  tenant records and accounts, correspondence and insurance documents  daily tally  s1  s
disbursement records to others  Invoices, supply records  expense records, money bags  documents rela  ng to
purchase of equipment  rental records  lease records  All travel records  including gasoline receipts  credit ca d
records, restaurant receipts

I am satisfied that the affidavit(s) and any recorded testimony  establish probable cause to believe that the  pes      pr
described is now concealed on the person or premises above-described and establish grounds for the issuan  c    rr

YOU ARE HEREBY COMMANDED to search on or before __ _ _ _ / 20. 97 _ _ _ _ _

(not to exceed 10 days) the person or place named above for the person or property specified, serving this w      r
search (in the daytime - 6:00 A.M. to 10 00 P M ) and if the person or property be found there to seize same   ea
warrant and receipt for the person or property taken, and prepare a written inventory of the person or pro,ex  r   d
return this warrant to __Susan Russ Walker_____ as required by law.
<small>United States Magistrate Judge</small>

___/ 10. 97     4 07pm_____
Date and Time Issued

at ___Montgomery  Alabama____
City and State

___Susan Russ Walker, United States Magistrate Judge___
Name and Title of Judicial Officer

_Susan  Russ  Walker_
Signature of Judicial Officer

IRS027

FD-697 (Rev 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

On (date) 1/12/97

Time 11:30 PM

(Name) HUNTS SEAFOOD Restaurant

(Street Address) 177 Campbellton Highway

(City) Dothan, Alabama 36301

Description of Item(s).

#1 3 envelopes with paper from Desk/office
#2 Box of business cards from Desk/office
#3 14 envelopes with paper from Desk/office
#4 Income tax papers from Desk/office
#5 3 envelopes with paper from Desk/office
#6 10 envelopes with papers from Desk/office
#7 Bank Records from Desk/office
#8 Misc paper from Desk/office
#9 Cash from office bldg. Cash
   455 one Dollar Bills    ARH
#10 Cash from office Filing cab
   $100-1, $50-1, $20-23, $10-15, $5-2,
   $1-117 ARH
#11 Cash from office safe, $100-409,
   $50-205, $20-34 ARH
#12 Cash from Safe, $100-114,
   $50-17, $20-173, $10-19, $5
   $1-16 ARH
#13 Cash from safe $100-453,
   $50-12, $20-33, $10-12, $5-10,
   $1-20 ARH
#14 Rental agreement & Divided stock in
   from gray small safe within safe
#15 Cash from Safe - gray Dot,
   $100-1,595, $50-123, check $16,500

Received by _____ (Signature)    Received from _____ (Signature)

IRS028

FD-597 (Rev 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page 2

On (date) *See page 1*

Item(s) listed
☐ Received
☐ Returned
☐ Released
☐ Seized

Time _____

(Name) _____

(Street Address) _____

(City) _____

Description of Item(s)

#16 Cash from safe, gray Box,
$100 - 59 · 850 - 44 ; $20 - 350 ; $10 - ?
$5 - 161 ; $2 - 1 ; $1 - 28   ARH
#17 Cash from safe - cloth bag ;
$100 - 596 ; $50 - 138 · $20 - 206 ; $10
$5 - 5 ; $1 - 4 ; check $335.00   ARH
#18 Cigar Box with cash, betting slips
lounge bar - WDJ
#19 bet slips & cash from lounge
bar   WDJ
#20 bet slips & cash from lounge
#21 Cherry machine tickets   WD?
#22 1987 football bet sheet
#23 checks from office safe   A?
#24 cash from safe , $100 - 87 · ?20 - ?
#25 Cash from safe, $100 - 119 , $50
$20 - 40  /ARH
#26 Receipts from gray Box in off?
safe ARH
#27 Cash from lounge bar , MEC
28 dimes ; 11 quarters, 23 nickles , ?
$5 - 2 ; $10 - 1 ; $1 - 95
#28 TRUCK KEYS from TRUCK   ??
#29 envelope with cash
#30 cash from Item #29   ??

Received by ___ (Signature) ___   Received from ___ (Signature) ___

P 14        285 792 5387        DOTHAN 088?8

IRS029

FC-597 (Rev 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page _2_

On (date) _See page 1_

Item(s) listed
☐ Received Fr
☐ Returned To
☐ Released To
☐ Seized

Time _____

(Name) _____

(Street Address) _____

(City) _____

Description of
Item(s)

#16 Cash from safe, gray Box.
$100 - 59; $50 - 44; $20 - 350; $10 - ...
$5 - 161; $2 - 1; $1 - 28   ARH

#17 Cash from safe - cloth bag;
$100 - 596; $50 - 138; $20 - 206; $10 ...
$5 - 5; $1 - 4; check $335.00   ARH

#18 Cigar Box with cash, betting slips
lounge bar - WDT

#19 bet slips & cash from lough
bar. WDJ

#20 bet slips & cash from lounge bar

#21 Cherry machine tickets ...

#22 1987 football bet sheet

#23 checks from office safe   A...

#24 cash from safe, $100 - 87, $50 - ...

#25 cash from safe, $100 - 119, $50 ...
$20 - 40 /ARH

#26 Receipts from gray Box in off...
safe ARH

#27 Cash from lounge bar, MEC,
28 dimes, 11 quarters, 23 nickles, 3 ...
$5 - 2; $10 - 1; $1 - 95

#28 TRUCK Keys from TRUCK ...

#29 envelope with cash ...

#30 cash from Item #29 ...

Received by ____ (Signature)

Received from _____ (Signature)

IRS030

FD-597 (Rev 3-29-84)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page 3

On (date) _See page 1_

item(s) list:
☐ Received
☐ Returned
☐ Released
☐ Seized

(Name) _____

(Street Address) _____

(City) _____

Description of item(s):

#31 Cash from item #20  WDJ
   $1-15; $5-9; $10-2; $20-14
#32 Cash from item #9  WDJ
   $100-1; $20-7; $10-4
#33 Cash from item #18  WDJ
   $20-1; $10-4; $5-13
#34 TRUCK receipt + title from [?]
#35 Cell phone from TRUCK  ME
#36 Business Cards, college bet sheet
#37 loan papers, property notes, c[?]
#38 Address book w/ safe + [?]
   Keys taken by Sgt Rae Weihs, D[?]
#39 Cancled check + tag receipt
#40 Title + loan papers  WDJ
#41 Property Deed  WDJ
#42 Glove Box — check depos'ts
#43 Misc Papers from office  RR
#44 Documents from Safe/office
#45 Address Both for Desk/office
#46 Cash from Poker Machine  RP
#47 Keys 95 GMC TRUCK  H[?]
#48 Assorted Documents From Safe/[?]
#49 Keys From item #38
#50 Misc Papers FM Walled Timothy
   Reeves  ARJ

"From Truck" (bracket for #34-41)

Received by: _____ (Signature)

Received from _____ (Signature)

IRS031

FD-597 (Rev 3-20-03)

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

Page 4

On (date) _See page 1_

Time _____

Item(s) listed b___
☐ Received f___
☐ Returned T___
☐ Released T___
☐ Seized

(Name) _____

(Street Address) _____

(City) _____

Description of Item(s):

#51  2 video tapes from office  RR
#52  video Board fw obag poker
#53  1st Bank Bag from safe  RR
#54  cash from Timothy J. Reeves
$100 - 2; $20 - 2
#55 - one Ring, one watch from
Timothy J. Reeves  ADB
#56  cash from Timothy J. Reeves
$100 - 104; $50 - 8; $10 - 7; $20 - 9
#57  misc Papers from office Desk

Received by _____          Received from _____
              [Signature]                        [Signature]

P 16                           285 792 5387

IRS032

# United States District Cou~~

____MIDDLE____ DISTRICT OF ____ALABAMA____

**In the Matter of the Search of**
(Name, address or brief description of person, property or premises to be searched)

the person of Terry D. Johnson or the
premises located at: 1640 South State
Highway 123, Newton, Alabama

**SEARCH WARRANT**

**CASE NUMBER**

To ___Charles A. Bravata, Sr.___ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___Charles A. Bravata, Sr.___ who has reason to

person of or ☒ on the property or premises located at (name and exact description/location)

Terry D. Johnson, or the premises located at  1640 South State Highway 123,

in the ____MIDDLE____ District of ____ALABAMA____ there is now

person or property, namely (describe the person or property to be seized)

Gambling records, gambling devices, wagering paraphernalia consisting of but not limited to paper record information, and any and all records relating to payoff of customers, letters, envelopes and United States address books including electronic address books and electronic notebooks, United States currency, facsimile machines, facsimile transmission records, computers including modems, hard drives, computer disk computer printouts, computer software, bank account records and other financial institution records, safes, locks, box keys and records, documents relating to the purchase and acquisition of real property including but not deeds, leases, contracts, tenant records and accounts, correspondence and insurance documents, daily tally sheets, disbursement records to others, invoices, supply records, expense records, money bags, documents relating purchase of equipment, rental records, lease records. All travel records including gasoline receipts, credit card records, restaurant receipts.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the described is now concealed on the person or premises above described and establish grounds for the issuance

YOU ARE HEREBY COMMANDED to search on or before ____1. 20. 97____

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant search (in the daytime - 6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same I and return this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property to return this warrant to ___Susan Russ Walker___ as required by law
                                                           **United States Magistrate Judge**

____1.10.97____   ____4:12 pm____
Date and Time Issued

at ___Montgomery, Alabama___
City and State

_Susan Russ W___
Signature of Judicial Officer

Susan Russ Walker, United States Magistrate Judge
Name and Title of Judicial Officer

IRS033

EVIDENCE INVENTORY LOG

LOCATION: 14th St + Hwy 183
DATE: 1-13-97
CASE IDENTIFIER: 182C-MO-39057
PREPARER/ASSISTANTS: Charlie English, Jim Stanley, Michael Magrino

PAGE ___ OF ___
PERSONNEL

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING DIRECT = D INDIRECT = I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 1 | Beeper Sheet | Nightstand 1st bedroom left | Stanley | Yes | | | |
| 2 | Notebook | Under Nightstand 1st bedroom | Stanley | Yes | | | |
| 3 | Assorted phone numbers | In Nightstand 1st bedroom | Stanley | Yes | | | |
| 4 | Black notebook + assorted numbers | On Desk in kitchen | Stanley | Yes | | | |
| 5 | Spiral book - red | All Desk in kitchen | Stanley | Yes | | | |
| 6 | Phone bill - 11-7-96 bill | Top of Desk 1st bedroom | Magrino | Yes | | | |
| 7 | Spiral book - brown | Top Chest Drawers 1st bedroom | Stanley | Yes | | | |
| 8 | Target marking machine | Bottom drawer on right | Magrino | No | | | |
| 9 | Coffee Nut B.D. grounds | Kitchen | Magrino | No | | | |
| 10 | Chicory Bulk Coffee | Kitchen | Maggeri | No | | | |
| 11 | Beeper sheet phone numbers | Floorboards of truck | Mag... | No | | | |

1-13-97   1:39 pm

IRS034

**AFFIDAVIT ATTACHMENT**

Affiant, SHIRLEY G. SAMANIEGO, being duly sworn, deposes as follows

Affiant is a Special Agent of the Federal Bureau of Investigation (FBI) and has been so employed for six years Affiant is presently assigned to the Mobile office of the FBI

For the purpose of application for search warrants, affiant is a Federal law enforcement officer under applicable provisions of the United States Code and under Rule 41 of the Federal Rules of Criminal Procedure

Affiant is knowledgeable of the Federal criminal jurisdiction relative to illegal bookmaking or sports book gambling operations and the jurisdiction of the FBI as prescribed by 18 U S C § 1955 and conspiracy to commit such offenses in violation of 18 U S C § 371.

Additionally, your affiant is knowledgeable of the Federal criminal jurisdiction relative to laundering of monetary instruments and the jurisdiction of the FBI as prescribed by 18 U S C § 1956 and conspiracy to commit such offenses in violation of 18 U.S C §§ 1956(g) and 371

Your affiant alleges that the illegal gambling which has been committed and is being committed is also in violation of the

Alabama Criminal Code, Section 13A-12-22, which prohibits bookmaking

## I   DEFINITIONS RELATING TO ILLEGAL GAMBLING BUSINESS - SPORTS BOOKMAKING

Essential to the conduct of a sports bookmaking operation involving the acceptance of wagers on football games, both professional and collegiate, which are scheduled on specific dates, are the following

A   The sports line -- a point differential usually determined by professional handicappers who specialize in setting point spreads on athletic events   There is both wagering and non-wagering line information   An example of non-wagering line would be the line of football prognosticators, which is published in many newspapers and broadcast on television and radio   This line is usually in whole points and is intended to represent the actual difference in strength between opposing teams   A wagering line while of course quite similar, is primarily intended to attract approximately equal amounts of money on each side of the athletic event or contest   This type of wagering line represents an effective use of half points.   There is no such thing as a universal line in the bookmaking community

2

In addition to the initial line, there are frequent and often hourly line changes which are communicated from sources of line information to the bookmakers   These line changes result from amounts of money bet on various teams, physical condition of players, location and weather conditions at the event

      B   <u>Layoffs by the bookmaker</u> - this practice requires the bookmaker to function in concert with other bookmakers or layoff sources in order to insure or protect himself against heavy losses as a result of an excessive number of wagers being placed by his betting customers on one team in a particular contest   The bookmaker strives to keep his book in balance, i e  to keep the bets on each side of the two teams in any particular contest approximately equal so that the winnings cancel the losses and the bookmaker makes a profit from a 10% "fee" charged the bettors on losing straight bets   It is common practice in the Dothan, Alabama area for several bookmakers to communicate directly with one another as to their specific needs for action or bets on one side of the contest in order for them to balance their individual books

      C   <u>Records</u> - essential to the conduct of a bookmaking operation, but not all-inclusive, are the following records

      A line sheet is a schedule of games played with appropriate blocks or squares to the right side of each team where

3

IRS037

customers and bookmakers can mark the line and changes in line along with the amount of money bet on each side of the contest, a betting slip is kept by the bookmaker for each customer to record the straight bets, parlay bets, teaser bets and records of layoff bets, coded lists of bettors; mailing lists, telephone contact numbers used among bookmakers and customers, account records of money owed by and to betting customers   Bookmakers concealed their records on their person as well as their residence

D   Wager amounts - it is known to your affiant based on her experience that in sports wagering one frequently finds wager amounts stated in the following terms   "Half" ($50 bet), "Dollar" ($100 bet), "Two dollars" ($200 bet), "Nickel" ($500 bet), "Dime" ($1,000 bet)

II   JURISDICTIONAL ASPECTS

Affiant declares that as a result of this investigation, which includes reports made to me by other Special Agents of the FBI and from officers of the Dothan, Alabama Police Department (DPD), I am familiar with the circumstances of the offenses   Based upon this familiarity, affiant alleges the facts contained in the paragraphs show that there is probable cause to believe that BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY SMITH REEVES, RONALD LYNN CHERRY, LARRY JOE COBB, DAVID FRANKLIN MIMS, JR , BENJAMIN MILLS HORNSBY, VIVIAN WELCH BOND, TERRY

4

DOUGLAS JOHNSON, VIRG LEE SELLERS, JERRY ONEIL SIMS, RONALD D BENEFIELD, MYRON

JAMES BROWN, MILTON K PHILLIPS, and others yet unknown, have been and

are now committing, and will continue to commit offenses against

the United States, i e to wit they and possibly others are

conducting, financing, managing, supervising, directing or owning

an illegal gambling business which has been in substantial and

continuous operation for a period in excess of 30 days and remains

in operation   This illegal gambling business has a gross revenue

of more than $2,000 in any single day of operation . This illegal

gambling business is in violation of 18 U S C  § 1955 and 18 U S C

§ 371   Your affiant notes that such conduct is prohibited under

the penal laws of the State of Alabama in violation of the Alabama

Criminal Code, Section 13A-12-22, which prohibits bookmaking

The above named individuals are involved in a bookmaking

operation which involves the acceptance of wagers on sporting

events, especially professional and collegiate football

III   PREDICATION OF INVESTIGATION

The information contained within this affidavit was

obtained by your affiant from other FBI Agents, from other law

enforcement officers of the DPD assigned to this investigation and

from surveillance conducted by the aforementioned law enforcement

officers

5

IRS039

On January 10, 1996, Lieutenant STEVE PARRISH and Sergeant ANDY HUGHES of the DPD advised the FBI that they were conducting an investigation into an illegal bookmaking operation in Dothan, Alabama, allegedly being operated by BILLY JOE REEVES and TIMOTHY REEVES, also known as (aka) TIM. HUGHES advised that this illegal operation appeared to be conducted from three separate locations. These three locations are as follows: Hunt's Seafood Restaurant and Oyster Bar, located at 177 Campbellton Highway, Dothan, Alabama; 1073 Malvern Road, Dothan, Alabama; and 3221 South State Highway 109, Dothan, Alabama.

Investigation to date conducted by the FBI and DPD, which is detailed in this affidavit, reveals that BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY SMITH REEVES, RONALD LYNN CHERRY, LARRY JOE COBB, DAVID FRANKLIN MIMS, JR., BENJAMIN MILLS HORNSBY, VIVIAN WELCH BOND, TERRY DOUGLAS JOHNSON, VIRGIL LEE SELLERS, JERRY ONIEL SIMS, RONALD D. BENEFIELD, MYRON JAMES BROWN, MILTON K. PHILLIPS are operating a large illegal sports book. Betting customers telephone the sports book by calling 334/677-8927, 334/677-7226, 334/677-3716 and 334/677-7844. Subpoenaed General Telephone Company (GTE) records reveal that 334/677-8927 is subscribed to VIVIAN WELCH BOND, 3221 South State Highway 109, Dothan, Alabama; 334/677-7226 is subscribed to THOMAS AUSTIN, 1073 Malvern Road,

6

IRS040

Dothan, Alabama (this telephone number is associated with DAVID

FRANKLIN MIMS, JR ), 334/677-3716 is subscribed to in the name of

THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone

number is associated with RONALD LYNN CHERRY, according to CS1),

and 334/677-7844 is subscribed to in the name of THOMAS AUSTIN,

1073 Malvern Road, Dothan, Alabama (this telephone number is

associated with LARRY JOE COBB, according to CS1)

## INFORMANTS

### INFORMANT INFORMATION FROM CS1

Confidential Source #1, hereinafter referred to as CS1,

has been known to the Dothan Office of the FBI from January, 1996

to the present date and has been contacted on more than 20

different occasions since that time    This source is personally

acquainted with individuals referred to in CS1's reporting    CS1

has also furnished information about other criminal activities in

the Dothan, Alabama area    The information provided by CS1 has been

verified wherever possible by independent investigation such as

surveillance and pen register records, subpoenaed telephone records

and other informants and has been proven to be accurate and

reliable    As an example of this, CS1 advised in this affidavit

that the sports book being operated by BILLY JOE REEVES, TIMOTHY

JOE REEVES, aka TIM, RONALD LYNN CHERRY, aka RONNIE, and BENJAMIN

7

IRS041

MILLS HORNSBY were using VIVIAN WELCH BOND to accept wagers   This

was confirmed by telephone intercepts

On January 10, 1996, CS1 advised that BILLY JOE REEVES

and TIMOTHY JOE REEVES, father and son, were operating a large

illegal sports book, which according to CS1 has been in operation

for the last three years   CS1 advised that both of the REEVES were

presently involved in taking wagers on college and professional

football games over the telephone   The REEVES had many customers

with some betting hundreds of dollars per game

On this same date, CS1 advised that VIVIAN WELCH BOND,

who lived at 3221 South State Highway 109, Dothan, Alabama,

334/677-8927, was involved in this illegal sports book operation

with BILLY JOE REEVES and TIMOTHY JOE REEVES   According to CS1,

VIVIAN WELCH BOND was the only person operating out of her

residence by answering the telephone, giving out line information

and accepting bets

CS1 gave a basic overview of how the illegal gambling

business was operated   CS1 reported that three different locations

were being used to conduct their gambling operation   Hunt's

Seafood Restaurant and Oyster Bar, VIVIAN WELCH BOND's residence

located at 3221 South State Highway 109, Dothan, Alabama, and a

trailer located at 1073 Malvern Road, Dothan, Alabama.  CS1 stated

8

IRS042

that a customer who was assigned a personal identification number by the gambling organization such as the number 100 could call three telephone numbers, 334/677-7226, 334/677-3716 and 334/677-7844   These three numbers are at the trailer located at 1073 Malvern Road, Dothan, Alabama   Upon calling these numbers the customer could place a bet or obtain line information   Bets would be made on the days Thursday through Monday, which normally covered the day's professional and college football games were played   CS1 advised on Tuesdays after a customer had placed a bet, whether they won or lost, they would go to Hunt's Seafood Restaurant and Oyster Bar where betting accounts would be settled   CS1 also advised that customers who placed bets at the trailer could pick up line sheets on Thursdays at Hunt's Seafood Restaurant and Oyster Bar

On September 5, 1996, CS1 contacted VIVIAN WELCH BOND by calling 334/677-8927   During this conversation, CS1 requested a current line sheet   BOND agreed and told CS1 she would meet him in Dothan at a specific place and time   BOND met with CS1 at the prearranged location where she gave CS1 a current line sheet

BOND also listed on the line sheet names and telephone numbers for CS1 to call in order to wager a bet in the event BOND was unable to be contacted   The telephone numbers and names given are as follows   334/677-7226 associated with an individual named

9

IRS043

MILLS, 334/677-784, associated with an individual named JOE, and

334/677-3716 associated with an individual named RONNIE.   A

physical surveillance was conducted of this meet

On September 6, 1996, VIVIAN WELCH BOND, who utilizes the

telephone number 334/677 8927, accepted a wager from CS1   CS1 also

asked BOND who the JOE was who was listed on the line sheet

obtained from her on September 5, 1996   BOND stated that JOE is

JOE COBB

On September 11, 1996, CS1 called 334/677-8927 and spoke

to VIVIAN WELCH BOND   CS1 called in reference to the payoff for

the wager that was made on September 6, 1996   CS1 also requested

an updated line sheet   BOND advised CS1 to meet her at a specific

place and time on this date in Dothan, Alabama   DPD officers

monitored the payoff by physical surveillance

On September 14, 1996, VIVIAN WELCH BOND, who utilizes

334/677-8927; accepted a wager from CS1

On September 17, 1996, CS1 called 334/677-8927 and spoke

to VIVIAN WELCH BOND about obtaining an updated line sheet   BOND

told CS1 that she had not received the new line sheets but she

would pick some up and then meet CS1 at a specific place and time

in Dothan, Alabama   A physical surveillance of BOND's residence

was conducted after the telephone call   DPD officers followed BOND

10

from her residence and then directly to Hunt's Seafood Restaurant and Oyster Bar.  From there she was followed to the predetermined meeting location with CS1 where she gave CS1 the line sheet.

On September 19, 1996, CS1 called 334/677-8927, utilized by VIVIAN WELCH BOND.  BOND accepted a wager made by CS1.  BOND also issued CS1 a bettor number in order that CS1 could call the telephone numbers at the trailer located at 1073 Malvern Road, Dothan, Alabama, in the event he could not contact her.

On September 25, 1996, CS1 called 334/677-8927, utilized by VIVIAN WELCH BOND.  A meeting was arranged so that the payoff for September 14 through 19, 1996 wagers could be made.  Also BOND was to provide CS1 with a current line sheet.  Later that day, CS1 met BOND in Dothan where the payoff was made at a shopping center parking lot in Dothan.  CS1 also received the current line sheet. Sergeant HUGHES of DPD monitored the meeting by a physical surveillance.

On October 25, 1996, CS1 reported to VIVIAN WELCH BOND's residence of 3221 South State Highway 109, Dothan, Alabama.  CS1 met BOND and obtained a current line sheet for college football games for Saturday, October 26, 1996, and professional football games for Sunday, October 27, 1996, through Monday, October 28,

11

IRS045

1996.  CS1 left BC_'s residence and then met Special Agent EMMETT
L. TRAMMELL (FBI) at a prearranged location.

On October 26, 1996, CS1 dialed 334/677-7226, which
subscribed to the telephone located at 1073 Malvern Road, Dothan,
Alabama.  An individual known to CS1 as DAVID MIMS answered the
telephone.  CS1 advised MIMS he was unable to contact VIVIAN WELCH
BOND, therefore, he was calling in order to obtain a current line
on the football games.  MIMS stated he had just spoken to BOND by
telephone and was aware that BOND was at her residence.  MIMS then
told CS1 to call BOND in order to obtain the line information.  CS1
then called 334/677-8927, utilized by VIVIAN WELCH BOND, and
obtained the current line.

On December 11, 1996, CS1 reported that VIVIAN WELCH BOND
of 3221 South State Highway 109, Dothan, Alabama, and who utilizes
the telephone number of 334/677-8927, accepted a wager from CS1 on
December 7, 1996.  The wager was placed on the college football
game between Florida University and the University of Alabama.

INFORMANT INFORMATION FROM CS2

Confidential Source #2, hereinafter referred to as CS2,
has been known to the Dothan Office of the FBI from November 13,
1996 to the present date and has been contacted on more than four
different occasions since that time.  The information provided by

12

IRS046

CS2 has been verified wherever possible by independent investigation such as surveillance, pen register records, subpoenaed telephone records and other informants On November 13, 1996, CS2 advised that there was an illegal bookmaking operation in the Dothan, Alabama area   CS2 advised that several employees from Jim Skinner Honda, 3823 Ross Clark Circle, Dothan, Alabama, were involved in the illegal wagering on football games   CS2 indicated that the bookmakers would arrive at the car dealership on various Tuesdays and Thursdays to handle the bookmaking matters   CS2 provided some betting line sheets that were left at the car dealership   On November 14, 1996, CS2 subsequently learned the name of one of the bookmakers as RONNIE (LAST NAME UNKNOWN) [LNU] when this individual brought some sport betting line sheets to the car dealership   CS2 also learned that another bookmaker, MILLS (LNU), who resides at the Barstone Apartments, Dothan, Alabama, is associated with RONNIE (LNU)

## TELEPHONE INFORMATION

A court order for the Authorization for Use of Pen Registers for 60 days equipped with the caller identification feature on 334/794-5193, subscribed to in the name of Hunt's Seafood Restaurant and Oyster Bar, 177 Campbellton Highway, Dothan, Alabama, 334/677-7226, subscribed to in the name of THOMAS AUSTIN,

13

IRS047

1073 Malvern Road, Dothan, Alabama (this telephone number is
associated with BENJAMIN MILLS HORNSBY, according to CS1), 334/677-
3716, subscribed to in the name of THOMAS AUSTIN, 1073 Malvern
Road, Dothan, Alabama (this telephone number is associated with
RONALD LYNN CHERRY, according to CS2), 334/677-7844, subscribed to
in the name of THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama
(this telephone number is associated with LARRY JOE COBB, according
to CS2), 334/677-8927, subscribed to in the name of VIVIAN WELCH
BOND, 3221 South State Highway 109, Dothan, Alabama, was signed by
United States Magistrate CHARLES S COODY on September 20, 1996,
said pen register went into effect on September 26, 1996   The pen
register revealed an extremely large number of phone calls between
these numbers during this period

XI    RESULTS OF INTERCEPTION OF WIRE COMMUNICATIONS

On December 23, 1996 in United States District Court,
Middle District of Alabama, Montgomery, Alabama, court order
CR/MISC/NO 446 was issued    This order authorized and ordered
Special Agents of the FBI, pursuant to an application authorized by
the Attorney General of the United States, to intercept wire
communications of THOMAS AUSTIN, associated with RONALD LYNN
CHERRY, aka RONNIE, LARRY JOE COBB, BENJAMIN MILLS HORNSBY and
VIVIAN WELCH BOND and others yet unknown, concerning violations of

14

IRS048

Illegal Gambling Business, Money Laundering and conspiracy to commit these offenses to and from the telephones bearing the numbers 334/677-8927, subscribed to VIVIAN WELCH BOND, 3221 South State Highway 109, Dothan, Alabama, 334/677-7226, subscribed to THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with BENJAMIN MILLS HORNSBY), 334/677-3716, subscribed to in the name of THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with RONALD LYNN CHERRY, according to CS1), and 334/677-7844, subscribed to in the name of THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with LARRY JOE COBB, according to CS1)

The period of authorization for this interception was ordered to continue until all communications are intercepted, which reveal fully the manner in which the above named persons and others as yet unknown are committing the offense described herein and other offenses which reveal fully the identities of their confederates, their places of operation and the nature of the conspiracy involved therein or for a period of 30 days from the date of the order

15

For the purpose of this affidavit, information developed from interceptions of conversations over 334/677-8927 will be designated as MDAL-12, interceptions of conversations over 334/677-7226 will be designated as MDAL-13, interceptions of conversations over 334/677-3716 will be designated as MDAL-14, and interceptions of conversations over 334/677-7844 will be designated as MDAL-15.

      MDAL-12      334/677-8927, residence of
                       VIVIAN WELCH BOND,
                       3221 South State Highway 109,
                       Dothan, Alabama

From December 27, 1996 through January 5, 1997 approximately 169 pertinent calls were intercepted on MDAL-12. The majority of the calls related to the bookmaking operation, i e placing and receiving bets, providing and receiving line information, settling up with customers and adding new customers to the operation. In addition, code names and numbers were utilized by the betting customers.

      MDAL-13      334/677-7226, trailer
                       located at 1073 Malvern Road,
                       Dothan, Alabama,
                       next to residence of
                       TIMOTHY JOE REEVES,
                       telephone number associated
                       with DAVID FRANKLIN MIMS, JR

16

IRS050

From December 27, 1996 through January 5, 1997 there were

approximately 617 pertinent phone calls intercepted on MDAL-13.

Many of these telephone calls intercepted related to the giving and

receiving of line information and the accepting of wagers on

college and professional football games

      MDAL-14      334/677-3716, trailer located
                            at 1073 Malvern Road,
                            Dothan, Alabama,
                            next to the residence of
                            TIMOTHY JOE REEVES, telephone
                            number associated with
                            RONALD LYNN CHERRY, aka
                            RONNIE CHERRY

From December 27, 1996 through January 5, 1997 there were

approximately 1,232 pertinent calls intercepted on MDAL-14.   A

large amount of the telephone calls intercepted related to the

giving and receiving of line information and the accepting of

wagers on college and professional football games  , Some of the

telephone calls intercepted also reflected the procedure to "settle

up" the wager   There were conversations between RONALD LYNN

CHERRY, aka RONNIE, and an unidentified female who was located at

4378 Kins Road, Malone, Florida, the residence of B  J  ADAMS   The

conversations intercepted on MDAL-14 also revealed that many of the

bettors used code numbers when placing bets

      MDAL-15      334/677-7844, trailer
                            located at 1073 Malvern Road,

IRS051

Dothan, Alabama, next to
residence of TIMOTHY JOE REEVES,
associated with LARRY JOE COBB

From December 27, 1996 through January 5, 1997 there were approximately 508 pertinent calls intercepted on MDAL-15   A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games   Some of the telephone calls intercepted also reflected the procedure to "settle up" the wager   There were conversations between LARRY JOE COBB and VIVIAN WELCH BOND, who was identified previously as MDAL-12   The conversations intercepted on MDAL-15 also revealed that many of the bettors used code numbers when placing bets

XII.   SPECIFIC INTERCEPTED CALLS

The following is a not inclusive list of specific intercepted calls related to selected individuals

(1) WENDY REEVES

(a) On December 31, 1996, WENDY REEVES discussed line information with RONNIE CHERRY.

(b) On December 27, 1996, at Hunt's, WENDY REEVES discussed paying a successful bettor (identified by a code -K875) with DAVID FRANKLIN MIMS

(2) TIMOTHY JOE REEVES

18

IRS052

(a) On December 27, 1996, TIMOTHY JOE REEVES discussed gambling losses with RONALD LYNN CHERRY

(b) On January 4, 1997, TIMOTHY JOE REEVES discussed a specific game with RONALD LYNN CHERRY

(c) On December 29, 1996, TIMOTHY JOE REEVES discussed placing a bet on behalf of a bettor using code K855 with DAVID FRANKLIN MIMS

(3) BILLY JOE REEVES

On January 2, 1997, at Hunt's Seafood Restaurant and Oyster Bar, BILLY JOE REEVES discussed a specific bet with RONALD LYNN CHERRY

## SURVEILLANCE

Affiant notes that FBI surveillances were conducted in this investigation   In these surveillances where affiant did not actually participate, the results were reported to her by other FBI Agents or Dothan police officers

On Tuesday, September 3, 1996, Sergeant RAYMOND WIFHE and Sergeant GARY COLEMAN of the DPD conducted a surveillance of Hunt's Seafood Restaurant and Oyster Bar   CS1 advised that on Tuesday there would be a lot of activity at the restaurant because it was

19

IRS053

the designated pay off day for customers of the illegal gambling operation   The surveillance took place between the hours of 10 29 A M  to 1 00 P M.   Thirty two (32) vehicles were observed entering and exiting the parking lot of Hunt's Seafood Restaurant and Oyster Bar    The vehicles observed were occupied primarily by male individuals    These individuals were observed driving onto the parking lot, getting out of their vehicles, and entering the restaurant    A red GMC pick-up truck bearing Alabama license plate number 81A19 Alabama University, was observed in the parking lot   According to the Alabama Department of Motor Vehicles, the truck is registered to TIMOTHY JOE REEVES.   A green GMC pick-up truck bearing Alabama license plate number 38DCG36 was also observed in the parking lot   Alabama Department of Motor Vehicles verified the vehicle to be registered to Hunt's Seafood Restaurant Incorporated.

On Wednesday, September 4, 1996, Sergeant HUGHES and Sergeant WIEHE of the DPD conducted a surveillance of the residence of VIVIAN WELCH BOND, located at 3221 South State Highway 109, Dothan, Alabama   One vehicle was parked at the residence, a white Pontiac Bonneville bearing Alabama license plate number 38CNR95   Alabama Department of Motor Vehicles verified the vehicle registered to VIVIAN WELCH BOND -

20

IRS054

On Thursday, September 5, 1996, Sergeant WIEHE conducted a surveillance of Hunt's Seafood Restaurant and Oyster Bar between the hours of 8 28 A M and 10 48 A M. Upon arrival at the restaurant, five (5) vehicles were already parked at the restaurant Thirteen (13) other vehicles were observed pulling into the parking lot, for a total of eighteen (18) vehicles

On Thursday, September 5, 1996, Sergeant HUGHES and Sergeant WIEHE conducted a surveillance of a meeting between CSI and VIVIAN WELCH BOND. BOND was occupying the white Pontiac Bonneville, 38CNR95 BOND was observed engaging in a conversation with CSI BOND was also observed handing CSI some white paper After the meeting between BOND and CSI, Sergeant HUGHES met CSI for a de-briefing. The paper was a current line sheet It also contained three telephone numbers, 334/677-7226, 334/677-3716, and 334/677-7844, which BOND told CSI to call to wager a bet if CSI was unable to contact her Those three numbers are subscribed to the trailer located at 1073 Malvern Road, Dothan, Alabama, and are utilized by BENJAMIN MILLS HORNSBY, RONALD LYNN CHERRY, also known as RONNIE, and LARRY JOE COBB

On Friday, September 6, 1996, Sergeant WIEHE of the DPD, conducted a surveillance of Hunt's Seafood Restaurant and Oyster bar between the hours of 7 41 A M and 11.07 A M Although the

21

IRS055

oyster bar does not open until 11:00 A M  there was a heavy amount of vehicular traffic flowing into the parking lot of the restaurant   WIEHE observed approximately twenty-two (22) vehicles arrive at the restaurant   WIEHE observed TIMOTHY JOE REEVES arrive in his GMC pick-up truck bearing Alabama license plate number 81A19 Alabama University   REEVES was later observed leaving the restaurant with a bag in his hand and was followed to the AmSouth Bank located at 2076 Ross Clark Circle   REEVES went inside the bank, spent a short period of time, and then left and was followed back to the restaurant   Also observed arriving at the restaurant was BILLY JOE REEVES occupying a green GMC pick-up truck bearing Alabama license plate number 38DGC36.

