IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIMOTHY JOE REEVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-CV-00542-MHT |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

_____Pursuant to the Order on Pretrial Hearing entered on May 16, 2007, the defendant,

United States of America, respectfully submits its Proposed Findings of Fact and Conclusions

of Law,[1] which are, as follows:

I.    PROPOSED FINDINGS OF FACT.

The plaintiff, Timothy Joe Reeves, conducted illegal bookmaking operations during the

periods covering 1994 through 1997.[2] In July, 2000, the Internal Revenue Service ("IRS")

_____

[1] The United States has previously discussed the facts and law pertaining to this case in various filings that remain pending. For this reason, the United States will refrain from repeating those discussions, and instead incorporates those filings herein. See Government's Motion for Summary Judgment filed on May 5, 2006 (Doc. 28); Government's Opposition to Plaintiff's Motion for Summary Judgment filed on May 31, 2006 (Doc. 31); Government's Opposition to Plaintiff's Motion for Trial By Jury filed on May 17, 2007 (Doc. 43).

[2] See e.g., Doc. 28-7 for Affidavit of Ronald Lynn Cherry executed on January 30, 2006, at p. 174, ¶ 2; Doc. 28-7 for Reeves' Expert Report prepared by David W. Parsons, CPA dated January 30, 2006 ("Parsons' report"), at pp. 156-160; Doc. 28-7 for Judgment in a Criminal Case entered on February 10, 2000 in United States v. Ronald Lynn Cherry, Case No. 1:99-CR-00013-004 (M.D. Ala), at pp. 185-191. See also, Doc. 27-2 for Plaintiff's Exhibit "A" for Indictment filed in United States v. Billy Joe

determined and advised Reeves that he owed wagering excise taxes of $585,876, plus penalties and interest, on wagers accepted by him in connection with sporting events, primarily professional and college football games, during certain periods covering 1994 through 1997. After Reeves made no payment, the IRS assessed the excise taxes, including penalties and interest, against him.

In June 2005, Reeves, filed a complaint to commence this action, seeking, *inter alia*, to recover a refund of certain wagering excise taxes, including penalties and interest, assessed against him for the tax periods ended September 30, 1994 through January 31, 1995, September 30, 1995 through January 31, 1996 and September 30, 1996 through January 31, 1997.  (Docs. 1 and 14).  In this action, Reeves seeks a refund of $1,500, plus interest thereon.  In response, the United States answered Reeves' complaint and filed a counterclaim, seeking a judgment against him for the remaining unpaid balance of the assessment, totaling $1,967,844, plus interest thereon.  (Docs. 7 and 15).  Thereafter in September 2005, Reeves answered the government's counterclaim, denying it.  (Docs. 9 and 18).

---

Reeves, et al., Case No. 99-CR-0013-S (M.D. Ala.), at pp. 1-8 and 10-22; Doc. 27-3 for Plaintiff's Exhibit "B" for Reeves' Plea Agreement executed on October 14, 1999, at pp. 1 and 17, including Factual Basis for Plea; Doc. 28-6 for Transcript of Sentencing Hearings held in United States v. Billy Joe Reeves, et al. Case No. 99-CR-0013-S (M.D. Ala.) on February 1, 2000, at pp. 58, 61 and 63; Doc 28-6 for Judgment in a Criminal Case entered in United States v. Timothy Joe Reeves, Case No. 1:99-CR-00013-002 (M.D. Ala.) on February 10, 2000, at pp. 87-94.  Although the above evidence is sufficient to establish Reeves' connection to the illegal bookmaking operations for excise tax purposes, other evidence obtained during the criminal investigation and offered at the criminal trial or produced by plaintiff in discovery, including gambling paraphernalia returned upon execution of various search warrants, bank records obtained via subpoenas and testimony and statements of various participants in the bookmaking operations, also would establish his connection with such wagering activities.

**Plea Agreement.**  In February 1999, the grand jury indicted Reeves and several other individuals[3] for certain non-tax offenses that included, *inter alia*, conducting a specified unlawful activity (i.e., illegal gambling business) and engaging in certain money laundering activities in or around Dothan, Alabama.  The Indictment charged Reeves with fourteen (14) counts and further provided that, if he was convicted of any of the money laundering offenses identified therein, he would be required to forfeit certain property, among which included any and all property involved in the money laundering offenses or any property traceable to such property.

On October 14, 1999, Reeves knowingly and voluntarily entered into a written plea agreement.  In the plea agreement, Reeves agreed, in pertinent part, to plead guilty to one count of money laundering, with the remaining charges in the Indictment being dismissed against him and his wife, Wendy Ann Smith Reeves.  The United States Attorney, in turn, agreed to recommend certain reductions in the offense level for sentencing purposes if certain conditions were met, including full compliance by Reeves with the terms of the plea agreement.