On Tuesday, September 10, 1996, Sergeant WIEHE, Sergeant COLEMAN, and Sergeant GONZALEZ of the DPD conducted a surveillance of Hunt's Seafood Restaurant and Oyster Bar between the hours of 7 26 A M  and 10 45 A M   This surveillance was conducted before the normal business hours of the oyster bar which opens at 11 00 A M  and the restaurant at 4 30 P M   Twenty-seven (27) vehicles were observed entering the parking lot and approximately thirty (30) people were observed entering the restaurant and oyster bar  TIMOTHY JOE REEVES was observed arriving at the restaurant and observed going in the restaurant.  REEVES was occupying the red GMC

22

pick-up truck bearing Alabama license plate number 81A19 Alabama University

On Wednesday, September 11, 1996, Sergeant HUGHES and Sergeant COLEMAN of the DPD conducted a surveillance of a pre-arranged meeting between VIVIAN WELCH BOND and CS1  BOND was occupying her white Pontiac Bonneville, Alabama license plate number 38CNR95  A pay off was made between VIVIAN WELCH BOND and CS1 from a wager that was made on September 6, 1996

On Saturday, September 14, 1996, at approximately 1 00 P M , Sergeant HUGHES of the DPD conducted a spot check of Hunt's Seafood Restaurant and Oyster Bar  HUGHES observed the same brown over tan GMC pick-up truck that was located at 1073 Malvern Road, Dothan, Alabama, parked at the restaurant  The GMC pick-up truck has a Alabama license plate number 38BRH19, which, according to the Alabama Department of Motor Vehicles, is registered to TERRY RAY KNIGHTON of 1075 Malvern Road  This address of 1075 Malvern Road is also listed as the residence of TIMOTHY JOE REEVES

On Tuesday, September 17, 1996, Sergeant HUGHES, Sergeant WIEHE, and Sergeant COLEMAN conducted a surveillance of VIVIAN WELCH BOND's residence located at 3221 South State Highway 109, Dothan, Alabama  The primary purpose of the surveillance was to follow VIVIAN WELCH BOND to a pre-arranged meeting with CS1

23

However, Agents were aware through a telephone conversation between
VIVIAN WELCH BOND and CS1, that BOND did not have any updated line
sheets and would have to stop somewhere in order to obtain the line
sheets before meeting with CS1   At 12.36 P M. BOND was observed
leaving her residence and was followed directly to Hunt's Seafood
Restaurant and Oyster Bar   BOND was observed exiting her vehicle
with nothing in her hands and then entering the oyster bar section
of the restaurant   One minute later BOND was observed exiting the
oyster bar with a stack of papers in her hand   BOND was then
followed to the pre-arranged meeting location where she met CS1 and
gave him an updated line sheet

On Wednesday, September 25, 1996, Sergeant HUGHES of the
DPD conducted a surveillance of a pre-arranged meeting between CS1
and VIVIAN WELCH BOND   The purpose of this meeting was for a payoff
between CS1 and BOND

On Thursday, October 24, 1996, Sergeant COLEMAN of the
DPD conducted a surveillance of Hunt's Seafood Restaurant and
Oyster Bar between the hours of 8 15 A M  and 11 00 A M   COLEMAN
observed approximately sixteen (16) vehicles go into and out of the
restaurant's parking lot   TIMOTHY JOE REEVES was observed leaving
a trailer located directly behind Hunt's Seafood Restaurant and
Oyster Bar   He was occupying a GMC pick-up with Alabama license

24

plate number 81A19 Alabama University.   TIMOTHY JOE REEVES was followed to the address of 1612 Fortner Street, Dothan, Alabama. TIMOTHY JOE REEVES was observed going into the residence at which time the surveillance was terminated

On Friday, October 25, 1996, Special Agent EMMETT L TRAMMELL conducted a surveillance of CS1 going to the residence of VIVIAN WELCH BOND, 3221 South State Highway 109, Dothan, Alabama BOND provided CS1 with a line sheet for the college and professional football games for Saturday, October 21, 1996 through Monday, October 28, 1996

On November 19, 1996, between the hours of 8.40 A M and 12.50 P M , DPD officers conducted a physical surveillance of the following locations · Hunt's Seafood Restaurant and Oyster Bar, BENJAMIN MILLS HORNSBY's residence of #62 Barstone Apartments, Dothan, Alabama, 1073 Malvern Road, Dothan, Alabama, and 1881 Hodgesville Road, Dothan, Alabama

On the same date at 9 05 A M , DPD officers observed TIMOTHY JOE REEVES truck, red GMC with Alabama University license plate 81A19, parked at EDWARD CHERRY's residence of 1881 Hodgesville Road, Dothan, Alabama   A blue over tan GMC pickup truck with Alabama license plate 38CBP55, which, according to Alabama Department of Motor Vehicles is registered to Hunt's Inc

25

IRS059

was also observed parked at EDWARD CHERRY's residence.   EDWARD

CHERRY is RONALD LYNN CHERRY's father

This same date at 9 10 A M , TIMOTHY JOE REEVES was

observed by DPD officers leaving 1881 Hodgesville Road and

returning to Hunt's Seafood Restaurant and Oyster Bar   Around

thirty minutes later RONALD LYNN CHERRY leaves 1881 Hodgesville

Road in the blue and tan GMC pickup truck, 38CBP55 and was followed

to Hunt's Seafood Restaurant and Oyster Bar   RONALD LYNN CHERRY

later departed Hunt's Seafood Restaurant and Oyster Bar and was

followed to 1073 Malvern Road, Dothan, Alabama   On the same date,

at 9 56 A M , BENJAMIN MILLS HORNSBY, was observed by DPD officers

driving away from his residence at #62 Barstone Apartments, Dothan,

Alabama, in his tan colored Buick LaSabre, 38APM34   He was

followed to Hunt's Seafood Restaurant and Oyster Bar where he

parked   BENJAMIN MILLS HORNSBY removed some papers from the glove

box of the vehicle and went into the trailer behind the restaurant

At 10 32 A M   BENJAMIN MILLS HORNSBY was observed by DPD officers

through the open door of the trailer talking on the telephone

About twenty minutes later BENJAMIN MILLS HORNSBY exits the trailer

and walks to the oyster bar and goes inside holding some papers in

his hand   One minute later he exits the oyster bar and returns to

the trailer

26

IRS060

On November 19, 1996, at 12 08 P M., RONALD LYNN CHERRY returned to Hunt's Seafood Restaurant and Oyster Bar and parks the blue over tan GMC pickup, Alabama license plate 38CBP55, he left the truck and went into the trailer at the rear of the restaurant with some papers in his hand   Two minutes later RONALD LYNN CHERRY left the trailer and was followed back to 1881 Hodgesville Road

On November 27, 1996, Sergeant RAYMOND WIEHE of the Dothan Police Department conducted a physical surveillance in the vicinity of Jim Skinner Honda, 3823 Ross Clark Circle, Dothan, Alabama.  The purpose of this surveillance was to attempt to observe RONALD LYNN CHERRY at that location to further corroborate information given by CS2   However, before the surveillance was set up at Jim Skinner Honda, RONALD LYNN CHERRY, who was operating a 1994 GMC extended cab pickup, blue/tan, Alabama license number 38CBP55, was observed southbound on Denton Road   CHERRY was followed from that point to the residence of EDWARD CHERRY, 1881 Hodgesville Road, Dothan, Alabama, where the surveillance was terminated

On December 27, 1996 at 1 00 p m, Sergeant ANTONIO GONZALEZ of the DPD conducted a physical surveillance of the white trailer located at 1073 Malvern Road, Dothan, Alabama.  At this location the vehicles associated with RONNIE CHERRY, which was a

27

blue and copper GMC pickup, a white El Camino Ford, belonging to LARRY JOE COBB and a red pickup truck were present

On December 27, 1996 at 1.30 p.m. through 2.30 p.m., a surveillance was conducted at Hunt's Seafood Restaurant and Oyster Bar  During the surveillance there were numerous vehicles observed arriving and departing with the occupants of the vehicles going into the restaurant and returning in a short period of time

On December 28, 1996 at 11.35 a.m., Sergeant JIMMY HOLLEY of the DPD observed the 1994 GMC pickup associated with RONNIE CHERRY parked at the trailer located at 1073 Malvern Road, Dothan, Alabama  Also observed was LARRY JOE COBB's white El Camino and a blue and tan Ford Ranger pickup  At 2.30 p.m., a drive-by surveillance was conducted at the same location and the GMC pickup associated with RONNIE CHERRY was present and COBB's vehicle had departed.

On December 29, 1996 at 3.10 p.m., Sergeant HOLLEY of the DPD observed VIVIAN WELCH BOND's Pontiac Bonneville at her residence at 3221 South State Highway 109, Dothan, Alabama

On December 29, 1996 at 3.35 p.m., the vehicle associated with RONNIE CHERRY, a GMC pickup, bearing Alabama license 38CBP55, was parked at 1073 Malvern Road

28

IRS062

On December 31, 1996 at 5 50 a.m , Lieutenant STEVE PARRISH of the DPD conducted a physical surveillance of the residence of RONNIE CHERRY at East Wayne Road and Hodgesville Road CHERRY departed the residence and went to the trailer located at 1073 Malvern Road

On December 31, 1996 at 7 27 a m , TIMOTHY JOE REEVES departed his residence at 1075 Malvern Road and reported to Hunt's Seafood Restaurant and Oyster Bar

On December 31, 1996 at 11 00 a m , RONNIE CHERRY returned to his residence on Hodgesville Road and departed at 11 20 a m in his GMC pickup   CHERRY reported to the post office on North Oates Street, went in and departed shortly thereafter.

On December 31, 1996 at 8 15 a m , Sergeants ANTONIO GONZALEZ, JIMMY HOLLEY and Lieutenant STEVE PARRISH conducted physical surveillance of Hunt's Seafood Restaurant and Oyster Bar During the surveillance, TIMOTHY JOE REEVES arrived in a small station wagon, parked at the trailer beside the store and got into his GMC pickup headed east on Ross Clark Circle   At 8 40 a m , RONNIE CHERRY arrived at the restaurant in the GMC pickup truck which is associated with CHERRY

On December 31, 1996 at 9 20 a m , a black GMC, short wheel base pickup truck, bearing Alabama disabled veteran tag

29

IRS063

RW658, occupied by a white male arrived at Hunt's Seafood Restaurant and Oyster Bar carrying papers   This individual departed the restaurant at 9 40 a.m   In addition, a white GMC pickup, bearing Alabama tag 34AVF86, arrived at 9 25 a.m  and departed at 10 51 a m

On December 31, 1996 at 10 28 a m , MIKE GOODSON was observed arriving at the restaurant in a Dodge King Cab pickup truck, bearing Alabama license 38DAR59   GOODSON went inside the restaurant and stayed approximately six minutes   Upon leaving the restaurant and returning to his vehicle he was observed carrying what appeared to be some papers   GOODSON proceeded to 1336 East Selma Street and then to the City Bait and Tackle Shop on Columbia Highway   GOODSON then headed east on Columbia Highway

On January 2, 1997 at approximately 5 00 p m , SA DAVID H  JOHNSON, FBI, entered Hunt's Seafood Restaurant and Oyster Bar at 177 Campbellton Highway, Dothan, Alabama   While inside the building in the oyster bar section, JOHNSON observed a piece of paper in an open drawer under the cash register   The piece of paper appeared to be a type of sports line sheet   JOHNSON also observed a white business size envelope with a handwritten name on the envelope   It was located in the open drawer under the cash

30

IRS064

register also    The drawer had been opened by a white female employee.

On January 4, 1997 at 2 48 p m , Sergeant RAY WIEHE, DPD, conducted a surveillance of VIRGIL SELLERS' residence in the Wayne Johnson Mobile Home Park at 177 West Saunders Road, Lot A7  The mobile home is white with beige trim around the top.  A check of light and water records show the trailer is registered to WALTER HENDERSON   Outside the residence an older model white Buick Century with Alabama tag 38DCY73 was parked in front   This vehicle is registered to VIRGIL SELLERS

On January 4, 1997 at 6 25 p m , Sergeant RAY WIEHE of the DPD conducted a surveillance of VIVIAN BONDS' residence and observed a white Dodge pickup truck that pulled into BONDS' driveway   At 6 40 p m , the vehicle backed out and drove away   The truck was followed and it displayed University of Alabama tag 66U61   The license plate was registered to TERRY D. JOHNSON, 1640 South State 123, Newton, Alabama

On January 6, 1997, SA TIMOTHY W  TURNER and Officers of the DPD, RAYMOND WIEHE, TONY GONZALEZ and MARK NELMS conducted a physical surveillance of RONNIE CHERRY   CHERRY would be occupying a GMC pickup truck, bearing Alabama license plate 38CBP55   This surveillance was conducted due to conversations intercepted from

31

IRS065

MDAL-14 which revealed RONNIE CHERRY telling layoff bettors that he would be making the payoffs for bets made on Monday, January 6, 1997

On January 6, 1997, Sergeants WIEHF and GONZALEZ followed CHERRY from Hunt's Seafood Restaurant and Oyster Bar to his father's residence, ED CHERRY, 1881 Hodgesville Road, Dothan  From this location CHERRY was followed to Headland Auto Sales located at 300 North Oates Street in Dothan at approximately 10 20 a m.  Two minutes later, CHERRY left Headland Auto Sales and was followed north to Eufaula, Alabama

On January 6, 1997 at approximately 11 34 a m , CHERRY arrived at the parking lot of the Park Management Office, which is located just off Highway 231  CHERRY was observed waiting in the parking lot until 11 52 a m  when  a GMC pickup, bearing Georgia Olympic license plate 762CM, occupied by a male and female met him  The driver of the GMC from Georgia was observed getting inside of CHERRY's vehicle  At 11 56 a m , both parties left with CHERRY now traveling south

On January 6, 1997 at approximately 1 30 p m , CHERRY was observed arriving at the residence of MILTON K  PHILLIPS of Rural Route 126, Phillips Road, Damascus, Georgia  At approximately 1 40 p m , CHERRY left  the  residence  where  he  was  followed  to

32

IRS066

Donaldsonville, Georgia where he stopped at a residence located on

10th Street   From there he was followed to Malone, Florida where

he stopped on the side of the road and met a white female who was

occupying a red and gray Ford Explorer with Alabama license plate

38CLW21

On January 6, 1997 at 3 30 p m , CHERPY was followed

along Interstate 10 headed toward Tallahassee, Florida at which

time the surveillance was terminated

On January 7, 1997 at 6 00 a m , Sergeant RAY WIEHE and

Lieutenant STEVE PARRISH, DPD, conducted a surveillance of VIRGIL

SELLERS' residence at 177 West Saunders Road, Lot A7, in the Wayne

Johnson Mobile Home Park   SELLERS' older model white Buick Century

with Alabama tag 38DCY73 was parked in front of the trailer

On January 10, 1997, search warrants were obtained from

the United States District Court for the Middle District of Alabama

for eleven (11) homes and businesses in Alabama   Included in the

places to be searched were the home of TIMOTHY JOE and WENDY

REEVES, and a trailer adjacent to that home, and Hunt's Restaurant

and Lounge and Oyster Bar, Inc   All these locations are in the

Dothan, Alabama area

Gambling records and paraphernalia were found in the home

of TIMOTHY JOE and WENDY REEVES and the adjacent trailer   Gambling

33

IRS067

records and paraphernalia were also found in Hunt's Restaurant and Lounge and Oyster Bar   Additionally, approximately $400,000 in United States currency was found in a safe in Hunt's   TIMOTHY JOE REEVES had the combination to the safe

TIMOTHY JOE REEVES made a statement to the effect that we have all this money because it is hard to get rid of because of the IRS

I know that this gambling organization was obtaining large amounts of U S currency as evidence by the discovery of approximately $400,000 in the safe at Hunt's

Further, it is clear that TIMOTHY JOE REEVES was concerned that the cash so obtained would come to the attention of the IRS or other government agencies, and took active measures to conceal this cash

I also know that this gambling organization created and maintained large quantities of gambling sheets, records and other paraphernalia, and stored these records in their homes and places of business

Based upon information obtained during these searches, I have determined that individuals within the organization would convert small denomination currency into 100-dollar bills at banks in the Dothan area

34

IRS068

Further, I know that BILLY JOE REEVES is the father of

TIMOTHY JOE REEVES

I know that individuals engaged in illegal activity use

safety deposit boxes to hide and secrete evidence such as records,

paraphernalia and the proceeds of crime   Further I have become

aware that the key to Safety Deposit Box ████ at First Bank of

Dothan, Alabama was found in BILLY JOE REEVES truck along with

gambling records and paraphernalia  I am also aware that BILLY JOE

REEVES, TIMOTHY JOE REEVES, and WENDY REEVES may have safety

deposit boxes at AmSouth Bank in Dothan, Alabama

There is probable cause to believe that these safety

deposit boxes contain evidence of violations of 18 USC Sections

1955, 1956, and 1957

I further know that in the safe at Hunt's along with

approximately $400,000 in U S. currency, records were found showing

that accounts ████████ , ████████ and Certificate of Deposit

number ████ at First Bank of Dothan existed  Also found in this

safe were records showing that account number ████████ at

SouthTrust Bank in Dothan, Alabama existed

I know that individuals involved in illegal activity

regularly use bank accounts and certificates of deposit to

"launder" the cash proceeds of illegal activity so as to hide the

35

source of the funds, promote and carry on the illegal activity and evade taxation.    I further know that DPD has received reliable information that one account ███████ at First Bank) was used to pay-off bettors

      -There is probable cause to believe that these accounts (and others held by BILLY JOE REEVES, TIMOTHY JOE REEVES, and WENDY REEVES) are property involved in violations of 18 USC Sections 981, 1956, and 1957

 

 

SHIRLEY G  SAMANIEGO
Special Agent, FBI
Montgomery Resident Agency

 

Sworn to me and subscribed
in my presence this _____
day of January, 1997

 

_____
United States Magistrate Judge

36

IRS070

## AFFIDAVIT ATTACHMENT

Affiant, CHARLES A  BRAVATA, SR , being duly sworn, deposes as follows

Affiant is a Special Agent of the Federal Bureau of Investigation (FBI) and has been so employed for five years  Affiant is presently assigned to the Mobile office of the FBI

For the purpose of application for search warrants, affiant is a Federal law enforcement officer under applicable provisions of the United States Code and under Rule 41 of the Federal Rules of Criminal Procedure  Affiant is knowledgeable as to the operation of sports wagering or bookmaking  This knowledge has been gained through experience as a Special Agent with the FBI, which has included specialized training in the investigation of illegal gambling businesses through affiant's association and exchange of information with other Special Agents of the FBI likewise assigned to investigate gambling matters and from information received from informants knowledgeable of gambling matters

Affiant is knowledgeable of the Federal criminal jurisdiction relative to illegal bookmaking or sports book gambling operations and the jurisdiction of the FBI as prescribed by 18 U S C  § 1955 and conspiracy to commit such offenses in violation of 18 U.S C  § 371

Additionally, your affiant is knowledgeable of the Federal criminal jurisdiction relative to laundering of monetary instruments and the jurisdiction of the FBI as prescribed by 18

U S C § 1956 and conspiracy to commit such offenses in violation
of 18 U S C. §§ 1956(g) and 371

Your affiant alleges that individuals named in this
affidavit and possibly others have committed and are committing
the violations of Federal law set forth above

Your affiant alleges that the illegal gambling which
has been committed and is being committed is also in violation of
the Alabama Criminal Code, Section 13A-12-22, which prohibits
bookmaking

I    DEFINITIONS RELATING TO ILLEGAL GAMBLING
       BUSINESS - SPORTS BOOKMAKING

Essential to the conduct of a sports bookmaking
operation involving the acceptance of wagers on football games,
both professional and collegiate, which are scheduled on specific
dates, are the following

A.  The sports line - a point differential usually
determined by professional handicappers who specialize in setting
point spreads on athletic events   There is both wagering and
non-wagering line information   An example of non-wagering line
would be the line of football prognosticators, which is published
in many newspapers and broadcast on television and radio   This
line is usually in whole points and is intended to represent the
actual difference in strength between opposing teams   A wagering
line, while of course quite similar, is primarily intended to
attract approximately equal amounts of money on each side of the
athletic event or contest.  This type of wagering line represents

2

IRS072

an effective use of half points   There is no such thing as a universal line in the bookmaking community

In addition to the initial line, there are frequent and often hourly line changes which are communicated from sources of line information to the bookmakers   These line changes result from amounts of money bet on various teams, physical condition of players, location and weather conditions at the event

B   Layoffs by the bookmaker - this practice requires the bookmaker to function in concert with other bookmakers or layoff sources in order to insure or protect himself against heavy losses as a result of an excessive number of wagers being placed by his betting customers on one team in a particular contest   The bookmaker strives to keep his book in balance, i e to keep the bets on each side of the two teams in any particular contest approximately equal so that the winnings cancel the losses and the bookmaker makes a profit from a 10% "fee" charged the bettors on losing straight bets.   It is common practice in the Dothan, Alabama area for several bookmakers to communicate directly with one another as to their specific needs for action or bets on one side of the contest in order for them to balance their individual books   are

C   Records - essential to the conduct of a bookmaking operation, These Records include, but are not limited to the following records.

A line sheet is a schedule of games played with appropriate blocks or squares to the right side of each team where customers and bookmakers can mark the line and changes in

3

IRS073

line along with the amount of money bet on each side of the contest, a betting slip is kept by the bookmaker for each customer to record the straight bets, parlay bets, teaser bets and records of layoff bets, coded lists of bettors, mailing lists, telephone contact numbers used among bookmakers and customers, account records of money owed by and to betting customers

D    Wager amounts - it is known to your affiant based on his experience that in sports wagering one frequently finds wager amounts stated in the following terms  "Half" ($50 bet), "Dollar" ($100 bet), "Two dollars" ($200 bet), "Nickel" ($500 bet), "Dime" ($1,000 bet)

II    JURISDICTIONAL ASPECTS

Affiant declares that as a result of my direction, management and participation in the investigation in this matter, which includes reports made to me by other Special Agents of the FBI and from officers of the Dothan, Alabama Police Department (DPD), I am familiar with the circumstances of the offenses Based upon this familiarity, affiant alleges the facts contained in the paragraphs show that

There is probable cause to believe that and others yet unknown, have been and are now committing, and will continue to commit offenses against the United States, i e to wit  they and possibly others are conducting, financing, managing, supervising, directing or owning an illegal gambling business which has been in substantial and continuous operation

4

for a period in excess of 30 days and remains in operation  This illegal gambling business has a gross revenue of more than $2,000 in any single day of operation   This illegal gambling business is in violation of 18 U S C  § 1955 and 18 U S C. § 371   Your affiant notes that such conduct is prohibited under the penal laws of the State of Alabama in violation of the Alabama Criminal Code, Section 13A-12-22, which prohibits bookmaking

The above named individuals are involved in a bookmaking operation which involves the acceptance of wagers on sporting events, especially professional and collegiate football

Additionally, your affiant alleges that the facts contained in paragraphs below show that BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY SMITH REEVES, RONALD LYNN CHERRY, LARRY JOE COBB, DAVID FRANKLIN MIMS, JR , BENJAMIN MILLS HORNSBY, VIVIAN WELCH BOND, TERRY DOUGLAS JOHNSON, VIRGIL LEE SELLERS, JERRY ONIEL SIMS, RONALD D BENEFIELD, MYRON JAMES BROWN, MILTON K PHILLIPS and others as yet unknown, have been and are now committing and will continue to commit offenses against the United States, i e  to wit  they and possibly others are committing violations of the laundering of monetary instruments laws in violation of 18 U S C  § 1956 and conspiracy to commit such offenses in violation of 18 U S C  §§ 371 and 1956(g)

III  PREDICATION OF INVESTIGATION

The information contained within this affidavit was obtained by your affiant and from other FBI Agents acting at the direction of your affiant, from other law enforcement officers of

5

IRS075

the DPD assigned to this investigation and from surveillance conducted by the aforementioned law enforcement officers

On January 10, 1996, Lieutenant STEVE PARRISH and Sergeant ANDY HUGHES of the DPD advised affiant that they were conducting an investigation into an illegal bookmaking operation in Dothan, Alabama, allegedly being operated by BILLY JOE REEVES and TIMOTHY REEVES, also known as (aka) TIM  HUGHES advised that this illegal operation appeared to be conducted from three separate locations  These three locations are as follows  Hunt's Seafood Restaurant and Oyster Bar, located at 177 Campbellton Highway, Dothan, Alabama, 1073 Malvern Road, Dothan, Alabama, and 3221 South State Highway 109, Dothan, Alabama

Investigation to date conducted by the FBI and DPD, which is detailed in this affidavit, reveals that BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY SMITH REEVES, RONALD LYNN CHERRY, LARRY JOE COBB, DAVID FRANKLIN MIMS, JR , BENJAMIN MILLS HORNSBY, VIVIAN WELCH BOND, TERRY DOUGLAS JOHNSON, VIRGIL LEE SELLERS, JERRY ONIEL SIMS, RONALD D  BENEFIELD, MYRON JAMES BROWN, MILTON K  PHIL are operating a large illegal sports book  Betting customers telephone the sports book by calling 334/677-8927, 334/677-7226, 334/677-3716 and 334/677-7844  Subpoenaed General Telephone Company (GTE) records reveal that 334/677-8927 is subscribed to VIVIAN WELCH BOND, 3221 South State Highway 109, Dothan, Alabama, 334/677-7226 is subscribed to THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with BENJAMIN MILLS HORNSBY); 334/677-3716

6

is subscribed to in the name of THOMAS AUSTIN, 1073 Malvern Road,
Dothan, Alabama (this telephone number is associated with RONALD
LYNN CHERRY, according to CS1), and 334/677-7844 is subscribed to
in the name of THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama
(this telephone number is associated with LARRY JOE COBB,
according to CS1)

## Background of Identified Conspirators

A   BILLY JOE REEVES

| | |
|---|---|
| Race | White |
| Sex | Male |
| Date of Birth (DOB) | ▮ 1928 |
| Height | 5'11" |
| Weight | 200 |
| Hair | Gray |
| Eyes | Brown |
| Social Security Account Number (SSAN) | ▮-6811 |
| Address | 2274 Campbellton Highway Dothan, Alabama 36301 |

A review for a prior criminal record for BILLY JOE
REEVES was negative

B   TIMOTHY JOE REEVES, aka TIM

| | |
|---|---|
| Race | White |
| Sex | Male |
| DOB | ▮ 1963 |
| Height | 5'6" |
| Weight | 185 |
| Hair | Black |
| Eyes | Brown |
| SSAN | ▮-6033 |
| Address | 1075 Malvern Road Dothan, Alabama 36301 |

A review for a prior criminal record for TIMOTHY JOE
REEVES was negative

C.   RONALD LYNN CHERRY, aka RONNIE

| | |
|---|---|
| Race | White |

7

IRS077

| | |
|---|---|
| Sex | Male |
| DOB | ████████, 1950 |
| Height | 5'11" |
| Weight | 237 |
| Hair | Black |
| Eyes | Blue |
| SSAN | ████-7962 |
| Address | Route 2, Box 22 |
| | Dothan, Alabama 36301 |

A review of the criminal records of RONALD LYNN CHERRY, aka RONNIE, revealed that he has FBI Number 752723LA2 and the following arrests

| | |
|---|---|
| 11/28/1981 | Pelham Police Department, Driving Under the Influence of Liquor |
| 05/02/1990 | Jefferson County Sheriff's Department, Larceny Second Degree |
| 06/23/1992 | Jefferson County Sheriff's Department, Probation Violation |

### D   LARRY JOE COBB

| | |
|---|---|
| Race | White |
| Sex | Male |
| DOB | ████████ 1945 |
| Height | 6'1" |
| Weight | 212 |
| Hair | Black |
| Eyes | Brown |
| SSAN | ████-3764 |
| Address | 205 Campbellton Highway |
| | Dothan, Alabama 36301 |

A review for a prior criminal record for LARRY JOE COBB was negative

### E   BENJAMIN MILLS HORNSBY

| | |
|---|---|
| Race | White |
| Sex | Male |
| DOB | ████████, 1950 |
| Height | 6' |
| Weight | 170 |
| Hair | Brown |
| Eyes | Brown |
| SSAN | ████ 0663 |

8

IRS078

Address                          927 Honeysuckle Road
                                 Barstone Apartments
                                 #62
                                 Dothan, Alabama 36301

A review of the criminal record of BENJAMIN MILLS
HORNSBY revealed the following arrests

07/13/1969    DPD, Licensing Registration - Carrying a Pistol
              without a Permit

11/22/1975    DPD, Driving Under the Influence

06/22/1979    Houston County Sheriff's Office, Driving Under
              the Influence

09/25/1985    DPD, Driving Under the Influence

04/05/1986    DPD, Driving Under the Influence

04/01/1988    DPD, Driving Under the Influence

10/23/1988    Houston County Sheriff's Office, Driving Under
              the Influence

03/23/1991    Daleville Police Department, Driving Under the
              Influence

VIVIAN WELCH BOND

        Race                     White
        Sex                      Female
        DOB                      ████████ 1953
        Height                   5'3"
        Weight                   125
        Hair                     Blonde
        Eyes                     Brown
        SSAN                     ███████ 3360
        Address                  3321 South State
                                 Highway 109
                                 Dothan, Alabama 36301

A review for a prior criminal record for VIVIAN WELCH
BOND was negative

CO-CONSPIRATORS

BILLY JOE REEVES
TIMOTHY JOE REEVES
WENDY SMITH REEVES

9

RONALD LYNN CHERRY
LARRY JOE COBB
DAVID FRANKLIN MIMS, JR
BENJAMIN MILLS HORNSBY
VIVIAN WELCH BOND
TERRY DOUGLAS JOHNSON
VIRGIL LEE SELLERS
JERRY ONIEL SIMS
RONALD D BENEFIELD
MYRON JAMES BROWN
MILTON K PHILLIPS
EDDIE JEROME CHERRY

Name          WENDY SMITH REEVES
Race          White
Sex           Female
DOB           ████ 1968
Height        5'2"
Weight        132
Hair          Brown
Eyes          Hazel
SSAN          ████-0430
Address       1075 Malvern Road
              Dothan, Alabama

A review for a prior criminal record for WENDY SMITH

REEVES was negative

Name          DAVID FRANKLIN MIMS, JR
Race          White
Sex           Male
DOB           ████ 1963
Height        5'8"
Weight        180
Hair          Brown
Eyes          Blue
SSAN          ████-0024
Address       501 Carroll Street
              Dothan, Alabama

A review of the criminal record of DAVID FRANKLIN MIMS,

JR revealed that he has FBI Number 398505VA9 and the following

arrests.

09/16/86        Houston County Sheriff's Department
                (HCSD), Assault 3rd Degree

11/29/86        HSCD, Family Offense, Non-Support

10

IRS080

| | |
|---|---|
| 01/23/94 | Daleville Police Department, Driving Under the Influence of Liquor |
| 07/29/95 | DPD, Driving Under the Influence of Liquor |
| 01/21/96 | HCSD, Fraud, Insufficient Funds Checks; seven counts |

Name          TERRY DOUGLAS JOHNSON
Race          White
Sex           Male
DOB           ██████████, 1968
Height        5'9"
Weight        190
Hair          Brown
Eyes          Hazel
SSAN          ████████2140
Address       1640 South State Highway 123
              Newton, Alabama

A review for a prior criminal record on TERRY DOUGLAS JOHNSON was negative

Name          VIRGIL LEE SELLERS
Race          White
Sex           Male
DOB           ██████████ 1951
Height        6'1"
Weight        230
Hair          Brown
Eyes          Brown
SSAN          ███████9116
Address       Route 3, Box 9C
              Ashford, Alabama

Alabama Operator's
License Number            2947644

A review for a prior criminal record for VIRGIL LEE SELLERS was negative.

Name          JERRY ONIEL SIMS
Race          White
Sex           Male
DOB           ██████████, 1951
Height        6'2"
Weight        220
Hair          Brown
Eyes          Brown

11

IRS081

```
SSAN                              ██████6051
Address                          Post Office Box 683
                                 Lot 7, Town and Country
                                 Estates
                                 Midland City, Alabama
                                 36350
```

A review for a prior criminal history for JERRY ONIEL

SIMS was negative

```
Name                             RONALD D  BENEFIELD
Race                             White
Sex                              Male
DOB                              ██████ 1946
Height                           5'9"
Weight                           165
Hair                             Brown
Eyes                             Brown
SSAN                             ██████3155
Address                          172 Greenview Circle
                                 Dothan, Alabama 36301
```

A review for a prior criminal record for RONALD D

BENEFIELD was negative

```
Name                             MYRON J  BROWN
Race                             White
Sex                              Male
DOB                              ██████ 1925
Height                           5'8"
Weight                           180
SSAN                             ██████5226
```

A review for a prior criminal record for MYRON J  BROWN

was negative

```
Name                             MILTON K  PHILLIPS
Race                             White
Sex                              Male
DOB                              ██████ 1932
Height                           5'11"
Weight                           170
Eyes                             Brown
SSAN                             ██████6774
Address                          Route 1, Box 136
                                 Damascus, Georgia
                                 31741-9602
```

A review for a prior criminal record for MILTON K

12

PHILLIPS was negative.

| | |
|---|---|
| Name | EDDIE JEROME CHERRY |
| Race | White |
| Sex | Male |
| DOB | ████████████ 1938 |
| Height | 5'11" |
| Weight | 230 |
| Hair | Gray |
| Eyes | Blue |
| SSAN | █████0382 |
| Address | 2403 Wilkins Street |
| | Dothan, Alabama |

A review for prior criminal record for EDDIE JEROME

CHERRY was negative.

## INFORMANTS

### INFORMANT INFORMATION FROM CS1

Confidential Source #1, hereinafter referred to as CS1,
has been known to the Dothan Office of the FBI from January, 1996
to the present date and has been contacted on more than 20
different occasions since that time. This source is personally
acquainted with individuals referred to in CS1's reporting. CS1
has also furnished information about other criminal activities in
the Dothan, Alabama area. The information provided by CS1 has
been verified wherever possible by independent investigation such
as surveillance and pen register records, subpoenaed telephone
records and other informants and has been proven to be accurate
and reliable. As an example of this, CS1 advised in this
affidavit that the sports book being operated by BILLY JOE
REEVES, TIMOTHY JOE REEVES, aka TIM, RONALD LYNN CHERRY, aka
RONNIE, and BENJAMIN MILLS HORNSBY were exchanging line

IRS083

information and layoff bets with the sports book being operated by *VIVIAN WELCH BOND*

On January 10, 1996, CS1 advised that *BILLY JOE REEVES* and *TIMOTHY JOE REEVES*, father and son, were operating a large illegal sports book, which according to CS1 has been in operation for the last three years   CS1 advised that both of the *REEVESes* were presently involved in taking wagers on college and professional football games over the telephone   The *REEVESes* had many customers with some betting hundreds of dollars per game

On this same date, CS1 advised that *VIVIAN WELCH BOND*, who lived at 3221 South State Highway 109, Dothan, Alabama, 334/677-8927, was involved in layoff bets with *BILLY JOE REEVES* and *TIMOTHY JOE REEVES*   According to CS1, *VIVIAN WELCH BOND* was *the only person operating out of her residence by answering the telephone, giving out line information and accepting bets*

CS1 gave a basic overview of how the illegal gambling business was operated   CS1 reported that three different locations were being used to conduct their gambling operation Hunt's Seafood Restaurant and Oyster Bar, *VIVIAN WELCH BOND's* residence located at 3221 South State Highway 109, Dothan, Alabama, and a trailer located at 1073 Malvern Road, Dothan, Alabama   CS1 stated that a customer who was assigned a personal identification number by the gambling organization such as the number 100 could call three telephone numbers, 334/677-7226, 334/677-3716 and 334/677-7844   These three numbers are at the trailer located at 1073 Malvern Road, Dothan, Alabama   Upon

14

sheet obtained from her on September 5, 1996. BOND stated that JOE is JOE COBB.