In the plea agreement, the parties also agreed to the disposition of certain properties subject to forfeiture.  Specifically, Reeves agreed to forfeit his interest in the following properties:  **(1)** cash in the sum of $95,296.87; **(2)** real property at 1073 Malvern Road, including improvements, fixtures and trailers thereon; and **(3)** a 1997 GMC Sierra pick-up truck.  The United States Attorney, in turn, agreed to return the following properties to Reeves

---

[3]  Some of these individuals entered guilty pleas while others were tried, some of whom were convicted and others of whom were acquitted.

and dismiss the civil forfeiture proceedings pertaining to such properties: **(1)** real property at 1075 Malvern Road, including fixtures and improvements; **(2)** computer equipment; and **(3)** cash in the sum of $14,000. As part of the plea agreement, the United States Attorney also agreed that he would recommend that no fine be imposed, since Reeves had agreed to the property forfeitures, identified above. With respect to the charge for which Reeves pled guilty, a fine could have been imposed in an amount not to exceed $250,000.

On October 14, 1999, Reeves and his counsel, L. Drew Redden, Esquire, signed the plea agreement. Charles Niven,[4] on behalf of the United States Attorney, approved the plea agreement. As evidence of that approval, the plea agreement was signed by Niven and former AUSA Ott, on behalf of the United States Attorney, on October 14, 1999. The plea agreement contained an integration clause in which the parties confirmed and acknowledged that their entire agreement was contained within the "four corners" of the written plea agreement and superseded any earlier or other understanding or agreement that they may have had.

On February 1, 2000, the Court sentenced Reeves to serve a term of imprisonment of 15 months and, upon release from imprisonment, to be placed on supervised release for a term of three years. After acknowledging the terms of Reeves' plea agreement, the Court ordered that

---

[4] Niven, retired First Assistant United States Attorney, was primarily responsible for handling the indictment and criminal prosecution of Reeves and the other indictees. In this respect, Niven was responsible for negotiating, drafting and approving any plea agreements that were entered into with Reeves and/or any of the other indictees and, if pleas were not entered, handling the trial of those persons who declined to plead. Niven's responsibilities also included monitoring any and all matters involving the sentencing of those persons who pled guilty or were convicted. As part of Niven's duties, he also was responsible for supervising the Assistant United States Attorneys ("AUSAs"), including former AUSA Ashton Holmes Ott, who were assigned to assist in the prosecution of Reeves and/or the other indictees. See Doc 28-5.

no fine be imposed.  Reeves, however, was ordered to pay a special assessment of $100.

During the Sentencing Hearing, Redden, Reeves' counsel, discussed the terms of the plea

agreement, but never once mentioned a purported promise to settle or compromise Reeves'

civil tax liabilities.  Instead, Redden made repeated representations consistent with the plea

agreement, that the parties agreed that no fine would be imposed because of the property

forfeitures agreed to by Reeves.  See Doc. 28-6, at pp. 58 and 60-61.

Reeves *now* claims that the IRS was precluded from assessing excise taxes, including

penalties and interest, against him for the periods covering 1994 through 1997 because the plea

agreement provided for the settlement and compromise of such tax liabilities.  The plea

agreement did not provide for any settlement or compromise of Reeves' civil tax liabilities for

the periods covering 1994 through 1997.  Nowhere in the plea agreement is such a settlement or

compromise ever mentioned.  In fact, the plea agreement does not contain any references to a

settlement or compromise of *any* civil tax liabilities.  Further, the plea agreement makes no

mention of what type of taxes (e.g., income, excise, employment), if any, were owed by Reeves

in connection with the wagering activities conducted by him during 1994 through 1997 or the

amount of any such taxes, including penalties and interest, that may be due from Reeves for

such period, let alone a settlement of such tax liabilities.  The amount of Reeves' civil tax

liabilities was not an element for any of the non-tax criminal offenses for which he was indicted

or the offense to which he ultimately pled guilty.  Although the parties never discussed

settlement of Reeves' civil tax liabilities as part of the plea agreement, they did discuss and

expressly agree in the plea agreement that there would be *no further criminal prosecution* of

Reeves for any tax offenses committed in connection with his illegal wagering activities, based on information and evidence then available to the government.

Niven, on behalf of the United States Attorney, participated in the discussions held to negotiate the plea agreement. Niven has declared, and is prepared to testify, that at no time during the plea discussions did the parties ever discuss a settlement or compromise of Reeves' civil tax liabilities. Niven also has declared, and is prepared to testify, that, had such discussions occurred, he would have advised Reeves and his counsel, Redden, that the United States Attorney and/or his delegate did not have the authority to settle or compromise Reeves' civil tax liabilities. See Doc. 28-5, at ¶ 22. If required to testify, Niven's testimony will be consistent with the terms of the written plea agreement executed by Reeves on October 14, 1999.

**"Excise Tax" Assessment.** As discussed, above, Reeves was engaged in the business of accepting unauthorized wagers during the periods covering 1994 through 1997. See e.g., fn. 2, *supra*. With respect to these wagering activities, Reeves was required to file excise tax returns (i.e., Forms 730), but failed to do so for at least fifteen (15) periods extending over a four-year term. He also failed to report substantial wagers and pay the excise tax of 2% due and owing on such wagers, as required by Section 4401 of the Internal Revenue Code, 26 U.S.C. See e.g., Doc. 28-7, at pp. 20-65; Doc. 28-6, at pp. 96-110 and 257-269.