On September 11, 1996, CS1 called 334/677-8927 and spoke to VIVIAN WELCH BOND. CS1 called in reference to the payoff for the wager that was made on September 6, 1996. CS1 also requested an updated line sheet. BOND advised CS1 to meet her at a specific place and time on this date in Dothan, Alabama. Affiant and DPD officers monitored the payoff by physical surveillance.

On September 14, 1996, VIVIAN WELCH BOND, who utilizes 334/677-8927, accepted a wager from CS1.

On September 17, 1996, CS1 called 334/677-8927 and spoke to VIVIAN WELCH BOND about obtaining an updated line sheet. BOND told CS1 that she had not received the new line sheets but she would pick some up and then meet CS1 at a specific place and time in Dothan, Alabama. A physical surveillance of BOND's residence was conducted after the telephone call. Affiant and DPD officers followed BOND from her residence and then directly to Hunt's Seafood Restaurant and Oyster Bar. From there she was followed to the predetermined meeting location with CS1.

On September 19, 1996, CS1 called 334/677-8927, utilized by VIVIAN WELCH BOND. BOND accepted a wager made by CS1 BOND also issued CS1 a bettor number in order that CS1 could call the telephone numbers at the trailer located at 1073 Malvern Road, Dothan, Alabama, in the event he could not contact her.

16

On September 25, 1996, CS1 called 334/677-8927,
utilized by VIVIAN WELCH BOND   A meeting was arranged so that
the payoff for September 14 through 19, 1996 wagers could be
made   Also BOND was to provide CS1 with a current line sheet
Later that day, CS1 met BOND in Dothan where the payoff was made
at a shopping center parking lot in Dothan   CS1 also received
the current line sheet   Sergeant HUGHES of DPD monitored the
meeting by a physical surveillance

On October 25, 1996, CS1 reported to VIVIAN WELCH
BOND's residence of 3221 South State Highway 109, Dothan,
Alabama   CS1 met BOND and obtained a current line sheet for
college football games for Saturday, October 26, 1996, and
professional football games for Sunday, October 27, 1996, through
Monday, October 28, 1996   CS1 left BOND's residence and then met
affiant and Special Agent EMMETT L  TRAMMELL (FBI) at a
prearranged location

On October 26, 1996, CS1 dialed 334/677-7226, which
subscribed to the telephone located at 1073 Malvern Road, Dothan,
Alabama   An individual known to CS1 as DAVID MIMS answered the
telephone   CS1 advised MIMS he was unable to contact VIVIAN
WELCH BOND; therefore, he was calling in order to obtain a
current line on the football games.  MIMS stated he had just
spoken to BOND by telephone and was aware that BOND was at her
residence   MIMS then told CS1 to call BOND in order to obtain
the line information.  CS1 then called 334/677-8927, utilized by
VIVIAN WELCH BOND, and obtained the current line

17

IRS086

On December 11, 1996, CS1 reported that VIVIAN WELCH

BOND of 3221 South State Highway 109, Dothan, Alabama, and who

utilizes the telephone number of 334/677-8927, accepted a wager

from CS1 on December 7, 1996   The wager was placed on the

college football game between Florida University and the

University of Alabama

### INFORMANT INFORMATION FROM CS2

Confidential Source #2, hereinafter referred to as CS2,

has been known to the Dothan Office of the FBI from November 13,

1996 to the present date and has been contacted on more than four

different occasions since that time   The information provided by

CS2 has been verified wherever possible by independent

investigation such as surveillance, pen register records,

subpoenaed telephone records and other informants   On

November 13, 1996, CS2 advised that there was an illegal

bookmaking operation in the Dothan, Alabama area   CS2 advised

that several employees from Jim Skinner Honda, 3823 Ross Clark

Circle, Dothan, Alabama, were involved in the illegal wagering on

football games   CS2 indicated that the bookmakers would arrive

at the car dealership on various Tuesdays and Thursdays to handle

the bookmaking matters   CS2 provided some betting line sheets

that were left at the car dealership.  On November 14, 1996, CS2

subsequently learned the name of one of the bookmakers as RONNIE

(LAST NAME UNKNOWN) [LNU] when this individual brought some sport

betting line sheets to the car dealership   CS2 also learned that

18

IRS087

another bookmaker, MILLS (LNU), who resides at the Barstone
Apartments, Dothan, Alabama, is associated with RONNIE (LNU).

### TELEPHONE INFORMATION

A court order for the Authorization for Use of Pen
Registers for 60 days equipped with the caller identification
feature on 334/794-5193, subscribed to in the name of Hunt's
Seafood Restaurant and Oyster Bar, 177 Campbellton Highway,
Dothan, Alabama, 334/677-7226, subscribed to in the name of
THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone
number is associated with BENJAMIN MILLS HORNSBY, according to
CS1), 334/677-3716, subscribed to in the name of THOMAS AUSTIN,
1073 Malvern Road, Dothan, Alabama (this telephone number is
associated with RONALD LYNN CHERRY, according to CS2),
334/677-7844, subscribed to in the name of THOMAS AUSTIN, 1073
Malvern Road, Dothan, Alabama (this telephone number is
associated with LARRY JOE COBB, according to CS2), 334/677-8927,
subscribed to in the name of VIVIAN WELCH BOND, 3221 South State
Highway 109, Dothan, Alabama, was signed by United States
Magistrate CHARLES S COODY on September 20, 1996, said pen
register went into effect on September 26, 1996.

XI   RESULTS OF INTERCEPTION OF WIRE COMMUNICATIONS

On December 23, 1997 in United States District Court,
Middle District of Alabama, Montgomery, Alabama, court order
CR/MISC/NO 446 was issued   This order authorized and ordered
Special Agents of the FBI, pursuant to an application authorized
by the Attorney General of the United States, to intercept wire

19

IRS088

communications of THOMAS AUSTIN, associated with RONALD LYNN CHERRY, aka RONNIE, LARRY JOE COBB, DAVID MIMS and VIVIAN WELCH BOND and others yet unknown, concerning violations of Federal law, specifically 18 U S C §§ 1955, 1956 and 371, to wit Illegal Gambling Business, Money Laundering and conspiracy to commit these offenses to and from the telephones bearing the numbers 334/677-8927, subscribed to VIVIAN WELCH BOND, 3221 South State Highway 109, Dothan, Alabama, 334/677-7226, subscribed to THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with BENJAMIN MILLS HORNSBY), 334/677-3716, subscribed to in the name of THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with RONALD LYNN CHERRY, according to CS1); and 334/677-7844, subscribed to in the name of THOMAS AUSTIN, 1073 Malvern Road, Dothan, Alabama (this telephone number is associated with LARRY JOE COBB, according to CS1).

The period of authorization for this interception was ordered to continue until all communications are intercepted, which reveal fully the manner in which the above named persons and others as yet unknown are committing the offenses described herein and which reveal fully the identities of their confederates, their places of operation and the nature of the conspiracy involved therein or for a period of 30 days from the date of the order.

For the purpose of this affidavit, information developed from interceptions of conversations over 334/677-8927

20

IRS089

will be designated as MDAL-12, interceptions of conversations over 334/677-7226 will be designated as MDAL-13, interceptions of conversations over 334/677-3716 will be designated as MDAL-14, and interceptions of conversations over 334/677-7844 will be designated as MDAL-15.

From December 27, 1996 through January 5, 1997 approximately 169 pertinent calls were intercepted on MDAL-12. The majority of the calls related to the bookmaking operation, i.e placing and receiving bets, providing and receiving line information, settling up with customers and adding new customers to the operation  In addition, code names and numbers were utilized by the betting customers

          MDAL-12            334/677-8927, residence of
                             VIVIAN WELCH BOND,
                             3221 South State Highway 109,
                             Dothan, Alabama

The location to be searched is the residence of VIVIAN WELCH BOND, 3221 South State Highway 109, Dothan, Alabama

From December 27, 1996 through January 5, 1997 there were approximately 169 pertinent calls intercepted on MDAL-12  A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games  There were numerous conversations between VIVIAN WELCH BOND and MDAL-15, which is associated with LARRY JOE COBB, 1073 Malvern Road, Dothan, Alabama   These telephone conversations included the disbursement of the line information as well as VIVIAN WELCH BOND.

21

IRS090

furnishing LARRY JOE COBB with the bets she had received from numerous bettors

In addition, VIVIAN WELCH BOND had several conversations with an individual known as TERRY (LNU), who was utilizing the telephone number of 334/692-3764, which was subscribed to TERRY D JOHNSON, Highway 123, Wicksburg, Alabama A portion of these conversations included TERRY (LNU) providing VIVIAN WELCH BOND with the bets he had received .

The following pertinent information concerns a vehicle registered to VIVIAN WELCH BOND that is used in furtherance of the illegal gambling business·

The vehicle to be searched is registered to VIVIAN WELCH BOND

The vehicle is a 1990 Pontiac Bonneville, four-door, white, Vehicle Identification Number 1G2H254C6L1272405, Alabama license tag #38CNR95, registered to VIVIAN W BOND, 3221 South State Highway, Dothan, Alabama 36301  (See paragraph #  re surveillance )

The following telephone calls were intercepted on MDAL-12 and are in chronological order.

On December 29, 1996 at 10 08 a m , VIVIAN WELCH BOND contacted MDAL-15, which is associated with LARRY JOE COBB, 1073 Malvern Road, Dothan, Alabama, during which LARRY JOE COBB provided the current betting line to VIVIAN WELCH BOND

On December 29, 1996 at 7 03 p.m , VIVIAN WELCH BOND contacted MDAL-15, which is associated with LARRY JOE COBB, 1073

22

IRS091

Malvern Road, Dothan, Alabama, and VIVIAN WELCH BOND provided LARRY JOE COBB with the bets she had received

On December 30, 1996 at 5 13 p m , VIVIAN WELCH BOND contacted MDAL-15 and spoke with LARRY JOE COBB   During the conversation, BOND requested the current line and COBB provided the current line   BOND also requested her total and COBB advised that her total was seventy-two fifty and COBB further stated that last week BOND's amount was 602

At 7 08 p m , VIVIAN WELCH BOND contacted MDAL-15 and made contact with LARRY JOE COBB.  During this conversation, VIVIAN WELCH BOND provided LARRY JOE COBB bets she had received

On December 31, 1996, VIVIAN WELCH BOND contacted MDAL-15 and made contact with LARRY JOE COBB at which time VIVIAN WELCH BOND provided LARRY JOE COBB the bets she had received

On January 1, 1997 at 9 14 a m , VIVIAN WELCH BOND contacted MDAL-15 and spoke with LARRY JOE COBB   During this conversation the status of bets was discussed between VIVIAN WELCH BOND and LARRY JOE COBB   The current football betting line was also addressed by both parties

At 12 16 p m , VIVIAN WELCH BOND, utilizing MDAL-12, telephone number 334/677-8927, took a sporting bet for $500

The location to be searched is the residence of TERRY D  JOHNSON, 1640 South State Highway 123, Newton, Alabama. Location also bears address of Highway 123, Wicksburg, Alabama.

On December 27, 1996 at 4 20 p.m , VIVIAN WELCH BOND called 334/677-3764, which is subscribed to TERRY D  JOHNSON,

23

Highway 123, Wicksburg, Alabama    During this conversation, the caller advised that FRED (LNU) had come by and left one thousand sixty with him    It was further discussed that FRED (LNU) still had an outstanding balance of three hundred    BOND then informed JOHNSON, "Okay, well, you can get your hundred out of that "

On December 28, 1996 at 2 51 p m , TERRY D    JOHNSON, utilizing 334/692-3764, called 334/677-8927, which is associated with VIVIAN WELCH BOND    During the conversation BOND and JOHNSON discussed some of the bets that were received by them

On December 29, 1996 at 10 15 a m , VIVIAN WELCH BOND called 334/692-3764, which is subscribed to TERRY D    JOHNSON, Highway 123, Wicksburg, Alabama    During this conversation BOND advised JOHNSON that the betting line for San Francisco was just moved to ten and one-half and thirty-nine in the circle

On December 31, 1996 at 11 41 a m , VIVIAN WELCH BOND received a call from 692-3764, which is subscribed to TERRY D JOHNSON    JOHNSON wanted to know the line changes and BOND provided the line changes to the caller

On January 2, 1997 at 6 59 p m , TERRY D    JOHNSON was receiving bets at VIVIAN WELCH BOND's residence, 3221 South State Highway 109, Dothan, Alabama    A caller contacted JOHNSON and placed several bets

On January 4, 1997, VIVIAN WELCH BOND called TERRY D JOHNSON to see if he had received any more bets    JOHNSON asked VIVIAN WELCH BOND if he needed to bring her some of the money he had received

24

IRS093

On January 5, 1997 at 11:24 p.m., TERRY D. JOHNSON called VIVIAN WELCH BOND to give her a bet that he had received. the bet was over thirty-nine and one-half for fifty.

MDAL-13          334/677-7226, trailer
                 located at 1073 Malvern Road,
                 Dothan, Alabama,
                 next to residence of
                 TIMOTHY JOE REEVES,
                 telephone number associated
                 with DAVID FRANKLIN MIMS, JR.

The location to be searched, 1073 Malvern Road, Dothan, Alabama, is the residence of THOMAS AUSTIN, associated with DAVID FRANKLIN MIMS, JR.

From December 27, 1996 through January 5, 1996 there were approximately 617 pertinent phone calls intercepted on MDAL-13. Many of these telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games. There were conversations between DAVID FRANKLIN MIMS, JR. and BENJAMIN MILLS HORNSBY wherein line information was disseminated by DAVID FRANKLIN MIMS, JR. The conversations intercepted on MDAL-13 also revealed that many of the bettors used code numbers when placing bets.

The location to be searched is the residence of BENJAMIN MILLS HORNSBY, 62 Barstone Apartments, 927 Honeysuckle Road, Dothan, Alabama.

The following telephone calls were intercepted on MDAL-13 and are in chronological order:

25

IRS094

December 29, 1996 at approximately 10.11 a m , DAVID FRANKLIN MIMS, JR. called 334/794-7449, subscribed to BENJAMIN MILLS HORNSBY   HORNSBY placed several bets with MIMS   MIMS advised HORNSBY to change the line information on San Francisco to 10 1/2 and a total of 39

On December 30, 1996 at 5 51 p m , DAVID FRANKLIN MIMS called 334/794-7449   HORNSBY placed several bets with MIMS and also discussed current line information

On January 1, 1997 at 4 12 p m ; BENJAMIN MILLS HORNSBY called DAVID FRANKLIN MIMS, JR   BENJAMIN MILLS HORNSBY advised he did not have any more bets   DAVID FRANKLIN MIMS, JR  advised BENJAMIN MILLS HORNSBY that they were losing every game BENJAMIN MILLS HORNSBY asked DAVID FRANKLIN MIMS, JR  about basketball ' DAVID FRANKLIN MIMS told him BENJAMIN MILLS HORNSBY could take the bets on basketball at his house' BENJAMIN MILLS HORNSBY asked DAVID FRANKLIN MIMS if he was going to get a line service because he knew they were not going to let him move the computers up there ' BENJAMIN MILLS HORNSBY advised DAVID FRANKLIN MIMS, JR  that he had enough players and that he had discussed it with TIM and RONNIE.

On January 4, 1997 at approximately 10 34 a m , DAVID FRANKLIN MIMS, JR. called the telephone number 334/794-7449, subscribed to BENJAMIN MILLS HORNSBY   MIMS gave HORNSBY a current line update.

26

IRS095

On January 5, 1997 at 10 55 a m , BENJAMIN MILLS HORNSBY called DAVID FRANKLIN MIMS, JR    HORNSBY placed several bets with MIMS

From December 27, 1996 through January 5, 1996 there were pertinent phone calls intercepted on MDAL-13    Many of these telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games    There were conversations between DAVID FRANKLIN MIMS, JR  and VIRGIL LEE SELLERS wherein line information was disseminated by DAVID FRANKLIN MIMS, JR   The conversations intercepted on MDAL-13 also revealed that many of the bettors used code numbers when placing bets

The location to be searched, 177 West Saunders Road, Lot A7, Dothan, Alabama, is the residence of VIRGIL LEE SELLERS

The following telephone calls were intercepted on MDAL-13 and are in chronological order

On December 27, 1996 at 6 28 p m , DAVID MIMS called 334/792-7529, subscribed to VIRGIL LEE SELLERS    MIMS asked SELLERS if he was ready to take down the bets    MIMS placed several bets with SELLERS

On December 28, 1996 at 11 01 p m , DAVID MIMS called 334/792-7529    MIMS placed several layoff bets with SELLERS as follows    eight ($800) on Buffalo, five ($500) on Dallas, one ($100) Clemson and Buffalo over 38 1/2 for twenty ($20).

27

IRS096

On December 30, 1996 at 5 36 p m , DAVID MIMS called 334/792-7529 and spoke to SELLERS   MIMS placed a bet with SELLERS on Michigan State - 6 1/2 on a buy for twenty ($20).

On January 1, 1997 at 9 50 a m , DAVID MIMS called 334/792-7529 and spoke to SELLERS   MIMS placed a bet with SELLERS on North Carolina under 36 points for twenty ($20)

On January 2, 1997 at 7 16 p m , DAVID MIMS called 334/792-7529 and spoke to SELLERS   MIMS laid off a bet on Florida 3 1/2 points and over 54 points for twenty ($20)

On January 5, 1997 at 3 04 p m , DAVID MIMS call 334/792-7529 and spoke to SELLERS.  MIMS laid off a bet to SELLERS on Dallas for twenty ($20)

From December 27, 1996 through January 5, 1996 there were pertinent phone calls intercepted on MDAL-13   Many of these telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games   There were conversations between DAVID FRANKLIN MIMS, JR  and RON BENEFIELD, 122 Greenview Circle Dothan, Alabama, wherein line information was disseminated by DAVID FRANKLIN MIMS, JR   The conversations intercepted on MDAL-13 also revealed that many of the bettors used code numbers when placing bets

The location to be searched, 122 Greenview Circle, Dothan, Alabama, is the residence of RON BENEFIELD.

The following telephone calls were intercepted on MDAL-13 and are in chronological order

28

IRS097

On December 29, 1996 at 2 17 p m., an individual who identified himself as GARY GROSS (PHONETIC) called DAVID FRANKLIN MIMS, JR   GROSS wanted to place a bet and gave the number K855   MIMS advised that neither RONNIE nor he was familiar with that code number   GROSS advised that RON BENEFIELD told him to call and gave him a card   MIMS advised he would have to check with RON BENEFIELD and he could call back in about 30 minutes   GROSS advised that he was TIM STACEY's friend and RON BENEFIELD gave him a card with the number K855   MIMS advised that he would have to find out more about it

On December 29, 1996 at 2 18 p m , MIMS called TIM REEVES at telephone number 334/797-0638   MIMS advised REEVES that a guy just called and said RON gave him a card, K855, with the name GARY GROSS   MIMS asked TIM REEVES what he should do   REEVES advised MIMS to call RON BENEFIELD at 334/677-5748 to clarify the matter

On December 29, 1996 at approximately 2 24 p m , MIMS called the telephone number of 334/677-5748, subscribed to RON BENEFIELD   BENEFIELD advised MIMS to wait a minute so he could get his book.   BENEFIELD, after finding his book, advised MIMS that GARY GROSS resides in Mobile, but has a friend who works at the same company at a different location   BENEFIELD also advised that GROSS' friend still resides in Dothan   BENEFIELD advised that he had GROSS' telephone number as well as fax number and GROSS would be good for the bet   MIMS asked BENEFIELD how much he wanted to let him bet   BENEFIELD replied probably no more

29

IRS098

than $50, but he would be good for much more   BENEFIELD advised that he was a regional salesman for Toyota

From December 27, 1996 through January 5, 1997 there were 612 pertinent calls intercepted on MDAL-13   A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games   Some of the telephone calls intercepted also reflected the procedure to "settle up" the wager   There were conversations between DAVID FRANKLIN MIMS, JR and MYRON JAMES BROWN   MYRON BROWN resides at 960 Old Highway 134, Daleville, Alabama   The conversations intercepted on MDAL-15 also revealed that many of the bettors used code numbers when placing bets

The location to be searched, 960 Old Highway 134, Daleville, Alabama, is the residence of MYRON BROWN.

The following telephone calls were intercepted on MDAL-15 and are in chronological order

On December 27, 1996 at 7 48 p m , DAVID MIMS called the telephone number 334/598-4555, subscribed to MYRON BROWN MIMS advised BROWN that the betting line had changed

On December 28, 1996 at 11 00 a m , DAVID MIMS call 334/598-4555   MIMS advised BROWN to give him what he had   BROWN then placed several bets with MIMS   MIMS then advised BROWN of the current line

On December 30, 1996 at 7-13 p m , DAVID MIMS called the same number   MIMS advised MYRON BROWN that they were not

30

IRS099

going to handle basketball MIMS then asked BROWN if he had settled up last week BROWN replied yes BROWN then advised MIMS that he would settle up with them tomorrow on December 31, 1996

On January 5, 1997 at 10 51 a m , DAVID MIMS called 334/598-4555 BROWN placed several bets with MIMS as well as getting the updated line

The following pertinent information concerns a vehicle registered to MYRON J BROWN, Post Office Box 361, Daleville, Alabama, which is used in furtherance of the illegal gambling business

The vehicle to be searched is a 1994 Sierra GMC pickup with Alabama license plate disabled veteran RW658.

The following telephone calls were intercepted on MDAL-13 and are in chronological order

On December 30, 1996 at 7 13 p m , DAVID MIMS called the same number MIMS advised MYRON BROWN that they were not going to handle basketball MIMS then asked BROWN if he had settled up last week BROWN replied yes BROWN then advised MIMS that he would settle up with them tomorrow on December 31, 1996 (see paragraph )

MDAL-14 334/677-3716, trailer located
at 1073 Malvern Road,
Dothan, Alabama,
next to the residence of
TIMOTHY JOE REEVES, telephone
number associated with
RONALD LYNN CHERRY, aka
RONNIE CHERRY

31

IRS100

From December 27, 1996 through January 5, 1997 there
were approximately 1,232 pertinent calls intercepted on MDAL-14
A large amount of the telephone calls intercepted related to the
giving and receiving of line information and the accepting of
wagers on college and professional football games   Some of the
telephone calls intercepted also reflected the procedure to
"settle up" the wager   There were conversations between RONALD
LYNN CHERRY, aka RONNIE, and an unidentified female who was
located at 4378 Kins Road, Malone, Florida, the residence of
B  J  ADAMS   The conversations intercepted on MDAL-14 also
revealed that many of the bettors used code numbers when placing
bets

The location to be searched, 4378 Kins Road, Malone,
Florida, is the residence of B. J. ADAMS

The following telephone calls were intercepted on MDAL-
14 and are in chronological order

On December 28, 1996 at 3 03 p m , RONNIE CHERRY called
904/569-1218, subscribed to B  J  ADAMS of 4378 Kins Road,
Malone, Florida   CHERRY asked the unidentified female if she had
anything   The unidentified caller said yes and placed several
bets with CHERRY

On December 29, 1996 at 7-05 p m., RONNIE CHERRY called
904/569-1218   The unidentified female placed several bets with
CHERRY

On December 31, 1996 at 10:12 a m , RONNIE CHERRY
called 904/569-1218   CHERRY spoke to an unidentified female

-32

CHERRY gave the female an update on the line information.  CHERRY then advised the female if GOAT wants to pick up the money he can go to the place.  If GOAT does not want to do that, CHERRY would bring them the money Monday.

On January 1, 1997 at 9:08 a.m., RONNIE CHERRY called 904/569-1218.  CHERRY advised the unidentified female that the game started in 50 minutes.  CHERRY advised the unidentified female of the updated line information.

On January 5, 1997 at 11:38 a.m., RONNIE CHERRY called 904/569-1218.  An unidentified female placed several bets with CHERRY.

From December 27, 1996 through January 5, 1997 there were 1,232 pertinent calls intercepted on MDAL-14.  A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games.  Some of the telephone calls intercepted also reflected the procedure to "settle up" the wager.  There were conversations between RONALD LYNN CHERRY, aka RONNIE, and WENDY REEVES of 1075 Malvern Road, Dothan, Alabama. The conversations intercepted on MDAL-14 also revealed that many of the bettors used code numbers when placing bets.

**The location to be searched, 1075 Malvern Road, Dothan, Alabama, is the residence of WENDY REEVES.**

The following telephone calls were intercepted on MDAL-14 and are in chronological order:

33

IRS102

On December 27, 1996 at 2 24 p m , RONNIE CHERRY called 334/677-3805, subscribed to TIM REEVES of 1075 Malvern Road, Dothan, Alabama   CHERRY spoke to WENDY REEVES, TIM REEVES' wife. CHERRY asked WENDY if she was going to work   WENDY said yes   CHERRY told her to come by and pick up something to carry to TIM   CHERRY said he wanted to get rid of this stuff, I do not want it down here over the weekend

On December 27, 1996 at 2 48 p m , RONNIE CHERRY called 334/794-5193, subscribed to Hunt's Seafood Restaurant and Oyster Bar   CHERRY talked to TIM REEVES and discussed the Syracuse game   TIM asked CHERRY how much do we have on them   CHERRY replied twelve thousand   CHERRY then told TIM that he sent some stuff by WENDY on her way to work

On December 31, 1996 at 1 29 p m , RONNIE CHERRY called 334/677-3805, subscribed to TIM REEVES   CHERRY advised WENDY REEVES on what television channel to watch a football game   CHERRY and WENDY discussed what football team they needed to win   CHERRY then told WENDY which game he placed a bet on

On December 31, 1996 at 4 05 p m , WENDY REEVES called 334/677-3716, utilized by RONNIE CHERRY   WENDY asked CHERRY who to pull for in the Auburn/Army game   CHERRY stated they could pull for Auburn   WENDY stated that she had all the televisions going on the satellite   WENDY and CHERRY discussed line information

From December 27, 1996 through January 5, 1997 there were pertinent calls intercepted on MDAL-14   A large amount of

34

IRS103

the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games.  Some of the telephone calls intercepted also reflected the procedure to "settle up" the wager.  There were conversations between RONALD LYNN CHERRY, aka RONNIE, and MILTON K. PHILLIPS, who was located at 126 Phillips Road, Damascus, Georgia.  The conversations intercepted on MDAL-14 also revealed that many of the bettors used code numbers when placing bets.

The location to be searched, 126 Phillips Road, Damascus, Georgia, is the residence of MILTON K. PHILLIPS.

The following telephone calls were intercepted on MDAL-14 and are in chronological order:

On December 28, 1996 at 2:37 p.m., RONNIE CHERRY received a telephone call from 912/758-3765, subscribed to MILTON K. PHILLIPS, 126 Phillips Road, Damascus, Georgia.  PHILLIPS placed a bet with CHERRY.

On December 29, 1996 at 4:52 p.m., RONNIE CHERRY received a telephone call from 912/758-3765.  MILTON J. PHILLIPS placed a bet with CHERRY.  PHILLIPS then verified with CHERRY the amount wagered by one of the bettors.

On December 31, 1996 at 12:45 p.m., RONNIE CHERRY received a telephone call from 912/758-3765.  PHILLIPS got the updated line information from CHERRY.

On January 1, 1997 at 9:59 a.m., RONNIE CHERRY received a telephone call from 912/758-3765.  The unidentified caller

35

IRS104

placed several bets with CHERRY as follows   Alabama on a pick for a nickel ($500), North Carolina - 7 for a nickel ($500), a teaser on Alabama and North Carolina for a nickel ($500), a teaser on Alabama +9, North Carolina +2 for a nickel ($500), a parlay on Alabama and North Carolina for a dollar ($100), parlay on Alabama, North Carolina and Texas for a dollar.  The caller placed a bet for LITTLE DON on Alabama for three dollars ($300)  The caller placed another bet for RICKY BRACEWELL on Alabama for a dollar and North Carolina for a dollar

On January 2, 1997 at 6·45 p m , RONNIE CHERRY received a phone call from 912/758-3765, subscribed to MILTON K  PHILLIPS  PHILLIPS placed several bets with CHERRY

On January 4, 1997 at 9 36 a m , an individual called from 912/758-3765, which is subscribed to 126 Phillips Road, Damascus, Georgia, and made contact with RONALD LYNN CHERRY   The caller attempted to obtain the line and complained to RONALD LYNN CHERRY about not buying points

On January 5, 1997 at 11 27 a m , an individual called from 912/758-3765 and made contact with RONALD LYNN CHERRY   The caller provided CHERRY with several bets

From December 27, 1996 through January 5, 1997 there were pertinent calls intercepted on MDAL-14   A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games   Some of the telephone calls intercepted also reflected the procedure to "settle up" the

36

IRS105

wager   There were conversations between RONALD LYNN CHERRY, aka RONNIE, and JERRY ONIEL SIMS, C7, Town and Country Estates, Midland City, Alabama   The conversations intercepted on MDAL-14 also revealed that many of the bettors used code numbers when placing bets

The location to be searched, C7, Town and Country Estates, Midland City, Alabama, is the residence of JERRY ONIEL SIMS.

The following telephone calls were intercepted on MDAL-14 and are in chronological order

On December 27, 1996 at 1-04 p m , RONALD LYNN CHERRY called 334/983-3178, which is subscribed to JERRY SIMS of Town and Country Estates, #C7, Midland City, Alabama   CHERRY advised the male individual of the weather update on the Liberty Bowl game   As of 1 00 p m  the weather would be a light fog   CHERRY then tells him the points just went up according to Excalibur while according to Caesar's stayed the same at 60   The individual then asked CHERRY for the totals on the other games   CHERRY then updated the individual on the line information

On December 27, 1996 at 3 46 p m , RONALD LYNN CHERRY called 334/983-3178, subscribed to JERRY SIMS of Town and Country Estates, #C7, Midland City, Alabama   CHERRY asked the individual how he did on Syracuse   The individual said good   CHERRY advised he was down $12,000   The individual told CHERRY maybe the team would get some more points to help them out.

37

On January 1, 1997 at 7 03 p m , RONALD LYNN CHERRY called 334/983-3178, subscribed to JERRY SIMS, Town and Country Estates, #C7, Dothan, Alabama  RONALD LYNN CHERRY asked the individual if he had won a game  The individual said he won one  CHERRY advised the individual he had lost every game

On January 4, 1997 at 10 32 a m , CHERRY called 334/983-3178  CHERRY bets on two football games  The bets appeared to be layoff bets

On January 5, 1997 at 9 43 a m , CHERRY called 334/983-3178 to tell him the total points were moving up on Dallas and Carolina all the way across the board up to 38 and the other one would move up to 40 or 41

From December 27, 1996 through January 5, 1997 there were pertinent calls intercepted on MDAL-14  A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games  Some of the telephone calls intercepted also reflected the procedure to "settle up" the wager  There were conversations between RONALD LYNN CHERRY, aka RONNIE, and ED CHERRY (the father of RONALD LYNN CHERRY), 1881 Hodgesville Road, Dothan, Alabama  The conversations intercepted on MDAL-14 also revealed that many of the bettors used code numbers when placing bets

The location to be searched, 1881 Hodgesville Road, Dothan, Alabama, is the residence of ED CHERRY

38

IRS107

The following telephone calls were intercepted on MDAL-14 and are in chronological order.

On December 27, 1996 at 12 54 p m , an unidentified male individual called RONALD LYNN CHERRY, aka RONNIE   The unidentified caller asked for line information   After RONALD LYNN CHERRY had given the caller the line information, RONALD LYNN CHERRY asked the caller if he had the address to send it to. The caller said no   CHERRY then gave the address of 1881 Hodgesville Road   The caller then stated he already had the address from where he sent it before

On December 27, 1996 at 1.21 p m , an unidentified male individual called RONALD LYNN CHERRY   The caller advised CHERRY that he sent it to Hodgesville Road   The caller then requested the line   CHERRY gave him the updated line   The caller then made a bet with CHERRY

On December 27, 1996 at 1 39 p m , RONALD LYNN CHERRY called 334/792-6184, which was subscribed to ED CHERRY   RONALD LYNN CHERRY told ED CHERRY that he was looking for a package from Federal Express   ED CHERRY told him it had already come   RONALD LYNN CHERRY told him to hold it for him

From December 27, 1996 through January 5, 1997 there were pertinent calls intercepted on MDAL-14   A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games.  Some of the telephone calls intercepted also reflected the procedure to "settle up" the

39

wager    There were conversations between RONALD LYNN CHERRY, aka RONNIE, and several individuals that involved Hunt's Seafood Restaurant and Oyster Bar, 177 Campbellton Highway, Dothan, Alabama, with the gambling operation    The conversations intercepted on MDAL-14 also revealed that many of the bettors used code numbers when placing bets

The location to be searched, Hunt's Seafood Restaurant and Oyster Bar, is the business located at 177 Campbellton Highway, Dothan, Alabama

The following telephone calls were intercepted on MDAL-14 and are in chronological order

On December 27, 1996 at 6 13 p m , RONALD LYNN CHERRY called 334/794-5193, which is subscribed to Hunt's Seafood Restaurant and Oyster Bar    RONALD LYNN CHERRY asked for TIM (TIMOTHY JOE REEVES)  RONALD LYNN CHERRY and TIMOTHY JOE REEVES talked about how they lost on the Syracuse football game

On December 30, 1996 at 4 13 p m , MICHAEL GOODSON, aka MIKE GOODSON, called RONALD LYNN CHERRY    They discussed how much MICHAEL GOODSON had won, which was two thousand and ninety    GOODSON told CHERRY he wanted to be paid off    CHERRY told GOODSON to go to the restaurant the next day and pick up his winnings

On December 30, 1996 at 4 16 p m , RONALD LYNN CHERRY called cellular telephone 334/797-0638    The individual who answered the phone was believed to be TIMOTHY JOE REEVES    The matter of discussion during the telephone conversation was the

40

IRS109

fact that TIM GOODSON wanted to be paid off for the sporting bets he had won  The individual with whom RONALD LYNN CHERRY was talking appeared to get upset and advised that he would handle TIM GOODSON  Also mentioned was that the payoff could possibly be handled at the restaurant

On January 2, 1997 at approximately 7.18 p m , RONNIE CHERRY called Hunt's Seafood Restaurant and Oyster Bar and asked for BILLY JOE  BILLY JOE answered the phone at which time CHERRY advised him they needed Florida to win by more than four points  CHERRY then advised if we win by more than 10, it would be favorable for us on all teaser bets

On January 4, 1997 at approximately 11 45 a m , RONNIE CHERRY received a phone call from TIM REEVES, who is located at Hunt's Seafood Restaurant and Oyster Bar , TIM advised CHERRY that they needed San Francisco, which started at six then went to seven

The following pertinent information concerns Hunt's Seafood Restaurant and Oyster Bar which was intercepted by MDAL-13, DAVID FRANKLIN MIMS, JR

On December 27, 1996 at 6 43 p m , a bettor who identified himself as K875 called DAVID FRANKLIN MIMS  K875 advised DAVID FRANKLIN MIMS, JR that he tried to go by the trailer that night, but no one was there to make his payoff of seventy-eight fifty  K875 then advised DAVID FRANKLIN MIMS, JR that he went by the restaurant, but it was too busy  MIMS then

41

IRS110

advised K875 he should still have an envelope up there and could be paid that night

On December 27, 1996 at 6 53 p m , DAVID FRANKLIN MIMS called 334/794-5193, subscribed to Hunt's Seafood Restaurant and Oyster Bar  WENDY REEVES spoke with MIMS  MIMS advised WENDY REEVES that K875 was coming there and he owed seventy eight fifty

The following pertinent information concerns a computer located at 1073 Malvern Road, Dothan, Alabama, which is used in furtherance of the illegal gambling business

The location to be searched for the computer is 1073 Malvern Road, Dothan, Alabama.