Reeves also failed to keep any books and records of his wagering activities that were conducted during those periods. See e.g., Doc. 28-7, at pp. 158 and 174-176. Because of the absence of such records, the IRS was required to reconstruct Reeves' wagering activities in

order to arrive at the wagering base upon which the excise tax should be assessed.  See Doc. 28-6, at pp. 96-110 and 257-269.  To determine such wagering base, the IRS used the "wagers accepted per day method" and, by applying such method, determined that wagering excise taxes, totaling $585,876, were due and owing in connection with the wagering activities conducted by Reeves during the periods covering 1994 through 1997.  The IRS's wagering determination was based primarily on the FBI report that was prepared during the criminal investigation to determine daily wagering amounts from court-authorized wire-tap communications that occurred over a seven-day period.[5]  See Doc. 28-6, at pp. 97-110 and 257-269.  In late 2004, after Reeves made no payments on his excise tax liability, the IRS assessed the excise taxes, including penalties and interest, against him for the periods covering 1994 through 1997.  See e.g, Doc. 28-7, at pp. 20-65; Doc. 28-6, at pp. 96-110 and 257-269.

    In a further attempt to contest the excise tax assessment that Reeves purportedly settled as part of his plea agreement, he claims that the excise tax assessment is "erroneous" and/or "grossly overstated."  In support of his "erroneous" and/or  "grossly overstated" claims, Reeves offers a report prepared by his expert, David W. Parsons, CPA.  See Doc. 28-7, at pp. 155-183. In preparing the report, Parsons advises that he primarily relied on:  **(1)** the oral representations of Reeves and Ronald Lynn Cherry, the person in charge of managing Reeves' illegal gambling

---

[5]  Because the seven-day period occurred during the college bowl season, the government retained an expert, Dr. George Ignatin, to opine on the excise tax liability due and owing from Reeves for the periods covering 1994 through 1997.  Dr. Ignatin computed the projected excise tax liability by using the "wagers accepted per game" method.  By applying this method, Dr. Ignatin arrived at a figure of $499,360 for the excise tax liability.  See Doc. 28-7, at pp. 193-197.  Dr. Ignatin's opinion confirms the reasonableness of the IRS's assessment.

operations during 1994 through 1997; and **(2)** an unqualified analysis performed by Cherry of some, but not all, of the court-authorized wire-tap communications that occurred during the period from December 27, 1996 through January 12, 1997.  <u>See</u> Doc. 28-7, at pp. 155-183.  <u>See also</u>, fn. 2, *supra*.  In November 1999, Cherry was found guilty of various offenses arising out of his involvement with the illegal gambling operations conducted by Reeves during 1994 through 1997.  <u>See</u> fn. 2, *supra*.

## II.    <u>PROPOSED CONCLUSIONS OF LAW.</u>

Applying the law to the facts present here, judgment in favor of the United States must be entered.  First, Reeves' argument that his written plea agreement settled or compromised his civil tax liabilities must be rejected.  The written plea agreement clearly and unambiguously shows that the parties did not settle or compromise any civil tax liabilities that may have been due and owing by Reeves in connection with the unauthorized wagering activities conducted by him during the periods covering 1994 through 1997.  Second, Reeves' alternative argument that the excise tax assessment is "erroneous" or "grossly overstated" also must be rejected.  The IRS's assessment is entitled to a presumption of correctness and Reeves has not offered any evidence that is legally sufficient to rebut that presumption.  In view of the above, judgment must be entered in favor of the United States for the sum of $1,967,844, plus interest thereon as is required by law.

**A.**    <u>**Reeves' Plea Agreement Did Not Settle His Civil Tax Liabilities.**</u>[6]

Contrary to Reeves' contentions, the written plea agreement simply does not provide for a settlement or compromise of his civil tax liabilities.  First, the plea agreement is a clear and unambiguous contract which, on its face, does not mention or purport to settle or compromise Reeves' civil tax liabilities.  In turn, because the plea agreement is clear and unambiguous, the intent of the parties is appropriately determined from the "four corners" of the document only and the court should not consider extrinsic evidence.  Second, there was no meeting of the minds over the terms that would have been necessary to effectuate a settlement or compromise of Reeves' civil tax liabilities (<u>e.g.</u>, type and amount of taxes).  Third, the extrinsic evidence that Reeves seeks to introduce concerning the scope of his plea agreement is both inadmissible and not probative.  In particular, the United States Attorney lacked authority to settle Reeves' civil tax liabilities and thus any agreement to do so would be unenforceable.  Fourth, the case in <u>Creel v. Commissioner</u>, 419 F.3d 1135 (11th Cir. 2005) does not support Reeves' contention because, here, Reeves was not prosecuted for tax offenses and there was no order to pay tax losses as part of his criminal plea.  Thus, there was no occasion for the United States Attorney to have resolved Reeves' civil tax liabilities as part of any restitution payment made in the criminal case.

---

[6]  Reeves also claims that his plea agreement precludes the IRS from relying on, or using, any prior testimony given by him during the criminal trial on October 28, 1999 or by deposition taken on February 3, 2000 in the civil forfeiture proceedings.  Although the United States does not agree with Reeves' contentions on this point, the Court need not address this issue because, even if Reeves' prior testimony was excluded, there exists other evidence that is sufficient to show that Reeves had the requisite minimum contact with illegal bookmaking operations during the periods at issue in this case to subject him to the excise tax provisions.  <u>See</u> <u>e.g.</u>, fn. 2, *supra*.