The following telephone calls were intercepted on MDAL 11 and are in chronological order

On January 1, 1997 at 5 00 p m , RONALD LYNN CHERRY called 1-800-851-5463  An unidentified male answered "sport" CHERRY advised the individual he was having trouble with his computer getting the line information  CHERRY and the individual discussed the procedures to correct the error on the computer

The following pertinent information concerns a 1994 GMC pickup truck, bearing Alabama license plate #3dCBP55, registered to Hunt's Restaurant, Inc , 2274 Campbellton Highway, Dothan, Alabama, which is used in furtherance of the illegal gambling business

42

IRS111

The following vehicle to be searched is a 1994 GMC pickup truck, bearing Alabama license plate #38CBP55, registered to Hunt's Restaurant, Inc.

The following telephone calls were intercepted on MDAL-14 and are in chronological order

On December 30, 1996 at 5·06 p m , RONALD LYNN CHERRY, received a call from an unidentified male, who was calling from 334/792-4485, subscribed to Headland Auto Sales, 300 South Oates Street, Dothan, Alabama.  The caller asked CHERRY for the sports line  CHERRY gave him the line and told him he would see them Monday to pay them

On December 31, 1996 at 10 21 a m , RONNIE CHERRY called the telephone number 912/254-3218 (cellular) and spoke with MILTON PHILLIPS   CHERRY discussed with PHILLIPS the status of the gambling wagers bet previously   CHERRY advised MILTON that he was up $18,517 50.  CHERRY advised PHILLIPS that he did not want to talk further on this unsecured line, that he would be by there on Monday  (See paragraph       )

MDAL-15     334/677-7844, trailer
            located at 1073 Malvern Road,
            Dothan, Alabama, next to
            residence of TIMOTHY JOE REEVES,
            associated with LARRY JOE COBB

From December 27, 1996 through January 5, 1997 there were approximately 508 pertinent calls intercepted on MDAL-15.  A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games   Some of the

43

IRS112

telephone calls intercepted also reflected the procedure to "settle up" the wager There were conversations between LARRY JOE COBB and VIVIAN WELCH BOND, who was identified previously as MDAL-12 The conversations intercepted on MDAL-15 also revealed that many of the bettors used code numbers when placing bets

The following telephone calls were intercepted on MDAL-15 and are in chronological order

On December 29, 1996 at 10 08 a m , VIVIAN WELCH BOND, contacted MDAL-15, which is associated with LARRY JOE COBB, 1073 Malvern Road, Dothan, Alabama, during which LARRY JOE COBB provided the current betting line to VIVIAN WELCH BOND

On December 29, 1996 at 7 03 p m , VIVIAN WELCH BOND contacted MDAL-15, which is associated with LARRY JOE COBB, 1073 Malvern Road, Dothan, Alabama, and VIVIAN WELCH BOND provided LARRY JOE COBB with the bets she had received

On December 30, 1996 at 5 13 p m , VIVIAN WELCH BOND, contacted MDAL-15 and spoke with LARRY JOE COBB During the conversation, BOND requested the current line and COBB provided the current line BOND also requested her total and COBB advised that her total was $72 50 and COBB further stated that last week BOND's amount was 602

At 7 08 p m , VIVIAN WELCH BOND contacted MDAL-15 and made contact with LARRY JOE COBB During this conversation, VIVIAN WELCH BOND provided LARRY JOE COBB bets she had received

44

On December 31, 1996, VIVIAN WELCH BOND contacted MDAL-15 and made contact with LARRY JOE COBB at which time VIVIAN WELCH BOND provided LARRY JOE COBB the bets she had received

On January 1, 1997 at 9 14 a m , VIVIAN WELCH BOND contacted MDAL-15 and spoke with LARRY JOE COBB    During this conversation the status of bets were discussed between VIVIAN WELCH BOND and LARRY JOE COBB    The current football betting line was also addressed by both parties

The following pertinent information concerns a vehicle registered to Hunt's Restaurant, 2274 Campbellton Highway, Dothan, Alabama, which is used in furtherance of the illegal gambling business

The vehicle to be searched is registered to Hunt's Restaurant, 2274 Campbellton Highway, Dothan, Alabama.

The following telephone calls were intercepted on MDAL-14 and are in chronological order

From December 27, 1996 through January 5, 1997 there were approximately 508 pertinent calls intercepted on MDAL-14    A large amount of the telephone calls intercepted related to the giving and receiving of line information and the accepting of wagers on college and professional football games    Some of the telephone calls intercepted also reflected the procedure to "settle up" the wager    There were conversations between RONALD LYNN CHERRY, aka RONNIE, and an unidentified female who was located at 4378 Kins Road, Malone, Florida, the residence of

45

IRS114

B   J. ADAMS   The conversations intercepted on MDAL-14 also revealed that many of the bettors used code numbers when placing bets

<u>SURVEILLANCE</u>

Your affiant notes that FBI surveillances were conducted in this investigation   In these surveillances where affiant did not actually participate, the results were personally reported to him by other FBI Agents or Dothan police officers

On Tuesday, September 3, 1996, Sergeant RAYMOND WIEHE and Sergeant GARY COLEMAN of the DPD conducted a surveillance of Hunt's Seafood Restaurant and Oyster Bar   CS1 advised that on Tuesday there would be a lot of activity at the restaurant because it was the designated pay off day for customers of the illegal gambling operation   The surveillance took place between the hours of 10 29 A M to 1 00 P M   Thirty two (32) vehicles were observed entering and exiting the parking lot of Hunt's Seafood Restaurant and Oyster Bar   The vehicles observed were occupied primarily by male individuals   These individuals were observed driving onto the parking lot, getting out of their vehicles, and entering the restaurant   A red GMC pick-up truck bearing Alabama license plate number 81A19 Alabama University, was observed in the parking lot   According to the Alabama Department of Motor Vehicles, the truck is registered to TIMOTHY JOE REEVES   A green GMC pick-up truck bearing Alabama license plate number 38DCG36 was also observed in the parking

46

IRS115

lot.  Alabama Department of Motor Vehicles verified the vehicle to be registered to Hunt's Seafood Restaurant, Incorporated.

On Wednesday, September 4, 1996, your affiant, Sergeant HUGHES and Sergeant WIEHE of the DPD conducted a surveillance of the residence of VIVIAN WELCH BOND, located at 3221 South State Highway 109, Dothan, Alabama.  One vehicle was parked at the residence, a white Pontiac Bonneville bearing Alabama license plate number 38CNR95.  Alabama Department of Motor Vehicles verified the vehicle registered to VIVIAN WELCH BOND.

On Thursday, September 5, 1996, Sergeant WIEHE of the DPD called telephone number 334/794-5193, subscribed to by Hunt's Seafood Restaurant and Oyster Bar.  The call was made in order to determine what the restaurant's business hours were so that patrons of the restaurant and customers of the illegal gambling operation could be separated.  Upon calling the telephone number, WIEHE spoke to a female employee, believed to be SHARON K. VICKERY, a daytime bartender.  The employee stated that the oyster bar opens at 11:00 A.M. and the restaurant opens at 4:30 P.M.

On Thursday, September 5, 1996, Sergeant WIEHE conducted a surveillance of Hunt's Seafood Restaurant and Oyster Bar between the hours of 8:28 A.M. and 10:48 A.M.  Upon arrival at the restaurant, five (5) vehicles were already parked at the restaurant.  Thirteen (13) other vehicles were observed pulling into the parking lot, for a total of eighteen (18) vehicles.

47

IRS116

On Thursday, September 5, 1996, affiant, Sergeant HUGHES and Sergeant WIEHE conducted a surveillance of a meeting between CS1 and VIVIAN WELCH BOND   BOND was occupying the white Pontiac Bonneville, 38CNR95   BOND was observed engaging in a conversation with CS1   BOND was also observed handing CS1 some white paper   After the meeting between BOND and CS1, affiant and Sergeant HUGHES met CS1 for a de-briefing   CS1 turned over the white paper to affiant   The paper was a current line sheet   It also contained three telephone numbers, 334/677-7226, 334/677-3716, and 334/677-7844, which BOND told CS1 to call to wager a bet if CS1 was unable to contact her.   Those three numbers are subscribed to the trailer located at 1073 Malvern Road, Dothan, Alabama, and are utilized by BENJAMIN MILLS HORNSBY, RONALD LYNN CHERRY, also known as RONNIE, and LARRY JOE COBB

On Friday, September 6, 1996, Sergeant WIEHE of the DPD, conducted a surveillance of Hunt's Seafood Restaurant and Oyster bar between the hours of 7 41 A M and 11 07 A M   Although the oyster bar does not open until 11 00 A M there was a heavy amount of vehicular traffic flowing into the parking lot of the restaurant.   WIEHE observed approximately twenty-two (22) vehicles arrive at the restaurant.   WIEHE observed TIMOTHY JOE REEVES arrive in his GMC pick-up truck bearing Alabama license plate number 81A19 Alabama University   REEVES was later observed leaving the restaurant with a bag in his hand and was followed to the AmSouth Bank located at 2076 Ross Clark Circle   REEVES went inside the bank; spent a short period of time, and then left and

48

IRS117

was followed back to the restaurant.  Also observed arriving at
the restaurant was BILLY JOE REEVES occupying a green GMC pick-up
truck bearing Alabama license plate number 38DGC36

    On Tuesday, September 10, 1996, Sergeant WIEHE,
Sergeant COLEMAN, and Sergeant GONZALEZ of the DPD conducted a
surveillance of Hunt's Seafood Restaurant and Oyster Bar between
the hours of 7 26 A M  and 10 45 A M.  This surveillance was
conducted before the normal business hours of the oyster bar
which opens at 11 00 A M  and the restaurant at 4.30 P M
Twenty-seven (27) vehicles were observed entering the parking lot
and approximately thirty (30) people were observed entering the
restaurant and oyster bar   TIMOTHY JOE REEVES was observed
arriving at the restaurant and observed going in the restaurant
REEVES was occupying the red GMC pick-up truck bearing Alabama
license plate number 81A19 Alabama University

    On Wednesday, September 11, 1996, affiant, Sergeant
HUGHES and Sergeant COLEMAN of the DPD conducted a surveillance
of a pre-arranged meeting between VIVIAN WELCH BOND and CS1, see
paragraph 37 of this affidavit   BOND was occupying her white
Pontiac Bonneville, Alabama license plate number 38CNR95.  A pay
off was made between VIVIAN WELCH BOND and CS1 from a wager that
was made on September 6, 1996

    On Friday, September 13, 1996, affiant and Sergeant
HUGHES of the DPD conducted a spot check of the trailer located
at 1073 Malvern Road, Dothan, Alabama   A brown and tan eighties

IRS118

model GMC pick-up truck believed to be registered to TERRY RAY

KNIGHTON was observed parked in the yard of the trailer

On Saturday, September 14, 1996, at approximately 1.00

P M , Sergeant HUGHES of the DPD conducted a spot check of Hunt's

Seafood Restaurant and Oyster Bar    HUGHES observed the same

brown over tan GMC pick-up truck that was located at 1073 Malvern

Road, Dothan, Alabama, parked at the restaurant    The GMC pick-up

truck has a Alabama license plate number 38BRH19, which,

according to the Alabama Department of Motor Vehicles, is

registered to TERRY RAY KNIGHTON of 1075 Malvern Road    This

address of 1075 Malvern Road is also listed as the residence of

TIMOTHY JOE REEVES

On Tuesday, September 17, 1996, affiant; Sergeant

HUGHES, Sergeant WIEHE, and Sergeant COLEMAN conducted a

surveillance of VIVIAN WELCH BOND's residence located at 3221

South State Highway 109, Dothan, Alabama    The primary purpose of

the surveillance was to follow VIVIAN WELCH BOND to a pre-

arranged meeting with CS1    However, Agents were aware through a

telephone conversation between VIVIAN WELCH BOND and CS1, that

BOND did not have any updated line sheets and would have to stop

somewhere in order to obtain the line sheets before meeting with

CS1.  At 12 36 P M  BOND was observed leaving her residence and

was followed directly to Hunt's Seafood Restaurant and Oyster

Bar    BOND was observed exiting her vehicle with nothing in her

hands and then entering the oyster bar section of the restaurant

One minute later BOND was observed exiting the oyster bar with a

50

IRS119

stack of papers in her hand   BOND was then followed to the pre-
arranged meeting location where she met CS1 and gave him an
updated line sheet.

On Wednesday, September 25, 1996, Sergeant HUGHES of
the DPD conducted a surveillance of a pre-arranged meeting
between CS1 and VIVIAN WELCH BOND, see paragraph 41 of this
affidavit.  The purpose of this meeting was for a payoff between
CS1 and BOND.

On Thursday, October 24, 1996, Sergeant COLEMAN of the
DPD conducted a surveillance of Hunt's Seafood Restaurant and
Oyster Bar between the hours of 8 15 A M  and 11 00 A M   COLEMAN
observed approximately sixteen (16) vehicles go into and out of
the restaurant's parking lot   TIMOTHY JOE REEVES was observed
leaving a trailer located directly behind Hunt's Seafood
Restaurant and Oyster Bar   He was occupying a GMC pick-up with
Alabama license plate number 81A19 Alabama University   TIMOTHY
JOE REEVES was followed to the address of 1612 Fortner Street,
Dothan, Alabama   TIMOTHY JOE REEVES was observed going into the
residence at which time the surveillance was terminated.

On Friday, October 25, 1996, affiant and Special Agent
EMMETT L  TRAMMELL conducted a surveillance of CS1 going to the
residence of VIVIAN WELCH BOND, 3221 South State Highway 109,
Dothan, Alabama   BOND provided CS1 with a line sheet for the
college and professional football games for Saturday, October 21,
1996 through Monday, October 28, 1996.

51

IRS120

On November 19, 1996, between the hours of 8 40 A M and 12 50 P M , affiant and DPD officers conducted a physical surveillance of the following locations Hunt's Seafood Restaurant and Oyster Bar, BENJAMIN MILLS HORNSBY's residence of #62 Barstone Apartments, Dothan, Alabama, 1073 Malvern Road, Dothan, Alabama, and 1881 Hodgesville Road, Dothan, Alabama

On the same date at 9 05 A M , DPD officers observed TIMOTHY JOE REEVES truck, red GMC with Alabama University license plate 81A19, parked at EDWARD CHERRY's residence of 1881 Hodgesville Road, Dothan, Alabama A blue over tan GMC pickup truck with Alabama license plate 38CBP55, which, according to Alabama Department of Motor Vehicles is registered to Hunt's Inc , was also observed parked at EDWARD CHERRY's residence. EDWARD CHERRY is RONALD LYNN CHERRY's father

This same date at 9 10 A M , TIMOTHY JOE REEVES was observed by DPD officers leaving 1881 Hodgesville Road and returning to Hunt's Seafood Restaurant and Oyster Bar Approx Around thirty minutes later RONALD LYNN CHERRY left leaves 1881 Hodgesville Road in the blue and tan GMC pickup truck, 38CBP55 and was followed to Hunt's Seafood Restaurant and Oyster Bar RONALD LYNN CHERRY later departed Hunt's Seafood Restaurant and Oyster Bar and was followed to 1073 Malvern Road, Dothan, Alabama On the same date, at 9 56 A M , BENJAMIN MILLS HORNSBY, was observed by DPD officers driving away from his residence at #62 Barstone Apartments, Dothan, Alabama, in his tan colored Buick LaSabre, 38APM134 He was followed to Hunt's Seafood Restaurant and Oyster

52

IRS121

Bar where he parked    BENJAMIN MILLS HORNSBY removed some papers
from the glove box of the vehicle and went into the trailer
behind the restaurant    At 10 32 A M   BENJAMIN MILLS HORNSBY was
observed by DPD officers through the open door of the trailer
talking on the telephone    About twenty minutes later BENJAMIN
MILLS HORNSBY exits the trailer and walks to the oyster bar and
goes inside holding some papers in his hand    One minute later he
exits the oyster bar and returns to the trailer.

On November 19, 1996, at 12 08 P M , RONALD LYNN CHERRY
returned to Hunt's Seafood Restaurant and Oyster Bar and parks
the blue over tan GMC pickup, Alabama license plate 38CBP55, he
exits the truck and goes into the trailer at the rear of the
restaurant with some papers in his hand    Two minutes later
RONALD LYNN CHERRY leaves the trailer and is followed back to
1881 Hodgesville Road

On November 27, 1996, affiant and Sergeant RAYMOND
WIEHE of the Dothan Police Department conducted a physical
surveillance in the vicinity of Jim Skinner Honda, 3823 Ross
Clark Circle, Dothan, Alabama    The purpose of this surveillance
was to attempt to observe RONALD LYNN CHERRY at that location to
further corroborate information given by CS2   However, before
the surveillance was set up at Jim Skinner Honda, RONALD LYNN
CHERRY, who was operating a 1994 GMC extended cab pickup,
blue/tan, Alabama license number 38CBP55, was observed southbound
on Denton Road   CHERRY was followed from that point to the

53

IRS122

residence of EDWARD CHERRY, 1881 Hodgesville Road, Dothan, Alabama, where the surveillance was terminated.

On December 27, 1996 at 1 00 p m , Sergeant ANTONIO GONZALEZ of the DPD conducted a physical surveillance of the white trailer located at 1073 Malvern Road, Dothan, Alabama   At this location the vehicles associated with RONNIE CHERRY, which was a blue and copper GMC pickup, a white El Camino Ford, belonging to LARRY JOE COBB and a red pickup truck were present

On December 27, 1996 at 1 30 p m  through 2 30 p m , a surveillance was conducted at Hunt's Seafood Restaurant and Oyster Bar   During the surveillance there were numerous vehicles observed arriving and departing with the occupants of the vehicles going into the restaurant and returning in a short period of time

On December 28, 1996 at 11 35 a m , Sergeant JIMMY HOLLEY of the DPD observed the GMC pickup associated with RONNIE CHERRY parked at the trailer located at 1073 Malvern Road, Dothan, Alabama   Also observed was LARRY JOE COBB's white El Camino and a blue and tan Ford Ranger pickup   At 2 30 p m , a drive-by surveillance was conducted at the same location and the GMC pickup associated with RONNIE CHERRY was present and COBB's vehicle had departed

On December 29, 1996 at 3 10 p m , Sergeant HOLLY of the DPD observed VIVIAN WELCH BOND's Pontiac Bonneville at her residence at 3221 South State Highway 109, Dothan, Alabama

54

IRS123

On December 29, 1996 at 3 35 p m , the vehicle associated with RONNIE CHERRY, a GMC pickup, bearing Alabama license 38CBP55, was parked at 1073 Malvern Road

On December 31, 1996 at 5 50 a m., Lieutenant STEVE PARRISH of the DPD conducted a physical surveillance of the residence of RONNIE CHERRY at East Wayne Road and Hodgesville Road   CHERRY departed the residence and went to the trailer located at 1073 Malvern Road

On December 31, 1996 at 7 27 a m , TIMOTHY JOE REEVES departed his residence at 1075 Malvern Road and reported to Hunt's Seafood Restaurant and Oyster Bar

On December 31, 1996 at 11:00 a m , RONNIE CHERRY returned to his residence on Hodgesville Road and departed at 11 20 a m  in his GMC pickup   CHERRY reported to the post office on North Oates Street, went in and departed shortly thereafter

On December 31, 1996 at 8.15 a m , Sergeants ANTONIO GONZALEZ, JIMMY HOLLEY and Lieutenant STEVE PARRISH conducted physical surveillance of Hunt's Seafood Restaurant and Oyster Bar   During the surveillance, TIMOTHY JOE REEVES arrived in a small station wagon, parked at the trailer beside the store and got into his GMC pickup headed east on Ross Clark Circle   At 8 40 a m , RONNIE CHERRY arrived at the restaurant in the GMC pickup truck which is associated with CHERRY

On December 31, 1996 at 9.20 a m , a black GMC, short wheel base pickup truck, bearing Alabama disabled veteran tag RW658, occupied by a white male arrived at Hunt's Seafood

55

IRS124

Restaurant and Oyster Bar carrying papers.  This individual departed the restaurant at 9:40 a.m.  In addition, a white GMC pickup, bearing Alabama tag 34AVF66, arrived at 9:25 a.m. and departed at 10:51 a.m.

On December 31, 1996 at 10:28 a.m., MIKE GOODSON was observed arriving at the restaurant in a Dodge King Cab pickup truck, bearing Alabama license 38DAR59.  GOODSON went inside the restaurant and stayed approximately six minutes.  Upon leaving the restaurant and returning to his vehicle he was observed carrying what appeared to be some papers.  GOODSON proceeded to the City Bait and Tackle Shop on Columbia Highway.  GOODSON then headed east on Columbia Highway.

On January 2, 1997 at approximately 5:00 p.m., SA DAVID H. JOHNSON, FBI, entered Hunt's Seafood Restaurant and Oyster Bar at 177 Campbellton Highway, Dothan, Alabama.  While inside the building in the oyster bar section, JOHNSON observed a piece of paper in an open drawer under the cash register.  The piece of paper appeared to be a type of sports line sheet.  JOHNSON also observed a white business size envelope with a handwritten name on the envelope.  It was located in the open drawer under the cash register also.  The drawer had been opened by a white female employee.

On January 4, 1997 at 2:48 p.m., Sergeant RAY WIEHE, DPD, conducted a surveillance of VIRGIL SELLERS' residence in the Wayne Johnson Mobile Home Park at 177 West Saunders Road, Lot A7.  The mobile home is white with beige trim around the top.  A check

56

IRS125

of light and water records show the trailer is registered to
WALTER HENDERSON   Outside the residence an older model white
Buick Century with Alabama tag 38DCY73 was parked in front   This
vehicle is registered to VIRGIL SELLERS

On January 4, 1997 at 6 25 p m , Sergeant RAY WIEHE of
the DPD conducted a surveillance of VIVIAN BONDS' residence and
observed a white Dodge pickup truck that pulled into BONDS'
driveway   At 6 40 p m , the vehicle backed out and drove away
The truck was followed and it displayed University of Alabama tag
66U61   The license plate was registered to TERRY D  JOHNSON,
1640 South State 123, Newton, Alabama

On January 6, 1997, SA TIMOTHY W  TURNER and Officers
of the DPD, RAYMOND WIEHE, TONY GONZALEZ and MARK NELMS conducted
a physical surveillance of RONNIE CHERRY   CHERRY would be
occupying a GMC pickup truck, bearing Alabama license plate
38CEP55   This surveillance was conducted due to conversations
intercepted from MDAL-14 which revealed RONNIE CHERRY telling
layoff bettors that he would be making the payoffs for bets made
on Monday, January 6, 1997

On January 6, 1997, Sergeants WIEHE and GONZALEZ
followed CHERRY from Hunt's Seafood Restaurant and Oyster Bar to
his father's residence, ED CHERRY, 1881 Hodgesville Road, Dothan
From this location CHERRY was followed to Headland Auto Sales
located at 300 North Oates Street in Dothan at approximately
10.20 a m  Two minutes later, CHERRY left Headland Auto Sales
and was followed north to Eufaula, Alabama.

57

IRS126

On January 6, 1997 at approximately 11:34 a.m., CHERRY arrived at the parking lot of the Park Management Office, which is located just off Highway 231. CHERRY was observed waiting in the parking lot until 11:52 a.m. when a GMC pickup, bearing Georgia Olympic license plate 762CM, occupied by a male and female met him. The driver of the GMC from Georgia was observed getting inside of CHERRY's vehicle. At 11:56 a.m., both parties left with CHERRY now traveling south.

On January 6, 1997 at approximately 1:30 p.m., CHERRY was observed arriving at the residence of MILTON K. PHILLIPS of Rural Route 126, Phillips Road, Damascus, Georgia. At approximately 1:40 p.m., CHERRY left the residence where he was followed to Donaldsville, Georgia where he stopped at a residence located on 10th Street. From there he was followed to Malone, Florida where he stopped on the side of the road and met a white female who was occupying a red and gray Ford Explorer with Alabama license plate 38CLW21.

On January 6, 1997 at 3:30 p.m., CHERRY was followed along Interstate 10 headed toward Tallahassee, Florida at which time the surveillance was terminated.

On January 7, 1997 at 6:00 a.m., Sergeant RAY WIEHE and Lieutenant STEVE PARRISH, DPD, conducted a surveillance of VIRGIL SELLERS' residence at 177 West Saunders Road, Lot A7, in the Wayne Johnson Mobile Home Park. SELLERS' older model white Buick Century with Alabama tag 38DCY73 was parked in front of the trailer.

58

IRS127

## CONCLUSION

Your affiant notes that from your affiant's experience in investigating illegal gambling businesses and particularly from this investigation, bookmakers maintain accurate and detailed records. Bookmakers deal primarily in cash and maintain records of financial transactions. Numerous conversations cited above in this affidavit reaffirm this fact.

Your affiant's experience in this investigation and similar investigations reveals that a sports book operator must obtain/transport his customer's tickets, line sheets, monies from collections, in his vehicle. A sports book operator must also use his vehicle to "settle up," payoff or collect from his customers in different areas of the community in which the sports book operates.

_____
CHARLES A. BRAVATA, SR.
Special Agent, FBI
Dothan Resident Agency

Sworn to me and subscribed
in my presence this _____
day of January, 1997

_____
United States Magistrate
Judge
Montgomery, Alabama.

IRS128

IRS129



GOVERNMENT
EXHIBIT
7/8



GOVERNMENT
EXHIBIT
77

IRS131



GOVERNMENT
EXHIBIT





GOVERNMENT
EXHIBIT



GOVERNMENT
EXHIBIT
74



GOVERNMENT
EXHIBIT
3

IRS136



Sorry

PLAINTIFF'S
EXHIBIT

IRS137



PLAINTIFFS'
EXHIBIT

IRS138

IRS139

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

FEB

CLERK
U S DISTRICT COURT
MIDDLE DIST OF ALA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR NO 99-13-S |
| | ) | |
| v. | ) | [18 USC 1955, |
| | ) | 18 USC 371, |
| BILLY JOE REEVES, | ) | 18 USC 1956(a)(1)(A)(1), |
| TIMOTHY JOE REEVES, | ) | 18 USC 1956(a)(1)(B)(1), |
| WENDY ANN SMITH REEVES, | ) | 18 USC 1956(h)] |
| RONALD LYNN CHERRY, | ) | |
| VIVIAN WELCH BOND, | ) | |
| LARRY JOE COBB, | ) | |
| DAVID FRANKLIN MIMS, | ) | |
| BENJAMIN MILLS HORNSBY, | ) | |
| MILTON K PHILLIPS, | ) | |
| BILLY JOE ADAMS, | ) | |
| JERRY O'NIEL SIMS, | ) | |
| VIRGIL LEE SELLERS, | ) | |
| RONALD BENEFIELD, | ) | |
| TERRY DOUGLAS JOHNSON, and | ) | |
| MYRON BROWN | ) | INDICTMENT |

The Grand Jury charges

COUNT I

From on or about a time in 1994, the exact date being

unknown to the grand jury, and continuously thereafter up to and

including January 12, 1997, in the Middle District of Alabama,

and elsewhere, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES,
WENDY ANN SMITH REEVES,
RONALD LYNN CHERRY,
VIVIAN WELCH BOND,
LARRY JOE COBB,
DAVID FRANKLIN MIMS,
BENJAMIN MILLS HORNSBY,
MILTON K PHILLIPS,

IRS140

BILLY JOE ADAMS,
JERRY O'NIEL SIMS,
VIRGIL LEE SELLERS,
RONALD BENEFIELD,
TERRY DOUGLAS JOHNSON, and
MYRON BROWN,

did willfully and knowingly combine, conspire, confederate, and

agree together, with each other and various other persons both

known and unknown to the grand jury, to commit the following

offense against the United States

to willfully conduct, finance, manage, supervise, direct and

own all or part of an illegal gambling business as defined

in Title 18, United States Code, Section 1955(b) and (c),

that is a gambling business in violation of the laws of the

State of Alabama, Section 13A-12-22, Code of Alabama, 1975,

and involving five or more persons who conducted, financed,

managed, supervised, directed and owned all or a part

thereof, and which remained in substantially continuous

operation for a period in excess of thirty days and which

had a gross revenue of $2,000 in any single day, all in

violation of Title 18, United States Code, Section 1955(a)

<u>Overt Acts</u>

In furtherance of the conspiracy and to effect the objects

thereof, one or more of the defendants and co-conspirators

2

IRS141

performed the following overt acts, among others

1    On or about the 6th day of December, 1994, John Thomas Starling paid gambling debts totaling $3710 00 to the REEVES' gambling organization.   This payment was in the form of three checks, two payable to RONNIE CHERRY, one payable to TIM REEVES, all deposited into account number ████████ at the First Bank of Dothan, an account assigned to Hunt's Restaurant, which designates BILLY JOE REEVES and TIMOTHY JOE REEVES as signatories thereon

2.   On or about the 16th day of February, 1995, Lalit Desai paid gambling debts totaling $3000.00 to the REEVES' gambling organization   This payment was in the form of two checks, made payable to RONNIE CHERRY and which were deposited in account number ████████ at the First Bank of Dothan, an account assigned to TIMOTHY JOE REEVES, which designates TIMOTHY JOE REEVES as signatory thereon

3 _ On or about the 25th day of May, 1995, Raymond Leppla paid gambling debts totaling $180 to the REEVES' gambling organization.   This payment was made in the form of a check made payable to MYRON BROWN and deposited in account number ████████ at the First Bank of Dothan, an account assigned to TIMOTHY JOE REEVES, which designates TIMOTHY JOE REEVES as signatory thereon

3

IRS142

4. On or about the 5th day of February, 1996, Lalit Desai paid gambling debts totaling $3000.00 to the REEVES' gambling organization. This payment was in the form of one check made payable to RONNIE CHERRY and deposited into account number ████ ████ at the First Bank of Dothan, an account assigned to BILLY JOE REEVES, which designates BILLY JOE REEVES as the signatory thereon.

5. On or about the 5th day of November, 1996, Chris Wilken paid gambling debts totaling $1470.00 to the REEVES' gambling organization. This payment was in the form of a check made payable to MILTON PHILLIPS and was deposited into account number ████ at SouthTrust Bank, an account assigned to BILLY JOE REEVES, which designates BILLY JOE REEVES as the signatory thereon.

6 - 13. On or about the following dates VIVIAN WELCH BOND and TERRY DOUGLAS JOHNSON, in conjunction with BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY ANN SMITH REEVES, RONALD LYNN CHERRY, LARRY JOE COBB, and DAVID FRANKLIN MIMS, operated an illegal bookmaking operation from VIVIAN WELCH BOND's home located at 3221 South State Highway 109, Dothan, Alabama:

6. December 27, 1996

7. December 28, 1996

4

IRS143

8    December 29, 1996

9    December 30, 1996

10    December 31, 1996

11.   January 1, 1997

12    January 2, 1997

13    January 4, 1997

14 - 23   On or about the following dates RONALD LYNN CHERRY,
DAVID FRANKLIN MIMS, and LARRY JOE COBB, in conjunction with
BILLY JOE REEVES, TIMOTHY JOE REEVES, WENDY ANN SMITH REEVES,
BENJAMIN MILLS HORNSBY, VIVIAN WELCH BOND, BILLY JOE ADAMS, JERRY
O'NIEL SIMS, VIRGIL LEE SELLERS, RONALD BENEFIELD and MYRON
BROWN, operated an illegal bookmaking operation from a trailer
located at 1073 Malvern Road, Dothan, Alabama

14    December 27, 1996

15    December 28, 1996

16    December 29, 1996

17    December 30, 1996

18    December 31, 1996

19    January 1, 1997

20    January 2, 1997

21    January 4, 1997

22    January 5, 1997

5

IRS144

23    January 6, 1997·

All in violation of Title 18, United States Code, Section 371.

<u>COUNT II</u>

From on or about a time in 1994, the exact date being

unknown to the grand jury, and continuously thereafter during the

football seasons of each year up to and including January 12,

1997, in the Middle District of Alabama, and elsewhere, the

defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES,
WENDY ANN SMITH REEVES,
RONALD LYNN CHERRY,
VIVIAN WELCH BOND,
LARRY JOE COBB,
DAVID FRANKLIN MIMS,
BENJAMIN MILLS HORNSBY,
MILTON K PHILLIPS,
BILLY JOE ADAMS,
JERRY O'NIEL SIMS,
VIRGIL LEE SELLERS,
RONALD BENEFIELD,
TERRY DOUGLAS JOHNSON, and
MYRON BROWN,

and other persons whose names are known and unknown to the grand

jury, unlawfully, willfully and knowingly did conduct, finance,

manage, supervise, direct and own all or part of an illegal

gambling business, said illegal gambling business involving

bookmaking for a gambling operation accepting and making wagers

on sporting events in violation of Section 13A-12-22, Code of

6

IRS145

Alabama, 1975, said illegal gambling business involved five or more persons who conducted, financed, managed, supervised, directed and owned all or a part thereof, and which gambling business remained in substantially continuous operation for a period in excess of thirty days and which had a gross revenue of $2,000 in any single day, all in violation of Title 18, United States Code, Section 1955

## COUNT III

On or about the 20th day of December 1996, in the Middle District of Alabama and elsewhere, the defendants,

TIMOTHY JOE REEVES and
RONALD LYNN CHERRY,

aided and abetted by others, both known and unknown to the grand jury, did knowingly conduct, attempt to conduct, and cause to be conducted, financial transactions affecting interstate commerce, to-wit: the purchasing of cashiers checks 015503 and 015504 drawn on First Bank of Dothan, using the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, with the intent to promote the carrying on of such specified unlawful activity, all in violation of Title 18, United States Code,

7

IRS146

Section 1956(a)(1)(A)(i)

## COUNT IV

On or about 7th day of January, 1997, in the Middle District

of Alabama, the defendant,

BILLY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, depositing monetary instruments into account number 02-

004-85 at the First Bank of Dothan, a bank involved in interstate

and foreign commerce, which involved the proceeds of a specified

unlawful activity, that is conspiracy to operate and the

operation of an illegal gambling organization, in violation of

Title 18, United States Code, Sections 371 and 1955, knowing that

the transaction was designed in whole and in part to conceal and

disguise the nature and source of the proceeds of said specified

unlawful activity and that while conducting and attempting to

conduct such financial transaction knew that the property

involved in the financial transaction, that is monetary

instruments in the amount of $3650.00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i).