1. **Reeves' Written Plea Agreement Is Clear and Unambiguous.**  Reeves' written plea agreement must be interpreted in order to determine if it effectuated a settlement or compromise of Reeves' civil tax liabilities.  The interpretation of a written plea agreement is a question of law.[7]  When, as here, the language of the agreement is clear and unambiguous, the parties' intent must be determined from examining the "four corners" of the document, without considering any extrinsic evidence.[8]  The written plea agreement here simply does not provide for the settlement or compromise of Reeves' civil tax liabilities.

In an attempt to support his "settlement" contention, Reeves misplaces reliance on certain selective provisions from his written plea agreement.  The first provision relied on by Reeves is, as follows:

> **G.    No Further Prosecution**
>
> The United States further agrees that in return for the defendant's compliance with the terms of this agreement there will be no further federal criminal prosecution of the defendant in the Middle District of Alabama based on the information and evidence now available to the United States regarding the defendant's involvement with violations of 18 USC § 1955, 1956, and 1957 or any federal tax provision.

Doc. 27-3, at p. 8, § III(G).

---

[7]  See e.g., United States v. Copeland, 381 F.3d 1101, 1104 (11th Cir. 2004).  See also, Doc. 28-2, at pp. 4-6.

[8]  This prohibition against offering such extrinsic evidence is further evident from the parties' knowing inclusion of the integration provision in the plea agreement.  The provision expressly requires that all terms be included in the agreement if they are to be binding upon the parties.  See e.g., Fed. R. Evid. 401 - 403.  See also, Beeks v. United States, 2006 WL 346475 (11th Cir. 2006); Marsh v. United States, 2005 WL 3150509 (11th Cir. 2005); Copeland, 381 F.3d at 1105; United States v. Weaver, 905 F.2d 1466, 1472 (11th Cir. 1990).  See also, Doc. 28-2, at pp. 4-6.

Reeves' reliance on this provision must fail.  The plain language of the provision does not support his "settlement" contention.  The language shows that the provision clearly and unambiguously is intended to reflect the parties' agreement that there would be no further *criminal prosecution* of Reeves for any tax offenses committed in connection with his illegal wagering activities, based on information and evidence then available to the government.  The provision makes no mention of any agreement to settle Reeves' civil tax liabilities and cannot be read or interpreted as reflecting such an agreement.

The second provision relied on by Reeves to support his "settlement" contention is, as follows:

**I.     SPECIAL PROVISIONS**

. . . .

B.  The defendant agrees to cooperate with the government under the conditions set forth below and, if the government, in its sole discretion, concludes that the defendant has fully complied with the terms of the cooperation agreement and has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the government agrees to make a recommendation to the Court that the defendant receive an additional two-level reduction of the offense level pursuant to § 5k1.1 of the United States Sentencing Guidelines, and that a sentence of 15 months is appropriate.  The United States will dismiss the indictment currently pending against Timothy Joe Reeves and Wendy Ann Smith Reeves.  The United States further agrees that, based upon the substantial forfeitures made pursuant to this agreement, there should be no fine imposed.  This agreement is entered into pursuant to the provisions of Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure.

Doc. 27-3, at pp. 2-3, § I(B).

Reeves' reliance on this provision also must fail.  Reeves' attempts at classifying the forfeiture of properties, which he agreed to in the plea agreement, as some settlement payment for his civil tax liabilities must be rejected.  See Doc. 27-3, at pp. 4-5.  The fact that Reeves

agreed to forfeit cash and property as part of his plea agreement is irrelevant to the civil tax liabilities due and owing by him and/or any settlement or compromise of such tax liabilities. The forfeiture provision contained in Reeves' plea agreement pertained to properties involved with or traceable to money laundering offenses.  See Doc. 27-3, at pp. 4-5.  Because Reeves agreed to forfeit certain properties, the United States Attorney, in turn, agreed to recommend that no fine be imposed for the money laundering charge for which Reeves agreed to plead guilty.  See Doc. 27-3, at pp. 4-5.  The Court concurred with the recommendation and, as a result, ordered that no fine be imposed.  See Doc. 28-6, at p. 61.  Had a fine been imposed, it could not have been any greater than $250,000.  See Doc. 27-3, at pp. 2-3 and 9.

The forfeiture provision in the plea agreement was a sanction which the parties agreed to as a result of Reeves' guilty plea.  See Doc. 27-3, at pp. 4-5.  The forfeiture of properties is not a payment of civil tax liabilities.  An agreement to forfeit property traceable to money laundering activities cannot *now* be reclassified by Reeves as an agreement to settle or compromise his civil tax liabilities.

The third provision of the plea agreement on which Reeves relies to support his "settlement" contention consists of the phrase *"there will not be a further trial of any kind."* This phrase, as pointed out by Reeves, appears in the following two provisions included in his plea agreement:

### K.    Scope Of The Agreement

1.  The defendant, before entering a plea of guilty to Count One of the information currently pending against him, advises the Court that:

. . . .

d. The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

. . . .

3. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

Doc. 27-3, at pp. 8-12, § III(K)(1)(d) and (3).