8

IRS147

<u>COUNT V</u>

On or about the 5th day of November, 1996, in the Middle District of Alabama, the defendants,

BILLY JOE REEVES and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate, and foreign commerce, to wit, depositing monetary instruments into account number 912-7931-4 at SouthTrust Bank, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $6070.00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

9

IRS148

<u>COUNT VI</u>

On or about the 27th day of November, 1996, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES and
TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, depositing monetary instruments into account number ▮▮▮▮

▮▮▮▮ at SouthTrust Bank, a bank involved in interstate and

foreign commerce, which involved the proceeds of a specified

unlawful activity, that is conspiracy to operate and the

operation of an illegal gambling organization, in violation of

Title 18, United States Code, Sections 371 and 1955, knowing that

the transaction was designed in whole and in part to conceal and

disguise the nature and source of the proceeds of said specified

unlawful activity and that while conducting and attempting to

conduct such financial transaction knew that the property

involved in the financial transaction, that is monetary

instruments in the amount of $5700.00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

10

IRS149

<u>COUNT VII</u>

On or about the 16th day of February, 1995, in the Middle

District of Alabama, the defendants,

TIMOTHY JOE REEVES and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, depositing monetary instruments into account number ▮▮▮

▮▮▮ at First Bank of Dothan, a bank involved in interstate and

foreign commerce, which involved the proceeds of a specified

unlawful activity, that is conspiracy to operate and the

operation of an illegal gambling organization, in violation of

Title 18, United States Code, Sections 371 and 1955, knowing that

the transaction was designed in whole and in part to conceal and

disguise the nature and source of the proceeds of said specified

unlawful activity and that while conducting and attempting to

conduct such financial transaction knew that the property

involved in the financial transaction, that is monetary

instruments in the amount of $3000.00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

11

IRS150

COUNT VIII

On or about the 27th day of February, 1995, in the Middle

District of Alabama, the defendants,

TIMOTHY JOE REEVES and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, depositing a monetary instrument into account number ▇▇▇

▇▇▇ at First Bank of Dothan, a bank involved in interstate and

foreign commerce, which involved the proceeds of a specified

unlawful activity, that is conspiracy to operate and the

operation of an illegal gambling organization, in violation of

Title 18, United States Code, Sections 371 and 1955, knowing that

the transaction was designed in whole and in part to conceal and

disguise the nature and source of the proceeds of said specified

unlawful activity and that while conducting and attempting to

conduct such financial transaction knew that the property

involved in the financial transaction, that is monetary

instruments in the amount of $1015 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

12

IRS151

## COUNT IX

On or about the 25th day of May, 1995, in the Middle District of Alabama, the defendant,

TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, depositing a monetary instrument into account number ████ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $180.00 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(1)

13

## COUNT X

On or about the 8th day of October, 1996, in the Middle

District of Alabama, the defendants,

> BILLY JOE REEVES,
> TIMOTHY JOE REEVES, and
> RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ▮▮▮▮▮ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $7220 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(1)

14

IRS153

## COUNT XI

On or about the 7th day of November, 1996, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES and
TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ▮▮▮▮▮ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955

, knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $4260.00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(1)

15

IRS154

<u>COUNT XII</u>

On or about the 21st day of November, 1996, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ▇▇▇▇▇▇▇ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $3400.00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i).

16

IRS155

## COUNT XIII

On or about the 9th day of December, 1996, in the Middle District of Alabama, the defendants,

BILLY JOE REEVES and
TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, endorsing and depositing monetary instruments into account number ███████ at First Bank of Dothan, a bank involved in interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, knowing that the transaction was designed in whole and in part to conceal and disguise the nature and source of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is monetary instruments in the amount of $2906 50 representing the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

17

IRS156

## COUNT XIV

On or about the 19th day of December, 1996, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

aid knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ████████ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary,

instruments in the amount of $1390 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

18

IRS157

## COUNT XV

On or about the 9th day of January, 1997, in the Middle

District of Alabama, the defendants,

BILLY JOE REEVES and
TIMOTHY JOE REEVES,

did knowingly and willfully conduct and attempt to conduct a

financial transaction affecting interstate and foreign commerce,

to wit, endorsing and depositing monetary instruments into

account number ███████ at First Bank of Dothan, a bank involved

in interstate and foreign commerce, which involved the proceeds

of a specified unlawful activity, that is conspiracy to operate

and the operation of an illegal gambling organization, in

violation of Title 18, United States Code, Sections 371 and 1955,

knowing that the transaction was designed in whole and in part to

conceal and disguise the nature and source of the proceeds of

said specified unlawful activity and that while conducting and

attempting to conduct such financial transaction knew that the

property involved in the financial transaction, that is monetary

instruments in the amount of $3050 00 representing the proceeds

of some form of unlawful activity, all in violation of Title 18,

United States Code, Sections 1956(a)(1)(B)(i)

19

IRS158

COUNT XVI

From an unknown date, but commencing at least as early as the 6th day of December, 1994, and continuing up to on or about the 20th day of December, 1996, in the Middle District of Alabama and elsewhere, the defendants,

BILLY JOE REEVES,
TIMOTHY JOE REEVES, and
RONALD LYNN CHERRY,

did knowingly and willfully combine, conspire, and confederate with each other and with divers other persons, known and unknown to the grand jury, to knowingly conduct, attempt to conduct, and cause to be conducted, financial transactions affecting interstate commerce, to wit: purchasing cashiers checks from First Bank of Dothan, a bank involved in interstate and foreign commerce, and money orders from the United States Postal Service using the proceeds of a specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, with the intent to promote the carrying on of the specified unlawful activity, and depositing monetary instruments into bank accounts at First Bank of Dothan and SouthTrust Bank, both being banks involved in interstate commerce, such monetary instruments being the proceeds of a

20

IRS159

specified unlawful activity, that is conspiracy to operate and the operation of an illegal gambling organization, in violation of Title 18, United States Code, Sections 371 and 1955, with the intent to conceal and disguise the nature and source of such funds, all in violation of Title 18, United States Code, Section 1956(h)

## FORFEITURE ALLEGATION

1    Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant who is convicted of the offense set forth in Counts III through XVI shall forfeit to the United States the following property

a    All right, title, and interest in any and all property involved in these money laundering offenses in violation of Title 18, United States Code, Section 1956, and all property traceable to such property, including but not limited to the following  1) all money or other property that was the subject of each financial transaction that the defendant(s) conspired to conduct in violation of Section 1956(a)(1) and (h)  2) all commissions, fees and other property obtained as a result of those violations, and 3) all property used in any manner or part to commit or to facilitate the commission of those violations

b    A sum of money equal to the total amount of money the

21

IRS160

defendant(s) conspired to launder   If more than one defendant is

convicted of the offense, the defendants so convicted are jointly

and severally liable for the amount involved in such offense

c.   Account number ███████ at First Bank of Dothan in the

name of Hunt's Restaurant and Oyster Bar, Inc

2.   Pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 18, United States Code, Section

982(b), each defendant shall forfeit substitute property, up to

the value of the amount described in paragraph 1, if, by any act

or omission of the defendant, the property described in paragraph

1, or any portion thereof, cannot be located upon the exercise of

due diligence, has been transferred, sold to or deposited with a

third party, has been placed beyond the jurisdiction of the

court, has been substantially diminished in value, or has been

commingled with other property which cannot be divided without

difficulty

A TRUE BILL

_Carolyn K. Simmons_
Foreperson

_Redding Pitt_
REDDING PITT
United States Attorney

_Ashton Holmes_
ASHTON HOLMES
Assistant United States Attorney

22

FEDERAL BUREAU OF INVESTIGATION
WASHINGTON, D C  20535

To      SAC Mobile

Date    July 20, 1998

Case ID #    182C-MO-39052

Lab No    70522051 I GU
          80129016 I GU

Reference    182C-MO-39052

Your No

Title   BILLY JOE REEVES,
        ET AL,

Specimens received

Specimens

Q1    Documents acquired from Jerry Oneil Sims

Q2    Documents acquired from Benjamin Mills Hornsby

Q3    Documents acquired from Terry Douglas Johnson and documents
      obtained from Virgil Lee Sellers

Q4    Documents acquired from Vivian Welch Pond

Q5    Documents acquired from residence at 1881 Hodgesville Road,
      Dothan, Alabama

Q6    Documents acquired from Myron James Brown

Q7    Documents acquired from Ronald D  Benefield

Q8    Documents acquired from Wendy Reeves

Page 1 of 2                                    (over)

This Report Is Furnished For Official Use Only

IRS162

Q9   Documents acquired from Hunt's Seafood Restaurant and Oyster Bar

Q10   Documents acquired from GMC Pick-up truck at 1073 Malvern Road, Dothan, Alabama

Q11   Taped telephone conversations from 334-677-8927, subscribed to in the name of Vivian Welch Bond, and located at 3221 South State Highway 109, Dothan, Alabama 36301 (MDAL-12)

Q12   Taped telephone conversations from 334-677-7226, subscribed to in the name of Thomas Austin, however David Franklin Mims, Jr is associated with this telephone number which is located at 1073 Malvern Road, Dothan, Alabama 36301 (MDAL-13)

Q13   Taped telephone conversations from 334-677-3716, subscribed to in the name of Thomas Austin, however, Ronald Lynn Cherry is associated with this telephone number which is located at 1073 Malvern Road, Dothan, Alabama 36301 (MDAL-14)

Q14   Taped telephone conversations from 334-677-7814, subscribed to in the name of Thomas Austin, however, Larry Joe Cobb is associated with this telephone number which is located at 1073 Malvern Road, Dothan, Alabama 36301 (MDAL-15)

The results of the Racketeering Records Analysis Unit (RRAU) examination of the submitted evidence are included in this report. The submitted evidence will be returned separately

RRAU - Page 2 of 2
70522051 I GU
80129016 I GU

IRS163



# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D C  20535

### Report of Examination

| | | | |
|---|---|---|---|
| Examiner Name | Douglas Dunlap | Date | 7/20/98 |
| Unit | RRAU | Phone No | (202) 324-6867 |
| Case ID # | 182C-HO-39052 | Lab No | 70522051 I GU |
| | | | 80129016 I GU |

## Results of Examinations

The Racketeering Records Analysis Unit (RRAU) examined the submitted documents and recorded telephone conversations as requested  The examination has determined that they are partial records from a sports bookmaking operation  The operation accepted wagers on collegiate and professional football contests that occurred between November 18, 1995 and January 12, 1997

This report is being set out according to the roles of the individuals involved in the bookmaking operation

### Timothy Joe Reeves and Ronald Lynn Cherry

The operation accepted wagers from approximately 273 account designations such as "G-1," "RB-17," "DS-500," "Fred," and "Little Don "  The operation employed approximately 28 "agents" and "salaried employees "  Timothy Joe Reeves, aka "Tim" and Ronald Lynn Cherry, aka "Ron" are both in the upper managerial level in the operation

In a conversation on cassette tape number 6130048 dated 12/31 96 at 10 12 hrs, Ron discusses delivering a payment to account "Goat," identified in specimen Q9 as a 10% juice agent (agent who receives a 10% commission on losing wagers turned in to the operation)

In a conversation on cassette tape number 6130051 dated 12/31/96 at 17 34 hrs, Ron and Tim discuss a payment by account "K-640 "  K-640 is identified as "Chris Wallace" in Q7 document number 6070009

RRAU - Page 1 of 5                                    (over)

This Report Is Furnished For Official Use Only

IRS164

In a conversation on cassette tape number 6130075 dated 1/2/97 at 16 44 hrs, Tim and Ron discuss wagering activity on the Sugar Bowl between Florida and Florida State University Ron moves the line from FL -3 ½ to FL-4   This line change is recorded on document 6020006

### David Franklin Mims Jr and Larry Joe Cobb

David Franklin Mims Jr, aka "Dave" and Larry Joe Cobb, aka "Joe" are both salaried employees who conduct the day to day activities of the bookmaking operation   In a conversation on cassette tape number 6140034 dated 12/29/96, at 17 51 hrs, Joe tells an unidentified person that he works for $400 per week The Q5 documents numbered 6050002 through 6050020 show that the operation paid $1200 to $1600 weekly for "Labor "  This represents payment to salaried employees who conduct the day to day business of the operation.

In a conversation on cassette number 6120058 dated 1/1/97, at 09 45 hrs, Dave accepts wagers from "Mills" (identified as Benjamin Mills Hornsby) that total $1,275   These wagers are also recorded in Q10 on document number 6100371

In a conversation on cassette number 6140078 dated 1/2/97, at 19 13 hrs, Joe accepts wagers from Vivian Bond   These wagers are recorded in Q10 on document 6100342 and in Q4 on document number 6040014

### Wendy Smith Reeves

Wendy Smith Reeves, aka "Werdy" is a salaried employee of the operation   The Q3 document 6090006 records the operation's payment of $500 to Wendy for the week of 9/6 (1996)   Document 6090004 records the operation's payment of $250 to Wendy for the week of 9/30 (1996)

In a conversation on cassette number 6130007 dated 12/27/96, at 14 24 hrs, Ron Cherry instructs Wendy to pick up the "stuff" (gambling records) so it won't be left around over the weekend   In a conversation on cassette number 6130075 dated 1/2/97, at 17.48 hrs, Ron Cherry and Wendy discuss line changes and sportsbook wagering activity.

### Benjamin Mills Hornsby

Benjamin Mills Hornsby, aka "Mills" is a salaried employee   Documents 6090004 through 6090007 indicate that the operation paid $400 00 per week to Mills for labor

RRAU - Page 2 of 5
70522051 I GU
80129016 I GU

(over)

IRS165

In a conversation on cassette tape number 6120074 dated
1/2/97, at 19 18 hrs, Mills gives Dave a wager for account
designation "Trip" for Florida -3 ½ for $200.  This wager is
also recorded in Q2 on document number 6020014, obtained from
Benjamin Mills Hornsby

### Ronald D Benefield

Documents 6090004 through 6090007 contain computations
setting forth that account designations "K" and "F" are 50%
agents (agents that receive  commission on wagers turned into
the operation)   Documents 6070041 through 6070115, obtained
from Ronald D Benefield consist of notations made in a small
address book   The notations contained the names, bottom
figures (amounts of money the wagering customer owes to or is
due from the bookmaking operation), and phone numbers for
approximately 74 coded account designations such as "K-500,"
"K-505," and "K-510 "   In a conversation on cassette tape
number 6120027 dated 12/29/96, at 14 17 hrs, a caller
identified himself to Dave Mims as "Gary Gross" and told Dave
that Ron Benefield gave him the account designation "K-855 "
On 12/29/96, at 14 18 hrs, Tim Reeves instructed Dave to check
account K-855 by calling Ron Benefield at telephone number
677-5748   On 12/29/96, at 14 24 hrs, Dave called Ron Benefield
and asked Ron to check on account K-855   Ron verified that K-
855 is in his book   Q7 document number 6070110 obtained from
Ron Benefield identifies "K-855" as "Gary Gross "

### Jerry Oniel Sims

Jerry Oniel Sims, aka "Sims" is a bookmaker that was
associated with the operation for line information and "layoff
wagers "  Layoff is the repetting of money received by the
operation   In a conversation on cassette tape number 6130050
dated 12/31/96, at 13 07 hrs, Sims placed a $700 wager with Ron
Cherry   The $700 wager is also recorded on Q1 document number
6010004 obtained from Jerry Oniel Sims

In a conversation on cassette number 6130036 dated
12/27/96, at 13 09 hrs, Ron Cherry passes game information to
Sims and advises Sims to change his line

### Virgil Lee Sellers

"Virgil" is a bookmaker that was associated with the
operation for line information and also accepted wagers from
salaried employees Dave Mims and Joe Cobb   It should be noted
that in the course of normal bookmaking businesses, employees
are not permitted to place wagers within the operation

RRAU - Page 3 of 5
70522051 I GU
80129016 I GU                                    (over)

IRS166

In a conversation on cassette 6130006 dated 12/27/96, at 13 12 hrs, Ron Cherry and Virgil discuss line information   On cassette 6120058 dated 1/1/97, at 10 24 hrs, Dave Mims places a $20 wager with Virgil   This wager is recorded in Q3 on document 6030305, obtained from Virgil Lee Sellers

### Vivian Welch Bond

Vivian Welch Bond, aka "Vivian" is listed in Q10 documents 6090004 through 6090007 as a juice agent   In a conversation on cassette number 6110057 dated 1/1/97, at 19·30 hrs, Vivian accepts a $100 wager on Penn State from account "Fred "   This wager is recorded in Q4 on document 6040014 obtained from Vivian Welch Bond   On 1/1/97, at 19 31 hrs, Vivian called the wager up to Larry Joe Cobb

### Terry Douglas Johnson

Terry Douglas Johnson, aka "Terry" is a bookmaker that was associated with the operation for line information   In a conversation on cassette number 6110024 dated 12/29/96, at 10 15 hrs, Vivian Bond gives Terry line information

In a conversation on cassette 6110071 dated 1/2/97, at 19 49 hrs, Terry accepts wagers from account "Dennis "   Dennis also called in wagers for "Wayman" and "Brad "   These wagers are recorded on Q3 document number 6030027 obtained from Terry Douglas Johnson   The documents show that Dennis is a 10% juice agent under Terry Douglas Johnson

### Myron James Brown

Myron James Brown, aka "Brown," is listed in Q10 documents 6090004 through 6090007 as a juice agent   In a conversation on cassette 6120073 dated 1/2/97, at 18 57 Hrs, Dave Mims accepted $270 in wagers from Brown   These wagers were also recorded in Q10 on document 6100382

In a conversation on cassette 6120073 dated 1/2/97, at 19 03 hrs, Dave Mims accepted a $50 wager from Brown   This wager is recorded in Q6 document 6060035 obtained from Myron James Brown

RRAJ - Page 4 of 5
70522351 I GU
80129016 I GU
                                    (over)

IRS167

## Milton K. Phillips

Milton K Phillips, aka "Milton" is listed in Q10 documents 6090004 through 6090007 as a juice agent   In a conversation on cassette 6130007 dated 12/27/96, at 17 24 hrs, Ron Cherry accepted a total of $475 in wagers from Milton for accounts "Brock," "Little Don," and "Harrell "  These wagers are recorded in Q10 on document 6100271

In a conversation on cassette 6130039 dated 12/30/96, at 16 34 hrs, Milton and Ron Cherry discuss settling the accounts that Milton is responsible for  In a conversation on cassette 6130048 dated 12/31/96, at 10 21 hrs, Milton and Ron Cherry discuss settling Milton's balance of +$18,517 50

## Other Juice Agents

Q9 documents 6090004 through 6090007 identify the following account designations as 10% juice agents  "Coy," "CL," "Goat," "PD," "JS," "Cash," "Lalit," "Clyde," "Cnet," "RB," "DS," "S-11," "Sizemore," and "Julian "

The following wagering totals were obtained from the recorded conversations  Wagers from the documents were not included in order to eliminate the possibility of duplication  The examination of the recorded phone conversations during the seven day period from Friday, December 27, 1996, to Thursday, January 2, 1997, revealed that the operation accepted wagers in the following approximate amounts

| DATE | APPROXIMATE AMOUNT WAGERED |
|------|----------------------------|
| 12/27/96 | $ 56,000 00 |
| 12/28/96 | 74,865 00 |
| 12/29/96 | 70,790 00 |
| 12/30/96 | 45,597 00 |
| 12/31/96 | 71,025 00 |
| 01/01/97 | 141,945 00 |
| 01/02/97 | 38,215 00 |
| Total | $498,437 00 |

RRAU - Page 5 of 5
70S22051 I GU
80129016 I GU

IRS168

EXHIBIT E

IRS169

# CURRICULUM VITAE

## OF

## JAMES DOUGLAS DUNLAP

Bachelor of Arts - Major in Psychology - University of Baltimore, Baltimore, Maryland   Degree confirmed June, 1973

Appointed to the Baltimore County Police Department (Maryland), October, 1972   In May, 1977, assigned to the Vice Unit of the Vice/Narcotics Control Section, Criminal Investigative Services   While assigned as a Detective in the Vice Unit, Mr Dunlap had the responsibility to investigate all vice related crimes, which included illegal gambling/bookmaking violations Retired from the Baltimore County Police Department , October, 1994

Mr Dunlap commenced employment with the Federal Bureau of Investigation, Washington, D C in October, 1994 as a Forensic Examiner in the Racketeering Records Analysis Unit (RRAU)   The RRAU conducts examinations of suspected gambling (bookmaking/gambling devices), money laundering, loansharking, prostitution and drug records for the purpose of determining whether they are the records of an illegal business   The RRAU attempts to determine the scope and organization of the business as revealed in the records   The RRAU provides training to Federal, state, and local enforcement agencies throughout the United States and Canada

Mr Dunlap is a member of the Eastern States Vice Investigators Association (ESVIA)   This Association consists of over 450 members from law enforcement agencies from the Eastern States of the United States   Mr Dunlap is a past Regional Coordinator and Director of Training of this Association   The ESVIA has an annual conference where all aspects of vice and racketeering investigations are taught and discussed   Mr Dunlap has attended and successfully completed several of these seminars   Mr Dunlap   as a Regional Coordinator for ESVIA, has conducted several training sessions for law enforcement officials, at which illegal gambling/bookmaking investigations were discussed

During Mr Dunlap's employment with the Baltimore County Police Department he had received training in the area of illegal gambling/bookmaking, from senior vice investigators, Special Agents of the FBI and investigators from Federal, state and local law enforcement agencies During his tenure with Baltimore County, Mr Dunlap participated in over 12 court authorized wiretaps for illegal gambling/bookmaking, which afforded him the opportunity to listen, record and transcribe illegal gambling wagers   Mr Dunlap has been the affiant of over 40 search and seizure warrants for illegal gambling/bookmaking

Mr Dunlap has participated in the execution of over 100 search and seizure warrants for illegal gambling/bookmaking

Page 1

IRS170

During the execution of said warrants, Mr. Dunlap has worked the telephone, at the respective raided locations, accepting wagers from individuals who were calling the "bookmaker" to place their wagers Pursuant to the execution of the warrants, Mr. Dunlap has searched, seized, examined and interpreted illegal gambling/bookmaking records in preparation for the issuance of charging documents, pre-trial conferences with prosecutors and for testimony in the subsequent trials Mr. Dunlap's expertise in the area of illegal gambling/bookmaking has been accepted by the Maryland courts over 30 times

In September, 1996 Mr. Dunlap successfully testified as a witness in an illegal gambling/ bookmaking case for the Internal Revenue Service in the United States Federal Tax Court in Washington, D C

In August, 1997 Mr. Dunlap testified in the United States Federal Court, District of Maryland, as an expert in the analysis and interpretation of records of illegal bookmaking operations

In May, 1999 Mr. Dunlap was promoted to the position of Supervisory Forensic Examiner in the Racketeering Records Analysis Unit

Mr. Dunlap has interviewed individuals involved in illegal gambling/ bookmaking The roles of the interviewees included bettors, writer/clerks and bookmakers This has provided Mr. Dunlap, the opportunity to become very familiar with the methodology used by individuals involved in this illegal activity Mr. Dunlap has personally interviewed legal bookmakers and oddsmaker in Las Vegas, Nevada

Mr. Dunlap has conducted numerous training seminars for Federal, state and local law enforcement officials in the area of gambling/bookmaking In September, 1997, Mr. Dunlap conducted a gambling seminar for the Minnesota Department of Public Safety, which was attended by law enforcement officials from North Dakota, South Dakota, Iowa, Minnesota, Wisconsin, and Ontario, Canada. In May, 1998 Mr. Dunlap conducted a gambling seminar in Ontario, Canada for the Ontario Illegal Gaming Enforcement Unit (OIGEU) The OIGEU is a partnership of select Ontario law enforcement agencies, consisting of the Ontario Provincial Police Hamilton-Wentworth Regional Police Service, London Police Service, Toronto Police Service, Niagara Regional Police Service, Ottawa-Carleton Police Service, Peel Regional Police Service, Windsor Police Service and York Regional Police Service In September, 1998, Mr. Dunlap conducted a gambling seminar for the Wisconsin Department of Justice

Page 2

**EXHIBIT** F

IRS172

# Tim Reeves

## Calculation of Gross Wagers by Quarter (based on wire tap)

| Date | Gross Wagers | Vigorish | Amount at Risk |
|------|-------------:|:--------:|---------------:|
| 12/27/1996 | $ 56,000 00 | 10% | $ 61 600 00 |
| 12/28/1996 | $ 74,865 00 | 10% | $ 82 351 50 |
| 12/29/1996 | $ 70,790 00 | 10% | $ 77,869 00 |
| 12/30/1996 | $ 45 597 00 | 10% | $ 50 156 70 |
| 12/31/1996 | $ 71,025 00 | 10% | $ 78,127 50 |
| 1/1/1997 | $ 141 945 00 | 10% | $ 156 139 50 |
| 1/2/1997 | $ 38 215 00 | 10% | $ 42 036 50 |
| | $ 498,437 00 | | $ 548,280 70 |

| | | |
|------|-------------:|---|
| Total Amount At Risk | $ 548,260 70 | |
| Number of Days | 7 | |
| Average Wagers per Day | $ 78,325 81 | |

## Calculation of Tax Due by Month

| | | Tax Rate | Tax Due |
|------|-------------:|:--------:|--------:|
| **September, 1994, 1995, 1996** | | | |
| Average Daily Wagers | $ 78 325 81 | | |
| Number of Days of Wagering | 15 | | |
| Total Wagers | $ 1 174 867 21 | 2% | $ 23 497 74 |
| | | | |
| **October, 1994, 1995, 1996** | | | |
| Average Daily Wager | $ 78 325 81 | | |
| Number of Days of Wagering | 31 | | |
| Total Wagers | $ 2,428,100 24 | 2% | $ 48,562 00 |
| | | | |
| **November, 1994, 1995, 1996** | | | |
| Average Daily Wagers | $ 78,325 81 | | |
| Number of Days of Wagers | 30 | | |
| Total Wagers | $ 2,349 774 43 | 2% | $ 46,995 49 |
| | | | |
| **December, 1994, 1995, 1996** | | | |
| Average Daily Wagers | $ 78 325 81 | | |
| Number of Days of Wagers | 31 | | |
| Total Wagers | $ 2,428 100 24 | 2% | $ 48,562 00 |
| | | | |
| **January, 1995, 1996** | | | |
| Average Daily Wagers | $ 78,325 81 | | |
| Number of Days of Wagers | 21 | | |
| Total Wagers | $ 1 644,842 10 | 2% | $ 32 896 84 |

**January, 1997**

| | | | | | |
|---|---|---|---|---|---|
| *Average Daily Wagers* | $ | 78 325 81 | | | |
| Number of Days of Wagers*** | | 11 | | | |
| Total Wagers | $ | 861,583 96 | 2% | $ | 17,231.68 |

**Total Tax Due**  $ 217,745 76

Notes

\* – Football season is generally held to begin around the middle of September

\*\* – Football season is generally held to end around the third week of January

\*\*\* – Operation was shut down upon execution of the search warrant on January 12, 1997

IRS174

COPY

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4    UNITED STATES OF AMERICA,

5              Plaintiff,

6                                      CIVIL ACTION
                                       NO  98-T-1334 S
7         vs

8    FIFTY-FIVE THOUSAND SEVEN
     HUNDRED THIRTY-ONE AND 49/100
     DOLLARS ($55,731 49) IN UNITED
9    STATES CURRENCY, SEIZED FROM MONEY
     MARKET ACCOUNT NUMBER ██████████
10   AND MONEY MARKET ACCOUNT NUMBER
     ██████████, LOCATED AT
11   THE SOUTHTRUST BANK OF DOTHAN

12   AND

13   THIRTY THOUSAND TWO HUNDRED
     THIRTY-FIVE AND 19/100 DOLLARS
14   ($30,235 19) IN UNITED STATES
     CURRENCY SEIZED FROM CHECKING
15   ACCOUNT NUMBER ██████████, AND
     CHECKING ACCOUNT NUMBER ██████████
16   LOCATED AT THE FIRST BANK OF DOTHAN

17             Defendant

18   ///////////////////////////////////

19   UNITED STATES OF AMERICA,

20             Plaintiff,
                                       CIVIL ACTION
21        vs                           NO  98-T-336-S

22   ONE HUNDRED NINETY SEVEN
     THOUSAND ($197,000) DOLLARS
23   IN UNITED STATES CURRENCY,

24             Defendant

25          DEPOSITION OF TIM REEVES
       Taken on Thursday, February 3, 2000

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS176

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                     SOUTHERN DIVISION

4    UNITED STATES OF AMERICA,

5                     Plaintiff,
                                        CIVIL ACTION
6         vs                            NO  98-T-571-S

7    ONE HUNDRED NINETY SEVEN
     THOUSAND ($197,000) DOLLARS
8    IN UNITED STATES CURRENCY,

9                     Defendant

10   ///////////////////////////////////////

11   UNITED STATES OF AMERICA,

12                    Plaintiff,
                                        CIVIL ACTION
13        vs                            NO  97-T-63-S

14   PARCEL OF REAL PROPERTY KNOWN
     AS HUNT'S RESTAURANT, LOUNGE,
15   AND OYSTER BAR LOCATED AT
     177 CAMPBELLTON HIGHWAY,
16   DOTHAN, HOUSTON COUNTY,
     ALABAMA, WITH ALL APPURTENANCES
17   AND IMPROVEMENTS THEREON,

18                    Defendant

19            *  *  *  *  *  *  *  *  *  *  *

20        DEPOSITION OF TIM REEVES, taken pursuant to

21   stipulation and agreement before Renee W  Marchand, Court

22   Reporter and Commissioner for the State of Alabama at Large,

23   at the Federal Courthouse, Dothan, Alabama on Thursday,

24   February 3, 2000, commencing at approximately 11 05 a m

25            *  *  *  *  *  *  *  *  *  *  *


                 DUNN, KING & ASSOCIATES
                    Montgomery, Alabama
            (334) 263-0261 or (800) 359-8001


                                                    IRS177

```
 1                    APPEARANCES

 2   FOR THE PLAINTIFF.

 3   Mr  John Harmon
     Assistant United States Attorney
 4   OFFICE OF THE UNITED STATES ATTORNEY
     One Court Square, Suite 201
 5   Montgomery, Alabama  36104

 6   FOR MR. TIM REEVES.

 7   Mr  David Johnston
     JOHNSTON, HINESLEY, FLOWERS & CLENNEY
 8   Attorneys at Law
     P  O  Box 2246
 9   Dothan, Alabama  36302

10   FOR MR. BILLY JOE REEVES:

11   Mr  David McKnight
     BAXLEY, DILLARD, DAUPHIN & McKNIGHT
12   Attorneys at Law
     2008 Third Avenue South
13   Birmingham, Alabama  35233

14   ALSO PRESENT.

15   Mr  Gillis Douglass

16               *  *  *  *  *  *  *

17              EXAMINATION INDEX

18   Examination by Mr  Harmon           4
     Examination by Mr  McKnight        59

19

20               *  *  *  *  *  *  *  *

21                STIPULATIONS

22        It is hereby stipulated and agreed by and between

23   counsel representing the parties that the deposition of TIM

24   REEVES is taken pursuant to the Federal Rules of Civil

25   Procedure and that said deposition may be taken before Renee
```

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS178

1  W Marchand, Court Reporter and Commissioner for the State of

2  Alabama at Large, without the formality of a commission, that

3  objections to questions other than objections as to the form

4  of the questions need not be made at this time but may be

5  reserved for a ruling at such time as the deposition may be

6  offered in evidence or used for any other purpose as provided

7  for by the Federal Rules of Civil Procedure

8         It is further stipulated and agreed by and between

9  counsel representing the parties in this case that said

10 deposition may be introduced at the trial of this case or

11 used in any manner by either party hereto provided for by the

12 Federal Rules of Civil Procedure

13              * * * * * * * * * * *

14                    TIM REEVES

15      The witness, having first been duly sworn or affirmed

16 to speak the truth, the whole truth and nothing but the

17 truth, testified as follows

18                   EXAMINATION

19 BY MR HARMON

20     Q   Mr Reeves, we talked with your attorney earlier

21 What's your desire about reading and signing the deposition?

22     A   I'm lost.  What are you talking about?

23         MR JOHNSTON   He's asking you whether you want to

24 read the deposition and sign it rather than just -- and the

25 answer is you do want to read and sign

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS179

1     A.    Hunt's Restaurant

2     Q.    And what do you do there?

3     A    I run it   Own it   Whatever

4     Q    You are the owner of the restaurant?

5     A    I am owner of the -- I don't own the property   I

6   just own the business.

7     Q    I understand   When did you first become owner of

8   the business?

9     A    It would probably be around the -- I'm going to say

10  '88   You know, I can't give you exact   But it's somewhere

11  in that neighborhood.

12    Q    Is Hunt's Seafood Restaurant a corporation?

13    A    Yes

14    Q    And is there stock in the corporation?

15    A    Right

16    Q    Who owns that stock?

17    A    I do

18    Q    And did you get that stock in 1988?

19    A    Yes

20    Q    How did you obtain that stock?

21    A    I don't remember   I'd have to look back   How I

22  obtained it, I don't know   I just know I own the stock in

23  it.

24    Q    Who owned the stock before you did?

25    A    Daddy did

IRS180

1    Q    That would be your father?

2    A    Uh-huh

3    Q    And your father is -- what's your father's name?

4    A    Billy Joe Reeves

5    Q    And so somehow there was a transfer of ownership of

6    the stock from Billy Joe Reeves, your father, to you?

7    A    Right

8    Q    At approximately 1988?

9    A    Uh-huh

10   Q    Did you pay for the stock or was it given to you?

11   How did you effect the transfer?

12   A    I don't recall how that got transferred right now.

13   I'd have to look back at the paperwork on that   I don't

14   remember

15   Q    And make sure I understand, you stated that the

16   stock is in the restaurant itself   It does not reflect

17   ownership of the real property where the restaurant is

18   located?

19   A    Right

20   Q    And who owns the real property where the restaurant

21   is located?

22   A    Billy Joe and my mother, Wilda Reeves

23   Q    You say you operate the restaurant   Are you the

24   person that's in charge of the day-to-day operation of it?

25   A    That's right

IRS181

```
 1      Q.    You have any employees there?

 2      A.    Oh, yes

 3      Q     Who are the current employees of the restaurant?

 4      A.    We're going to name all of them?

 5      Q     Well, how many you got?

 6      A     It's probably 35

 7      Q     Oh, I won't do that, then   I'll just -- I'll ask
```
you about some specific people later   You have an accounting
service that assists you in doing the accounting work for the
restaurant?
```
11      A     Does it for me, right

12      Q     And who is that person?

13      A     Sandra McCormick

14      Q     And how long has Ms  McCormick done this for you?

15      A     I want to say since probably about '90

16      Q     Who did it before that?

17      A     Billy King

18      Q     Billy?

19      A     King

20      Q     K-I-N-G?

21      A     Uh-huh

22      Q     Does Ms  McCormick also prepare your tax returns?

23      A     Yes

24      Q     Do you generally do a tax return for the restaurant
```
corporation?

1    A.    Uh-huh

2    Q    And do you also do a tax return for your personal

3  income?

4    A    Uh-huh

5    Q    And Ms  McCormick does both of them?

6    A    Does it all

7    Q    Does Ms  McCormick do bookkeeping work for you also?

8    A    What do you mean by -- what kind?

9    Q.    What I'm trying -- I guess -- you're right  I

10  should be more specific  For example, does she do your

11  payroll?

12    A    Yeah

13    Q    And does she do any -- let me back up  Does she

14  ensure that bills and invoices are paid?

15    A    No  I do that

16    Q    You do that yourself?

17    A    I pay the bills

18    Q.    How do you report information to Ms  McCormick so

19  she can prepare these tax returns?

20    A    She prepares me a daily work sheet

21    Q    And what's on that daily worksheet?

22    A    Restaurant sales, beer, liquor, oysters  And you

23  just -- you know, down to what the credit cards is  If

24  there's any cash  you know, any cash payouts of any kind -

25    Q    And you fill that out every day and submit that to

IRS183

1    her on a daily basis?

2    A    No, it's -- we fill it out and she gets it at the

3    end of the month

4    Q    So it's submitted to her on a monthly basis?

5    A    That is on a monthly basis, yes

6    Q    Does she give you -- based upon that give you

7    reports about money made or money lost during the months or

8    does --

9    A    Yeah  We go over it, yeah  We --

10   Q    Now, Mr Reeves let me ask you this.  And I

11   apologize for having to bring up a sore subject  But as I

12   understand, you have pleaded guilty in federal court to a

13   violation of 18 United States Code, Section 1957, is that

14   right?