Reeves' reliance on this phrase to support his "settlement" contention also must fail.

Specifically, and contrary to Reeves' contention, the above-quoted phrase, *"there will not be a further trial of any kind,"* is not unique to his plea agreement, but instead is a standard phrase that was included in all plea agreements that the United States Attorney's Office for the Middle District of Alabama entered into at or around the time that Reeves entered into his Plea Agreement on October 14, 1999. For instance, the identical phrase, quoted above, is included in the written plea agreements that Vivian Welch Bond and David Franklin Mims executed in

the same criminal case.[9]  The plain language of the above provisions, when read in their entirety, show that the phrase, *"there will not be a further trial of any kind."* pertains to the charge to which Reeves pled guilty in October 1999 and, in no way, relates to a trial that may result from the refund suit that Reeves filed in June 2005.  Further, it is well-recognized that the phrase *"no trial of any kind"* is regularly used in plea agreements and is clearly used in the context of this plea agreement, to ensure that the criminal defendant, when entering a plea, fully understands that he is waiving his constitutional right to a trial on the criminal charges to which he is entering a plea.  See e.g., Advisory Committee Notes, 1974 Amendments to Fed. R. Cr. P. 11.  See also, Boykin v. Alabama, 395 U.S. 238, 242-244 (1969).

   **2.  There Was No Meeting of the Minds for Terms Necessary To Settle Reeves' Tax Liabilities.**  Despite Reeves' feeble attempts, it is evident that the language of his plea agreement is not ambiguous.  As a result, the Court is limited to interpreting the parties' intent by examining the unambiguous language of the agreement and may not resort to extrinsic evidence, such as affidavits or oral testimony.  See e.g., Copeland, 381 F.3d at 1105.  See also, fn. 8, *supra*.  The unambiguous language of Reeves' plea agreement shows that his civil tax liabilities were not settled.  Nowhere in the plea agreement is there ever a mention of Reeves' civil tax liabilities, let alone any settlement or compromise of such liabilities.  The silence of the plea agreement on this point speaks volumes.  In this respect, the plea agreement makes no

---

   [9]  See e.g., Doc. 28-7 for Plea Agreement of Vivian Welch Bond filed in United States v. Billy Joe Reeves, et al., Case No. 99-CR-0013-S (M.D. Ala.) on October 14, 1999, at pp. 67-78, § III(K)(1)(d) and (3); Doc. 28-7 for Plea Agreement of David Franklin Mims filed in United States v. Billy Joe Reeves, et al., Case No. 99-CR-0013-S (M.D. Ala.) on October 20, 1999, at pp. 80-90, § III(K)(1)(d) and (3).

reference to taxes at all.  The plea agreement makes no mention of the type of taxes (e.g., income, excise) or the amount of the tax liabilities that Reeves *now* claims were settled. Moreover, as can be seen from the language of the plea agreement, the parties certainly knew how to specify the terms of a settlement when they wanted to do so.  This conclusion is evident from the detailed and precise language employed in the provisions evidencing the parties' intent to settle the matters involving the properties subject to forfeiture.[10]  See Doc. 27-3, at pp. 4-5. As a result of the above, Reeves is indebted to the United States for the excise tax assessment due and owing for the periods covering 1994 through 1997.

3.  **The Extrinsic Evidence Reeves Seeks To Admit Is Inadmissible and Not Probative.**  Reeves attempts to rely on the testimony of himself and former AUSA Ashton Holmes Ott in an effort to give credence to his settlement claims.  This must be rejected as a matter of law.  See e.g, Docs. 27-9 and 27-10.  As previously discussed, consideration of such extrinsic evidence is inappropriate in light of the clear and unambiguous language of the written plea agreement.  See e.g., fn. 8, *supra*.  Even if the Court determines consideration of such extrinsic evidence is permissible, the government is prepared to offer the testimony of Charles Niven, the retired First Assistant United States Attorney.  Niven was responsible for handling and supervising the criminal prosecution of Reeves, including negotiating, drafting and approving Reeves' plea agreement.  See Doc. 28-5.  If called to testify, Niven is expected to

---

[10]  "A forfeiture provision in a plea agreement is not a plea to a substantive charge, but a sanction to which the parties agree as a result of the defendant's plea."  United States v. Boatner, 966 F.2d 1575, 1581 (11th Cir. 1992).  The forfeiture provision contained in Reeves' plea agreement pertained to properties involved with the money laundering offense.  Forfeitures of property are not payments of civil tax liabilities.  An agreement to forfeit property is not an agreement to settle or compromise a criminal defendant's civil tax liabilities.

offer testimony that would be consistent with the terms of the written plea agreement. See Doc. 28-5.

Further, even if extrinsic evidence is allowed, the testimony proffered by Reeves fails to provide the "objective ascertainable" proof necessary to warrant a finding that he could have reasonably understood that the plea agreement provided a settlement or compromise of his civil tax liabilities. For instance, the proffered testimony, as shown by the affidavits of Reeves and Ott, is based solely on subjective beliefs and/or general conclusory allegations. See Docs. 27-9 and 27-10. In Reeves' affidavit, he claims that "it was [his] understanding, based on the actions and representations of the United States Government, that the Plea Agreement included both the settlement of civil and criminal proceedings against [him], and was intended by the United States Government to be a total settlement agreement of all criminal and civil matters," including prohibiting the IRS from making the excise tax assessment. See Doc. 27-9, at p. 2. In Ott's affidavit, she states "[t]hat the Plea Agreement . . . was intended by [her] as Assistant United States Attorney representing the United States to be a global settlement agreement, thereby precluding [the IRS from making the excise tax assessment]." See Doc. 27-10, at p. 2.