15   A    Whatever is -- what is that?

16   Q    Okay  Let me ask you this  Do you recall  you

17   have --

18   A    I pled guilty to something, but if that's what I

19   pled guilty to, I guess I did

20   Q    Well, has -- anybody tell you it s like a money

21   laundering offense?  Did you understand it to be that?

22   A    Well, I pled guilty to an information on money

23   laundering.  Isn't that right, David?

24   MR  JOHNSTON.  That's correct

25   Q    And again, in that information, it indicated that

1  you expended approximately 25,000, maybe a little less,

2  $25,000 to purchase a vehicle, is that correct?

3     A.   Yeah

4     Q    And the information also alleged that this $25,000

5  were gambling proceeds, is that correct?

6          THE WITNESS   We get back into this every time, you

7  know

8          MR  JOHNSTON   You pled guilty to --

9          THE WITNESS   I pled -- yeah.

10         MR  JOHNSTON   Tell him the circumstances

11         THE WITNESS   Yeah  Can I tell the circumstances?

12         MR  JOHNSTON   Tell him the circumstances of the

13 bank loan

14     A   Okay  I traded trucks every two years  That's a

15 business truck  I trade a truck every two years  I called

16 my banker up, Rex Blount  And I said, I'm fixing to get me a

17 truck  It's come in over here at the GMC place  Do you want

18 me to write a check for it or do you want me to come over

19 there and get a cashier's check from you  Just write a

20 check  I'll cover the -- I'll cover the upper -- check in

21 the account  And you come by here and sign a note one day

22 next week  I said, All right  That's fine  So, you know,

23 we put them as the lienholder on it, the whole nine yards

24 Just like I did any other truck I bought  And Rex got sick

25         When I went by there to sign a note, he had it on his

IRS185

12

1    desk but didn't have it all done   In other words, to me, I

2    thought he had already funded the check in my banking

3    account, but he had not   Well, this comes up and my truck is

4    gone and, you know, he had never funded the check   So the

5    loan never made it through   So --

6    Q   Well, let me ask you this, then   Are you saying

7    you're not guilty of what you pleaded guilty to?

8    A   I pled guilty to information, you know

9    Q   I understand   But didn't -- didn't -- during the

10   acceptance of your guilty plea, didn't the judge ask you or

11   give you a factual basis for the guilty plea?  Didn't you

12   hear that?

13   A   Yeah

14   Q   Didn't you say that was what you did?

15   A   Yes, I reckon it was

16   Q   Were you telling the truth when you told the judge

17   that was what you did?

18   A   Well, yeah, I think I was telling the truth   I

19   just, you know, just to be honest with you this money,

20   laundering business I got to catch on a little about knowing

21   what all this was about.  You know, maybe I didn't interpret

22   it the same way some other people do but, you know   I do

23   recall what I done then, you know, and that's what I said

24   Q   And I'm not trying to put words in your mouth   I'm

25   just trying to find out were you truthful with the judge when

13

```
 1    he -- at the time of your guilty plea?

 2        A    Yeah, I was truthful with the judge

 3        Q    Now, if that approximately 25,000 -- I think it may

 4    be a little less  I understand that  But that $25,000 in

 5    gambling proceeds that you used to purchase the truck, how

 6    did you obtain those?

 7            MR  McKNIGHT   Now, I'm going to state an objection

 8    for the record

 9            MR  HARMON   Okay

10            MR  McKNIGHT   I don't understand what this has any

11    relevance to do with the charges that we're facing as far as

12    the two bank accounts, the money in the restaurant, and the

13    restaurant   It just seems --

14            THE WITNESS   My truck is already gone

15            MR  HARMON   Well, that's not -- here's where I'm

16    going on it   What I want to do is  Mr  Reeves has pleaded

17    guilty --

18            MR  McKNIGHT   Correct

19            MR  HARMON   -- to conducting a financial

20    transaction involving approximately $25,000 in gambling

21    proceeds   It's my belief -- that's why we got this case

22    that Mr  Reeves has conducted an extensive gambling

23    operation   I need to know -- you know, that's the --

24    starting with the established fact, as I hope Mr  Reeves did

25    when he pleaded guilty, that he has obtained at least
```

IRS187

14

```
1    $25,000 in gambling proceeds   So I want to know how he got
2    it
3         MR  McKNIGHT   Well, he's pled guilty to getting the
4    25,000 and the car   I don't see where we need to go back in
5    and open that can of worms
6         MR  HARMON   Well, I need to know -- I want to find
7    out about how he got it, because he had to get it through a
8    gambling operation   That's my -- unless I may be wrong
9         MR  McKNIGHT   Now, didn't the guilty -- didn't the
10   information say that?
11        MR  HARMON   The information said that he pleaded
12   guilty to a 1957 violation, which is not specifically a
13   gambling offense   It's money laundering
14        MR  McKNIGHT   Well, doesn't it say that -- does the
15   information say that the money came from gambling?
16        MR  JOHNSTON   Yes   I think the information does
17   speak for itself
18        MR  HARMON   That's fine
19        MR  McKNIGHT   You know, and he s pled guilty to
20   that and I
21        MR  HARMON   I want to know how he got the money
22   That's what I'm asking
23        MR  McKNIGHT   Well, the information says he got it
24   from gambling and plea guilty to it
25        MR  HARMON   That's fine   And I want to find out
```

IRS188

1    MR HARMON    I have    It's been established.    I'm

2    going to find out the basis for it    Mr Johnston, do you

3    have any objection to going into this question?

4    MR JOHNSTON    John, not up to this point

5    MR HARMON    Okay

6    Q    Now, Mr Reeves, as I recall, what I posed to you

7    was, you know, the guilty plea

8    A    Right

9    Q    And the, you know, the approximate amount of money

10    involved in the transaction which -- and the information

11    alleges it was gambling proceeds    You pleaded guilty to

12    that    That's established conclusively for purposes of this

13    What I want to find out is where did you -- how did you

14    obtain that $25,000 that was used in the purchase of the

15    truck?

16    A    I don't really -- you know, exact transaction I

17    don't how I obtained it, you know

18    Q    Well, I'm not asking you specific transactions

19    We'll look at it like this    Were you conducting a gambling

20    operation during this period whereby you obtained this funds?

21    A    Yes    I guess that was right

22    Q    Well, now, don't guess, Mr Reeves    I need to know

23    if that was right, yes or no?

24    A    Yes, that's what I -- that's what I pled guilty to

25    in that information count gambling proceeds    That's what I

IRS189

1   did

2       Q    And were you in fact conducting an illegal gambling

3   operation during this period?

4       A    I was

5       Q    Now, who all was involved with you in that illegal

6   gambling operation?  The people    Other than I don't want to

7   know anything about your father

8       A    You mean people that was helping me?

9       Q    Yes, sir

10      A    Okay   Well, me and Ronny Cherry and Joe Cobb   And

11  David Mims, and Mills Hornsby would have been the ones

12      Q    Now, I don't want to go into great detail but tell

13  me what each one of these individuals was doing for your

14  gambling organization?

15      A    Well, now, Ronny run the thing   A to Z, he done

16  it   Rest of them just answered the phone

17      Q    And that would be like taking bets that came in --

18      A    Right

19      Q    -- over the phone   Now what did you do in relation

20  to the gambling operation?

21      A    I didn't do nothing as far as the everyday operation

22  was concerned   I was working my tail off up there at that

23  restaurant   But the only thing I would have done would have

24  been, you know, I naturally would have known if we won or we

25  lost, you know   You'd think that would naturally be a

IRS190

18

1    concern that you'd have   And I'd give Ronny money to pay

2    people off with

3        Q    Now, how did Ronny report to you the wins and

4    losses?  How did you know what you had done?

5        A    It wasn't no set thing   We would just run into one

6    another   He'd stop by my house or, you know, call me on the

7    truck or, you know, whatever

8        Q    Now, was Ronny getting a percentage of the take or

9    was he a salaried employee?

10       A    No, he got a bonus at the end of the year

11       Q.   I understand he got a bonus   But how did he get

12   paid during the year?

13       A    He just -- it was like a salary, yeah

14       Q    In other words, he did not get a percentage of the

15   winnings that he --.

16       A    Every week, you mean?

17       Q    Yes, sir

18       A    No

19       Q    Who received the winnings?  Who got the winnings

20   from the organization?

21       A    Me

22       Q    And on average during the period of the time you

23   were conducting the operation, what was your average weekly

24   income during the betting periods?

25       A    It varies   You know, some weeks you win, some you

IRS191

```
 1   lose   I don't know, you know   And you know, I don't
 2   necessarily mean you win when you win   Because when you win,
 3   you may not win because they may not pay you   So it's hard
 4   I couldn't give you an accurate figure on that knowing
 5   exactly how much it was
 6        Q    Did you make money, though, during the conduct of
 7   this organization?
 8        A    At times I did and sometimes we didn't
 9        Q    Were you in a -- generally, did you make money
10   during the entire year or --
11        A    Last year?
12        Q    Yes, sir
13        A    Unh-unh
14        Q    How about the year before that?  Did you make money?
15        A    made some money year before that
16             MR JOHNSTON   What year are you referring to when
17   you asked the last year?
18             MR HARMON   Well --
19             THE WITNESS   Last year would have been '96
20             MR HARMON   '96   Yes   I'm sorry   You're right
21   I should have been more specific
22        Q    1996 would have been the last year that the gambling
23   operation was conducted, is that correct?
24        A    That's right.  And that was not a very good year
25        Q    And that would -- I think it ended at the time of
```

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS192

```
 1   the execution of the search warrants and the arrest?

 2        A      You better believe it

 3        Q      And do you remember when those were conducted?

 4        A      Oh, yeah, I can remember that well    January the

 5   12th

 6        Q      Of 19 --

 7        A      '97

 8        Q      In the periods when you made money in the gambling

 9   operation, did you report the income to Ms  McCormick?

10        A      No

11        Q      What would you do with the proceeds that you

12   obtained from the gambling operation?  Physically what did

13   you do with them?

14        A      Just kept them in cash

15        Q      And where did you keep the cash?

16        A      I'd keep some of it in my safe up at the restaurant

17        Q      And anywhere else?

18        A      Yeah, Ronny would keep some sometime in his safe

19        Q      Where was Ronny's safe?

20        A      At Hodgesville Road

21        Q      I'm sorry?

22        A      Hodgesville Road

23        Q      That's was Ronny's home?

24        A      His daddy's

25        Q      Physically where was your gambling operation
```

1   conducted?

2        A    Down in the trailer behind my house

3        Q    That's on Padget Road?

4        A    No, that's on Malvern Road

5        Q    Excuse me   Malvern Road   Excuse me   That's

6   correct   And how close is that to your home?

7        A    I'd say about seven -- six, seven hundred yards

8        Q    And did anyone live in that trailer?

9        A    Yeah

10       Q    Who lived there?

11       A    Terry Knighton

12       Q    And was Mr  Knighton working with you?

13       A    No, he works in the oyster bar

14       Q    Were any of the gambling operations or activities

15   conducted at Hunt's Seafood Restaurant?

16       A    No, we didn't take bets there   We took them down at

17   the trailer

18       Q    Did you ever keep line sheets at the Hunt's Seafood

19   Restaurant?

20       A    Yeah, I've kept   I've had line sheets there

21   Yeah

22       Q    Did you ever have envelopes there, kept there to pay

23   off individuals who had won bets?

24       A    I've had a few   I didn't have that much   A few

25   times

IRS194

1    Q    And how would that -- tell me how that envelope

2    process worked?

3    A    Ronny just put the money in the envelope, put their

4    name on the envelope, put it in the drawer, and they just

5    come by and get the envelope

6    Q    Who would actually take care of giving them the

7    envelope?

8    A    Could have been me   Could have, you know, just

9    whoever was right there handy, you know, just pick up the

10   envelope, you know   Like I said, there wasn't that many of

11   them

12   Q    How about the -- any phone calls made to Hunt's

13   Seafood Restaurant in furtherance of the gambling operation?

14        MR   JOHNSTON   Phone calls to who?

15   Q    Were any phone calls made to Hunt's Seafood

16   Restaurant in order to place bets --

17   A    No

18   Q    -- or receive betting lines?

19   A    To receive betting lines or place bets?   No, they

20   didn't call   They always -- if somebody had called, I would

21   have -- I know I would have referred them to the other

22   number

23   Q    How anybody called to get betting line information?

24   Anybody ever call Hunt's Seafood?

25   A    No, they wouldn't have done that because they've got

IRS195

1   them other numbers to call

2       Q      Did you ever make any phone calls from Hunt's to

3   individuals concerning the betting operation?

4       A      Questions about -- such as what are you --

5       Q      For example, did you ever make a call to anyone

6   from -- or anyone make a call, to your knowledge, from Hunt's

7   Seafood to someone about collecting a gambling debt that was

8   owed?

9       A      I might have called Ronny and discussed it on the

10  phone, you know, somebody down there owed, you know

11      Q      Did you ever make any phone calls to a gambling

12  service or anyone to obtain line information from Hunt's?

13      A      No

14      Q      How did you obtain your line information?

15      A      Ronny got that from one of them outfits out there in

16  Vegas   Don Best Sports, I believe is the name of it

17      Q      And that would have the latest line information?

18      A      Yeah.

19      Q      Did you have an office at Hunt's?

20      A      Yeah

21      Q      And was it your office?

22      A      Uh-huh

23      Q      And what did you use that office there at Hunt's

24  for?

25      A      Well, you know, pay my bills, whatever -- what does

1   you recall specifically the day that the law enforcement

2   executed the search warrants?

3        A    Yeah, I remember the date

4        Q    Were you at Hunt's Seafood Restaurant when the

5   warrant was executed?

6        A    All day and half the night

7        Q    Do you recall making a statement to law enforcement

8   authorities regarding the cash in the safe when they found

9   it?

10       A    What statement are we talking about?

11       Q    Well, do you recall any statements you made?

12       A    No, not really   I had a rough day that day

13       Q    Do you recall telling the law enforcement that you

14  couldn't put that kind of money in the bank or else the IRS

15  would be on you?  Do you recall making a statement or words

16  to that effect?

17       A    Whom did I make that statement to?

18       Q    Law enforcement

19       A    I know, but who?

20       Q    Well, I'm asking you did you make it?

21       A    I'd have to find out who it was to make me remember

22  if I said something like that   I don't believe I said that

23  but, you know   I had a hard day, but I don't remember saying

24  it

25       Q    Do you remember being interviewed in the U S

1    Attorney's office about your cooperation agreement in this

2    in the criminal case?

3        A    Yeah

4        Q    Do you remember Mr Gillis being there in that

5    interview?

6        A    Yes

7        Q    Do you remember telling Mr Gillis that as far as

8    you were concerned all the money in the safe was gambling

9    proceeds?

10       A    I don't remember what I said    I -- you know  That

11   day, you can't imagine what that day was like for me

12       Q    Well, tell me what it was like for you  What was

13   the problem?

14       A    I was -- I was completely to pieces

15       Q    Were you intoxicated?

16       A    No, I wasn't intoxicated

17       Q    Were your under the influence of any drug?

18       A    No  Wasn't under the influence of nothing  I was

19   just upset

20       Q    You were upset  Well, I understand you were upset,

21   but tell me how that affected what you were --

22       A    Well, I was just -- you know, been up there all day

23   in front of the magistrate judge  And I watched all these

24   people, friends of mine all my life  And, you know, it

25   just -- that would have been better if it waited till another

1     Q.    Well, even when you did that, even when you got the

2   money out of the safe, what would ultimately happen to the

3   checks?

4     A.    Well, they'd ultimately go to the bank.   Ultimately

5   have to, you know.

6     Q.    Who did the deposits of the checks at the bank?

7     A.    I did.

8     Q.    Did your father ever cash --

9         MR. McKNIGHT:  I object.

10        MR. JOHNSTON:  Object.

11        MR. HARMON:  Excuse me.  You're right.  I'm sorry.

12    Q.    Other than your father, anyone else ever do any

13  checks for you at the bank?

14    A.    Make a deposit for me?

15    Q.    Yes.

16    A.    They might have run over there and made a deposit,

17  but they didn't do the -- I worked it up.  You understand

18  what I'm saying?  You know what I'm saying, they might have

19  went over there and got my change and made the deposit.  But

20  I had worked it up myself.

21    Q.    Did Ronny Cherry ever go the bank for you and do

22  this?

23    A.    I don't know.  I couldn't answer that question.  I

24  don't.

25    Q.    You don't remember or you just don't know?

IRS199

32

```
1      A    I don't remember  If -- I don't think he had, but I
2  don't remember
3      Q    When someone was placing a bet with you, how did
4  they physically place the bet?  Was there a written sheet
5  done by that person?
6      A    Are you talking about the bettor or the -
7      Q    The bettor  Let me back up and I'll ask it another
8  way  How did you keep a record of the bets placed by a
9  bettor?
10     A    Just wrote it down on a piece of paper
11     Q    Who wrote it down?
12     A    Ronny
13     Q    Did you ever write one down?
14     A    Not to my knowledge
15     Q.   Now, what would you do with those sheets of paper
16  that reflected the debts?  Where were they kept?
17     A.   Ronny took care of them  They were down there at
18  the trailer
19     Q    Any of them ever maintained there at the Hunt's
20  Seafood Restaurant?
21     A    No  Not the betting  As far as the day to-day,
22  that would have been down there.
23     Q    And then how were these bets reconciled so that you
24  know who was the loser and who was the winner?  Who went
25  through the sheets to determine winners and losers?
```

IRS200

```
 1        A     You mean figure the sheet up?

 2        Q     Yes

 3        A     Ronny

 4        Q     And did you ever go back and check that to see if he

 5   was doing it accurately?

 6        A     No, I didn't   I trusted him   I didn't have no

 7   problem with Ronny   I didn't even worry about that   I

 8   didn't have time to go back and do that

 9        Q     Do you make money through the operation of Hunt's

10   Seafood Restaurant?

11        A     Oh, yeah

12        Q     Let me back up a minute   Since the execution of the

13   search warrants and the arrest, has there been any change in

14   the management procedures at Hunt's Seafood Restaurant?

15        A     No

16        Q     Has your father become more involved in the

17   operation of the restaurant?

18        MR  JOHNSTON   Object

19        MR  McKNIGHT   Object to asking about his dad.

20        MR  HARMON   That's not a question about any

21   criminal   I'm just asking if he'd become more -- since

22   the --

23        MR  JOHNSTON   The judge said no questions, period

24        MR  McKNIGHT   The judge said absolutely no

25   questions about his dad
```

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

34

1    Q    Has the restaurant become more profitable since the

2    operation of -- I mean since the execution of the search

3    warrants?

4    A    It's doing well

5    Q    Has it become more profitable than it was before?

6    A    I mean, we do a little better every year

7    Q    Did the --

8    A    And hope to keep on doing a little better every

9    year

10   Q    Did you ever use the Hunt's Seafood operating

11   account to clear checks you received from losing bettors?

12   A    To clear?

13   Q    Yes   Or deposit   Maybe deposit checks that you

14   A    Well, I cash the checks, and then, you know, I just

15   got cash out of the checks   And, yeah, they went in a

16   deposit, you know   But I had gotten the cash out of my check

17   cashing money

18   Q    So let me make sure I understand   You correct me if

19   I'm wrong   If you received a check from a losing bettor for

20   $100, you would go into the safe and get $100 out, is that

21   right?

22   A    I'd go into my check cashing money

23   Q    Where was the check cashing money?

24   A    Had a box there where we had money separated that we

25   could cash payroll checks and all that stuff, and that's

IRS202

1  where I cashed them checks out of.

2     Q.  And whose money was that?

3     A   Well, what I was cashed out of it would have been my

4  money

5     Q   All right  So you go in that check cashing box and

6  get $100 out for this check?

7     A   Right

8     Q   Now what happened to the check?  What would happen

9  to the check?

10    A   Either I'd take the check and go to the bank and get

11  it cashed, or I'd put it in the deposit  you know, and I'd

12  get the cash back out

13    Q   So if you went and got the -- if you cashed the

14  check and you got $100 from the bank, what would you do with

15  that $100?

16    A   Put it in my pocket

17    Q   And if you deposit the check, what would happen to

18  the money that was deposited into the account?  What happened

19  to it ultimately?

20    A   I'd got the cash back in my hand

21    Q   You would eventually get cash out of the --

22    A   No, I got it out before then  I already had that

23  I cashed it before I put the check in there

24    Q   All right  Now, I'm sorry  I'm being confused

25  now  Listen to me carefully  if someone -- a losing bettor

IRS203

1     A     (Witness nods head )

2           MR HARMON.  Then you get that $100 out   He's got
3     $100 now, and he's got a check in his hand   He's got a
4     check for $100 and a $100 bill   Example   And you told me,
5     if I understood you right, either that $100 bill either
6     might go to pay off another bet or might go in your pocket?

7     A     Uh-huh.

8     Q     But you've still got that check   You see what I'm
9     saying?  You've still got the check in your hand

10    A     Uh-huh

11    Q     Now, what do you do with that check?

12    A     Well, I deposit the check into the -- some of them,
13    like I said, if I had some checks, I just went and cashed
14    Some of them I might have deposited into the account

15    Q     And what account did you use to deposit those
16    checks?

17    A     The Hunt's account

18    Q     Did you ever use any other accounts to deposit
19    checks?

20    A     Well, not to my knowledge   But it said -- I think
21    Gillis showed me one or two checks were somehow allowed to
22    me   I didn't remember getting into the -- into an account

23    Q     Well, me let ask you about some specific
24    individuals   Do you know an individual named Saket Sharen?
25    That's S-A-K-E-T, S-H-A-R-E-N?

IRS204

```
 1      A    Uh-huh

 2      Q    Did Chris pay off with checks?

 3      A    Sometime

 4      Q    How about Dr  Jimmy Johnson?

 5      A    I don't know him.

 6      Q    Do you know if Dr  Johnson bet with you?

 7      A    I don't even know Dr  Jimmy Johnson

 8      Q    How about Paul F  Lederman?

 9      A    Is that a Georgia?

10      Q    I don't know

11      A    I don't know

12      Q.   Do you know if Mr  Lederman ever bet with you?

13      A    I couldn't answer that because I'm not sure about

14   I know some Pauls, but I don't know if that's the same Paul

15   I'm thinking about

16      Q    How about Raymond Leppla?

17      A    Uh-huh

18      Q    Did Mr  Leppla bet with you?

19      A    He bet with Mr  Myron Brown

20      Q    And did Mr  Leppla ever pay off to you with any

21   checks?

22      A    He paid off to Myron and Myron paid me or paid Ronny

23   whatever  I wound up getting it

24      Q.   How about Enoch Glenn Toole?

25      A    I know him
```

42

```
1    Q    Did Mr Toole bet with you?

2    A    Yes

3    Q    Did he pay off with checks?

4    A    Sometimes.

5    Q    How about James E Short, Jr?

6    A    I don't recall that name  I'd have to -- I'm

7    sitting here looking at blank paper  I don't know

8    Q    Now, did you ever -- besides paying -- we've been

9    talking about how you got paid when you won  How did you pay

10   when you lost?  I say -- I'm talking about your

11   organization  How did your organization pay off bettors that

12   won?

13   A    Cash

14   Q    Did you ever use anything else?

15   A    Yes, some days  Ronny used some money orders and

16   some cashier's checks

17   Q    Did you ever go and obtain money orders and

18   cashier's checks in order to pay off winning bettors?

19   A    Yeah

20   Q    Where would you go and do that?

21   A    First Bank of Dothan

22   Q    Would you use cash to obtain the money orders or

23   cashier's checks, or would you use your funds from an account

24   to do that?

25   A    I just used cash.
```

IRS206

43

1      Q      When the government initially seized a couple of

2  accounts, account number ████████ at SouthTrust Bank and

3  account number ██████ at First Bank   You filed a claim to

4  those accounts   Do you recall that?

5      A      I don't recall that   I think Drew and David handled

6  the filing of the claim

7      Q      Did you have any interest in the accounts?

8      A      What accounts are there?

9          MR   JOHNSTON   Yeah   You'd have to show them to us

10  if you know whose name they're in

11         MR   HARMON    Here are the account numbers SouthTrust

12  Bank   And Mr   Reeves filed a claim asserting an ownership

13  Now, they've subsequently been withdrawn

14      A      Yeah, that's right, because I remember Drew saying

15  something about that

16      Q      So it would be your statement now you don't think

17  you have any -- did you have any interest in the accounts?

18      A      No

19      Q      Did you have any advance information that the law

20  enforcement authorities were looking at your gambling

21  operation before the execution of the warrants?

22      A      Don't -- excuse me for laughing   Why no

23      Q      What?

24      A      No, sir

25      Q      Did you have any advance information that there was

IRS207

1    any type of investigation of you as far as a gambling

2    operation?

3        A    No

4        Q.    Tell me how Hunt's operates    When does it open for

5    business?

6        A    Opens about eight o'clock in the morning to let the

7    domino players start playing dominos

8        Q    And how many domino players generally do you have

9    there?

10        A    Well, you've got about eight or ten playing and

11    about five or six sweaters, I call them

12        Q    What's that?

13        A    Standing around arguing about why he should have

14    played this one and didn't play that one    These are all

15    retired people

16        Q    And are you cooking any food or serving anything

17    during that period?

18        A.    No    Just do serve a beer    Not that many, but you

19    serve a few

20        Q    When do you open for business    start serving lunch,

21    for example?

22        A    Eleven o'clock

23        Q    And how late do you stay open at night?

24        A.    Till ten    But, you know, sometimes it's -- I left

25    there last night at 12.15

1    and go back to work with GTF   So she went back over there

2    and finished out tnat little time where it would benefit her

3    more on her retirement   And then she come back   And she's

4    been with me ever since, you know

5        Q    Mr Reeves, what time does she usually arrive at the

6    restaurant?

7        A    Generally about 4 30 or five o'clock

8        Q    Okay   How late does she stay there?

9        A    She usually tries to get out of there about nine

10   Sometimes she'll stay to closing, but she's old   She

11   don't --

12       Q    And how about your father?   Does he come to the

13   restaurant often?

14       MR  JOHNSTON   Objection

15       MR  HARMON   Excuse me   That's right

16       Q    Mr  Reeves, explain to me, looking at your trial

17   testimony you talked about individuals that got juice   And I

18   know you explained it in the criminal trial   But it was hard

19   for me to understand   Can you explain that to me again what

20   you meant by the individuals that got juice on the bets?

21       A    It's got 20 percent of the winners -- winning week,

22   you know

23       Q    And how do those individuals get that?   What do they

24   have to do to get that?

25       A    Wasn't no set deal about what they had to do   They

IRS209

47

1   just had some few people that played with them   And you know

2   it was a common thing   There's so many people booking

3   football around here and everybody was doing it

4        Q    As I understand how -- and you correct me if I'm

5   wrong -- the gambling business works is if you win, you get

6   paid, you know, what you bet   If you lose, you pay what you

7   bet plus a certain percentage, is that correct?

8        A    That's right

9        Q    How much more over his bet does a loser pay?

10       A    Ten percent on his losing

11       Q    And so --

12       A    But that would not be on all bets, now

13       Q    What would be an example where you have a different

14   percentage?

15       A    Like on a -- if he played a parlay or something   He

16   gets odds on that, win more money   And if he loses, it's

17   even money

18       Q    And then so that when you paid juice money, where

19   did that come from?   How did you get money to pay the juice?

20       A    It just come out of their winnings

21       Q    So in other words, if an individual -- and correct

22   me if I'm wrong   I don't want to put words in your mouth.

23   If an individual brought you some bettors and they lost and

24   they had to pay that extra 10 percent and, of course, their

25   loss, you would, of course, receive the total amount of

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS210

48

1   money, but you were giving the people that brought you the

2   bettors 20 percent or something as juice for them bringing

3   them to you?

4        A   -Yeah   It varied with different things, yeah   20

5   percent   Some got less than that

6        Q   And who were some of the people, you know, that were

7   getting juice from you on this situation?

8        A   I think Vivian   And like I said, you know, this is

9   one of these deals Ronny handled all this stuff with these

10  people with the juices

11       Q   Did you ever have any bettors that were unhappy or

12  perhaps felt like they had been mistreated by Ronny that came

13  to you about the situation?

14       A   They'd been mistreated?

15       Q   Yes

16       A   In what kind of way?

17       Q   Maybe they thought that somebody -- Ronny wrote

18  their bet down wrong   For example, Georgia and Florida

19  and -- you know, Ronny wrote down that they picked Florida

20  and they said no, I picked Georgia   How would that situation

21  with that be handled?

22       A   Ronny would handle it

23       Q   Well, did anybody ever come to you about that?

24       A   No, because he would have handled it because most of

25  the time you can't tell nobody   When they tell you

IRS211

49

```
1    something, you just got to go ahead and say that's the way it
2    is, I guess   I made the mistake and go on   Like that
3         Q     You indicated that sometimes you couldn't collect
4    from people?
5         A    Oh, yeah
6         Q     And how did you handle that?  What would you do if
7    you couldn't collect?
8         A    Well, you'd just talk with all the bookies in Dothan
9    and tell them that this person don't pay.  Let's don't take
10   no bets off of him   And that's about the end of it
11        Q     And this would be, for example -- in other words,
12   you would contact other bookies in the area and tell them
13   this was happening, and you would just say, you don't get to
14   bet anymore?
15        A    Yeah   Well, tell them I'd -- be in their best
16   interest they wouldn't need to take no bets off of them
17        Q     Did they ever call you and let you know somebody
18   wasn't paying?
19        A    Yeah
20        Q     And how did you keep up with the people that you did
21   not want to accept bets from?
22        A    Well, I reckon you can just remember that
23        Q    So you didn't keep a sheet or anything like that?
24        A    I didn't, no
25        Q     Do you know if Ronny kept one?
```

```
1    A    He could have   I don't know

2    Q    Do you know if Mr  Cherry had a bank account?

3    A    I don't have any idea

4    Q    Do you know if he had any method of handling any of
5    the -- for example, any checks that were received by the
6    organization as payoff for a losing bet?

7    A    If he had a what now?

8    Q    Did he have any method of handling those checks that
9    came in as payment for a losing bet on his own as an
10   individual?

11   A    I don't know

12   Q    Excuse me.

13   A    I don't know

14   Q    Do you know if he ever took care of any checks on
15   his own without having to get you involved as far as handling
16   a check that was received on a losing bet?

17   A    I wouldn't know that anyway   I would -- most of it
18   would have come through me, I'm sure

19   Q    Did you ever obtain a tax stamp for gambling?

20   A    No, I didn't know you could get one

21   Q    Did you ever file a gambling tax return?

22   A    I filed some gambling on tax returns

23   Q    Would that be the Hunt's return or your personal
24   return?

25   A    Personal return
```

IRS213

51

1     Q    Did you report to Ms McCormick that that was

2  gambling income that you received?

3     A.   Well, I got a -- when I was in Vegas was what it

4  was

5     Q    This was money you won while you were in Vegas?

6     A    Right

7     Q    Did you ever report to her any of the money you made

8  in the gambling operation here in Dothan?

9     A    No

10    Q    Was Ms McCormick aware that you were conducting a

11 gambling operation here?

12         MR McKNIGHT   Object to the form of the question

13    A    No

14    Q    Did you ever tell her you were doing that?

15    A.   No

16    Q    And I know we mentioned you don't own the real

17 property where the --

18    A    That's right

19    Q    -- where the restaurant is located   And I believe

20 you have a lease agreement with your father?

21    A    Right

22    Q    Mr Reeves, the money that you -- that was yours in

23 the safe, how long did it take you to accumulate that amount

24 of money there?

25    A    I don't even know   I wouldn't even know what the

IRS214

1    answer to be to that

2        Q    Did you begin accumulating it when you started your

3    gambling operation?

4        A    Yeah    That's where it come from, I mean, you know

5    I don't know what years, you know

6        Q    How did you know what money you made from, for

7    example, Hunt's Seafood or some activity conducted at Hunt's

8    Seafood versus money you made gambling?  How did you

9    differentiate between the two?

10        A    When I had Hunt's, I just drew a paycheck, you know,

11    just like everybody there

12        Q    Well, I understand    I'm not talking about

13    specifically how you got paid    I'm talking about when you

14    made money gambling, and you made money through Hunt's, how

15    did you keep the two separate so you knew what you were

16    making gambling versus what you were making through Hunt's

17        A    Well, it was because it was separated

18        Q    I understand that    But how did you keep them

19    separate, though?

20        A    I didn't have to keep them    That was just

21    separated    That would happen somewhere else and that was

22    happening -- the rest was happening up there

23        Q    Well, for example, you mentioned that you used the

24    Hunt's Seafood account in some instances to handle checks you

25    received from losing bettors, is that correct?

IRS215

1    A    Never had to   That never did become a problem

2    Q    No one ever asked you about that?

3    A    No   Never had the wrong person go get the wrong

4  money either so, you know, I don't know

5    Q    Pretty honest bunch down here, huh?

6    A    Yeah

7    Q    Mr Reeves, when you obtained cash from your

8  gambling operation, did you ever go to the bank and exchange

9  small bills for large bills?

10    A    Now, how that -- I'm going put -- that's one thing

11  that I read in something and some of this stuff   How that

12  happened is not like that's been told   Let me tell you how

13  that happened   You go up there and I cash some checks   And

14  they either say, how do you want it   I said, it don't make

15  no difference   She said, will larger be fine?   I say that's

16  fine   That's how that come up   I didn't run up there and

17  say I want $100 bills for everything I got, you know   And

18  you know human nature if somebody's going to count money,

19  they'd rather count $100 bill than they'd count 20 in there

20  So that goes vice versa with that   that didn't -- ain't all

21  my, you know   I said -- if they said that, I said, okay   If

22  they didn't, I have gotten 20s

23    Q    So you didn't care if it was in large bills or small

24  bills?

25    A    No   It didn't make that much difference to me

59

1     A    I don't know

2     Q    Did you specifically need, for example,

3  approximately $200,000 in cash at the Hunt's Seafood

4  Restaurant for any specific business purpose?

5     A    No    Just -- I just had the money

6     Q    Mr Reeves, is there anything else you want to tell

7  me about?

8     A    No    My daughter is getting surgery on her ear    I

9  just want to get out of here where I can go see about her

10    Q    I understand

11       MR HARMON    Well, gentlemen, that concludes me

12  unless y'all have something

13       MR McKNIGHT    I've got a couple of real quick

14  ones

15                         EXAMINATION

16  BY MR McKNIGHT

17    Q    We're talking about the envelopes in the restaurant

18  and you said that happened on an infrequent basis?

19    A    Right

20    Q    As far as the gambling bets operation go, what

21  percentage of the bets were ever collected at the

22  restaurant?  Can you put a percentage on it?