Neither affidavit sets forth the specific allegations that are required to support the claims being asserted therein. See e.g., Fed. R. Civ. P. 56(e). Neither affidavit alleges exactly what actions and representations were made by the government to cause Reeves to "reasonably" understand that his civil tax liabilities were settled or compromised as part of his plea

agreement.[11]  Neither affidavit specifically alleges what discussions, if any, occurred between the IRS and/or the prosecuting attorneys and Reeves and/or his counsel to agree to a settlement or compromise of his civil tax liabilities as part of his plea agreement.  Neither affidavit sets forth any allegations with regard to the parties' purported agreement as to the essential elements necessary to effectuate a settlement or compromise of Reeves' civil tax liabilities, among which includes determining the types and amount of taxes that supposedly were settled or compromised.  Neither affidavit sets forth the reasons why such purported settlement or compromise of Reeves' civil tax liabilities was not specifically mentioned in the plea agreement despite the parties' knowing inclusion of the integration provision in the written plea agreement, requiring all terms to be included in the agreement if they are to be enforceable.

In addition, conspicuously missing from Ott's affidavit is the source of her authority, as an AUSA, to settle or compromise any civil tax liabilities due and owing by Reeves for the periods covering 1994 through 1997.  See Doc. 27-10.  Ott's former position, as AUSA, was not by itself sufficient to grant her the authority to enter into the plea agreement, let alone enter

---

[11]  Both Reeves and Ott claim that the participation of certain IRS Criminal Investigation Division agents ("CID agents") in the criminal investigation of Reeves for non-tax offenses and/or the civil forfeiture proceedings indicates that Reeves' understanding of the plea agreement is reasonable. However, both Reeves and Ott fail to disclose that the CID agents' participation in the criminal investigation had nothing to do with investigating any tax offenses or settling any civil tax liabilities. One  CID agent, Louie Wilson, was assigned to assist in the execution of a search warrant.  The other CID agent, A. Gillis Douglass, III, was assigned to participate in the money laundering aspects of the criminal investigation.  Douglass also provided assistance in connection with certain civil proceedings that involved the forfeiture of various properties pertaining to the money laundering offenses that arose out of the criminal investigation of Reeves and the other indictees.  Both Reeves and Ott also fail to disclose that neither CID agent had the requisite authority to settle or compromise any civil tax liabilities that may have been due and owing by Reeves for the periods covering 1994 through 1997.  Compare Docs. 27-9 and 27-10 with Docs. 31-3, 31-4 and 31-5.

into a settlement or compromise of any civil tax liabilities due and owing by Reeves.  Even if

Ott claims that she (or the United States Attorney) intended to discharge Reeves' civil tax

liabilities, she (and the United States Attorney) simply lacked the authority to settle or

compromise such tax liabilities, and as a result, any such settlement agreement is

unenforceable.  Klein v. Commissioner, 899 F.2d 1149, 1153 (11th Cir. 1990).[12]

    **4.  Creel Does Not Apply.**  In an effort to further support his "settlement" contention,

Reeves misplaces reliance on Creel v. Commissioner, 419 F.3d 1135 (11th Cir. 2005).  A

comparison of the facts in this case with those in Creel show that the cases are distinguishable.

In Creel, the Eleventh Circuit found that satisfaction of a taxpayer's restitution obligation also

discharged his civil tax obligations.  Creel, 419 F.3d at 1141-1142.  Creel, unlike here, involved

the criminal prosecution of tax offenses.  Creel, 419 F.3d at 1137.  The plea agreement in Creel,

unlike the one here, specifically required Creel to file returns for 1985 through 1991 and to

make full restitution for the tax losses resulting from his failure to file such returns.  Creel, 419

F.3d at 1137.

    The unique set of facts present in Creel are not present here.  There was no criminal

prosecution of Reeves for tax offenses.  There was no discussion by or among the parties of any

---

[12]  See also, San Pedro v. United States, 79 F.3d 1065, 1067, n. 1 and 1072 (11th Cir. 1996) (The court held that the "not to prosecute . . . for any other offenses" provision included in the plea agreement did not include a promise not to deport the criminal defendant.  The court further found that even if the promise of non-deportation was made, the promise could not bind the INS because the United States Attorney and AUSAs had no authority to make such a promise); United States v. Rourke, 74 F.3d 802, 810 (7th Cir. 1996) (The court found that FAA's suspension of the defendant's license did not violate his plea agreement because the United States Attorney had no authority to bind the FAA to the terms of a plea agreement).

taxes, including penalties and interest, that may be due and owing by Reeves for the periods

covering 1994 through 1997. Reeves' plea agreement contained no agreement that required

him to file any tax returns, including excise tax returns, for the periods covering 1994 through

1997 and/or to pay restitution to the IRS for any taxes, including penalties and interest, that may

be due and owing for such periods. There is simply no evidence that exists to show that

Reeves' civil tax liabilities, like those in <u>Creel</u>, were "inextricably intertwined" with the non-

tax offenses for which he was indicted or the non-tax offense for which he ultimately pled

guilty.[13] There also is nothing in the plea agreement that mentions Reeves' civil tax liabilities,

let alone provides for any purported agreement to settle or compromise such tax liabilities. The

evidence here, unlike in <u>Creel</u>, does not warrant a finding that the plea agreement discharged

Reeves' civil tax obligations.