23    A    It would have to be less than five percent    Two or

24  three percent at the most

25    Q    And when you talk about the envelopes behind there

IRS217

60

```
 1     in the lounge, did you also put envelopes back there to

 2     pay --

 3         A     Vendors with?

 4         Q     -- vendors?

 5         A.    Yeah   Done that too

 6         O.    And so if somebody was bringing oysters by, you

 7     might have an envelope back there for the oyster man?

 8         A     And beer trucks too

 9         Q     Okay   And they would go, and Don Taylor would hand

10     them those envelopes when they came back there?

11         A     Oh, yeah

12         MR  McKNIGHT   That's all I've got

13         THE WITNESS  Are y'all through with me?

14         MR  HARMON   You have anything?

15         MR  JOHNSTON   I don't have anything

16         MR  HARMON   Just one second, Mr  Reeves, and I'll

17     be almost through

18              (Short pause)

19         MR  HARMON   I have nothing further

20              (The deposition concluded at 12 11 p m )

21              * * * * * * * * * *

22         FURTHER DEPONENT SAITH NOT

23              * * * * * * * * * *

24

25
```

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS218

1                           REPORTER'S CERTIFICATE

2   STATE OF ALABAMA

3   AUTAUGA COUNTY

4      I, Renee W Marchand, Court Reporter and Commissioner for

5   the State of Alabama at Large, hereby certify that on

6   Thursday, February 3, 2000, I reported the deposition of TIM

7   REEVES, who was first duly sworn or affirmed to speak the

8   truth in the matter of the foregoing cause, and that pages 4

9   through 60 contain a true and accurate transcription of the

10  examination of said witness by counsel for the parties set

11  out herein

12     I further certify that I am neither of kin nor of counsel

13  to any of the parties to said cause, nor in any manner

14  interested in the results thereof

15                  This 15th day of February, 2000

16

17

18

19

20

21

22  RENEE W MARCHAND, Court Reporter
    Commissioner for the State
23  of Alabama at Large

24  MY COMMISSION EXPIRES  7/20/2002

25

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS219

62

```
 1                    SIGNATURE OF WITNESS

 2          I, TIM REEVES, hereby certify that I have read the

 3   transcript of my deposition consisting of pages 4 through 60,

 4   and except for the corrections listed below, certify that it

 5   is a true and correct transcription

 6

 7

 8        _____  _____

 9                       TIM REEVES

10

11   SWORN TO AND SUBSCRIBED before me
     this_____ day of_____, 2000
12

13   _____
              NOTARY PUBLIC
14           *  *  *  *  *  *  *  *  *  *

15

16   Page   Line   Correction and reason therefor

17

18

19

20

21

22

23

24

25
```

DUNN, KING & ASSOCIATES
Montgomery, Alabama
(334) 263-0261 or (800) 359-8001

IRS220

**EXHIBIT** *H*

IRS221

**EXHIBIT** I

IRS222

Page 1

```
              IN THE UNITED STATES DISTRICT COURT

             FOR THE MIDDLE DISTRICT OF ALABAMA

                     SOUTHERN DIVISION


UNITED STATES

                            CRIMINAL ACTION 99-13-S
                            Montgomery Alabama
                            October 26 - November 1  1999

              vs

BILLY J REEVES  RONALD L CHERRY
LARRY J COLB AND BILLY J ADAMS


                  TESTIMONY OF TIM REEVES
                     October 28  1999

         BEFORE THE HONORABLE ROBERT B PROPST
              UNITED STATES DISTRICT JUDGE

                     APPEARANCES

FOR THE GOVERNMENT           C  Redding Pitt
                             U S  Attorney
                             Montgomery  Alabama
                        or   Ashton Holmes
                             Charles R  Niven
                             Ass't U S  Attorneys

FOR THE DEFENDANT BILLY J REEVES   William Baxley
                             Attorney at Law
                             Birmingham, Alabama

FOR THE DEFENDANT CHERRY      John T  Kirk
                             Attorney at Law
                             Montgomery Alabama

FOR THE DEFENDANT COBB        John T  Smith
                             Attorney at Law
                             Dothan, Alabama

FOR THE DEFENDANT ADAMS       Samuel L  Adams
                             Attorney at Law
                             Dothan  Alabama

         Proceedings recorded by mechanical
```

---

Page 2

```
1
2         MS HOLMES The United States calls Tim Reeves
3         TIM REEVES GOVERNMENT'S WITNESS SWORN
4              DIRECT EXAMINATION
5         COURTROOM DEPUTY CLERK state your name and spell
6    your last name
7    A Tim Reeves  R-e-e-v-e-s
8    BY MS HOLMES
9    Q  Please state your name
10   A  Tim Reeves
11   Q  And where do you live Mr  Reeves?
12   A  1073 Malvern Road
13   Q  What city is that in?
14   A  Dothan, Alabama
15   Q  How long have you lived in Dothan?
16   A  All my life
17   Q  During  Well, at least as early as 1994 were you
18   involved in a bookmaking operation in Dothan, Alabama?
19   A  I was
20   Q  What was the structure of this organization?
21   A  I don't really know what
22   Q  Well what was your role in this organization?
23   A  Well, I owned the organization  It was mine.
24   Q  And who were your salaried employees?
25   A  Ronnie Cherry and Joe Cobb and David Munn and Mills
```

---

Page 3

```
1    Hornsby
2    Q  Do you see Joe Cobb in this room today?
3    A  Yes, ma'am
4    Q  Would you please point him out?
5       Tell us who you are pointing to
6    A  The fellow with the black hair there
7    Q  Do you see Ron Cherry?
8    A  Yes
9    Q  Would you please point him out?
10   A  In the light blue shirt
11      MS HOLMES Your Honor, may the record please
12   reflect that the witness has accurately identified each of the
13   defendants
14   Q  What was Mr Cherry's job in your organization?
15   A  He ran the day to-day  run the operation
16   Q  Well when you say he ran the day-to-day operations  what
17   does that consist of?
18   A  Just answered phones, took the bets, checked it up
19   Q  What do you mean by checked it up?
20   A  Check up the wins and losses
21   Q  Did he have any duties with regards to settling up?
22   A  Yes  He paid  He paid some players
23   Q  With respect to the organization's or the operation's
24   accounting system, who was responsible for that?
25   A  Ronnie kept up with the books
```

---

Page 4

```
1    Q  And if it was time to settle up  what exactly were his
2    duties with regards to settling up with the bettors?
3    A  Well, he would  I would give him the money  and he would
4    settle up with the bettors
5    Q  Do you know how he went about doing this?
6    A  Go see them, pay them
7    Q  Did he ever  Are you familiar with an envelope system
8    that was used by your organization?
9    A  Yes  Where you put the money in envelopes with somebody's
10   name on the outside of it or a number, or whatever
11   Q  And were some of those envelopes delivered to Hunt's
12   Restaurant and Oyster Bar?
13   A  There was a few  yes
14   Q  And why were they delivered there?
15   A  There was a few people that came in there that picked up
16   There were not many, but a few
17   Q  Was this information also disseminated there?
18   A  The sheet? Line sheet? Yeah, I had a line sheet there
19   Q  How many employees did you have at the trailer answering
20   telephones?
21   A  Three
22   Q  And I believe you identified earlier three different
23   individuals who had, at different times, operated the
24   telephone?
25   A  Yes
```

IRS223

Page 5

1  Q  Who controlled.
2      Let me back up  Did you all have a line service?
3  A  Yes, we did
4  Q  Explain to the jury what a line service is
5  A  It is.. It just gives you the line where you get the
6  numbers off of, same thing you see in the USA today" except
7  you get it through a different thing.
8  Q  Well, how much did that line service cost per month?
9  A  I don't remember the exact figures on that
10  Q  Do you know who your line service was with?
11  A  Don Best Sports  Is that right?
12  Q  If I showed you a money order to Don Best Sports would
13  that give you an indication of how much you paid for your line
14  service?
15  A  Yeah.
16      Okay
17  Q  How much did you pay a month for that line service?
18  A  Five hundred.
19  Q  Now this line service, there has been a lot of talk
20  about whether --
21      THE COURT  Just ask questions
22  BY MS. HOLMES.
23  Q  Why would you pay five hundred dollars a month if you
24  could just get the line out of "USA Today"?
25  A  Well  you use it because you get changes faster if you

Page 6

1  had it right there in front of you
2  Q  Did you keep a sharper line?
3  A  Well, you just got  I reckon, you know, better numbers
4  Q  In your organization  Excuse me  your operation, who
5  would have controlled the movement of the line? -
6  A  Well, Ronnie would have moved the line  He might have
7  called me if there was some decision had to be made on
8  something  And I might make the final decision on that.
9  Q  But, in general, was Mr  Cherry in charge of the line
10  information?
11  A  Yeah.
12  Q  Do you know Billy Joe Adams?
13  A  I know him, yes, ma'am
14  Q  Do you know him by a name other than Billy Joe Adams?
15  A  Goat
16  Q  Did you have a business relationship with Goat?
17  A  No, I didn't have a business relationship  I bought a few
18  watermelons from him
19  Q  Was Goat Adams tied into your gambling operation?
20      MR. ADAMS  I object, may it please the Court
21      THE COURT  Well, just ask what activities, if any,
22  did he have in relation to it
23  BY MS  HOLMES
24  Q  What activity or associations, if any, did you have with
25  respect to Billy Joe Adams?

Page 7

1  A  I didn't have any association with him myself
2  Q  Were you aware of who he was or --
3      THE COURT  And the question, when she asked if you
4  were aware, it means did you have some personal knowledge  Did
5  you see it or hear it or  Not what something somebody told
6  you.
7  A  That I.
8      MS  HOLMES  If I may  Your Honor
9  Q  Did you have an arrangement with regards to gambling with
10  Billy Joe Adams?
11  A  I didn t have any arrangement, no
12  Q  Did our organization?
13      MR. ADAMS  I object, may it please the Court
14      THE COURT  Well, again  the question is do you have
15  some personal knowledge by having virtue of seen Mr  Adams say
16  or do something as opposed to what somebody may have told you
17  A  I didn't see him do anything
18      THE COURT  All right  Go ahead with another
19  question, then
20  BY MS. HOLMES
21  Q  With respect to monies that were paid out by our
22  organization, are you aware of any monies that were paid by
23  your gambling operation to Billy Joe Adams?
24  A  The way I did that, I didn t stuff the envelopes  I just
25  gave out the money

Page 8

1      MS  HOLMES  May I approach the witness, Your
2  Honor?
3      THE COURT  All right
4  BY MS. HOLMES.
5  Q  I am going to show a copy of a piece of paper that
6      If I might have just one moment, Your Honor
7      I am showing you what has been introduced and admitted
8  in evidence as Government's Exhibit 61  These are papers that
9  were removed from your restaurant
10      Based on your business relationship with Ronnie Cherry
11  and  did he provide you with certain updates with regards to
12  the gambling business?
13  A  Yes  As far as who we needed  such as that
14  Q  What about what you were paying out to whom, how the
15  business was doing?
16  A  Well, the only thing he would really ever get into
17  something like that, if somebody owed you, you know  and he was
18  worried about them not paying you, or something like that
19  Q  This was taken from your restaurant  Do you recognize
20  that?
21  A  Are you sure that wasn t taken out of my truck, actually?
22  Q  It was taken either from the restaurant or your truck
23  parked in front of the restaurant
24      No  I believe that was taken from the restaurant
25  itself  It is Government s Exhibit 61  Do you recognize this

IRS224

## Page 9

```
 1   sheet of paper?
 2   A  Yes
 3   Q  What is this?
 4   A  It just the totals for what
 5   Q  The totals for what?
 6   A  Wins, losses, whatever
 7   Q  Does it have.  What is this listed to the side here?
 8   A  That would be the ones that got juice
 9   Q  What is juice?
10   A  They turn in some bets and you give them twenty percent of
11   the winners
12   Q  And the third one from the top, who does this show getting
13   juice?
14        MR. ADAMS  I object based on the fact he didn't
15   write this, it wasn't done by him and I don't think he can
16   testify as to that.
17        THE COURT  I will overrule and make reference to
18   the Bourjaily again
19        MR. ADAMS  Yes sir
20   A  Now, what was the question?
21   BY MS. HOLMES.
22   Q  Third from the top under the list of juice agents who does
23   that show getting juice?
24   A  Says Goat.
25   Q  How much?
```

## Page 10

```
 1   A  Ten eighty-three
 2   Q  Who is Goat?
 3        MR. ADAMS  I object, may it please the Court.
 4        THE COURT  Well, it's repetitious.  Go ahead.
 5   BY MS. HOLMES
 6   Q  Is the Goat noted on this piece paper the same Goat that
 7   you previously identified as also being B J Adams?
 8        MR. ADAMS  I object, may it please the Court.  It's
 9   repetitious again --
10        THE COURT  You can ask him does he have any, any
11   personal knowledge, as to who that references to
12   BY MS. HOLMES
13   Q  Do you have any personal knowledge as to who that
14   references to?
15   A  Well, it says Goat, you know.  I didn't do business with
16   Goat.  But, you know  I am kind of at a loss here
17   Q  Mr Reeves  do you recognize the individuals listed here
18   under the word juice?
19   A  Right.
20   Q  Do you know who each of those individuals would be?
21   A  I don't know who this is  I don't who that one is  I
22   know who the rest of them are
23   Q  Okay  Now, you pointed out C L  Is that correct?
24   A  Yes
25   Q  So, you are saying that you do know who Goat is?
```

October 28 , 1999

## Page 11

```
 1        MR. ADAMS  Your Honor, I object again
 2        THE COURT  All right.  I sustain
 3   BY MS. HOLMES.
 4   Q  Is this one of the business records from your gambling
 5   business?
 6   A  Yes  I didn't make it out, but it is mine
 7   Q  Who wrote it out?
 8   A  Ronnie.
 9   Q  Did he give it to you?
10   A  Yes, he give it to me
11   Q  For what reason would he give you this piece of paper?
12   A  Well, to be honest with you, I was looking at the bottom
13   figure there  I wasn't really paying no attention to the rest
14   of it
15   Q  Why did he give you this paper?
16   A  To look at the figures
17   Q  To let you know how the business was doing?
18   A  Let me see if I won or lost.
19   Q  In your position as the owner of this business, were aware
20   of Goat s arrangement, or Billy Joe Adams  arrangement, as far
21   as how much he would be paid, when he would be paid, how he
22   would be paid?
23        MR. ADAMS  Objection, may it please the Court
24   Compound question  And in addition to that, it's repetitive
25        THE COURT  I sustain as to the form of the
```

## Page 12

```
 1   question
 2   BY MS. HOLMES
 3   Q  As the owner of this gambling operation were you aware of
 4   what your operations arrangement was with Billy Joe Adams as
 5   far as compensation is concerned?
 6        MR. ADAMS  Objection
 7        THE COURT  You all come up here just a minute
 8        (OUT OF THE PRESENCE OF THE JURY)
 9        THE COURT  Let me ask my officers of the court a
10   question
11   I see no reason why, if somebody was on the stand who
12   was not and had not been a defendant in the case, under the
13   rules regarding conspiracy, somebody could testify as to what
14   somebody told them that was in aid of and in furtherance of the
15   conspiracy
16   Now  I would assume that this witness could testify as
17   to what somebody told him that might be in aid of and in
18   furtherance of the conspiracy, even if it mentioned Mr Adams
19   Now  do you see any reason why he couldn't?
20        MR. ADAMS  Judge  I still go back and  I
21   understand you have told us the Bourjaily case and all that
22        THE COURT  This is not really Bourjaily  This is
23   pre-Bourjaily
24        MR. ADAMS  And I go back to the Apollo case
25        THE COURT  Well  Apollo, I think about is as old
```

IRS225

## Page 13

1  the original Apollo
2      MR ADAMS I know it s old, but from what I
3  researched I think it is still good law  And I think it
4  should be.
5      THE COURT I think you would find differently if
6  you really got into it
7      But I am just trying to decide in my mind
8      Does anybody  I can t see why he can't tell what
9  somebody told him that might have been in furtherance of the
10  conspiracy
11      MR NIVEN He should be able to
12      THE COURT Well, you know, the questions that
13  sometimes just infuriate me, because it gets so old is
14  somebody says "are you aware of something"  You know I'm
15  aware that there was killing over Armenia or somewhere
16  yesterday  But I can't testify to it
17      So, try to pin it down as to  Did you have some
18  conversation with somebody concerning your gambling operation
19  and so forth
20      The awareness, I don t know where that comes from.
21      (IN THE PRESENCE OF THE JURY)
22      THE COURT All right.
23  BY MS. HOLMES
24  Q  Mr Reeves, were you informed by Ron Cherry or some other
25  member of your gambling operation as to what your business

## Page 14

1  arrangement was with respect to Billy, or Goat, Adams?
2      MR. ADAMS Your Honor, I object to the compound
3  question again
4      THE COURT Well, just ask them one at a time
5  BY MS HOLMES
6  Q  Were you informed by Ronnie Cherry what your gambling
7  operatio  relationship was with B J Adams?
8  A  I know that  I didn't make any arrangements as far as
9  the percentages, and such as that  I didn't do that  He did
10  that
11  Q  But did he tell you what those percentages were?
12  A  Yes, some of them  Like I said, I don't remember all of
13  them exactly  Yeah, it would have come up
14  Q  What did he tell you the business arrangement was with
15  Goat Adams?
16      MR. ADAMS I object, just for the record
17      THE COURT All right  Overruled
18  A  I think it was twenty percent
19  BY MS HOLMES
20  Q  You say you think it was twenty percent  Does that mean
21  Mr Adams was a juice agent for your operation?
22  A  I ain't never heard it called that way, but
23  Q  Well, explain to the jury what Mr Adams' role was with
24  respect to your gambling business
25  A  Well, he would turn the bets in, you know  And at the end

## Page 15

1  of checking up, it would be twenty percent if there was any
2  winners
3  Q  So, you are saying that he placed bets for more people
4  than just himself?
5  A  I don't know what he did about that, now  I didn t take
6  his bets
7  Q  If I were to just call up and place a bet with your
8  organization, and I lost that bet, are you going to give me
9  twenty percent of that bet?
10  A  Just by yourself  no
11  Q  So, in order for a person to get a percentage of the
12  losses from your organization, what did they have to be?
13  A  Well, they would just have to have few players  you know,
14  to be worth doing it
15  Q  So, what was Mr Cobb s role in your organization?
16  A  He just answered the phones
17  Q  Was he salaried?
18  A  Yes
19  Q  What was he paid?  Do you know?
20  A  I think three hundred dollars a week
21  Q  What did he answer the phone for?
22  A  To take bets
23  Q  And where did he answer the phone?
24  A  At the trailer
25  Q  Is that the trailer that was next to your home?

## Page 16

1  A  Yes
2  Q  Now, how many phone lines were running into that trailer?
3  A  I think three
4  Q  Were any of those lines 1-800 numbers?
5  A  Yes
6  Q  How many?
7  A  I don t remember  but I think it was 1 800 number on each
8  phone.
9  Q  And why did you have 1-800 numbers in that trailer?
10  A  Well, I don t remember how that come about  I got them,
11  you know, but I don't remember how it came about.
12  Q  Does it cost more to have a 1-800 number than it does to
13  have just a regular telephone number?
14  A  I m sure it does
15  Q  So why did your - not what caused it - but for what
16  reason did your gambling operation pay to have those 1 800
17  numbers running into that trailer?
18  A  Well  I'm sure it was for people that was you know, long
19  distance; it would be a free call to them
20  Q  I m showing you what has been marked Government's Exhibit
21  80  Can you tell me what this is?
22  A  This is a Fed Fx copy
23  Q  And who is it to?
24  A  Carey Shahid
25  Q  Who is it from?

October 28 , 1999

IRS226

**Page 17**

1 A. From Ronnie Cherry
2 Q Was this in your residence on January 12th, 1997, when a
3 search warrant was executed?
4 A. I don t remember that. But where you got it from?
5 Q If  do you recognize this?
6 A. Yeah.
7 Q What is  Do you know what it was for?
8 A I don't know exactly what the package was that was
9 involved in it. But I'm sure it was for gambling.
10       MS HOLMES. Your Honor, we would move that
11 Government's Exhibit 80 be admitted
12       THE COURT. All right  No objection  Admitted.
13 BY MS. HOLMES.
14 Q I am going to show you what has been marked Government's
15 Exhibit 81  Do you recognize that?
16 A. Is this out of my Rolodex?
17 Q I believe it is from your restaurant
18 A. That is what I'm asking about
19 Q Do you recognize that as a document that would have been
20 at your restaurant on January 12th, 1997?
21 A  Actually  I believe this would have come out of the
22 Rolodex at the trailer  I recognize the number  I mean, the
23 name
24 Q Okay  Regardless of where this came from  do you
25 recognize this

**Page 18**

1    What do you recognize this as?
2 A Some of these folks that bet
3       MS HOLMES. Your Honor  we move that Government's
4 Exhibit 81 be admitted
5 Q I m showing you what has been marked as Government's
6 Exhibit 82
7       THE COURT  wait a minute  Let him take a look at
8 that and let me rule on it
9    What is the number?
10      MS HOLMES. 81 I believe, Your Honor
11    THE COURT  Any objection?
12      MR. ADAMS. I don t have any —
13      THE COURT  Admitted
14 BY MS HOLMES
15 Q I'm showing you what has been marked Government's Exhibit
16 82  Do you recognize that?
17 A  Yes
18 Q What is that?
19 A  That was a thing that me and Danny Austin wrote up  And,
20 like I say, I don t know whether I paid him for that or
21 something we wrote up saying I received ownership
22 Q Of what?
23 A  The trailer
24 Q That would be the trailer at 1073 Malvern Road?
25 A  That s right

**Page 19**

1 Q Is that your signature it the bottom?
2 A  That is
3       MS HOLMES  we would move that Government s Exhibit
4 82 be admitted
5       THE COURT  Admitted
6 BY MS HOLMES.
7 Q Mr Reeves, I'm showing you what has been admitted as
8 Government's Exhibit 107  It's a deposit made into the
9 operating account for Hunt's Restaurant and Oyster Bar on
10 September 19th, 1996  I m going to ask you if you recognize
11 that  Excuse me  Do recognize that check?
12 A  Yes
13 Q And who is it made out to?
14 A. Ronnie Cherry
15 Q Was that check  Did that check represent lost sporting
16 wagers?
17 A  Yes
18 Q This check from K W Mitchell made out to you  How much
19 is that?
20 A  Three hundred and two dollars
21 Q What is the date on it?
22 A  9/9
23 Q And what was that check for?
24 A  Gambling proceeds, I imagine
25 Q Showing you what has been admitted is Government's Exhibit

**Page 20**

1 112  This is a deposit made into Hunt's Restaurant and Oyster
2 Bar operating account on October 6th, 1996  This is a check
3 from K W Mitchell to Tim Reeves  Do you recognize that check?
4 A  Yes
5 Q What is the date on the check?
6 A. 10/1
7 Q And what is the amount of the check?
8 A Two fifty-seven fifty
9 Q What is that check for?
10 A  Football bets
11 Q Showing you what has been admitted as Government's Exhibit
12 111  Deposit made into Hunt s restaurant and Oyster Bar
13 operating account on 10/28/1996  Showing you a check made out
14 to Tim Reeves drawn on the account of K W Mitchell  What is
15 the date on that check?
16 A  10/22
17 Q What year?
18 A  '96
19 Q And how much is the check for?
20 A  Cash, three hundred and seventy dollars
21 Q And what was that check for?
22 A. A football bet
23 Q Showing you what has been marked Government s Exhibit 115
24 deposit made into Hunts  operating account on 10/31/1996
25 Showing you a copy of a check  does show who it s payable to,

October 28 , 1999

IRS227

## Page 21

1  but it is drawn on the account Doyle Newby  How much that is
2  for?
3  A  Case for three hundred dollars
4  Q  And what is the date on it?
5  A  I can't tell  Tenth month  And I don't know what the
6  other part is
7  Q  What was that check for?
8  A  Well, Doyle  That could have been cashing a check there
9  or it could have been a football bet
10  Q  Showing you Government's Exhibit 117 a deposit made into
11  Hunt's operating account on November 14th, 1996  another check
12  from Doyle Newby for three hundred dollars  Do you know what
13  that check is for?
14  A  I don t know  Doyle cashed some, and he made some
15  football, too  This here I feel he just cashed a check there,
16  I don't know that
17  Q  Now I'm showing you what has been admitted as Government's
18  Exhibit 120 Hunt's operating account deposit for November
19  29th, 1996, a check from Doyle Newby for two hundred and
20  forty five  Dollars do you know what that check is for?
21  A  Like I said, it could have been for a gambling debt  But
22  I could have cashed that check for Doyle, too
23  Q  Right underneath that there is a check drawn on the
24  account of Robert Shahid
25  A  I cashed that for three hundred, and that was a gambling

## Page 22

1  debt
2  Q  How is it made payable to?
3  A  Ronnie Cherry
4  Q  Showing you what has been admitted as Government s Exhibit
5  125  This is a deposit made into Hunt s operating account on
6  12/19/96  This is a check from K.W. Mitchell to Tim Reeves
7  How much is that check for?
8  A  Nine forty five
9  Q  What is the date on it?
10  A  12/10
11  Q  What year?
12  A  '96
13  Q  What is that check for?
14  A  Probably cashed that for a football bet
15  Q  Here is another check from Doyle Newby  Who is that
16  payable to?
17  A  Looks like Ronnie
18  Q  Ronnie who?
19  A  Cherry
20  Q  How much is that check for?
21  A  One hundred seventy
22  Q  And what was that check for?
23  A  That could have been cashed for a football bet
24  Q  Government s Exhibit 126  This is a deposit made into
25  Hunt s operating account on January 2nd, 1997  This is a check

## Page 23

1  from Robert Shahid to Ronnie Cherry  How much is that check
2  for?
3  A  Three hundred dollars
4  Q  What was that check in payment of?
5  A  Cash for a football bet
6  Q  I m showing you Government's Exhibit 133  That is a
7  cashier check that has Ronnie Cherry as the remitter.  It is
8  payable to Subhash Patel and it s for two thousand, seven
9  hundred eighty dollars  Was that check made at your direction?
10  A  It was to pay off a gambling debt
11  Q  The next page, what is that?
12  A  It is another cashier check we paid off a gambling debt
13  Q  And how much is it for?
14  A  Twenty-seven eighty
15  Q  Who is it to?
16  A  Subhash Patel
17  Q  And who is the remitter?
18  A  Ronnie Cherry
19  Q  Was this cashier check made at your direction?
20  A  Yes
21  Q  Third page  Can you tell me what that is?
22  A  Another cashier check
23  Q  Who is it payable to?
24  A  Ronnie Cherry  I mean Lalit Desai
25  Q  Who is the remitter?

## Page 24

1  A  Ronnie Cherry
2  Q  Was that check made at your direction?
3  A  Yes
4  Q  What was it for?
5  A  To pay him off what we owed him
6  Q  For what?
7  A  For a football bet
8  Q  Showing you Government's Exhibit 134  Do you recognize
9  that?
10  A  Yes
11  Q  What is it?
12  A  Cashier check for six hundred dollars
13  Q  Payable to whom?
14  A  Don Best Sports
15  Q  Who is the remitter?
16  A  Ronnie Cherry
17  Q  What was this check for?
18  A  That would have been for line service
19  Q  And at whose direction was it made?
20  A  Mine
21  Q  Showing you Government s Exhibit 137  Do you recognize
22  that?
23  A  Yes
24  Q  And what is that?
25  A  Cashier check for twenty-eight ten made payable to J T-

IRS228

Page 25

1 Starling
2 Q Who is the remitter?
3 A Ronnie Cherry
4 Q And what was this Excuse me.
5    Was this check made at your direction?
6 A Yes, it was
7 Q And what was the purpose of this check?
8 A To may off a football bets
9 Q Showing you Government's Exhibit 138 Can you please
10 identify that?
11 A Yes Another cashier check
12 Q Who is it made payable to?
13 A J T Starling
14 Q And who is the remitter?
15 A Ronnie Cherry
16 Q What was this check for?
17 A Paying off a football bet
18 Q Was it made at your direction?
19 A Yes
20 Q Tell me about how these cashier checks came to be
21 A What do you mean how they came to be?
22 Q When you needed a cashier check made out as part of your
23 gambling business what would you do?
24 A I would just call over there and get a cashier check made
25 out.

Page 26

1 Q Who would you call?
2 A I would usually called Janet
3 Q Janet Newton?
4 A That's right
5 Q When was she employed at tat time?
6 A First Bank of Dothan
7 Q What instructions would you give her?
8 A I said I need a cashier check for the amount of money
9 Q Would you tell her who the remitter was to be?
10 A Yeah
11 Q And then what would happen?
12 A We would pay off the bet off
13 Q Well, after the check was made who would go get it?
14 A Ronnie would, usually
15 Q And after he picked up the check, what would he do with
16 it?
17 A He send it to whomever I owed the money to
18 Q Was this a regular part of you all's business, gambling
19 business?
20    THE COURT It has been indicated to me that one of
21 the jurors needs to take a recess Let's be in recess for five
22 minutes Please don't discuss or comment on the case
23    (After recess)
24    THE COURT I understand the government is through
25 questioning this witness Go ahead

October 28 , 1999

Page 27

1    CROSS EXAMINATION
2 BY MR ADAMS
3 Q Mr Reeves, as I understand your testimony, and I tried
4 the summarize it real quick You didn't have any dealings with
5 the day to day gamblers or anybody else in the operation Is
6 that correct?
7 A I didn't have anything to do with nothing except, like I
8 said, just getting up the money
9 Q And the bottom line?
10 A That's right
11 Q And you didn't have any direct dealings with Mr B J
12 Adams?
13 A No
14 Q And the only dealings direct to Mr B J Adams is, you
15 bought a load of watermelons and cantaloupes to go in your
16 restaurant?
17 A It is And I don't think I paid him yet
18    MR ADAMS That is what I understand
19    That's all I have Thank you
20    CROSS EXAMINATION
21 BY IR SMITH
22 Q Ron Cherry was an employee I believe that is what you
23 said Is that correct?
24 A That's correct
25 Q Did he receive any commissions for anything that he did?

Page 28

1 A He received a salary
2 Q That's what I am talking about He did receive a salary
3 But did he get any juice money so to speak?
4 A He didn't get juice money no
5 Q And juice money was really a commission for what you all
6 charged for handling transactions when the other side lost,
7 isn't it?
8 A Yeah For certain ones right
9 Q So he did not receive any commission
10    Some of the so-called juice agents that has been
11 referred you paid twenty percent?
12 A That's right
13 Q But Ronnie was a straight salary Is that correct?
14 A That's right He wasn't a juice agent
15 Q What was his salary?
16 A I am thinking, five hundred
17 Q To refresh your recollection, was it four hundred dollars
18 a week?
19 A I was thinking five I don't know
20 Q And did he receive a bonus at the end of year?
21 A Yes
22 Q Was the bonus based on any kind of sales commission or
23 anything or was that just a straight bonus that he received?
24 A It was just a bonus
25 Q Now, you owned the business?

**Page 29**

1  A. That's right.
2  Q  And you had the ultimate say in everything that went on,
3  did you not?
4  A  Yes I would have if I was needed
5  Q  But Ronnie operated the business for you on your behalf?
6  A  Right
7  Q  And you trusted him to do that?
8  A  Yes
9  Q  Now all the proceeds that came in from the business
10  whether it was by cash or by check, went into your account. Is
11  that correct?
12  A  Went into my hands
13  Q  And you put it wherever you wanted it to be?
14  A  That's right
15  Q  Ronnie do not have a bank account?
16  A  No
17  Q  Do you know whether he had a bank account of any kind?
18  A  I didn't keep up with his banking business so I don't
19  know
20  Q  None of the proceeds that came by check or cash, though,
21  went into the bank on behalf of Ronnie?
22  A  No
23  Q  Now when you would receive a check, some of the checks
24  would be made out to you individually for gambling debts  Is
25  that correct?

**Page 30**

1  A. That's right.
2  Q  And you would endorse those checks and would place them in
3  whatever account that you wanted them to go into?
4  A  Or cash them
5  Q  Sometimes into Hunt's Seafood and Restaurant account?
6  A  Yeah, when I cashed a check sir
7  Q  Did you own Hunt's Seafood and Restaurant?
8  A  I do
9  Q  You operated it?
10  A  I own and operate it
11  Q  Now, when these proceeds that would come in that would be
12  made payable  checks  let me say  that would come in that
13  would be made payable to Ronnie Cherry, you had the authority
14  to endorse Ronnie's name on those checks and to place them into
15  whatever account you wanted to, didn't you?
16  A  If they hadn't been signed, I signed them  Yeah
17  Q  You signed... As a matter of fact, you signed most of them
18  that came in, regardless of whose name was on it?
19  A  I would have done that.
20  Q  Do you know or have you seen any of the checks here that
21  Ronnie signed?
22  A  I don't know
23  Q  If we... Do you know his signature?
24  A  Not really
25  Q  I see  But as far as you know, you would sign the checks

**Page 31**

1  as they came in no matter whose name was on the check?
2  A  Yeah, I have done that
3  Q  Now, when you all lost a bet, as I understand the business
4  was that you would take bets on, let's say, Georgia and
5  Florida  And you would take bets for and against either one of
6  them, would you not?
7  A  That's right
8  Q  And sometimes it would be pretty much a balanced out,
9  let's say ten thousand on one hand and ten thousand on the
10  other  Is that correct?
11  A  Well, you can't go by that all the time. It wasn't like
12  that always
13  Q  But the only money that you would make if that was the
14  case would be the commission that came off of it  Is that
15  correct?
16  A  The ten percent
17  Q  And that did not go to Ronnie Cherry, except in the form
18  of salaries?
19  A  I got the money, yeah
20  Q  Now  when you would lose a bet, generally you would pay
21  the person that won out of the proceeds of the money that came
22  in in cash  Is that correct?
23  A  That's right
24  Q  Now, if you had someone that won a bet, though, that lived
25  out of town  how would you pay that individual?