Applying the law to the facts here, there simply is no provision in the agreement that

allows one to conclude that Reeves' civil tax liabilities were compromised or settled. There

also is simply no provision in the agreement that bars the IRS from assessing and/or collecting

any federal taxes, including penalties and interest, due and owing by Reeves for the periods

covering 1994 through 1997. Thus, the excise tax assessment is neither inconsistent with, nor

prohibited by, the terms of the written plea agreement. Reeves' plea agreement does not

provide for any settlement or compromise of his civil tax liabilities, and as a result, he is

---

[13]  Reeves refers to the fact that a copy of the Criminal Judgment entered against him on
February 10, 2000 was received by the IRS Examination Group on April 28, 2000. Receipt of a copy of
such judgment by the IRS Examination Group, after his plea agreement and sentencing in October 1999
and February 2000, respectively, can hardly be evidence of settlement or compromise of his civil tax
liabilities.

obligated to pay the excise tax assessment due and owing by him for the periods covering 1994 through 1997.

**B.**     **Reeves Has Failed To Offer Evidence To Rebut The Correctness of the IRS's Assessment.**

Reeves also claims that the excise tax assessment that he purportedly settled as part of his plea agreement is "erroneous" and/or "grossly overstated."  However, the evidence shows that Reeves' contentions must be rejected and the IRS's assessment upheld.

There is no doubt that Reeves was in the business of accepting unauthorized wagers during 1994 through 1997.  See fn. 2, *supra*.  There also is no doubt that Reeves did not keep adequate books and records of his wagering activities conducted during those periods.  See e.g., Doc. 28-7, at pp. 158 and 174-176.  In the absence of such records, the IRS may reconstruct the wagering activities of the taxpayer "by any reasonable method" in order to arrive at the wagering base upon which the excise tax should be assessed.  When the wagering amounts are known for a portion of the tax periods, the amounts may be projected over time by using one of two methods:  the "wagers accepted per day" method or the "wagers accepted per game" method.  See e.g., Heyman v. United States, 497 F.2d 121, 122 (5th Cir. 1974).  See also, Doc. 28-2, at pp. 24-26.

Here, the IRS used the "wagers accepted per day method" to determine the wagering base and, by applying that method, determined that excise taxes, totaling $585,876, were due and owing in connection with the wagering activities conducted by Reeves during the periods covering 1994 through 1997.  The IRS's wagering determination is primarily computed based on the FBI report that was prepared during the criminal investigation to arrive at daily wagering

amounts, as determined from court-authorized wire-tap communications that occurred over a seven-day period.  See Doc. 28-6, at pp. 97-110 and 257-269.

The IRS's assessment is entitled to a presumption of correctness unless the taxpayer can prove that the assessment is erroneous.  See e.g., Carson v. United States, 560 F.2d 693, 696-698 (5th Cir. 1977).  See also, Doc. 28-2, at pp. 23-26.  In this respect, a taxpayer bears a heavy burden to overcome the presumption when he has not maintained adequate books and records of his wagering activities.  See e.g., Carson, 560 F.2d at 697.  See also, Doc. 28-2, at pp. 23-26.  For instance, evidence based on speculation and conjecture are not sufficient.  Further, the submission of uncorroborated, unsubstantiated or self-serving testimony is not sufficient to rebut the presumption of correctness that the IRS's assessment is entitled.  See e.g., Heyman, 497 F.2d at 122.  See also, Doc. 28-2, at pp. 25-26.  "As a practical matter and as a matter of law, [a taxpayer] could have established an entitlement to a refund only through records it was required to keep under the Code."  Alabama Power Co. v. United States, 1985 WL 6245, at *4 (N.D. Ala. 1985).

Here, Reeves attempts to offer evidence to rebut the presumption of correctness, but his evidence is woefully deficient in overcoming the presumption.  Specifically, Reeves attempts to challenge the assessment by offering Parsons' report.  See Doc. 28-7, at pp. 155-183.  In that report, Parsons claims that Reeves' excise tax liability totals $158,938, by using a "wagers accepted per day" method.  See Doc. 28-7, at p. 156.  However, in arriving at this number, Parsons primarily relies on "legally insufficient" information that he obtained from:  **(1)** the oral representations of Reeves and Ronald Lynn Cherry, the person who managed Reeves' illegal

bookmaking operations during 1994 through 1997;[14] and **(2)** an unqualified analysis performed by Cherry of some, but not all, of the court-authorized wire-tap communications that occurred during the period from December 27, 1996 through January 12, 1997.  See Doc. 28-7, at pp. 155-183.[15]  Parsons' report relies heavily, if not exclusively, on the uncorroborated testimony of Cherry.  As a result, Parsons' report should be given no weight as substantive evidence of the amounts accepted by Reeves as wagers during the periods covering 1994 through 1997.  In view of the above, Reeves has not offered any reliable evidence by which to show that the excise tax assessment is erroneous and/or grossly overstated.