**Page 32**

1  A  We would send them a cashier check
2  Q  Now you stated that you would call the bank and  I
3  believe, Janet Newton I believe, and have her to make out a
4  cashier check for the amount, I suppose that would be the
5  amount of the payment of the bet. Is that correct?
6  A  That's correct
7  Q  And you called her, and you all were on first name basis
8  Is that correct?
9  A  Yeah  she was a friend of mine
10  Q  And you would have  You would instruct her how to make a
11  check out?
12  A  I did
13  Q  And you instructed her to make Ron Cherry the remitter?
14  A  I did
15  Q  Now, in fact, you were actually the remitter  were you
16  not?  You were the one paying for it?
17  A  Well, I guess so  I mean...
18  Q  You just put Ron's name on it because he was--
19  A  Because he was going to pick it up
20  Q  He was going to pick it up  And he was the one that was
21  running the business for you?
22  A  Right
23  Q  And... But you paid the money  did you not?
24  A  That's right
25  Q  Did you put the money... Generally you would put the money

October 28 , 1999

IRS230

**Page 33**

1  in an envelope and give it to Ron to go pay it?
2  A  Right. Give him cash or whatever
3  Q  Well, if you gave him cash did you put it in something or
4  just hand him 25 hundred dollars and say, Hey, go get it?
5  A. Either way  I have given him a check and I have given him
6  cash
7  Q  Did you tell him where the proceeds, the money that you
8  gave him came from, whether you got it from your restaurant
9  business, whether you took it out of your gambling business?
10  Did you go into any detail as to where the money that he bought
11  these money orders or certified checks with?
12  A  No  I just give him the money to go get a check
13  Q  And he didn't inquire as to where the money came from?
14  A  No
15  Q  Now let me ask you this  Was that transaction did he
16  did you give it to him knowing that you were trying to conceal
17  the source of ownership or disguise the money in any manner?
18  A  No  I was just trying to pay the bettor off
19  Q  And he did not know where the money came from and he was
20  not trying to conceal or disguise the proceeds of that money
21  was he?
22  A. He was just trying to pay the bettor off
23  Q  As far as Ronnie Cherry knew, he was just in the business
24  of taking bets?
25      MS. HOLMES  Objection  How could he know what

**Page 34**

1  Ronnie Cherry knew?
2      THE COURT  I sustain as to the form of the
3  question
4  BY MR SMITH.
5  Q  Now, I believe that we have a list in one of the
6  exhibits  If I could find it just a moment here
7      Exhibit 14 T, of several checks, cashier checks, that
8  was made out  You ordered all these cashiers checks, did you
9  not?
10  A  I am not looking at them  but, yeah, I think I did
11  Q. You don't ever know of Ronnie ordering one from the bank?
12  A  No, sir  I had to do that
13  Q. When you would take bets  many times the people that you
14  dealt with did not pay until a later time, and sometimes you
15  all would wait until the end of month or end of the year even
16  to ante up as to who owed whom?
17  A  I have done that on a few occasions  yes
18  Q  Did you ever have any bets that individuals did not pay?
19  A  Sure
20  Q  What did you do with regard to those bets?
21  A  You just ate them
22  Q  You marked them off?
23  A  Well, there was nothing you could do
24  Q  You didn't send anybody out to break any bones?
25  A. Lord, no

**Page 35**

1  Q  And you didn't have any problems like that?
2  A. No, sir
3  Q  Now, there was some exhibits that is in evidence that are
4  money orders  We have talked about cashier checks  The money
5  orders that you  Did you order for money orders to be made
6  out to various individuals that had won bets?
7  A  It would be the same way the cashier checks
8  Q  And you would have instructed Ronnie, then, to go do that
9  and you gave him the money and he was just a courier, so to
10  speak  Is that correct?
11  A  I give him money and he went and bought the money orders
12  Q  You were not present back on the 12th of January when they
13  first came into the trailer at Rehobeth?
14  A  I was not there
15  Q  Is that close to where you live?
16  A  Yes
17  Q  You actually live in Rehobeth, don't you?
18  A  Right  It is about six or seven hundred yards from our
19  house
20  Q  But it has a Dothan address, doesn't it?
21  A  Right
22  Q  But it is an independent town of Rehobeth?
23  A  It is now
24  Q  And did you  We have an exhibit of briefcase in
25  evidence. We have Government s Exhibit Number 23 that was

**Page 36**

1  found in Ron Cherry's apartment, I believe  Do you know whose
2  briefcase that is?
3  A  Yep  That is mine.
4  Q  And all the documents and so forth contained in it would
5  belong to you?
6  A  Yes  Whatever is in there
7  Q  You don't remember  Or do you know how it got there at
8  Ron's house?
9  A  To the best of my knowledge, I just left it over there
10  with him and had a I went back to pick it up
11  Q  You would discuss the business with Ron  You all had a
12  magazine and you had a line service, I believe  you testified
13  to  But this type of line service, it has been brought out
14  before, but I ask you  You could get it out of the newspaper
15  any day could you not?
16  A  It changes every day  Any paper yeah
17  Q  Well  would your service was faster than the paper?
18  A  Yes
19      MR SMITH  I believe that is all I have, Your
20  Honor
21          CROSS EXAMINATION
22  BY MR BAXLEY
23  Q  Tim  you have a lawyer who is out here. And you made an
24  agreement with the government to plead guilty, didn't you?
25  A  I did

October 28 , 1999

IRS231

## Page 37

1  Q  And you are going to have to go to prison?
2  A  I am
3  Q  How long did they say they would recommend that the judge
4  sentence you to?
5  A  15 to 22 months
6  Q  Any further time after that on some kind of—
7  A  Probation
8  Q  But you have actually got to go to the federal prison for
9  15 to 22 months?
10  A  That's right.
11  Q  And to get that reduced from all the charges you were
12  charged with, you had to agree to tell the truth, didn't you?
13  A  That's right.
14  Q  If pled guilty to everything in this indictment, it would
15  be years and years and years and years, wouldn't it?
16  A  A bunch of them
17  Q  So, part of the deal for you to get 15 to 22 months in
18  prison is you have got to tell the truth?
19  A  That's right.
20  Q  All right.  Now, during the time that this indictment
21  charges in fact, at any time in the 1990's, has your daddy,
22  Billy Joe Reeves, been involved in the gambling operation that
23  you have testified about?
24  A  Never  Not in those times
25  Q  In fact, does your dad now — or during this time have

## Page 38

1  anything to do with the operation of Hunt's?  I mean, as far as
2  payroll or -
3  A  No  he didn't have anything to do with it  He hasn't been
4  through the bank statement in ten years
5  Q  During this period of time did he receive salary from
6  Hunt's?
7  A  He gets a lease check for the building
8  Q  So he owns the property?
9  A  That's right.
10  Q  And you have the business and you lease the property from
11  your dad - your dad and mama?
12  A  That's right.
13  Q  That lease that Mr Smith showed you that was found in
14  Mr Cherry's house or apartment was yours?
15  A  That's right
16  Q  And there were some papers in there, an insurance policy
17  I think, of your dad's in there.  Did that have anything at all
18  to do with any kind of gambling?
19  A  No  That insurance policy, I handle a lot of daddy's
20  insurance for him.
21  Q  Did you know that there were some papers, also, that your
22  dad had in there about a man named Ward?  Do you know what that
23  was about?
24  A  Ward?  I don't know.
25  Q  We will come back to that.

## Page 39

1  This trailer that there has been so much testimony
2  about is down there six or seven hundred yards away from you
3  house  Where was that located?
4  A  1073 Malvern Road
5  Q  How far away is that from Hunt's?
6  A  Six and a half miles
7  Q  All right  Did your daddy, Billy Joe Reeves  ever set
8  foot in that trailer down there?
9  MS HOLMES  Your Honor, we object  That exceeds
10  the scope of the direct examination
11  THE COURT  All right.  I overrule
12  BY MR. BAXLEY
13  Q  Has your daddy ever been in that trailer?
14  A  Not to my knowledge
15  Q  Now  was there some money in Hunt's in a lock-box and a
16  safe that was your daddy's money?
17  A  Yes
18  Q  It has been his —
19  MS HOLMES  We object.  It exceeds the scope of
20  direct
21  THE COURT  Well, come up just a minute.
22  (OUT OF THE PRESENCE OF THE JURY)
23  THE COURT  I know that I suggested this as a
24  possibility  And it is my suggestion and it may look like I'm
25  waffling

## Page 40

1  But on the other hand  he was asked about his
2  organization  and so forth.  And you have got a man out there
3  whom you all are at least suggesting is part of the
4  organization  And the man has testified as to what his
5  organization is  and I can see why it is not appropriate to
6  ask on cross  you know, who is in that organization  And that
7  seems like to me that is appropriate
8  Now, with regard to the plea agreement part of this
9  thing  I don't know whether the term third party beneficiary is
10  applicable or not.  But to the extent that  You know, this
11  may or may not open up whatever that might look like it is in
12  conflict with the plea agreement  It is being opened up, if it
13  is opened up, by the man who supposedly was the beneficiary
14  So  I assume that will have something to do with it.  I don't
15  know
16  (IN THE PRESENCE OF THE JURY)
17  BY MR. BAXLEY
18  Q  Turn  the question I think was  Did your daddy have some
19  money that belonged to him that was out there in a lock box or
20  a safe at Hunt's?
21  A  Yes
22  Q  Is that money that he has had for years?
23  A  I don't know just what it is  It's his money  I don't
24  know how long it's been there
25  Q  And he kept it in a certain place out there?

October 28 , 1999

IRS232

## Page 41

1  A  Yeah.
2  Q  Now, some of the money that he was seized wasn't your
3  dad's  Is that right?
4  A  That's right.
5  Q  And he made claim and they have introduced the money he
6  said belongs to him?
7  A  I don't know what has been introduced but.
8  Q  Well, let me ask you if  Do you know whether your dad
9  loaned people money from time to time and charged  loaned
10  them money?
11      MS. HOLMES  Your Honor, we object unless he has
12  firsthand knowledge
13      THE COURT  All right  If he saw it happen, he can
14  tell about it  But he can't tell something somebody just told
15  him
16  A  I have seen dad loan money for years to people
17  BY MR. BAXLEY
18  Q  Well, do you know whether your dad cashed for people
19  often?
20  A  All the time
21  Q  Out of his money?
22  A  Out of his money
23  Q  How long had he been doing  Did you ever ask your dad to
24  cash checks for you?
25  A  On numerous occasions

## Page 42

1  Q  Now the government has  In fact, there are some
2  exhibits here the government is going to offer  Let me ask you
3  if you asked your dad to cash five checks on the 24th of
4  November, 1994, from a fellow by the name of Brian Hennessy?
5  A  Yeah, he cashed those for me.
6  Q  At your request?
7  A  Yes
8  Q  So you got cash from your dad?
9  A  I did
10  Q  And gave him those checks?
11  A  That's right
12  Q  All right  Did  Over into '96  do you remember whether
13  you asked your dad to cash a check that you had that was sent
14  from a fellow named Chris Wilkins?
15  A  I cashed that check.
16  Q  You cashed that check?
17  A  He cashed that check, but I got the cash
18  Q  You got cash from your dad for it?
19  A  Right.
20  Q  What about the same question in February for Lalit Desai?
21  A  Yeah  He cashed that check for me, as well.
22  Q  What about in November of '96 a Doctor James Johnson?
23  A  He cashed that check for me, too
24  Q  What the same date in January in '97, three checks from
25  two of them from a fellow Laman Lefler and one from a fellow

## Page 43

1  named Paul Letterman?
2  A  He cashed all those checks
3  Q  What about in '96, November the 5th, the same day another
4  check from a Chris Wilkins, a check from a Glen Toole, a check
5  from James Shorter a check from W G  McClendon?
6  A  He cashed those checks for me
7  Q  What about the end of the month of November '96 a check
8  are John N  Bowden?
9  A  He cashed that for me, as well
10  Q  What about a check the December '96 a check from Lalit
11  Desai and another one from Doctor Johnson?
12  A  He cashed those checks too
13  Q  Why did you ask your daddy to cash those checks?
14  A  I just  He was going to go to the bank and I had the
15  checks in my pocket and said, How about if cash the checks for
16  me
17  Q  Why did you want cash for them?
18  A  Where I could pay off some gambling debts
19  Q  At the time you asked your dad to do that were you
20  attempting to conceal or disguise where those checks came from?
21  A  No  I just wanted him to cash them for me so I would have
22  the cash
23  Q  So when you deposited checks in the Hunt's account, were
24  you running those checks through Hunt's or did you take cash
25  money out of Hunt's for the checks?

## Page 44

1  A  I took cash money out of it
2  Q  So every check that you deposited in Hunt's account
3  A  I cashed in
4  Q  And you took cash back out?
5  A  That's right
6  Q  What did you do  What did you want that cash for?
7  A  To pay off people
8  Q  So, you weren't cashing or depositing those checks to
9  conceal or disguise where they came from?
10  A  No
11  Q  I want to show you what came out of your briefcase  If
12  you know  You may not  what has been marked Exhibit 52-B and
13  D  having to do with Jimmie Ward  Do you know anything about
14  that?
15  A  Yeah  We paid Mr  James' light bill for him
16  Q  Tell the jury  That was in your briefcase?
17  A  Yeah.
18  Q  What  Who is Mr  James Ward and what did your dad do for
19  him?
20      MS. HOLMES  Objection unless he has firsthand
21  knowledge, Your Honor, has actually seen what his father has
22  done for him
23      THE COURT  Tell under what circumstances you have
24  known about it other than something your father told you, if
25  there are any such circumstances

IRS233

**Page 45**

1  A. Well, I did, too   I paid the light bill for Mr James
2  myself   He had a little camper trailer down at a little
3  fishing place   And, you know, he would make sure the, you
4  know, grass was cut, and whatever   And we paid his light bill
5  Q  Who is Mr Ward?
6  A. Well, he is dead now   He is an old friend of ours
7  Q  So that is what those documents there were: Mr Ward
8  your dad took care of the power at the little --
9  A  Power for the little trailer down at the fishing place.
10  Q  Tim, I asked you this generally but I'm going to ask you
11  specifically by reading some language from the indictment
12      During this period of time, 94 until now, did your
13  daddy  Billy Joe Reeves  in any way conduct gambling
14  the things you pled to and have testified to
15      MS HOLMES, objection  Your Honor  That asks for a
16  legal conclusion that will legally be defined by your
17  instructions in this particular case.
18      THE COURT  Well, gambling is, I think, not just
19  necessarily a legal term  I think most people understand what
20  it is  I overrule
21  A  Ask the question again
22  BY MR. BAXLEY
23  Q  Did your daddy, during this period of time the indictment
24  covers or any time in 90's that you have testified about being
25  involved in gambling, during any of that period of time, did

**Page 46**

1  your daddy conduct any gambling?
2  A  None whatsoever
3  Q  Did you finance any of the gambling part of it?
4  A  No sir
5  Q  Did he manage any of the gambling part of it?
6  A  No, sir
7  Q  Did he supervise any of the gambling part of it?
8  A  No, sir
9  Q  Did he direct any of the gambling part of it?
10  A  No sir
11  Q  Did he own all or part of that gambling enterprise?
12  A  Not a bit
13  Q  All right  Let me ask you this  Did he...
14      Let's go back to Count 1  During this same period of
15  time did you conspire with your dad to conduct any part of that
16  gambling operation?
17  A  I did not
18  Q  Did you conspiracy or agree with your dad to finance any
19  part of it?
20  A  He had no part of the financing of it.
21  Q  Did you conspire or agree with him to manage any part of
22  it?
23  A  I did not.
24  Q  Did you conspire or agree with him to supervise any part
25  of it?

**Page 47**

1  A  Did not
2  Q  Did you conspire or agree with him to direct any part of
3  the gambling?
4  A  I did not
5  Q  Did you conspire or agree with him to own any or all of
6  it?
7  A  I did not
8  Q  Now  when your dad cashed those checks that I showed you
9  for you, did he  He gave you money for every check you gave
10  him  Is that right?
11  A  That is right.
12  Q  So, he didn't  When those checks were deposited in his
13  account, he wasn't making any profit out of the gambling
14  operation  Is that right?
15  A  Not a penny
16      MS HOLMES  Objection
17      THE COURT  All right  Go ahead
18      MR BAXLEY  I am not sure they could hear his
19  answer
20      THE COURT  All right  What was your answer?
21  A  Not a penny
22  BY MR BAXLEY
23  Q  I will also ask if you during the time of this indictment,
24  did you ever conspired or agree with your dad to purchase
25  cashier checks, or otherwise, in an effort to conceal or

**Page 48**

1  disguise where the money came from?
2  A  No, sir
3  Q  Did you conspiracy or agree with your dad to purchase any
4  postal money orders with the intent to conceal where the money
5  came from?
6  A  No sir
7  Q  Why  one more time did you want this cash?
8      MS HOLMES  Objection  Your Honor  Asked and
9  answered
10      THE COURT  All right  Overruled
11  BY MR BAXLEY
12  Q  Why did you want cash for these instruments?
13      MS HOLMES  Same objection  Your Honor
14      THE COURT  Overruled.
15  A  To pay off gambling debts with
16  BY MR BAXLEY
17  Q  When Mr Smith asked you about this and I think I might have
18  answered it
19      When you either went or you sent Mr Cherry to go buy,
20  money orders, or cashier checks  why did you want to do that?
21  A  To pay off gambling debts  To pay people off I owed
22  Q  Was there a penny of that gambling money that ever went to
23  the operation or into the account of Hunt's?
24  A  Do what, now?
25  Q  Was there ever a penny of the gambling money that went

USA vs Reeves, et al                                                                    Condensed!                                                                    USA vs Reeves

## Page 49

1   into the Hunt's account without cash coming back?
2   A   No   I cashed all the checks
3   Q   Was there ever a penny of the gambling money during this
4   period time that ever went to your dad?
5   A   No
6        MR BAXLEY   That's all
7        THE COURT   Mr Kirk?
8             CROSS EXAMINATION
9   BY MR KIRK
10  Q   Can I ask you to use the date of January 12th, '97, as a
11  point of reference, and can you tell us, if you will  how long
12  Joe Cobb had been at the trailer at Malvern Road  Rehobeth
13  How many weekends or months had he been at that trailer under
14  the term that you used, as an employee?
15  A   I will say around September
16  Q   Could it have been November when he began working there?
17  A   I don't recall that  I was just trying to think when
18  football season started
19  Q   Let me ask you this, sir  Were you  in the fall of '95
20  I'm sorry  Excuse me  In the fall of '96 did you consider,
21  and I believe you pronounce the name Mills  Hornsby  was he an
22  employee?
23  A   I'm trying to think   '96
24  Q   Up before the raid of January the 12th of '97, as a point
25  of reference.

## Page 50

1   A   Are you saying that same month?  Is that what you are
2   saying?
3   Q   Let me ask you this way
4        Do you recall and is it not true that Joe Cobb went to
5   work at that trailer only because of Mills Hornsby's sickness
6   with alcoholism?
7   A   That was one of reasons  It sure was
8   Q   Now, at that point in time would that have been during the
9   football season, fall of '96, preceding the raids of January of
10  '97?
11  A   That's correct
12  Q   Now, at that same point in time were you and Mr  Joe Cobb
13  involved in another business venture raising emus?
14  A   We were
15  Q   All right  Some of us may not know what a emu is
16  Including myself  What is it in reference to another animal
17  called a rhea?
18  A   It's like an ostrich, smaller ostrich
19  Q   Now, during the fall of '96 would it be fair to say that
20  Joe Cobb became pretty heavily indebted to you for his part of
21  the business raising emus?
22  A   Yes  He owed me some money
23  Q   Did you at that time, is it not true, suggest to him that
24  he work off some of the indebtedness to you over the annual emu
25  farm by working up at the trailer

## Page 51

1   A   Yes  he worked some of his debt off doing that  Because
2   he had to look after them sometimes
3   Q   Now, Mr Reeves, if he is working off an indebtedness to
4   you that doesn't have anything to with the gambling
5   organization at that time  would you say that he entered into
6   that employment  so to speak, at the trailer on a willful
7   basis?
8        MS HOLMES  Objection, Your Honor
9        THE COURT  All right  I sustain
10       There is no need to shout the objections  I have got
11  relatively good hearing
12  BY MR KIRK
13  Q   Mr Reeves  from the point in time that he did go up to
14  take trail, for whatever reason, do you remember that during
15  the months of November and December and up until the date of
16  the raid of January the 12th, that Mr Joe Cobb did not work
17  every weekend where college and pro ball games were involved?
18  A   There might have been one weekend or two when the eggs
19       The emus lay eggs and you have got to be right on top
20  of it when the eggs are coming  And that is somewhere around
21  I think they start laying in November  early December  And you
22  have got to get them incubated or you will lose them
23  Q   If we use the point in time of early November of '96 up
24  until the end of '97, January 12th  would you give us your
25  best judgment, please  sir  how many weekends Joe Cobb was not

## Page 52

1   in any way associated with  present at, participating in
2   anything going on in that trailer on Malvern Road?
3   A   I couldn't recall the exact dates  You are talking about
4   a long time ago  I don't remember
5   Q   Did you ever pay him any money yourself for services
6   rendered or traded off on those emus, did you pay him in any
7   was directly yourself?
8   A   Well, the way we were doing that, I didn't have to pay
9   him  He was working out a debt
10  Q   And to your knowledge he was working off indebtedness to
11  you, rather than being paid by the organization for gambling
12  services?
13  A   He was working off a debt
14  Q   Now, may I ask please, sir, just so that I understand  He
15  was not in any way involved with the financing of that
16  business  such as paying utilities  such as financing money on
17  the trailer for various things that they needed, he wasn't
18  involved in any way in that?
19  A   No  Not at all
20  Q   He certainly was not in a supervisor position in any form
21  or fashion, was he?
22  A   No
23  Q   He certainly in no way directed you as the owner of the
24  business how you ought to operate that business?
25  A   No

October 28 , 1999                                                                    Page 49 - Page 52

IRS235

Page 53

1  Q  And certainly he did not own even the slightest percentile
2  of your business?
3  A  No
4  Q  To your knowledge, was his only function in the working
5  off debt, on a separate debt, the onus was his only function
6  in working that indebtedness off was writing down numbers on a
7  sheet of paper and giving it to someone else?
8  A  Writing down the bets?
9  Q  Yes, sir
10 A  Yes, he was writing them down
11 Q  That is all he did to work off that indebtedness?
12 A  To my knowledge, he just wrote the bets down
13 Q  Let me ask you this, please, sir  To your knowledge did
14 he ever write a single person's name on a white envelope of any
15 kind designating someone could pick it up by giving their name?
16 A  No
17 Q  Did he ever by a stamp, or postage, by licking it on a
18 white envelope and mailing it?
19 A  Not to my knowledge
20 Q  Did he ever go to the post office to mail any of these
21 items the government has introduced in this case?
22 A  Not to my knowledge
23 Q  Did he ever buy stamps or retrieve anything from the P O
24 box for you or anyone else in the operation of that business
25 that you owned?

Page 54

1  A  No, he never did
2  Q  Did he ever write a check out at your direction where his
3  writing would have been on any document that the government has
4  in this case?
5  A  Not to my knowledge
6  Q  Did he ever have anything to do with setting the line or
7  in any way affecting the individual bettors and how they placed
8  their bets?
9  A  He didn't set the line
10 Q  He didn't solicit bets from anybody?
11 A  He just took the bets
12 Q  To your knowledge did he ever make a deposit out of
13 kindness or offering through some service, did he ever go to
14 the bank for you or anybody in your organization?
15 A  No, sir
16 Q  Mr Reeves, the government has showed you a series of
17 checks today  And please correct me if I am wrong - on every
18 check that was written for the amount of three hundred dollars
19 you the qualified your answers being it could have been a
20 gambling debt or for something else?
21 A  Uh-huh
22 Q  Let me ask you, sir from your experience, when I look at
23 a three hundred dollar check is there any way that you can
24 determine that that includes juice as a result of a gambling
25 debt, when it comes out to three hundred dollars even?

October 28 , 1999

Page 55

1  A  Well, you don't know  It could have been different
2  denominations  But usually it has got three thirty, or
3  something like that
4  Q  Okay  Isn't it reasonable to assume, and the jury can
5  look at these documents and assume, if it doesn't have a ten or
6  hundred on it, it probably did not involve juice?
7  A  Well, it may have just been a check I cashed
8  Q  Okay  So if it didn't have ten dollars per hundred on
9  it, from your experience  you would look at the check and you
10 could not say it had anything to do with gambling could you?
11 A  Well, I would have look at each one, you know, to make
12 that decision by looking at it.
13 Q  And, also some of checks that government has in this case
14 include pennies, like sixty five cents  Do you think, from
15 anything that you ever did in the gambling business, that a
16 check for sixty five cents had anything to do with the gambling
17 operation that you ran?
18 A  Not sixty-five cents
19 Q  So, if anything was on there was  like a hundred and
20 eleven dollars and sixty-five cents  would it be fair to say,
21 from your experience, that nothing to do with gambling debts?
22 A  I would have to look at it, but it doesn't sound like one
23 Q  Mr Reeves, if you were to think back about Joe Cobb and
24 his in kind working to work off that debt, would it be fair to
25 say your recollection would probably be that Joe Cobb worked a

Page 56

1  few weeks in between mid November of 96 up until the first
2  part of January of '97?
3  A  I don't know how many weekends  I couldn't answer that
4  question fairly  But I know he had to get out there with them
5  some.
6  Q  But at no time did you ever entrust to Joe Cobb the
7  function of taking money and holding it in one hand and passing
8  on to someone else, having anything, to do with a single bet
9  during that period of time?
10 A  Not to my knowledge
11    MR KIRK  Mr Reeves, that is all I have  Thank
12 you very much sir
13    REDIRECT EXAMINATION
14 BY MS HOLMES
15 Q  Mr Reeves you were talking about these checks are either
16 even amounts or with some cents on the end  If someone lost a
17 parlay or a teaser, would there have been any juice?
18 A  Not on a parlay  I think may be on a three  or four-game,
19 teaser then  would have been
20 Q  So, if someone bet parlay and lost, it would be an even
21 hundred dollar amount possibly?
22 A  Yeah
23 Q  Additionally  if somebody made a twenty dollar bet and
24 lost it, what would the juice on that twenty-five dollar bet
25 be?

IRS236

Page 57

1  A  Two dollars an fifty
2  Q  Mr Reeves, I believe you testified earlier that every one
3  of these checks that went into your daddy's account, you asked
4  him to cash. What checks did you ask him to cash on November
5  5, 1996?
6  A  I don t remember right off hand  But them checks, he
7  cashed them for me  I remember that
8  Q  Well let's see  On January 23, 1996, how many checks did
9  he cash for you?
10  A  I don t recall
11  Q  So, you only recall that your daddy cashed for you
12  specifically the checks that relate to this case?
13  A  No  He has cashed checks for me many times  But, you
14  know, I have never paid no attention to it  I just got the
15  cash
16  Q  So, you only paid attention to those that are in this case
17  now?
18  A  No  He just showed them to me and I know he cashed the
19  checks for me
20  Q  Where would you have been when he would cash these checks
21  for you?
22  A  Numerous places
23  Q  Such as?
24  A  We may have been right outside the building  We might
25  have been in his truck

Page 58

1  Q  Right outside what building?
2  A  Outside of Hunt's
3  Q  Hunt s  Now that is the same restaurant where you had
4  three hundred and ninety-seven thousand dollars in cash right
5  inside?
6  A  That s right
7  Q  Speaking of that three hundred and ninety seven thousand
8  dollars cash, I believe you testified today that part of that
9  was your daddy s?
10  A  To my knowledge, yes
11  Q  And it didn t have anything to do with gambling?
12  A  I don t have anything to do with that.  That s his money
13  He would have to answer that.
14  Q  Do you remember sitting at an interview in my office with
15  federal agent Bravata and others  and telling those individuals
16  that every bit of the money in that safe, that three hundred
17  and ninety-seven thousand dollars, was from gambling and you
18  didn't know why your daddy s lawyer filed a claim on that
19  hundred and ninety-seven thousand dollars?
20  A  I said my dad s lawyer had filed a claim on a hundred and
21  ninety-seven thousand dollars
22  Q  Are you testifying that you did not state that that entire
23  amount of money was from gambling?
24  A  Ashley  I don't recall  You know what kind of state of
25  mind I was in right then

Page 59

1  MS. HOLMES  No further questions
2  THE COURT  All right.
3  MR ADAMS  Your Honor, can I ask a couple of short
4  ones and just stand here?
5  THE COURT  Sure
6  RECROSS EXAMINATION
7  BY MR ADAMS
8  Q  Mr Reeves, back from December the 27th of 1996 down
9  through January 6th of 1997, did B J Adams ever operate any
10  bookmaking out of that trailer on Malvern Road to your
11  knowledge?
12  A  Ronnie done the bookmaking out of the trailer
13  Q  And B J Adams to your knowledge, never worked out of the
14  trailer  Is that correct?
15  MS. HOLMES  We object  This exceeds the scope of
16  redirect
17  THE COURT  Overruled
18  BY MR ADAMS
19  Q  Did he ever, to your knowledge, operate, during that
20  period of time operate an illegal gambling business out of 1073
21  Malvern Road, Dothan, Alabama?
22  A  Not to my knowledge
23  Q  Have you ever seen B J Adams in that trailer?
24  A  No, sir
25  Q  And you are the one that bought the trailer, aren t you?

Page 60

1  A  Yes  sir
2  Q  Do you know where B J  lives?
3  A  Somewhere in Esto  I think it is
4  Q  Down in Florida?
5  A  To the best of my knowledge  I am t never been there
6  That is just what I heard
7  MR ADAMS  That's all  Thank you
8  RECROSS EXAMINATION
9  BY MR KIRK
10  Q  Mr Reeves  Joe Cobb did not work for you in the football
11  season  94 through 95, did he?
12  A  No
13  Q  He did not work with you in any form or fashion in that
14  gambling that you structured down there booking games in  93 to
15  94?
16  A  Not to my knowledge
17  Q  His only contact with that bookmaking  did I understand
18  you correctly  was mid November  several weekends up until the
19  raid of January 97?
20  A  You know  I think  96 was the year  That stuff is three
21  years old- I think  96
22  MR KIRK  That is all
23  THE COURT  All right.  The witness is excused
24
25

October 28 , 1999

IRS237

USA vs Reeves, et al                    Condenseit                    USA vs Reeves

```
                                                      Page 61

 1      * * * * * * * * * *

 2           REPORTER'S CERTIFICATE
        UNITED STATES DISTRICT COURT
 3      MIDDLE DISTRICT OF ALABAMA
            I, Lewis F. Wimberley, Official Court Reporter for the
 4      United States District Court for the Middle District of
        Alabama, do hereby certify that the foregoing 60 computer
 5      printed pages represent a true and correct transcription of the
        testimony of TIM REEVES on October 28, 1999 in the heretofore
 6      captioned cause, Criminal Action 99 13 S heard in the United
        States District Court for the Middle District of Alabama,
 7      Montgomery Alabama.
            DATED this the 3rd day of January, 2000

 8

 9           LEWIS F. WIMBERLEY
             Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

October 28 , 1999                                    Page 61 - Page 61

IRS238

AO 245B (Rev 3/95) Sheet 1   Judgment in a Criminal Case

# United States District Court

## Middle District of Alabama

UNITED STATES OF AMERICA

v

**TIMOTHY JOE REEVES**

**JUDGMENT IN A CRIMINAL CASE**

(For Offenses Committed On or After November 1 1987)

Case Number   1 99CR00013-0

**FILED**

L. Drew Redden

Defendant's Attorney

**FEB 1 0 2000**

CLERK
U S DISTRICT COURT
MIDDLE DIST OF ALA.

### THE DEFENDANT

[X] pleaded guilty to count(s)   1s of the Superseding Information on 10/14/1999

[ ] pleaded nolo contendere to count(s) _____
which was accepted by the court

[ ] was found guilty on count(s) _____
after a plea of not guilty

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U S C  § 1957 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity | 12/19/1996 | 1s |

RECEIVED
INTERNAL REVENUE SERVICE

APR 2 8 2000

EXAMINATION GROUP 1330
BIRMINGHAM, ALABAMA

The defendant is sentenced as provided in pages 2 through   6   of this judgment   The sentence is imposed pursuant to the Sentencing Reform Act of 1984

[ ] The defendant has been found not guilty on count(s) _____

[ ] Count(s) _____ (is)(are) dismissed on the motion of the United States

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution costs and special assessments imposed by this judgment are fully paid

Defendant's Soc Sec No   ████6033

Defendant's Date of Birth   ████1963

Defendant's USM No   10412-002

Defendant's Residence Address

1075 Malvern Road

Dothan                   AL      36301

Defendant's Mailing Address

1075 Malvern Road

Dothan                   AL      36301

EOD   2-11-00

02/01/2000

Date of Imposition of Judgment

*(signature)*

**ROBERT B PROPST**

**SENIOR U S DISTRICT JUDGE**

Name & Title of Judicial Officer

Feb. 1, 2000

Date

IRS239

AO 245B (Rev 3/95) Sheet 2  Imprisonment

DEFENDANT        TIMOTHY JOE REEVES
CASE NUMBER     1 99CR00013-002

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of ____15____ month(s)

☐ The court makes the following recommendations to the Bureau of Prisons

☐ The defendant is remanded to the custody of the United States Marshal

☒ The defendant shall surrender to the United States Marshal for this district or the designated institution.

    ☒ at ____10 00____ a m on ____03/07/2000____

    ☐ as notified by the United States Marshal

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons

    ☐ before 2 p m on _____

    ☐ as notified by the United States Marshal

    ☐ as notified by the Probation or Pretrial Services Office

# RETURN

I have executed this judgment as follows

_____

_____

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

UNITED STATES MARSHAL

By _____
          Deputy U.S. Marshal

IRS240

DEFENDANT      TIMOTHY JOE REEVES
CASE NUMBER    1 99CR00013-002

# SUPERVISED RELEASE

Upon release from imprisonment the defendant shall be on supervised release for a term of _____3_____ year(s)

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons

The defendant shall not commit another federal, state or local crime

The defendant shall not illegally possess a controlled substance

*For offenses committed on or after September 13 1994*

The defendant shall refrain from any unlawful use of a controlled substance  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter  as directed by the probation officer

☒ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse  (Check if applicable )

☒ The defendant shall not possess a firearm as defined in 18 U S C § 921  (Check, if applicable )

If this judgment imposes a fine or a restitution obligation  it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release, in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below)  The defendant shall also comply with the additional conditions on the attached page (if indicated below)

See Special Conditions of Supervision - Sheet    3 01

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer,
4) the defendant shall support his or her dependents and meet other family responsibilities
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling  training, or other acceptable reasons,
6) the defendant shall notify the probation officer ten days prior to any change in residence or employment,
7) the defendant shall refrain from excessive use of alcohol
8) the defendant shall not frequent places where controlled substances are illegally sold, used  distributed  or administered
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer,
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics  and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement

IRS241

DEFENDANT      TIMOTHY JOE REEVES
CASE NUMBER    1 99CR00013-002

# SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release, failure to submit to a search may be grounds for revocation, the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition

Judgment Sheet    3.01

IRS242

DEFENDANT    TIMOTHY JOE REEVES
CASE NUMBER    1 99 CR00013-002

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5 Part B

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals | $    100 00 | $ | $ |

[ ] If applicable  restitution amount ordered pursuant to plea agreement    $ _____

# FINE

The above fine includes costs of incarceration and/or supervision in the amount of $ ____    0 00

The defendant shall pay interest on any fine of more than $2 500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U S C  § 3612(f)  All of the payment options on Sheet 5  Part B may be subject to penalties for default and delinquency pursuant to 18 U S C  § 3612(g)

[ ] The court determined that the defendant does not have the ability to pay interest and it is ordered that

[ ] The interest requirement is waived

[ ] The interest requirement is modified as follows

# RESTITUTION

[ ] The determination of restitution is deferred in a case brought under Chapters 109A  110  110A and 113A of Title 18 for offenses committed on or after 09/13/1994, until _____  An Amended Judgment in a Criminal Case will be entered after such determination

[ ] The defendant shall make restitution to the following payees in the amounts listed below

If the defendant makes a partial payment  each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below

| Name of Payee | ** Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Totals | $ _____ | $ _____ | |

** Findings for the total amount of losses are required under Chapters 109A  110  110A  and 113A of Title 18 for offenses committed on or after September 13  1994

IRS243

AO 245B (Rev 3/95) Sheet 5 Part B  Criminal Mon.  Penalties

Judgment Page __5__ of __6__

DEFENDANT        TIMOTHY JOE REEVES
CASE NUMBER      1 99CR00013-002

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order (1) assessment, (2) restitution (3) fine principal (4) cost of prosecution, (5) interest, (6) penalties

Payment of the total fine and other criminal monetary penalties shall be due as follows

A  ☒  in full immediately, or

B  ☐  $ _____ immediately, balance due (in accordance with C, D or E), or

C  ☐  not later than _____ or

D  ☐  in installments to commence _____ day(s) after the date of this judgment  In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision  the U S  probation officer shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate  or

E  ☐  in _____ (e g  equal weekly monthly, quarterly) installments of $ _____ over a period of _____ year(s) to commence _____ day(s) after the date of this judgment

The National Fine Center will credit the defendant for all payments previously made toward any criminal monetary penalties imposed

Special instructions regarding the payment of criminal monetary penalties

Payment of all criminal monetary penalties shall be made to the U S  District Court Clerk, P O  Box 711, Montgomery, AL 36101

The special assessment is due immediately and may be collected in accordance with the Bureau of Prisons Inmate Financial Responsibility Program

☐  Joint and Several

☐  The defendant shall pay the cost of prosecution

☐  The defendant shall pay the following court cost(s)

☐  The defendant shall forfeit the defendant s interest in the following property to the United States

Unless the court has expressly ordered otherwise in the special instructions above  if this judgment imposes a period imprisonment  payment of criminal monetary penalties shall be due during the period of imprisonment  All criminal monetary penalty payments are to be made to the United States Courts National Fine Center  Administrative Office of the United States Courts, Washington DC  20544, except those payments made through the Bureau of Prisons  Inmate Financial Responsibility If the National Fine Center is not operating in this district, all criminal monetary penalty payments are to be made to the Clerk or the United States attorney

IRS244