---

[14]  Cherry's "unqualified, self-serving and unsubstantiated testimony," via affidavit, is "unpersuasive."  Doc. 28-7, at p. 174.  See e.g., Robinson, T.C. Memo 1986-382.  The testimony provided by Cherry's affidavit lacks trustworthiness.  A substantial period of time has lapsed between when the wagering activities were conducted in 1994 through 1997 and the drafting of Cherry's affidavit in 2006.  The length of time between the wagering activity and the execution of the affidavit by Cherry, in and of itself, significantly undercuts the reliability of Cherry's recollection of the amount of wagers accepted by Reeves during the periods at issue, or the annual percentage increase in gross wagers that occurred during the periods at issue.  The lack of trustworthiness to be accorded Cherry's affidavit is further reinforced by the fact that the affidavit is not "a spontaneous expression of Cherry's knowledge," but instead was drafted at the request of Reeves for the specific purpose of contesting the amount of the IRS assessment at issue here.  In addition to the above, the affidavit is not supported by any corroborating evidence, such as books and records, but instead reflects "vague" guesses and speculations by Cherry.

[15]  Parsons' report, in part, relies on Cherry's baseless and unsubstantiated allegations that he "was unable to analyze and review the [government's wire-taps for the] 6 days of December 28, 1996, through January 2, 1997, as the government has not yet produced the tapes for that portion of the wiretap period."  See Doc. 28-7, at pp. 174-175, ¶ 4.  This allegation is baseless and unsubstantiated for a number of reasons.  First, transcripts of the court-authorized wire-tap communications for those days are in Reeves' possession.  Indeed, Reeves produced the transcripts to the United States during discovery in this case.  Second, to the extent that Cherry did not have the requisite tapes and/or transcripts to perform his unqualified analysis, Reeves was not precluded from obtaining a Rule 6(e) order to secure the information.  However, Reeves made no effort to obtain a Rule 6(e) order.  Third, Reeves made no attempts to depose the FBI Forensic Examiner who prepared the FBI report on which the IRS relied.  Fourth, Cherry does admit that he was able to perform an unqualified analysis of the wire-tap communications that occurred on December 27, 1996, and based on that analysis, he arrived at a wagering amount  of $56,000 for that day.  See e.g. Doc. 28-7, at pp. 160-161 and 174-175, at ¶ 4.  This $56,000 wagering amount is consistent with the wagering amount determined by the FBI for that day. Compare Doc. 28-7, at pp. 160-161 with Doc. 28-6, at pp. 263 and 268.

Given what was available to determine the excise tax assessment, the IRS "arrived at substantially correct results. In any event, [Reeves] has offered little or nothing as an alternative." Robinson, T.C. Memo 1986-382. The IRS used the "wagers accepted per day" method and arrived at an excise tax amount of $585,876 for the 4-year period. See Doc. 28-6, at pp. 96-110 and 257-269. The report of the government's expert further supports the reasonableness of the IRS's assessment given the lack of records maintained by Reeves. The government's expert used the "wagers accepted per game" method and arrived at an excise tax estimate of $499,360, comparable to that determined by the IRS. See Doc. 28-7, at pp. 193-197. These figures are both in stark contrast to the estimate of Reeves' expert, who, by using a "wagers accepted per day" method claims the excise tax liability equals $158,938. See Doc. 28-7, at p. 156.

Here, Reeves' plea agreement does not provide for any settlement or compromise of his civil tax liabilities, and as a result, he is obligated to pay the excise tax assessment due and owing by him for the periods covering 1994 through 1997. Further, the government met its burden of showing some link between Reeves and his wagering activities for the periods at issue. Reeves has failed to prove that the government's method of calculating the amount of wagers placed with him was unreasonable or that the amount calculated was erroneous. As a result, the excise tax assessment is presumed correct, and the United States is entitled to

judgment in its favor in the amount of the unpaid tax assessment of $1,967,844, plus interest

thereon as is required by law.

Dated this 6th day of July, 2007.


LEURA GARRETT CANARY
United States Attorney


s/ Lynne M. Murphy
LYNNE M. MURPHY
Trial Attorney, Tax Division
U.S. Department of Justice
La. Bar No. 20465
D.C. Bar No. 485928
P.O. Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone:    (202) 514-5881
Facsimile:    (202) 514-9868
E-mail:        lynne.m.murphy@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**IT IS HEREBY CERTIFIED** that service of the foregoing Defendant's Proposed Findings of Fact and Conclusions of Law has this 6th day of July, 2007 been made by electronically filing the documents with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

> William W. Hinesley, Esquire
> whinesley@JHFC-law.com
>
> G. David Johnston, Esquire
> djohnston@jhfc-law.com
>
> L. Drew Redden
> melissa@rmclaw.com

>      s/ Lynne M. Murphy
>      Trial Attorney, Tax Division
>      U.S. Department of Justice
>      P.O. Box 14198
>      Ben Franklin Station
>      Washington, D.C.  20044